4.    Attached hereto as Exhibit B are the Merger Certificate from the Secretary of State of the State of Delaware certifying the merger of Progress Financial Corporation with and into FleetBoston Financial Corporation and the Certificate of Merger or Consolidation of the Secretary of the State of Rhode Island and Providence Plantations certifying the merger of Progress Financial Corporation and FleetBoston Financial Corporation.

/s/ Stuart M. Brown
Stuart M. Brown

SWORN AND SUBSCRIBED BEFORE ME ON THIS 1st DAY OF JUNE, 2004.

/s/ Jamie L. Osburn

A Notary Public, State of Delaware
My Commission Expires July 14th, 2005

A00070

# EXHIBIT A

A00071



**PENNSYLVANIA**
**Department of State**

| PA Keyword: | | Go | | Search | | Go |

DOS Homepage

## Entity Details　　　　　　　　　　　　　　　　　　　　　　　?

Request
- New Request

Free Search
- General Name Search
- Old Name Search
- Orphan Search

| Basic Entity Information | | | |
|---|---|---|---|
| Entity Type | PENNSYLVANIA BUSINESS CORPORATION | | |
| Entity Name | KMR MANAGEMENT, INC. | | |
| Entity No. | 2723196 | | |
| Filing Date | 11/07/1996 | Letter of Consent | No |
| Address | 4 SENTRY PKWY STE 200 | | |
| | BLUE BELL　Pennsylvania　USA　19422 | | |
| County | Montgomery | Jurisdiction | PA |
| Purpose | BROAD | | |
| Limited Authority | No | | |

| Corporate Officers | |
|---|---|
| Updated Date | 11/07/1996 |
| President | W KIRK WYCOFF |
| Secretary | ERIC J MORGAN |
| Treasurer | FREDERICK E SHEA |
| Vice-President | STEVE HOBMAN/TERRY J SOEFERA |

| Instrument History | | | | | |
|---|---|---|---|---|---|
| Doc Type | Microfilm# | Micro# Start | Micro# End | Filing Date | Comments |
| ARTICLES MERGER/CONSOLIDATION-ALL TYPES | 200001 | 1359 | 1361 | 01/06/2000 | SRV NCFR: PROGRESS ASSET MANAGEMENT COMPANY |
| ARTICLES OF INCORPORATION-BUSINESS | 9673 | 1615 | 1615 | 11/07/1996 | - |

Home | Site Map | View as Text Only



A00072

# EXHIBIT B

A00073

# Delaware

PAGE 1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"PROGRESS FINANCIAL CORPORATION", A DELAWARE CORPORATION,

WITH AND INTO "FLEETBOSTON FINANCIAL CORPORATION" UNDER THE
NAME OF "FLEETBOSTON FINANCIAL CORPORATION", A CORPORATION
ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF RHODE
ISLAND, AS RECEIVED AND FILED IN THIS OFFICE THE THIRTIETH DAY
OF JANUARY, A.D. 2004, AT 1:21 O'CLOCK P.M.



*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

3759013  8100M

040066150

**AUTHENTICATION: 2901460**

**DATE: 01-30-04**

A00074



STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
*Office of the Secretary of State*

**Matthew A. Brown**
*Secretary of State*

## CERTIFICATE OF MERGER OR CONSOLIDATION
## INTO

### FleetBoston Financial Corporation

I, MATTHEW A. BROWN, Secretary of State of the State of Rhode Island and Providence Plantations, hereby certify that duplicate originals of Articles of Merger of **FleetBoston Financial Corporation,** a domestic corporation, and **Progress Financial Corporation,** a foreign corporation. Duly signed and verified pursuant to the applicable provisions of the Rhode Island General Laws, 1956, as amended, have been received in this office and are found to conform to law. The affixed is a duplicate original of the Articles of Merger or Consolidation.

WITNESS my hand and the seal of the State of Rhode Island and Providence Plantations on this 30th day of January, 2004.

*Matthew Brown*

Secretary of State

By *Jane Berthiaume*

A00075

## CERTIFICATE OF SERVICE

I, Stuart M. Brown, certify that on this 2nd day of June, 2004, I caused true and correct

copies of the Memorandum of Law in Support of the Motion to Dismiss by Defendant,

FleetBoston Financial Corporation and Affidavit of Stuart M. Brown to be served on the

following parties in the manner indicated:

**VIA HAND-DELIVERY**
Stephen W. Spence
Phillips, Goldman & Spence
1200 N. Broom Street
Wilmington, DE 19806

Office of the United States Trustee
844 King Street, Room 2207
Lockbox 35
Wilmington, DE 19801

**VIA U.S. FIRST-CLASS MAIL**
KMR Management, Inc.
4 Sentry Parkway
Blue Bell, PA 19422

Robert Riesner
KMR Management, Inc.
4 Sentry Parkway
Blue Bell, PA 19422

Waring Justis, Jr.
1007 Cold Spring Road
Baltimore, MD 21220-4425

/s/ Stuart M. Brown
Stuart M. Brown

## File a Court document:

04-52879-PJW NHI, Inc. v. Fleetboston Financial Corporation et al

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Brown, Stuart M. entered on 6/2/2004 at 1:46 PM EDT and filed on 6/2/2004

**Case Name:**        NHI, Inc. v. Fleetboston Financial Corporation et al
**Case Number:**    04-52879-PJW
**Document Number:** 15

**Docket Text:**
Memorandum of Law *in Support of the Motion to Dismiss by Defendant, FleetBoston Financial Corporation* (related document(s)[12] ) Filed by Fleetboston Financial Corporation (Attachments: # (1) Affidavit of Stuart M Brown# (2) Exhibit A to Affidavit# (3) Exhibit B to Affidavit# (4) Certificate of Service) (Brown, Stuart)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**U:\Wilmington Bankruptcy\NHI\Memo in Support of Mtn to Dismiss.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=6/2/2004] [FileNumber=2666095-0]
[4c3c7edbcc114ca5e8fb0e60ffaf48863a7b1b4dd9a2892ff7b1a6e51f8405e34a7fb
4d0b6ad443ac8e2176599f11e951bc3f1b7d58849a8b3f51593b3f4c382]]
**Document description:**Affidavit of Stuart M Brown
**Original filename:**U:\Wilmington Bankruptcy\NHI\Affidavit of Stuart M Brown.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=6/2/2004] [FileNumber=2666095-1]
[0db469ff8adf03767294b55f32cfa8bd356fa51dc189696be310486b79ebf4aa0dc95
05ac41feedd20f2d950194fd5ac6819c922254c28c79d5da942ea24e92c]]
**Document description:**Exhibit A to Affidavit
**Original filename:**U:\Wilmington Bankruptcy\NHI\Exhibit A to Mtn to Dismis.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=6/2/2004] [FileNumber=2666095-2]
[6c210313de7b2d62f2b1b94df00aad4c3967f0661a2d9e4e4eafc092c01f61ffa0d0a
e818e3e9bc0aac99dba8bac853f04b68062d50e5ce0395bcc5a61e7ce2a]]
**Document description:**Exhibit B to Affidavit
**Original filename:**U:\Wilmington Bankruptcy\NHI\Exhibit B to Mtn to Dismiss.pdf

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                          :
                                                :      Case No. 02-10651 (PJW)
NHI, INC.,                                      :
A DELAWARE CORPORATION                          :      Chapter 11
                                                :

NHI, INC.,                                      :
                                                :
              Plaintiff                         :
                                                :
       v.                                       :      Adversary No. 04-52879
                                                :
FLEET BOSTON FINANCIAL                          :
COPRORATION, KMR MANAGEMENT,                    :
INC., ROBERT RIESNER and WARING                 :      Reference Docket No. 1
S. JUSTIS, JR.,                                 :
                                                :
              Defendants                        :


## PLAINTIFF'S FIRST AMENDED COMPLAINT

### I. PARTIES


        1.      Plaintiff, NHI, Inc. (hereinafter "NHI"), formerly known as Nanticoke Homes,

Inc., filed a voluntary petition for relief (hereinafter "Petition") with the United States

Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code on

March 1, 2002. NHI was incorporated under the laws of the State of Delaware on October 7,

1971. Prior to 2002, NHI was engaged in manufacturing customized homes at its plant in

Greenwood, Delaware. NHI is currently maintaining its business as a Debtor-in-Possession.

2.      Defendant, KMR Management, Inc. (hereinafter "KMR"), on information and belief, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Blue Bell, Pennsylvania.

3.      Defendant, Fleet Boston Financial Corporation (hereinafter "Fleet"), on information and belief, is a corporation organized and existing under the laws of the State of Rhode Island, with its principal place of business in Boston, Massachusetts.  On information and belief, Fleet is successor in interest to Progress Financial Corporation (hereinafter "Progress"), which, on information and belief, was a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.  On information and belief, Defendant KMR was a wholly owned subsidiary of Progress, and is now a wholly owned subsidiary of Defendant Fleet.

4.      Defendant, Robert Riesner, on information and belief, is an adult resident of or near Willow Grove, Pennsylvania.  Defendant Riesner is the President of Defendant KMR.

5.      Defendant, Waring S. Justis, Jr., on information and belief, is an adult resident of or near Baltimore, Maryland.  Defendant Justis is the Regional Vice President of Defendant KMR.

## II. JURISDICTION AND VENUE

6.      All of the negotiations, discussions, representations and agreements out of which this case arises took place in Delaware; hence this court has jurisdiction over this matter and

2

A00079

venue is appropriate in Wilmington, Delaware. This Court also has venue pursuant to 28 U.S.C. § 1409 and jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 11 U.S.C. §§ 544(B), 547, 548, 550.

7.      This matter is a core proceeding pursuant to 28 U.S.C. § 1409.

### III. FACTUAL BACKGROUND

8.      NHI was the first pre-manufactured home-builder in Delaware and, for more than thirty years, conducted a successful manufacturing business. NHI was founded by John M. Mervine, Sr. (hereinafter "Mervine Sr.").

9.      Prior to 2002, NHI's primary manufacturing facilities were located in Greenwood, Delaware. NHI constructed homes according to customers' specifications and delivered and installed the homes on the customers' property. NHI's customer base was comprised of individuals and real estate developers throughout the Mid-Atlantic region, although the largest concentration was in Delaware and Maryland.

10.      NHI's business was highly successful. Over three decades, it established a reputation for manufacturing a high-quality, high-end product in an expanding market. At the height of NHI's business, it had a sales volume of approximately $60,000,000 a year. In the early 1990's, NHI decided to expand its business into the manufacturing of lower-cost homes.

3

11.     Thereafter, Shawnee Homes, Inc. (hereinafter "Shawnee") was incorporated under the laws of the State of Delaware on November 2, 1992. From 1992 until October 2000, Shawnee was engaged in the manufacturing of mid-range houses at a plant in Salisbury, Maryland, which was owned by Shawnee Enterprises, LLC, a Delaware Limited Liability Corporation, owned by Mervine Sr.'s three sons, John M. Mervine, Jr. (hereinafter "Mervine Jr."), William H. Mervine, III, and Gregory O. Mervine, and their children. Shawnee's customer base was comprised mostly of Mervine Family owned real estate developers. Shawnee was run by William H. Mervine, III.

12.     Pawnee Homes, Inc. (hereinafter "Pawnee") was incorporated under the laws of the State of Delaware on October 29, 1996. From 1996 to October 2000, Pawnee was engaged in the manufacturing of low-range homes at a NHI plant in Greenwood, Delaware. Pawnee's customer base was comprised mostly of mobile home dealers and mobile home communities. Pawnee was run by Mervine Jr.

13.     Nanticoke Homes Midwest, Inc. (hereinafter "Midwest"), was incorporated under the laws of the State of Indiana in 1999. From 1999 to April 2000, Midwest was engaged in the manufacturing of homes at a plant in Indianapolis, Indiana, which was owned by Shawnee Enterprises Midwest, LLC, which was owned by Shawnee Enterprises, LLC. Midwest was run by Gregory O. Mervine.

14.     In establishing Shawnee, Pawnee and Midwest, NHI greatly increased it indebtedness with the enthusiastic support of its banking institution, Mercantile Safe Deposit and

4

Trust Company (hereinafter "Mercantile"). All outstanding debt owed to Mercantile by NHI and its affiliated companies, Shawnee, Pawnee and Midwest, and its affiliated real estate holding companies and Freedom Motors, Custom Decorative Mouldings, National Concrete and Classic Carpet (hereinafter "Related Entities"), was cross collateralized.

15.    For approximately 6 years prior to 2002, NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities maintained both Term and Demand Loan Lines of Credit relationships with Mercantile. The interest rate on the Term and Demand Loan Lines of Credit with Mercantile was Mercantile's prime rate.

16.    In late 1999, NHI owned assets with an adjusted book value of approximately $26 million and NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities owed approximately $17 million in multiple loans to Mercantile. NHI had a net book value of approximately $8 million.

17.    Because of increasing cash demands, NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities borrowed on the Term and Demand Loan Lines of Credit with Mercantile in excess of the loans' collateral value, yet remained current on all payment and monetary terms under the Term and Demand Loan Lines of Credit.

18.    Because the balance of the Term and Demand Loan Lines of Credit was in excess of the collateral value, as of late 1999 all of NHI's outstanding debt to Mercantile was considered by Mercantile to be in technical default under the loan documents. All outstanding

5

cross collateralized debt of NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities was considered cross defaulted..

19.    On or about March 21, 2000, Mercantile and NHI entered into a Forbearance Agreement (hereinafter "First Forbearance Agreement"). Pursuant to the First Forbearance Agreement, the interest rate on NHI's Term and Demand Loan Lines of Credit with Mercantile increased from Mercantile's prime rate to Mercantile's prime rate, plus two percent, and all debt of NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities, totaling approximately $17.5 million, was being monitored on a month-to-month basis by NHI's contact at Mercantile, Tim Naylon.

20.    On or about June 15, 2000, NHI agreed with Naylon that NHI would bring its outstanding debt to Mercantile down to $9 million by selling off non-operating assets.

21.    On or about July 27, 2000, Mercantile and NHI entered into a Second Forbearance Agreement.

22.    In August 2000, NHI learned that Mercantile was considering calling NHI's loans and placing NHI into liquidation, even though NHI remained current on its loan payments, but was alleged to be in default of technical, non-monetary covenants.

23.    In September 2000, NHI listed for sale various properties, divisions, related entities and other assets.

6

24.     In early October 2000, Mervine Jr. became Chief Executive Officer of NHI.

25.     On or about October 6, 2000, Scott Krieger, Mercantile's workout manager, replaced Naylon as NHI's contact at Mercantile.  Krieger insisted – on the threat of calling all of Mercantile's loans – that NHI retain a management consultant and strongly suggested/urged that Defendants KMR, Riesner and Justis be hired as management consultants.  Krieger assured NHI that Defendants KMR, Riesner and Justis were "turn around" consultants, as opposed to "liquidation guys."

26.     On or about October 18, 2000, Krieger indicated to NHI that Mercantile would provide an additional $1.5 million of financing for NHI if KMR, Riesner and Justis considered NHI to be a viable going concern.

27.     On or about October 19, 2000, under the threat of calling all of Mercantile's loans, NHI, Pawnee, Shawnee, Midwest and the Mervine family, entered into a Consulting Agreement with Defendants KMR, Riesner and Justis.  A copy of the Consulting Agreement and the amendments thereto are attached hereto as Exhibit "A" (hereinafter the "Consulting Agreement").

28.     Under the Consulting Agreement, KMR, Riesner and Justis, who had represented themselves to be highly skilled professionals, agreed to provide NHI with professional management for the purposes of helping to stabilize NHI's financial condition and perpetuating

7

NHI's business. Under the Consulting Agreement, KMR, Riesner and Justis undertook to act as fiduciaries, assumed positions of responsibility and undertook a duty of loyalty with respect to NHI as NHI's agents. Pursuant to the Consulting Agreement, KMR, Riesner and Justis assumed the complete control, responsibility and authority for managing the business of NHI.

29.    On or about October 25, 2000, the Mervine family met with KMR, Riesner and Justis in Baltimore, Maryland. KMR proposed a plan whereby NHI would cut expenses, sell non-operating assets, close Pawnee and move Shawnee to Greenwood, Delaware, and KMR would hire a Chief Financial Officer and General Manager for NHI and approach Mercantile to request another forbearance agreement and the provision of additional funds to NHI. To effectuate the plan, the members of the Mervine family agreed to cut their own salaries by fifty percent and to give Mercantile first mortgage liens on their personal residences.

30.    Under the Consulting Agreement, NHI agreed to pay KMR certain specified hourly rates for services rendered.

31.    From March 2001 through May 2001, KMR, Riesner and Justis hired Pasqualle Petrucci as NHI's Plant Manager, Michael Cottingham as NHI's Chief Financial Officer and G. Robert Lord as NHI's Sales Manager.

32.    After assuming control of NHI, unbeknownst to any of the Mervine family, KMR, Riesner and Justis embarked on a short-sighted and result-oriented management scheme to scuttle and liquidate NHI in direct breach of the Consulting Agreement and in violation of their

8

fiduciary duties and obligations of loyalty.  KMR, Riesner and Justis made their primary priorities the paying down of NHI's debt to Mercantile and the collection of exorbitant and extorted consulting fees for KMR, while at the same time relegating NHI's business operations and viability as a going concern to distant secondary priorities, in direct contravention of the Consulting Agreement.

33.    KMR, Riesner and Justis did not operate independently and for the benefit of NHI. Upon information and belief, KMR, Riesner and Justis served at the direction and pleasure of Mercantile.

34.    Upon information and belief, Riesner and/or Justis were in contact with Mercantile at least daily during the term of the Consulting Agreement.

35.    Upon information and belief, Riesner and/or Justis were also in contact with Progress, predecessor to Fleet, at least daily during the term of the Consulting Agreement.

36.    Upon information and belief, Riesner and/or Justis apprised Progress, predecessor to Fleet, of the day-to-day business operations of NHI.

37.    Upon information and belief, Progress, predecessor to Fleet, participated with KMR, Riesner and Justis in the making of day-to-day business decisions at NHI.

9

38.    Mervine Jr. and the other members of the Mervine Family were excluded by KMR, Riesner and Justis from any and all discussions with Progress, predecessor to Fleet.

39.    All contact made by KMR and/or Riesner and/or Justis to Progress, predecessor to Fleet, was conducted behind closed doors and without the participation of Mervine Jr. or the Mervine Family.

40.    When Riesner and/or Justis went behind closed doors to contact Progress, predecessor to Fleet, Riesner and/or Justis would indicate that they were going to "talk to their boss".

41.    When Mervine Jr. requested that Riesner and/or Justis put Mervine Jr. in direct contact with their "boss", Riesner and/or Justis refused to do so.

42.    When Mervine Jr. asked Riesner and/or Justis who at Progress, predecessor to Fleet, Mervine Jr. could speak to, or who was in charge at Progress, predecessor to Fleet, Riesner and/or Justis responded, "We are Progress."

43.    Accordingly, it is believed and therefore alleged that KMR, Riesner and Justis took their instructions from Progress, predecessor to Fleet.

44.    Fleet is therefore liable to NHI as successor in interest to Progress.

10

A00087

45.    By the end of December 2000, KMR, Riesner and Justis had written approximately $500,000 in checks, which Mercantile refused to cover because a third forbearance agreement had not been negotiated or signed. NHI's outstanding debt to Mercantile was reduced to $11.5 million as a result of the sale of assets by NHI.

46.    On or about January 2, 2001, Mercantile and NHI entered into a Third Forbearance Agreement made effective to December 31, 2000. Mercantile subsequently covered the approximately $500,000 in checks issued by KMR, Riesner and Justis that had not been paid by Mercantile.

47.    In 2001, KMR, Riesner and Justis continued on a concentrated course of action to pay Mercantile and KMR at the fastest possible rate without regard to the continuation of NHI's business, while stripping NHI of assets. In collaboration with Krieger, KMR, Riesner and Justis discontinued paying NHI's vendors, suppliers, health care claims and taxing authorities, removed critical employees from plant operations, shipped homes out of the plant prior to completion and with substantial defects, failed to complete homes in the field and focused on short-term returns to Mercantile and KMR, without any concern for the long-term impact on NHI, which were in fact ruinous to NHI's viability as a going concern.

48.    At the same time, although NHI was still only in technical default with Mercantile, KMR, Riesner and Justis systematically made payments to Mercantile the day after late fees and penalties were incurred. It was apparent that KMR, Riesner and Justis were not

11

A00088

concerned with NHI's ability to continue as a going concern – rather, the sole concern of KMR, Riesner and Justis was that Mercantile and KMR be paid.

49.     By the beginning of September 2001, due to the systematic failure of KMR, Riesner and Justis to pay NHI's vendors and suppliers, NHI was the named defendant in approximately twenty-two lawsuits by its customers, vendors and suppliers. By October 2001, the number of lawsuits against NHI by its customers, vendors and suppliers had increased to forty-three. As a result, NHI was unable to secure supplies and materials from vendors, which resulted in NHI having to resort to alternate and more expensive sources of supplies and materials.

50.     On or about October 22, 2001, KMR, Riesner and Justis removed Cottingham as Chief Financial Officer of NHI.

51.     Under the management of NHI by KMR, Riesner and Justis, NHI's reputation as a manufacturer of high quality customized homes was ruined. KMR, Riesner and Justis proved to be incompetent in running the day-to-day operations of NHI's manufacturing business. Instead of operating NHI with the intent that it continue as a viable going concern, the sole objective of KMR, Riesner and Justis was to pay down bank debt and liquidate assets to the benefit of Mercantile and KMR, and to the detriment of NHI's shareholders.

52.     In November 2001, it became apparent to Mervine Jr. that KMR, Riesner and Justis had been systematically failing to make state tax payments on behalf of NHI, failing to pay

A00089

workers' compensation benefits, and failing to pay health and life insurance premiums and 401(k) contributions for NHI employees. Mervine Jr. confronted Justis with this information and accused Justis of fraud.

53.    On or about November 7, 2001, KMR, Riesner and Justis fired Mervine Jr.

54.    When Mervine Jr. was fired, Riesner and Justis indicated to Mervine Jr. that their "boss told them KMR could not continue with [Mervine Jr.] in the way."

55.    On or about November 12, 2001, Justis proposed to the Mervine Family that Justis be named Chief Executive Officer and Chief Operating Officer of NHI.

56.    On or about November 20, 2001, the members of the Mervine family and the Directors of NHI decided that it was not in NHI's best interests that Justis be Chief Executive Officer and Chief Operating Officer of NHI. Accordingly, Justis's proposal was revoked by NHI.

57.    Because it had become apparent that NHI needed to discontinue its relationship with Mercantile and find a new lender, the Mervine family initiated negotiations with various lenders.

13

A00090

58.    In January 2002, after already having been paid approximately $1.9 million by NHI, KMR, Riesner and Justis submitted a proposal to find a new lender to replace Mercantile in exchange for a two and one-half percent commission.

59.    On or about January 29, 2002, Justis abruptly "went on vacation" and did not maintain contact with NHI or the members of the Mervine family. This was the first indication to NHI and the Mervine family that KMR was pulling out. Justis never returned to work at NHI.

60.    From October 2000 through January 2002, KMR, Riesner and Justis grossly mismanaged NHI's business; made decisions which maximized cash flows to Mercantile and KMR while destroying NHI's relationships with its customers, suppliers, contractors, employees, etc., with the obvious result of destroying NHI as a viable going concern; violated the Consulting Agreement; breached their fiduciary duty and duty of loyalty by – rather than providing "turn around" management -- devising a stealth plan to strip NHI of all cash and assets possible before running NHI into liquidation, all for the sole benefit of Mercantile, KMR, Riesner and Justis, and to the extreme detriment and prejudice of NHI and its shareholders and creditors.

61.    By February 2002, as a result of the gross mismanagement of NHI by KMR, Riesner and Justis, NHI was in such dire financial straits that it was not able to re-finance or sell its operations as a going concern.

14

62.    From October 2000 through February 2002, a period of approximately fourteen months, KMR, Riesner and Justis caused NHI to pay KMR consulting fees of approximately $1.9 million.

63.    On or about February 6, 2002, Mercantile demanded payment on all of NHI's loans and lines of credit.

64.    Thereafter, on or about February 26, 2002, the members of the Mervine family found themselves in such financial duress that they entered into an agreement with Mercantile, which over the next twenty months settled NHI's debt with Mercantile, satisfied Mercantile's liens on the assets of NHI and the Mervine family members' personal residences, and released Mercantile from all liability to NHI.

65.    NHI never received the additional $1.5 million of funding from Mercantile, even though KMR, Riesner and Justis assured Mercantile that NHI was a viable going concern.

66.    NHI terminated its manufacturing operations on February 19, 2002.

67.    On March 1, 2002, NHI filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code.

## COUNT I

### NHI v. Fleet, KMR, Riesner and Justis

15

A00092

## Breach of Contract

68.    The allegations set forth in paragraphs 1 through 67 above are incorporated herein as though fully set forth at length.

69.    NHI engaged KMR, Riesner and Justis under the Consulting Agreement.

70.    As part of the Consulting Agreement, on November 12, 2001, NHI and KMR entered into an agreement whereby the parties agreed that Riesner and Justis would perform the functions which a Chief Executive Officer and Chief Operating Officer would perform.

71.    NHI engaged KMR, Riesner and Justis solely at the direction of Mercantile to serve as NHI's management consultants.

72.    KMR, Riesner and Justis knew that in the event NHI failed to execute the Consulting Agreement with KMR, Mercantile would call all of the loans and declare NHI in default thereof.

73.    Under the Consulting Agreement, KMR, Riesner and Justis were obligated to provide various services "directed to effect an improvement in the operating structure and content of Nanticoke".

16

74.    Under the Consulting Agreement, KMR, Riesner and Justis were obligated to provide various services "use its best efforts to cause a change in operation and conduct of the business and to structure the business to profitable operation".

75.    Under the Consulting Agreement, KMR, Riesner and Justis were obligated to "advise and consent with [NHI's] Board of Directors in the implementation of the business plan".

76.    Rather than complying with the above referenced terms of the Consulting Agreement, and as set forth above, KMR, Riesner and Justis failed to provide services directed to effect an improvement in the operating structure and content of NHI, failed to use their best efforts to cause a change in operation and conduct of the business and to structure the business to profitable operation, and failed to secure the advice and consent of NHI's Board of Directors in the implementation of the business plan.

77.    To the contrary, and as set forth above, KMR, Riesner and Justis engaged in a course of conduct designed to: a) destroy NHI as a going concern; b) apply NHI's assets only for the benefit of KMR and Mercantile; c) drive NHI into bankruptcy for the benefit of its secured creditors; and d) ignore the desires and wishes of NHI's Board of Directors.

78.    Under the Consulting Agreement, KMR, Riesner and Justis undertook a duty of loyalty. By their course of action, KMR, Riesner and Justis breached their duty of loyalty.

17

A00094

79.   The conduct of KMR, Riesner and Justis constituted a breach of the Consulting Agreement.

80.   The breach by KMR, Riesner and Justis of the Consulting Agreement caused damage to NHI.

81.   Fleet is liable for the above referenced damage as successor in interest to Progress.

82.   WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, and any such other and further relief as justice requires.


## COUNT II

### NHI v. Fleet, KMR, Riesner and Justis

### Breach of The Covenant of Good Faith and Fair Dealing


83.   The allegations set forth in paragraphs 1 through 82 above are incorporated herein as though fully set forth at length.

84.   Every contract imposes upon the parties thereto an obligation of good faith and fair dealing.

18

A00095

85.    As set forth above, the conduct of KMR, Riesner and Justis violated the covenant of good faith and fair dealing.

86.    The breach by KMR, Riesner and Justis of their obligation of good faith and fair dealing under the Consulting Agreement and amendments thereto caused damage to NHI.

87.    Fleet is liable for the above referenced damage as successor in interest to Progress.

88.    WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, and any such other and further relief as justice requires.

## COUNT III

## NHI v. Fleet, KMR, Riesner and Justis

## Gross Negligence

89.    The allegations set forth in paragraphs 1 through 88 above are incorporated herein as though fully set forth at length.

90.    NHI engaged KMR, Riesner and Justis as consultants to provide statistical analysis, management evaluation, asset evaluation and banking relations, and to perform the functions which a Chief Executive Officer and Chief Operating Officer would perform.

19

91.    KMR, Riesner and Justis, as consultants to NHI, owed a duty to NHI to act in the best interests of NHI and its shareholders and to engage in a course of conduct to place NHI into the position of operating as an ongoing, profitable concern.

92.    KMR, Riesner and Justis breached that duty to NHI and were grossly negligent in their efforts by failing to act in the best interests of NHI and were grossly negligent in their efforts to engage in a course of conduct to place NHI into the position of operating as an ongoing profitable concern by:

   a.  knowingly failing to pay employee wages, workers' compensation benefits and other health benefits;

   b.  knowingly failing to pay sales and use taxes;

   c.  knowingly delaying the payments to Mercantile until after additional penalties for late payment were assessed;

   d.  knowingly assuring payment of KMR's invoices over the payment of other expenses which would have enable NHI to continue in business;

   e.  knowingly issuing checks which would not clear;

   f.  knowingly reducing NHI's obligations to Mercantile to the point where Mercantile would compel the filing of a bankruptcy;

   g.  selling assets of NHI which KMR, Riesner and Justis knew would have been better utilized in the recovery of NHI;

20

A00097

h.  knowingly withholding health insurance premiums from the employees and failing to remit those payments to the health plan provider; and

i.  knowingly issuing checks that would not be honored by Mercantile and which were returned "NSF."

93.     The gross negligence of KMR, Riesner and Justis proximately caused NHI damages.

94.     Fleet is liable for the above referenced damages as successor in interest to Progress.

95.     WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, and any such other and further relief as justice requires.

## COUNT IV

### NHI v. Fleet, KMR, Riesner and Justis

### Breach of Fiduciary Duty

96.     The allegations set forth in paragraphs 1 through 95 above are incorporated herein as though fully set forth at length.

21

A00098

97.     NHI engaged KMR, Riesner and Justis as consultants to provide statistical analysis, management evaluation, asset evaluation and banking relations, and to perform the functions which a Chief Executive Officer and Chief Operating Officer would perform.

98.     As consultants, KMR, Riesner and Justis were placed in a position of special confidence and trust, requiring the exercise of utmost discretion as fiduciaries in the protection of the interests of NHI.

99.     In complete abrogation of their fiduciary responsibilities to NHI, KMR, Riesner and Justis intentionally, unlawfully and willfully acted in a fashion that served only the interests of Mercantile and their own self-interests, including but not limited to:

    a.   knowingly failing to pay employee wages, workers' compensation benefits and other health benefits;

    b.   knowingly failing to pay sales and use taxes;

    c.   knowingly delaying the payments to Mercantile until after additional penalties for late payment were assessed;

    d.   knowingly assuring payment of KMR's invoices over the payment of other expenses which would have enable NHI to continue in business;

    e.   knowingly issuing checks which would not clear;

    f.   knowingly reducing NHI's obligations to Mercantile to the point where Mercantile would compel the filing of a bankruptcy;

A00099

g. selling assets of NHI which KMR, Riesner and Justis knew would have been better utilized in the recovery of NHI;

h. knowingly withholding health insurance premiums from the employees and failing to remit those payments to the health plan provider; and

i. knowingly issuing checks that would not be honored by Mercantile and which were returned "NSF."

100. The breaches by KMR, Riesner and Justis of their duties to NHI caused NHI damages.

101. Fleet is liable for the above referenced damages as successor in interest to Progress.

102. WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, and any such other and further relief as justice requires.

## VIII. COUNT V

### NHI v. Fleet, KMR, Riesner and Justis

### Fraud

103. The allegations set forth in paragraphs 1 through 102 above are incorporated herein as though fully set forth at length.

23

A00100

104.    On information and belief, KMR through Riesner and Justis engaged in a scheme to defraud and to raid NHI for the purposes of stripping assets in satisfaction of bank debt and running down NHI to the point where NHI could only be liquidated for the benefit of Mercantile rather than turning the company around, as represented.

105.    KMR, Riesner and Justis took steps to implement their fraudulent purpose including: (1) Mercantile insisting on NHI's hiring KMR; (2) Riesner and Justis knowingly failing to take any action which would permit NHI to continue as a going concern; (3) placing Justis in a position to perform the duties which a Chief Executive Officer and Chief Operating Officer would perform without any intention of having him act in the best interests of NHI; (4) the making of a series of management decisions by KMR, Riesner and Justis, which had the effect of running down NHI's business; (5) insisting on the surrender of voting rights of NHI's shareholders; (6) refusing to supply the NHI Board of Directors with financial information about the company or to involve it in any way in its present operations; (7) placing NHI into an insolvent condition in a fashion designed to protect only Mercantile; and (8) siphoning off approximately $1.9 million to KMR in fees rather that utilizing those assets to assist NHI's business operations.

106.    The NHI Board of Directors relied upon the representations of KMR, Riesner and Justis as to their skill and knowledge to their detriment.

107.    The conduct of KMR, Riesner and Justis was intentional and wrongful.

24

108.    Fleet is liable for the above referenced conduct as successor in interest to Progress.

109.    WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, plus punitive damages, and any such other and further relief as justice requires.

## COUNT VI

### NHI v. Fleet, KMR, Riesner and Justis

### Waste of Corporate Assets

110.    The allegations set forth in paragraphs 1 through 109 above are incorporated herein as though fully set forth at length.

111.    On information and belief, KMR through Riesner and Justis engaged in a scheme to waste the assets of NHI to the point where NHI could only be liquidated for the benefit of Mercantile.

112.    KMR, Riesner and Justis took steps to implement their fraudulent purpose including: (1) Mercantile insisting on NHI's hiring KMR; (2) Riesner and Justis knowingly failing to take any action which would permit NHI to continue as a going concern; (3) placing Justis in a position to perform the duties which a Chief Executive Officer and Chief Operating

25

Officer would perform without any intention of having him act in the best interests of NHI; (4) the making of a series of management decisions by KMR, Riesner and Justis, which have had the effect of running down NHI's business; (5) insisting on the surrender of voting rights of NHI's shareholders; (6) refusing to supply NHI with financial information about the company or to involve it in any way in its present operations; (7) placing NHI into bankruptcy in a fashion designed to protect only Mercantile; and (8) siphoning off approximately $1.9 million to KMR in fees rather that utilizing those assets to assist NHI's business operations.

113.   The conduct of KMR, Riesner and Justis was intentional and wrongful.

114.   Fleet is liable for the above referenced conduct as successor in interest to Progress.

115.   WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, and any such other and further relief as justice requires.

## COUNT VII

### NHI v. Fleet, KMR, Riesner and Justis

### Tortious Interference with Contract and Prospective Business Advantage

116.   The allegations set forth in paragraphs 1 through 115 above are incorporated herein as though fully set forth at length.

26

A00103

117.   At all times relevant to the instant case, NHI had contractual rights under all loans with Mercantile, and was ready, willing and able to institute, an actionable and meritorious lender liability claim against Mercantile.

118.   The conduct of KMR, Riesner and Justis, as set forth above, prejudiced NHI's ability to do business and made it impossible for NHI to maintain any semblance of equal bargaining power with Mercantile.

119.   As a direct cause of the conduct of KMR, Riesner and Justis, NHI's shareholders were compelled to provide to Mercantile personal guarantees of all of NHI's loans, secured by virtually all of their personal tangible assets.

120.   Accordingly, and as a direct result of the conduct of KMR, Riesner and Justis, NHI was placed in such a situation of economic duress and in such a disparate bargaining position that it was unable to protect its interests vis-à-vis Mercantile.

121.   Mercantile then was able, through threats against NHI's principals, to compel NHI to provide multiple general releases to Mercantile, foreclosing NHI's ability to enforce its rights under all of its loans or to institute an action against Mercantile for Mercantile's wrongful acts.

27

A00104

122.    The conduct of KMR, Riesner and Justis constitutes intentional interference with all loan agreements between NHI and Mercantile and interfered with NHI's prospective business advantage afforded through an action against Mercantile.

123.    The conduct of KMR, Riesner and Justis was intentional and wrongful, was done without justification and caused harm to NHI.

124.    Fleet is liable for the above referenced conduct as successor in interest to Progress.

125.    WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, plus punitive damages, and any such other and further relief as justice requires.

## COUNT VIII

### NHI v. Fleet, KMR, Riesner and Justis

### Fraudulent Transfer, 11 U.S.C. §§ 544(b), 548

126.    The allegations set forth in paragraphs 1 through 125 above are incorporated herein as though fully set forth at length.

127.    The transfers made to KMR, Riesner and Justis were made on or within four years before the date of filing of the Petition.

28

128.    The transfers made to KMR, Riesner and Justis were transferred or incurred with actual intent to hinder, delay or defraud any entity to which NHI was or became indebted to on or after the date that such transfers were made.

129.    The transfers made to KMR, Riesner and Justis were made when NHI was insolvent or became insolvent as a result of such transfers.

130.    The transfers from NHI to KMR, Riesner and Justis are voidable pursuant to the Uniform Fraudulent Transfer Act of Maryland or Delaware as incorporated pursuant to Section 544(b) of the United States Bankruptcy Code.

131.    To the extent that any of the above referenced transfers from NHI to KMR, Riesner and Justis were made within one year before the filing of the Petition, they are voidable pursuant to 11 U.S.C. § 548.

132.    Fleet is liable for the above referenced transfers as successor in interest to Progress.

133.    WHEREFORE, NHI respectfully requests judgment against Fleet, KMR, Riesner and Justis:

    (a)    declaring that the transfer(s) be set aside and declared void;

A00106

(b)    entering judgment in favor of the Trustee and against Defendants Fleet, KMR, Riesner and Justis in the amount of $1.9 million plus interest and costs;

(c)    ordering that the Defendants Fleet, KMR, Riesner and Justis immediately pay over the sum of $1.9 million to the Trustee in accordance with Section 550(a) of the Bankruptcy Code;

(d)    ordering that any claims which the Defendants Fleet, KMR, Riesner and Justis may hold against NHI be disallowed until such transfer(s) are surrendered in accordance with Section 502(d) of the Bankruptcy Code; and

(e)    granting Plaintiff NHI such other and further relief as may be just and appropriate.


## COUNT IX

### NHI v. Fleet, KMR, Riesner and Justis

### Fraudulent Conveyance


134.    The allegations set forth in paragraphs 1 through 133 above are incorporated herein as though fully set forth at length.


135.    The transfers made to KMR, Riesner and Justis as alleged above were made on or within four (4) years before the date of filing of the Petition.


30

A00107

136.    The transfers made to KMR, Riesner and Justis were made for less than reasonably equivalent value in exchange for such transfers.

137.    The transfers made to KMR, Riesner and Justis were made when NHI was insolvent or became insolvent as a result of such transfers.

138.    The transfers made to KMR, Riesner and Justis were not charitable contributions as defined in 11 U.S.C. § 548(d)(3).

139.    The transfers from NHI to KMR, Riesner and Justis are voidable pursuant to the Uniform Fraudulent Transfer Act of either Maryland or Delaware as incorporated pursuant to Section 544(b) of the United States Bankruptcy Code.

140.    To the extent that any of the above referenced transfers from NHI to KMR, Riesner and Justis were made within one year before the filing of the Petition, they are voidable pursuant to 11 U.S.C. § 548.

141.    Fleet is liable for the above referenced transfers as successor in interest to Progress.

142.    WHEREFORE, Plaintiff NHI respectfully requests judgment against the Defendants:

31

(a)    declaring that the transfer(s) be set aside and declared void;

(b)    entering judgment in favor of the Trustee and against the Defendants Fleet, KMR, Riesner and Justis in the amount of $1.9 million plus interest and costs;

(c)    ordering that the Defendants Fleet, KMR, Riesner and Justis immediately pay over the sum of $1.9 million to the Trustee in accordance with Section 550(a) of the Bankruptcy Code;

(d)    ordering that any claims which the Defendants Fleet, KMR, Riesner and Justis may hold against NHI be disallowed until such transfer(s) are surrendered in accordance with Section 502(d) of the Bankruptcy Code; and

(e)    granting Plaintiff NHI such other and further relief as may be just and appropriate.

## COUNT X

### NHI v. Fleet, KMR, Riesner and Justis

### Fraudulent Conveyance

143.    The allegations set forth in paragraphs 1 through 142 above are incorporated herein as though fully set forth at length.

144.    The transfers made to KMR, Riesner and Justis were made on or within four years before the date of filing of the Petition.

32

A00109

145.   The transfers made to KMR, Riesner and Justis were made for less than reasonably equivalent value in exchange for such transfers.

146.   NHI was engaged in a business or a transaction or was about to engage in a business or a transaction for which any property remaining with NHI was an unreasonably small capital.

147.   The transfers made to KMR, Riesner and Justis were not charitable contributions as defined in 11 U.S.C. § 548(d)(3).

148.   The transfers from NHI to KMR, Riesner and Justis are voidable pursuant to the Uniform Fraudulent Transfer Act of Maryland or Delaware as incorporated pursuant to Section 544(b) of the United States Bankruptcy Code.

149.   To the extent that any of the above referenced transfers from NHI to KMR, Riesner and Justis were made within one year before the filing of the Petition, they are voidable pursuant to 11 U.S.C. § 548.

150.   Fleet is liable for the above referenced transfers as successor in interest to Progress.

33

A00110

151.    WHEREFORE, Plaintiff NHI respectfully requests judgment against the Defendants:

(a)    declaring that the transfer(s) be set aside and declared void;

(b)    entering judgment in favor of the Trustee and against the Defendants Fleet, KMR, Riesner and Justis in the amount of $1.9 million plus interest and costs;

(c)    ordering that the Defendants Fleet, KMR, Riesner and Justis immediately pay over the sum of $1.9 million to the Trustee in accordance with Section 550(a) of the Bankruptcy Code;

(d)    ordering that any claims which the Defendants Fleet, KMR, Riesner and Justis may hold against NHI be disallowed until such transfer(s) are surrendered in accordance with Section 502(d) of the Bankruptcy Code; and

(e)    granting Plaintiff NHI such other and further relief as may be just and appropriate.

## COUNT XI

### NHI v. Fleet, KMR, Riesner and Justis

### Fraudulent Conveyance

152.    The allegations set forth in paragraphs 1 through 151 above are incorporated herein as though fully set forth at length.

34

153.    The transfers from NHI to KMR, Riesner and Justis were made on or within four years before the date of filing of the Petition.

154.    The transfers from NHI to KMR, Riesner and Justis were made for less than reasonably equivalent value in exchange for such transfers.

155.    The transfers from NHI to KMR, Riesner and Justis were made when NHI was insolvent or became insolvent as a result of such transfers.

156.    The transfers from NHI to KMR, Riesner and Justis were made while NHI intended to incur debts beyond its ability to pay as such debt matured.

157.    The transfers from NHI to KMR, Riesner and Justis are voidable pursuant to the Uniform Fraudulent Transfer Act of Maryland or Delaware as incorporated pursuant to Section 544(b) of the United States Bankruptcy Code.

158.    The transfers from NHI to KMR, Riesner and Justis are not a charitable contribution as defined in 11 U.S.C. § 548(d)(3).

159.    To the extent that any of the above referenced transfers from NHI to KMR, Riesner and Justis were made within one year before the filing of the Petition, they are voidable pursuant to 11 U.S.C. § 548.

35

160.    Fleet is liable for the above referenced transfers as successor in interest to Progress.

161.    WHEREFORE, NHI respectfully requests judgment against the Defendants Fleet, KMR, Riesner and Justis:

(a)    declaring that the transfer(s) be set aside and declared void;

(b)    entering judgment in favor of NHI and against the Defendants Fleet, KMR, Riesner and Justis in the amount of $1.9 million plus interest and costs;

(c)    ordering that the Defendants Fleet, KMR, Riesner and Justis immediately pay over the sum of $1.9 million to the Trustee in accordance with Section 550(a) of the Bankruptcy Code;

(d)    ordering that any claims which the Defendants Fleet, KMR, Riesner and Justis may hold against NHI be disallowed until such transfer(s) are surrendered in accordance with Section 502(d) of the Bankruptcy Code; and

(e)    granting Plaintiff such other and further relief as may be just and appropriate.

## COUNT XII

## NHI v. Fleet, KMR, Riesner and Justis

36

A00113

## Avoidance of Preferences, 11 U.S.C. § 547

162.   The allegations set forth in paragraphs 1 through 161 above are incorporated herein as though fully set forth at length.

163.   During the one year period prior to the Petition Date (hereinafter the "Insider Preference Period"), KMR, Riesner and Justis received from NHI one or more transfers by check, wire transfer, or their equivalent (the "Transfers"), in the amounts and on or before the clear dates identified in Exhibit "B", attached hereto.

164.   Each Transfer identified in Exhibit B hereto was directly to or for the benefit of KMR, Riesner and Justis.

165.   KMR, Riesner and Justis were creditors of NHI at the time of the Transfers.  At the time of the Transfers, KMR, Riesner and Justis asserted a right to payment on account of an obligation owed to KMR, Riesner and Justis by NHI.

166.   The Transfers were to or for the benefit of creditors who were insiders within the meaning of 11 U.S.C. § 547(b)(1).

167.   The Transfers were made for or on account of an alleged antecedent debt owed by NHI because the Transfers were made on account of an alleged debt before the Transfers were made within the meaning of 11 U.S.C. § 101(2).

37

A00114

168.    NHI was insolvent throughout the Insider Preference Period.

169.    As a result of the Transfers, KMR, Riesner and Justis received more than they would have received if: (i) NHI's case was a case under chapter 7 of Title 11; (ii) the Transfers had not been made; and (iii) KMR, Riesner and Justis received payment on their debts under the provisions of Title 11.

170.    NHI is entitled to avoid the Transfers pursuant to 11 U.S.C. § 547(b) and to recover for the benefit of its estate from KMR, Riesner and Justis under Section 550 of the Bankruptcy Code all Transfers to or for the benefit of KMR, Riesner and Justis or the aggregate value thereof.

171.    Fleet is liable for the above referenced transfers as successor in interest to Progress.

172.    WHEREFORE, Plaintiff NHI prays for entry of judgment in its favor and against the Defendants Fleet, KMR, Riesner and Justis:

    (a)    avoiding each of the Transfers set forth in Exhibit B;

    (b)    awarding NHI a judgment in an amount against Fleet, KMR, Riesner and Justis equal to the aggregate value of the Transfers to KMR, Riesner and

A00115

Justis and directing KMR, Riesner and Justis forthwith to return the amount awarded to NHI;

(c)     providing that any and all claims against NHI scheduled or filed in this case by Fleet, KMR, Riesner and Justis shall be disallowed in full if Fleet, KMR, Riesner and Justis fail or refuse to return to NHI the amount awarded;

(d)     awarding NHI interest on each amount for which judgment is entered at the maximum legal rate, from the initial date of this Complaint to the date judgment is entered; and, until the date the judgment is paid in full;

(e)     awarding costs incurred in this suit; and

(f)     awarding any such other relief as this Court may deem necessary and proper.

Guy A. Donatelli, Esquire
LAMB MCERLANE PC
24 East Market Street
Post Office Box 565
West Chester, PA  19381-0565
(610) 430-8000
Date:   June 10, 2004

Stephen W. Spence, Esquire (#2033)
PHILLIPS GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
(302) 655-4210 (fax)
Co-counsel to NHI, Inc.

A00116

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | : | |
|  | : | Case No. 02-10651 (PJW) |
| NHI, INC., | : | |
| A DELAWARE CORPORATION | : | Chapter 11 |
|  | : | |
|  | : | |
| NHI, INC., | : | |
|  | : | |
| Plaintiff | : | |
|  | : | Adversary No. 04-52879 |
| v. | : | |
|  | : | |
| FLEET BOSTON FINANCIAL | : | |
| COPRORATION, KMR MANAGEMENT, | : | Reference Docket No. 12, |
| INC., ROBERT RIESNER and WARING | : | |
| S. JUSTIS, JR., | : | |
|  | : | |
| Defendants | : | |

## ORDER DENYING MOTION OF FLEETBOSTON
## FINANCIAL CORPORATION AND ALLOWING THE FILING
## <u>OF THE AN AMENDED COMPLAINT</u>

And Now this _____ day of _____, 2004, having considered the Motion to

Dismiss filed by Fleet Boston Financial Corporation (the "Motion"), and the response filed by

the Debtor/Plaintiff (the "Response"); and it appearing that good cause exists for denying the

Motion and for granting the relief requested by the Plaintiff in its Response, it is hereby

ORDERED that the Motion is denied; and it is further

ORDERED that the Plaintiff may file its First Amended Complaint.


THE HONORABLE PETER J. WALSH
U.S. BANKRUPTCY COURT JUDGE

2

A00117

## CERTIFICATE OF SERVICE

I, CELESTE A. HARTMAN, Senior Paralegal, do hereby certify that I caused the foregoing document to be served upon those persons appearing on the attached list, via U.S. Mail on June 14, 2004.

Under penalty of perjury, I certify the foregoing to be true and correct.

_____
CELESTE A. HARTMAN

3

A00118

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Case No. 02-10651 (PJW) |
| NHI, INC., | : | |
| A DELAWARE CORPORATION | : | Chapter 11 |
| | : | |
| | : | |
| NHI, INC., | : | |
| | : | |
| Plaintiff | : | |
| | : | Adversary No. 04-52879 |
| v. | : | |
| | : | |
| FLEET BOSTON FINANCIAL | : | |
| COPRORATION, KMR MANAGEMENT, | : | Reference Docket No. 12 |
| INC., ROBERT RIESNER and WARING | : | |
| S. JUSTIS, JR., | : | |
| | : | |
| Defendants | : | |

## PLAINTIFF'S ANSWER TO MOTION TO DISMISS
## OF DEFENDANT, FLEET BOSTON FINANCIAL CORPORATION

Plaintiff, NHI, Inc., by and through its counsel, Lamb McErlane PC, hereby files this

Answer to Motion to Dismiss of Defendant, Fleet Boston Financial Corporation. Plaintiff

respectfully requests that the Motion to Dismiss be denied.

A Memorandum in Support of this Answer is attached hereto as Exhibit "A" and

incorporated herein by reference. Plaintiff also requests permission to file a First Amended

Complaint, which is attached hereto as Exhibit "B" in a black-lined format and as Exhibit "C" in

a clean copy.

Dkt. No. ___17___

Date Filed: _0-14-04_

A00119

WHEREFORE, Plaintiff respectfully requests that this Court enter the attached order denying Defendant's Motion to Dismiss and allowing Plaintiff to file an Amended Complaint.

Date:    June 14, 2004

LAMB McERLANE PC
Guy A. Donatelli, Esquire
24 East Market Street
Post Office Box 565
West Chester, PA  19381-0565
(610) 430-8000

PHILLIPS GOLDMAN & SPENCE, P.A.


STEPHEN W. SPENCE, ESQUIRE (#2033)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
(302) 655-4210 (fax)
Co-counsel to NHI, Inc.

# EXHIBIT "A"

A00121

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | |
| | : | Case No. 02-10651 (PJW) |
| NHI, INC., | : | |
| A DELAWARE CORPORATION | : | Chapter 11 |
| | : | |
| | : | |
| NHI, INC., | : | |
| | : | |
| Plaintiff | : | |
| | : | Adversary No. 04-52879 |
| v. | : | |
| | : | |
| FLEET BOSTON FINANCIAL | : | |
| COPRORATION, KMR MANAGEMENT, | : | |
| INC., ROBERT RIESNER and WARING | : | |
| S. JUSTIS, JR., | : | |
| | : | |
| Defendants | : | |

### MEMORANDUM IN SUPPORT OF
### PLAINTIFF'S ANSWER TO MOTION TO DISMISS
### OF DEFENDANT, FLEET BOSTON FINANCIAL CORPORATION

Plaintiff, NHI, Inc. ("NHI"), by and through its counsel, Lamb McErlane PC,

respectfully submits this Memorandum in Support of its Answer to the Motion to Dismiss of

Defendant, Fleet Boston Financial Corporation ("Fleet").

In the Motion to Dismiss, Fleet claims that the Complaint does not allege facts sufficient

to state a claim against Fleet or to pierce the corporate veil. The Motion to Dismiss should be

denied on the basis of the attached First Amended Complaint filed herewith by NHI, which states

that Fleet is liable to NHI as successor in interest to Progress Financial Corporation ("Progress").

In the Motion to Dismiss, Fleet also claims that the Complaint fails to allege fraud with the requisite specificity. NHI respectfully submits that it could not be more clear from the face of the First Amended Complaint, filed herewith, that the circumstances constituting fraud have been stated with sufficient particularity. Fed.R.Civ.P. 9(b).

NHI has pleaded that under the threat of calling all of Mercantile Safe Deposit and Trust Company's ("Mercantile") loans to NHI, NHI was required by Mercantile to hire KMR Management, Inc. ("KMR"), not because Mercantile or KMR expected KMR to act as a true management consultant to reverse the financial course of NHI, but rather (unbeknownst to NHI at the time it hired KMR) to scuttle and liquidate NHI in direct breach of the Consulting Agreement entered into between KMR and NHI. The First Amended Complaint alleges that this fraud took place in Delaware, from October 2000 (when NHI entered into the Consulting Agreement with KMR) to February 2002 (when NHI filed for bankruptcy). The First Amended Complaint makes clear that KMR was hired on the basis of a covert plan between Mercantile and KMR to pay down NHI's debt to Mercantile while leaving intact sufficient assets to satisfy the remaining debts of NHI upon liquidation. Thus, the First Amended Complaint pleads the "date, place or time" of Fleet and KMR's alleged fraud. As reflected in the First Amended Complaint, during the time KMR was acting as management consultant to NHI, KMR refused to divulge the identity of those persons at Progress, predecessor to Fleet, participating with KMR in the making of day-to-day business decisions at NHI. It is only through the discovery process that NHI will be able to identify the additional actors, as Fleet representative(s) or agent(s), that participated in these activities, and the exact time and place of such.

2

Accordingly, Fleet's Motion to Dismiss should be denied on the basis of the attached

First Amended Complaint, filed herewith.

Date:      June 14, 2004

LAMB McERLANE PC
Guy A. Donatelli, Esquire
24 East Market Street
Post Office Box 565
West Chester, PA  19381-0565
(610) 430-8000

PHILLIPS GOLDMAN & SPENCE, P.A.


STEPHEN W. SPENCE, ESQUIRE (#2033)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
(302) 655-4210 (fax)
Co-counsel to NHI, Inc.

A00124

# EXHIBIT "B"

A00125

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                              :        Case No. 02-10651 (PJW)
                                    :
NHI, INC.,                          :        Chapter 11
A DELAWARE CORPORATION              :
                                    :
                                    :
NHI, INC.,                          :
                                    :
          Plaintiff                 :        Adversary No. 04-52879 ............. [ Deleted: 04-5____ ]
                                    :
     v.                             :
                                    :
FLEET BOSTON FINANCIAL              :
COPRORATION, KMR MANAGEMENT,        :
INC., ROBERT RIESNER and WARING     :
S. JUSTIS, JR.,                     :
                                    :
          Defendants                :

PLAINTIFF'S FIRST AMENDED COMPLAINT

I. PARTIES

1.    Plaintiff, NHI, Inc. (hereinafter "NHI"), formerly known as Nanticoke Homes,

Inc., filed a voluntary petition for relief (hereinafter "Petition") with the United States

Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code on

March 1, 2002. NHI was incorporated under the laws of the State of Delaware on October 7,

1971. Prior to 2002, NHI was engaged in manufacturing customized homes at its plant in

Greenwood, Delaware. NHI is currently maintaining its business as a Debtor-in-Possession.

A00126

2.    Defendant, KMR Management, Inc. (hereinafter "KMR"), on information and belief, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Blue Bell, Pennsylvania.

3.    Defendant, Fleet Boston Financial Corporation (hereinafter "Fleet"), on information and belief, is a corporation organized and existing under the laws of the State of Rhode Island, with its principal place of business in Boston, Massachusetts.  On information and belief, Fleet is successor in interest to Progress Financial Corporation (hereinafter "Progress"), which, on information and belief, was a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.  On information and belief, Defendant KMR was a wholly owned subsidiary of Progress and is now a wholly owned subsidiary of Defendant Fleet.

4.    Defendant, Robert Riesner, on information and belief, is an adult resident of or near Willow Grove, Pennsylvania.  Defendant Riesner is the President of Defendant KMR.

5.    Defendant, Waring S. Justis, Jr., on information and belief, is an adult resident of or near Baltimore, Maryland.  Defendant Justis is the Regional Vice President of Defendant KMR.

## II.  JURISDICTION AND VENUE

6.    All of the negotiations, discussions, representations and agreements out of which this case arises took place in Delaware; hence this court has jurisdiction over this matter and

2

Deleted: Commonwealth of Massachusetts,

Deleted: Boston Financial Corporation

Deleted: Management, Inc.,

Deleted: Financial Corporation

Deleted: Fleet Boston Financial Corporation.  Defendant Fleet Boston Financial Corporation is named as Defendant herein in the event that Defendant KMR Management, Inc. is without assets to satisfy any judgment entered against KMR Management, Inc., under a theory of piercing the corporate veil.

Deleted: <#>(KMR Management, Inc. and Fleet Boston Financial Corporation are hereinafter collectively referred to as "KMR").¶

Deleted: Management, Inc

Deleted: Management, Inc

venue is appropriate in Wilmington, Delaware. This Court also has venue pursuant to 28 U.S.C. § 1409 and jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 11 U.S.C. §§ 544(B), 547, 548, 550.

7.     This matter is a core proceeding pursuant to 28 U.S.C. § 1409.

### III.  FACTUAL BACKGROUND

8.     NHI was the first pre-manufactured home-builder in Delaware and, for more than thirty years, conducted a successful manufacturing business. NHI was founded by John M. Mervine, Sr. (hereinafter "Mervine Sr.").

9.     Prior to 2002, NHI's primary manufacturing facilities were located in Greenwood, Delaware. NHI constructed homes according to customers' specifications and delivered and installed the homes on the customers' property. NHI's customer base was comprised of individuals and real estate developers throughout the Mid-Atlantic region, although the largest concentration was in Delaware and Maryland.

10.     NHI's business was highly successful. Over three decades, it established a reputation for manufacturing a high-quality, high-end product in an expanding market. At the height of NHI's business, it had a sales volume of approximately $60,000,000 a year. In the early 1990's, NHI decided to expand its business into the manufacturing of lower-cost homes.

3

A00128

11.    Thereafter, Shawnee Homes, Inc. (hereinafter "Shawnee") was incorporated under the laws of the State of Delaware on November 2, 1992. From 1992 until October 2000, Shawnee was engaged in the manufacturing of mid-range houses at a plant in Salisbury, Maryland, which was owned by Shawnee Enterprises, LLC, a Delaware Limited Liability Corporation, owned by Mervine Sr.'s three sons, John M. Mervine, Jr. (hereinafter "Mervine Jr."), William H. Mervine, III, and Gregory O. Mervine, and their children. Shawnee's customer base was comprised mostly of Mervine Family owned real estate developers. Shawnee was run by William H. Mervine, III.

12.    Pawnee Homes, Inc. (hereinafter "Pawnee") was incorporated under the laws of the State of Delaware on October 29, 1996. From 1996 to October 2000, Pawnee was engaged in the manufacturing of low-range homes at a NHI plant in Greenwood, Delaware. Pawnee's customer base was comprised mostly of mobile home dealers and mobile home communities. Pawnee was run by Mervine Jr.

13.    Nanticoke Homes Midwest, Inc. (hereinafter "Midwest"), was incorporated under the laws of the State of Indiana in 1999. From 1999 to April 2000, Midwest was engaged in the manufacturing of homes at a plant in Indianapolis, Indiana, which was owned by Shawnee Enterprises Midwest, LLC, which was owned by Shawnee Enterprises, LLC. Midwest was run by Gregory O. Mervine.

14.    In establishing Shawnee, Pawnee and Midwest, NHI greatly increased it indebtedness with the enthusiastic support of its banking institution, Mercantile Safe Deposit and

4

Trust Company (hereinafter "Mercantile"). All outstanding debt owed to Mercantile by NHI and its affiliated companies, Shawnee, Pawnee and Midwest, and its affiliated real estate holding companies and Freedom Motors, Custom Decorative Mouldings, National Concrete and Classic Carpet (hereinafter "Related Entities"), was cross collateralized.

15.    For approximately 6 years prior to 2002, NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities maintained both Term and Demand Loan Lines of Credit relationships with Mercantile.  The interest rate on the Term and Demand Loan Lines of Credit with Mercantile was Mercantile's prime rate.

16.    In late 1999, NHI owned assets with an adjusted book value of approximately $26 million and NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities owed approximately $17 million in multiple loans to Mercantile. NHI had a net book value of approximately $8 million.

17.    Because of increasing cash demands, NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities borrowed on the Term and Demand Loan Lines of Credit with Mercantile in excess of the loans' collateral value, yet remained current on all payment and monetary terms under the Term and Demand Loan Lines of Credit.

18.    Because the balance of the Term and Demand Loan Lines of Credit was in excess of the collateral value, as of late 1999 all of NHI's outstanding debt to Mercantile was considered by Mercantile to be in technical default under the loan documents.  All outstanding

5

cross collateralized debt of NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities was considered cross defaulted.

19.     On or about March 21, 2000, Mercantile and NHI entered into a Forbearance Agreement (hereinafter "First Forbearance Agreement").  Pursuant to the First Forbearance Agreement, the interest rate on NHI's Term and Demand Loan Lines of Credit with Mercantile increased from Mercantile's prime rate to Mercantile's prime rate, plus two percent, and all debt of NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities, totaling approximately $17.5 million, was being monitored on a month-to-month basis by NHI's contact at Mercantile, Tim Naylon.

20.     On or about June 15, 2000, NHI agreed with Naylon that NHI would bring its outstanding debt to Mercantile down to $9 million by selling off non-operating assets.

21.     On or about July 27, 2000, Mercantile and NHI entered into a Second Forbearance Agreement.

22.     In August 2000, NHI learned that Mercantile was considering calling NHI's loans and placing NHI into liquidation, even though NHI remained current on its loan payments, but was alleged to be in default of technical, non-monetary covenants.

23.     In September 2000, NHI listed for sale various properties, divisions, related entities and other assets.

6

A00131

24.    In early October 2000, Mervine Jr. became Chief Executive Officer of NHI.

25.    On or about October 6, 2000, Scott Krieger, Mercantile's workout manager, replaced Naylon as NHI's contact at Mercantile. Krieger insisted – on the threat of calling all of Mercantile's loans – that NHI retain a management consultant and strongly suggested/urged that Defendants KMR, Riesner and Justis be hired as management consultants. Krieger assured NHI that Defendants KMR, Riesner and Justis were "turn around" consultants, as opposed to "liquidation guys."

26.    On or about October 18, 2000, Krieger indicated to NHI that Mercantile would provide an additional $1.5 million of financing for NHI if KMR, Riesner and Justis considered NHI to be a viable going concern.

27.    On or about October 19, 2000, under the threat of calling all of Mercantile's loans, NHI, Pawnee, Shawnee, Midwest and the Mervine family, entered into a Consulting Agreement with Defendants KMR, Riesner and Justis. A copy of the Consulting Agreement and the amendments thereto are attached hereto as Exhibit "A" (hereinafter the "Consulting Agreement").

28.    Under the Consulting Agreement, KMR, Riesner and Justis, who had represented themselves to be highly skilled professionals, agreed to provide NHI with professional management for the purposes of helping to stabilize NHI's financial condition and perpetuating

7

NHI's business.  Under the Consulting Agreement, KMR, Riesner and Justis undertook to act as fiduciaries, assumed positions of responsibility and undertook a duty of loyalty with respect to NHI as NHI's agents.  Pursuant to the Consulting Agreement, KMR, Riesner and Justis assumed the complete control, responsibility and authority for managing the business of NHI.

29.    On or about October 25, 2000, the Mervine family met with KMR, Riesner and Justis in Baltimore, Maryland.  KMR proposed a plan whereby NHI would cut expenses, sell non-operating assets, close Pawnee and move Shawnee to Greenwood, Delaware, and KMR would hire a Chief Financial Officer and General Manager for NHI and approach Mercantile to request another forbearance agreement and the provision of additional funds to NHI.    To effectuate the plan, the members of the Mervine family agreed to cut their own salaries by fifty percent and to give Mercantile first mortgage liens on their personal residences.

30.    Under the Consulting Agreement, NHI agreed to pay KMR certain specified hourly rates for services rendered.

31.    From March 2001 through May 2001, KMR, Riesner and Justis hired Pasqualle Petrucci as NHI's Plant Manager, Michael Cottingham as NHI's Chief Financial Officer and G. Robert Lord as NHI's Sales Manager.

32.    After assuming control of NHI, unbeknownst to any of the Mervine family, KMR, Riesner and Justis embarked on a short-sighted and result-oriented management scheme to scuttle and liquidate NHI in direct breach of the Consulting Agreement and in violation of their

8

A00133

fiduciary duties and obligations of loyalty. KMR, Riesner and Justis made their primary priorities the paying down of NHI's debt to Mercantile and the collection of exorbitant and extorted consulting fees for KMR, while at the same time relegating NHI's business operations and viability as a going concern to distant secondary priorities, in direct contravention of the Consulting Agreement.

33. KMR, Riesner and Justis did not operate independently and for the benefit of NHI. Upon information and belief, KMR, Riesner and Justis served at the direction and pleasure of Mercantile.

34. Upon information and belief, Riesner and/or Justis were in contact with Mercantile at least daily during the term of the Consulting Agreement.

35. Upon information and belief, Riesner and/or Justis were also in contact with Progress, predecessor to Fleet, at least daily during the term of the Consulting Agreement.

36. Upon information and belief, Riesner and/or Justis apprised Progress, predecessor to Fleet, of the day-to-day business operations of NHI.

37. Upon information and belief, Progress, predecessor to Fleet, participated with KMR, Riesner and Justis in the making of day-to-day business decisions at NHI.

9

38. Mervine Jr. and the other members of the Mervine Family were excluded by KMR, Riesner and Justis from any and all discussions with Progress, predecessor to Fleet.

39. All contact made by KMR and/or Riesner and/or Justis to Progress, predecessor to Fleet, was conducted behind closed doors and without the participation of Mervine Jr. or the Mervine Family.

40. When Riesner and/or Justis went behind closed doors to contact Progress, predecessor to Fleet, Riesner and/or Justis would indicate that they were going to "talk to their boss".

41. When Mervine Jr. requested that Riesner and/or Justis put Mervine Jr. in direct contact with their "boss", Riesner and/or Justis refused to do so.

42. When Mervine Jr. asked Riesner and/or Justis who at Progress, predecessor to Fleet, Mervine Jr. could speak to, or who was in charge at Progress, predecessor to Fleet, Riesner and/or Justis responded, "We are Progress."

43. Accordingly, it is believed and therefore alleged that KMR, Riesner and Justis took their instructions from Progress, predecessor to Fleet.

44. Fleet is therefore liable to NHI as successor in interest to Progress.

10

45. By the end of December 2000, KMR, Riesner and Justis had written approximately $500,000 in checks, which Mercantile refused to cover because a third forbearance agreement had not been negotiated or signed. NHI's outstanding debt to Mercantile was reduced to $11.5 million as a result of the sale of assets by NHI.

46. On or about January 2, 2001, Mercantile and NHI entered into a Third Forbearance Agreement made effective to December 31, 2000. Mercantile subsequently covered the approximately $500,000 in checks issued by KMR, Riesner and Justis that had not been paid by Mercantile.

47. In 2001, KMR, Riesner and Justis continued on a concentrated course of action to pay Mercantile and KMR at the fastest possible rate without regard to the continuation of NHI's business, while stripping NHI of assets. In collaboration with Krieger, KMR, Riesner and Justis discontinued paying NHI's vendors, suppliers, health care claims and taxing authorities, removed critical employees from plant operations, shipped homes out of the plant prior to completion and with substantial defects, failed to complete homes in the field and focused on short-term returns to Mercantile and KMR, without any concern for the long-term impact on NHI, which were in fact ruinous to NHI's viability as a going concern.

48. At the same time, although NHI was still only in technical default with Mercantile, KMR, Riesner and Justis systematically made payments to Mercantile the day after late fees and penalties were incurred. It was apparent that KMR, Riesner and Justis were not

11

concerned with NHI's ability to continue as a going concern – rather, the sole concern of <u>KMR,</u> Riesner and Justis was that Mercantile and KMR be paid.

49.    By the beginning of September 2001, due to the systematic failure of <u>KMR,</u> Riesner and Justis to pay NHI's vendors and suppliers, NHI was the named defendant in approximately twenty-two lawsuits by its customers, vendors and suppliers. By October 2001, the number of lawsuits against NHI by its customers, vendors and suppliers had increased to forty-three. As a result, NHI was unable to secure supplies and materials from vendors, which resulted in NHI having to resort to alternate and more expensive sources of supplies and materials.

50.    On or about October 22, 2001, <u>KMR,</u> Riesner and Justis removed Cottingham as Chief Financial Officer of NHI.

51.    Under the management of NHI by KMR, Riesner and Justis, NHI's reputation as a manufacturer of high quality customized homes was ruined. <u>KMR,</u> Riesner and Justis proved to be incompetent in running the day-to-day operations of NHI's manufacturing business. Instead of operating NHI with the intent that it continue as a viable going concern, the sole objective of KMR, Riesner and Justis was to pay down bank debt and liquidate assets to the benefit of Mercantile and KMR, and to the detriment of NHI's shareholders.

52.    In November 2001, it became apparent to Mervine Jr. that <u>KMR,</u> Riesner and Justis had been systematically failing to make state tax payments on behalf of NHI, failing to pay

12

workers' compensation benefits, and failing to pay health and life insurance premiums and 401(k) contributions for NHI employees. Mervine Jr. confronted Justis with this information and accused Justis of fraud.

53.    On or about November 7, 2001, KMR, Riesner and Justis fired Mervine Jr.

54.    When Mervine Jr. was fired, Riesner and Justis indicated to Mervine Jr. that their "boss told them KMR could not continue with [Mervine Jr.] in the way."

Formatted: Bullets and Numbering

55.    On or about November 12, 2001, Justis proposed to the Mervine Family that Justis be named Chief Executive Officer and Chief Operating Officer of NHI.

56.    On or about November 20, 2001, the members of the Mervine family and the Directors of NHI decided that it was not in NHI's best interests that Justis be Chief Executive Officer and Chief Operating Officer of NHI. Accordingly, Justis's proposal was revoked by NHI.

57.    Because it had become apparent that NHI needed to discontinue its relationship with Mercantile and find a new lender, the Mervine family initiated negotiations with various lenders.

13

58.    In January 2002, after already having been paid approximately $1.9 million by NHI, KMR, Riesner and Justis submitted a proposal to find a new lender to replace Mercantile in exchange for a two and one-half percent commission.

59.    On or about January 29, 2002, Justis abruptly "went on vacation" and did not maintain contact with NHI or the members of the Mervine family.  This was the first indication to NHI and the Mervine family that KMR was pulling out.  Justis never returned to work at NHI.

60.    From October 2000 through January 2002, KMR, Riesner and Justis grossly mismanaged NHI's business; made decisions which maximized cash flows to Mercantile and KMR while destroying NHI's relationships with its customers, suppliers, contractors, employees, etc., with the obvious result of destroying NHI as a viable going concern; violated the Consulting Agreement; breached their fiduciary duty and duty of loyalty by -- rather than providing "turn around" management -- devising a stealth plan to strip NHI of all cash and assets possible before running NHI into liquidation, all for the sole benefit of Mercantile, KMR, Riesner and Justis, and to the extreme detriment and prejudice of NHI and its shareholders and creditors.

61.    By February 2002, as a result of the gross mismanagement of NHI by KMR, Riesner and Justis, NHI was in such dire financial straits that it was not able to re-finance or sell its operations as a going concern.

14

A00139

62.    From October 2000 through February 2002, a period of approximately fourteen months, KMR, Riesner and Justis caused NHI to pay KMR consulting fees of approximately $1.9 million.

63.    On or about February 6, 2002, Mercantile demanded payment on all of NHI's loans and lines of credit.

64.    Thereafter, on or about February 26, 2002, the members of the Mervine family found themselves in such financial duress that they entered into an agreement with Mercantile, which over the next twenty months settled NHI's debt with Mercantile, satisfied Mercantile's liens on the assets of NHI and the Mervine family members' personal residences, and released Mercantile from all liability to NHI.

65.    NHI never received the additional $1.5 million of funding from Mercantile, even though KMR, Riesner and Justis assured Mercantile that NHI was a viable going concern.

66.    NHI terminated its manufacturing operations on February 19, 2002.

67.    On March 1, 2002, NHI filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code.

## COUNT I

### NHI v. Fleet, KMR, Riesner and Justis

15

**Breach of Contract**

68.    The allegations set forth in paragraphs 1 through 67 above are incorporated herein

[Formatted: Bullets and Numbering]

[Deleted: 56]

as though fully set forth at length.

69.    NHI engaged KMR, Riesner and Justis under the Consulting Agreement.

70.    As part of the Consulting Agreement, on November 12, 2001, NHI and KMR entered into an agreement whereby the parties agreed that Riesner and Justis would perform the functions which a Chief Executive Officer and Chief Operating Officer would perform.

71.    NHI engaged KMR, Riesner and Justis solely at the direction of Mercantile to serve as NHI's management consultants.

72.    KMR, Riesner and Justis knew that in the event NHI failed to execute the Consulting Agreement with KMR, Mercantile would call all of the loans and declare NHI in default thereof.

73.    Under the Consulting Agreement, KMR, Riesner and Justis were obligated to provide various services "directed to effect an improvement in the operating structure and content of Nanticoke".

16

A00141

74.     Under the Consulting Agreement, KMR, Riesner and Justis were obligated to provide various services "use its best efforts to cause a change in operation and conduct of the business and to structure the business to profitable operation".

75.     Under the Consulting Agreement, KMR, Riesner and Justis were obligated to "advise and consent with [NHI's] Board of Directors in the implementation of the business plan".

76.     Rather than complying with the above referenced terms of the Consulting Agreement, and as set forth above, KMR, Riesner and Justis failed to provide services directed to effect an improvement in the operating structure and content of NHI, failed to use their best efforts to cause a change in operation and conduct of the business and to structure the business to profitable operation, and failed to secure the advice and consent of NHI's Board of Directors in the implementation of the business plan.

77.     To the contrary, and as set forth above, KMR, Riesner and Justis engaged in a course of conduct designed to: a) destroy NHI as a going concern; b) apply NHI's assets only for the benefit of KMR and Mercantile; c) drive NHI into bankruptcy for the benefit of its secured creditors; and d) ignore the desires and wishes of NHI's Board of Directors.

78.     Under the Consulting Agreement, KMR, Riesner and Justis undertook a duty of loyalty.  By their course of action, KMR, Riesner and Justis breached their duty of loyalty.

17

79.    The conduct of KMR, Riesner and Justis constituted a breach of the Consulting Agreement.

80.    The breach by KMR, Riesner and Justis of the Consulting Agreement caused damage to NHI.

81.    Fleet is liable for the above referenced damage as successor in interest to Progress.

82.    WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, and any such other and further relief as justice requires.

**COUNT II**

**NHI v. Fleet, KMR, Riesner and Justis**

**Breach of The Covenant of Good Faith and Fair Dealing**

83.    The allegations set forth in paragraphs 1 through 82 above are incorporated herein as though fully set forth at length.

84.    Every contract imposes upon the parties thereto an obligation of good faith and fair dealing.

18

A00143

85.    As set forth above, the conduct of KMR, Riesner and Justis violated the covenant of good faith and fair dealing.

86.    The breach by KMR, Riesner and Justis of their obligation of good faith and fair dealing under the Consulting Agreement and amendments thereto caused damage to NHI.

87.    Fleet is liable for the above referenced damage as successor in interest to Progress.

Formatted: Bullets and Numbering

88.    WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, and any such other and further relief as justice requires.

## COUNT III

### NHI v. Fleet, KMR, Riesner and Justis

### Gross Negligence

89.    The allegations set forth in paragraphs 1 through 88 above are incorporated herein as though fully set forth at length.

Formatted: Bullets and Numbering

Deleted: 75

90.    NHI engaged KMR, Riesner and Justis as consultants to provide statistical analysis, management evaluation, asset evaluation and banking relations, and to perform the functions which a Chief Executive Officer and Chief Operating Officer would perform.

19