The February 26, 2002 Agreement is a public record as it was attached as Exhibit "B" to the Objection of the Official Committee of Unsecured Creditors to the Debtor's Motion for, among other things, Order Approving Asset Sale and Bidding Procedures [D.I. 198]. A copy of the February 26, 2002 Agreement is attached hereto as **Exhibit "A"** and incorporated herein by this reference.

NHI was a party to the February 26, 2002 Agreement. [*See* February 26, 2002 Agreement, introductory paragraph and signature pages.] In the February 26, 2002 Agreement, NHI and its principals agree that all action taken prior to the execution of the February 26, 2002 Agreement in relation to the loans, loan obligations, loan documents, collateral or administration thereof (as more particularly described in Plaintiff's Amended Complaint) gave rise to no claims or defenses.

**In Order to Obtain Mercantile's Consent to Debtor's Use of Cash Collateral, Debtor Reaffirmed to this Court that it has Released all Claims against Mercantile and its Agents, KMR, Riesner and Justis**

On March 1, 2002, NHI filed its voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the U.S. Bankruptcy Code. [Amended Complaint ¶67; *See also In re NHI, Inc.*, United States Bankruptcy Court for the District of Delaware, Case No. 02-10651 (PJW).] In seeking liquidity in its case, the Debtor entered into the Interim Agreement for Use of Cash Collateral and Adequate Protection with Mercantile ("Cash Collateral Agreement"). [*See*, the Consent Order, dated April 2, 2002 ("Order") and the attached Cash Collateral Agreement [D.I. 34].] A copy of the Consent Order with attached Cash Collateral Agreement is attached hereto as **Exhibit "B"** and incorporated herein by this reference. The Cash Collateral Agreement, signed by Debtor NHI, presented to

_500371_1/

**A00220**

the Court for approval through counsel for Debtor, *and approved by the Court*, contains several

affirmations, including the following:

- NHI's pre-petition indebtedness to Mercantile "is secured by validly perfected first priority security interests, liens and mortgage liens." [Cash Collateral Agreement at p. 2.]

- NHI's pre-petition indebtedness is "fully secured and constitutes the legal, valid and binding obligations of the Debtor, enforceable in accordance with the terms of all applicable documents." [Cash Collateral Agreement at p. 3.]

- "no offsets, defenses or counterclaims to the [pre-petition indebtedness to Mercantile] exist, and no portion of the [pre-petition indebtedness] is subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law." [Cash Collateral Agreement at p. 4.]

The Cash Collateral Agreement was entered into *post-petition* and is dated March 15, 2002.

Accordingly, the Cash Collateral Agreement ratifies and cures all defects, if any, in the pre-

petition forbearance agreements and the February 26, 2002 Agreement.

Pursuant to the February 26, 2002 Agreement, NHI and the other obligors to Mercantile

acknowledged and confirmed their obligations to Mercantile [February 26, 2002 Agreement at

pp. 1 - 5 and Section 1], recited that in each of the preceding three forbearance agreements with

Mercantile they waived all claims against Mercantile and defenses to Mercantile's claims against

them [February 26, 2002 Agreement at p. 5 and Section 1], agreed to liquidate Mercantile's

collateral [February 26, 2002 Agreement Section 2], and gave a broad general release to

Mercantile **and its agents** [February 26, 2002 Agreement Section 20].[3]

---

[3] Section 20 of the February 26, 2002 Agreement provides:
   IN ORDER TO INDUCE [MERCANTILE] TO ENTER INTO THIS AGREEMENT, [NHI] FOREVER
   RELEASES AND DISCHARGES [MERCANTILE] AND [MERCANTILE'S] ... AGENTS
   (COLLECTIVELY, THE "RELEASED PARTIES") FROM ANY AND ALL CLAIMS, CAUSES OF
   ACTION, SUITS AND DAMAGES (INCLUDING CLAIMS FOR ATTORNEYS' FEES AND COSTS)
   WHICH [NHI] ... EVER HAD OR MAY NOW HAVE OF ANY KIND OR NATURE AGAINST ANY
   OF THE RELEAED PARTIES ARSIING OUT OF OR RELATED IN ANY WAY TO ANY OF THE
   LOANS, THE LOAN DOCUMENTS, THE OBLIGATIONS OR THE COLLATERAL OR THE
   ADMINISTRATION THEREOF OR THIS AGREEMENT, WHETHER KNOW OR UNKNOWN,

_500371_1/

**A00221**

Despite the terms and conditions of the several forbearance agreements entered into by NHI and Mercantile, the February 26, 2002 Agreement and the Cash Collateral Agreement, all confirming and acknowledging that NHI holds no claims against Mercantile and no defenses to Mercantile's claims and liens, Plaintiff NHI alleges in the Amended Complaint that at all times NHI held claims against Mercantile.[4]

## III.    ARGUMENT

### A.  Standard Of Law

In considering a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6) and Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, this Court must accept as true all of the allegations pled in the complaint and view the facts in the pleadings and all reasonable inferences in favor of the Debtor, the non-moving party. *See Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir. 1991); *BP Amoco Chem. Co. v. Sun Oil Co.,* 166 F. Supp. 2d 984, 989 (D. Del. 2001). This Court may dismiss a complaint for failure to state a claim only when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations in the Complaint. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

---

INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS BASED UPON OR RELYING ON ANY ALLEGATIONS OR ASSERTIONS OF DURESS, ILLEGALITY, UNCONSCIONABILITY, BAD FAITH, BREACH OF CONTRACT, REGULATORY VIOLATIONS, IMPROPER CONTROL OF THE COMPANIES OR THEIR AFFAIRS, NEGLIGENCE, MISCONDUCT, OR ANY OTHER TORT, CONTRACT OR REGULATORY CLAIM OF ANY KIND OR NATURE. THIS RELEASE IS INTENDED TO BE FINAL, IRREVOCABLE AND IMMEDIATE AND IS NOT SUBJECT TO THE SATISFACTION OF ANY CONDITIONS OF ANY KIND.

[4] "At all times relevant to the instant case, NHI had contractual rights under all loans with Mercantile, and was ready, willing and able to institute, an actionable and meritorious lender liability claim against Mercantile." [Amended Complaint ¶ 117.]

_500371_1/

**A00222**

**B. The Plaintiff Fails To State A Claim Upon Which Relief Can Be Granted**

**1.    The Cash Collateral Agreement Contains Judicial Admissions.**

A judicial admission is a formal statement by a party in the course of judicial proceedings, which removes an admitted fact from the field of controversy. *Pesta v. Warren*, 2004 WL 1172996 (Del. Super. May 13, 2004). NHI's claims must be dismissed as to all Defendants, because NHI is judicially estopped by the admissions that it made in the Cash Collateral Agreement.[5]   The Debtor asserts, acknowledges and reaffirms in the Cash Collateral Agreement that "no offsets, defenses or counterclaims to the [pre-petition indebtedness to Mercantile] exist." Such statements are judicial admissions and a reaffirmation of the release contained in the February 26, 2002 Agreement.

At the very heart of NHI's Amended Complaint is the claim that the Defendants acted as the agent for Mercantile in the collection of its pre-petition claims for Mercantile's ultimate benefit and in so doing engaged in acts of bad faith, and breaches of contract and of fiduciary

---

[5]   The Cash Collateral Agreement was attached to the Consent Order entered on the docket of the Bankruptcy case and approved by the Court. [*See* Order, dated April 2, 2002, [D.I. 34]] The February 26, 2002 Agreement was attached to a pleading filed by the Committee in the contested matter concerning sale procedures [D.I. 198]. As such, the Court may take judicial notice of the Cash Collateral Agreement and February 26, 2002 Agreement, either by virtue of the fact that they are filings in the same case, Collier on Bankruptcy, ¶301.03 ("The term [bankruptcy] case, therefore, refers to the overall spectrum of legal action taken under one of the debtor relief chapters. . . .The term 'proceeding,' by contrast, refers to any particular action raised or commenced within the case, including motions and adversary proceedings[.]"), or because they are public records insofar as they are filed on the docket of this case, *see, e.g. United States v. Wolfson*, 294 F. Supp. 267, 273 (D. Del. 1968) (where documents and testimony are filed with the Court, they become a matter of public record).  Viewed either way, therefore, the Defendants' reference to the February 26, 2002 Agreement and the Cash Collateral Agreement should not have the effect of converting the Defendants' Motion To Dismiss into a Motion For Summary Judgment.  *See, e.g., Lum v. Bank of America*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (for the purposes of a Motion To Dismiss, a court can generally consider matters of public record, allegations in the complaint, exhibits to the Complaint, and documents that form the basis of the claim); *Pension Benefit Guaranty Corp. v. White Consolidated Industries*, 998 F.2d 1192 (3d Cir. 1993) (where public has access to documents filed with the court, they are generally considered to be public records).  *See also Caleb v. CRST, Inc.*, 2002 WL 1986499 *1 n.6 (3d Cir. Aug. 28, 2002) (on a motion to dismiss court may look to matters of public record, including the judgments and Orders entered in an underlying action), *citing S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999).  In the event the Court determines that Defendants' Motion to Dismiss is to be construed as a Motion for Summary Judgment, Defendants reserve the right to take discovery and supplement the motion as may be appropriate.

_500371_1/

A00223

duties.[6]  In stark contrast to those allegations, however, the February 26, 2002 Agreement and

Cash Collateral Agreement make clear that NHI has no such claims.  Prior to the institution of

this proceeding and for the nearly two years that NHI's bankruptcy case has been administered,

NHI admitted to this Court that its debt to Mercantile – which is the basis for its claims against

the Defendants – is completely free of any taint that is ascribed to it in the Amended Complaint.

As a result of those admissions, the allegations in the Amended Complaint are subject to judicial

estoppel and NHI's claims against the Defendants must be dismissed with prejudice.

The Cash Collateral Agreement entered into by NHI and Mercantile affirms that NHI's

pre-petition debt to Mercantile is enforceable, legal, binding, and NHI has no claims against

Mercantile.[7]  NHI states that its pre-petition indebtedness to Mercantile "is secured by validly

perfected first priority security interests, liens and mortgage liens." [Cash Collateral Agreement

at p. 2.]  NHI also states that its pre-petition indebtedness is "fully secured and constitutes the

legal, valid and binding obligations of the Debtor, enforceable in accordance with the terms of all

applicable documents." [Cash Collateral Agreement at p. 3.]  Finally, NHI admits that "no

offsets, defenses or counterclaims to the [pre-petition indebtedness to Mercantile] exist, and no

portion of the [pre-petition indebtedness to Mercantile] is subject to avoidance or subordination

pursuant to the Bankruptcy Code or applicable non-bankruptcy law." [Cash Collateral

Agreement at p. 4.][8]

---

[6]  Plaintiff alleges that Defendants acted as Mercantile's agent and acted in concert with Mercantile.  For the
purposes of the Motion to Dismiss only, Defendants take Plaintiff's allegations of agency as true.  Defendants
reserve the right to deny they acted as Mercantile's agent or in concert with Mercantile.
[7]  *See contra supra.* Fn. 3 citing to the allegation in the Amended Complaint in which NHI states that it always held
claims against Mercantile.  See also NHI's Schedule of Assets B, describing potential claims asserted in the instant
action but omitting any claim against Mercantile [D.I. 50].
[8]  The Cash Collateral Agreement permits parties-in-interest in the Debtor's estate to challenge the extent, validity,
enforceability and perfection of Mercantile's claims and liens within specified periods of time, but the Debtor was at
all times bound.  Cash Collateral Agreement at ¶ 1.  Upon information and belief, all parties' rights to challenge the
claims and liens of Mercantile or assert claims against Mercantile have expired and Debtor's representations and
admissions are binding on its estate and all parties-in-interest in its case.

_500371_1/

**A00224**

The representations, acknowledgements and reaffirmations of Debtor in the Cash Collateral Agreement constitute binding and conclusive judicial admissions by the Debtor and its estate as to the validity of, and lack of wrongdoing associated with, the pre-petition loan, the pre-petition administration of the loans and the circumstances leading up to the commencement of the within case. *See In re Foxmeyer Corp.*, 286 B.R. 546, 567 (Bankr. D. Del. 2002); *See also* 2 John W. Strong, McCormick on Evidence §§ 254, 257 (5th ed.1999) (effective pleadings in a case constitute binding and conclusive judicial admissions within such case but only nonbinding, nonconclusive evidentiary admissions within other litigation); Barry Russell, Bankruptcy Evidence Manual § 801.22 at 884 (2002 ed.2001); *Glick v. White Motor Co.,* 458 F.2d 1287, 1291 (3rd Cir.1972) (*citing State Farm Mutual Automobile Insurance Co. v. Worthington,* 405 F.2d 683, 686 (8th Cir.1968)). Because the Debtor makes such binding and conclusive judicial admission, the Court necessarily must conclude, and without even the presentation of proof, that Mercantile and the Defendants are free from wrongdoing.

### 2. NHI Is Judicially Estopped From Pursuing The Claims Alleged In The Amended Complaint As A Result Of Its Judicial Admissions

As a result of NHI's judicial admissions and affirmation of he February 26, 2002 Agreement, as evidenced by the Cash Collateral Agreement, NHI is judicially estopped from claiming wrongdoing on the part of any of the Defendants. "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 1814 (2001) (*quoting Davis v. Wakelee,* 156 U.S. 680, 689, 15 S.Ct. 555 (1895).) *See also United States v. Transport Administrative Services,* 260 F.3d 909, 917 (8th Cir. 2001) ("[t]he doctrine of judicial estoppel prohibits a party from taking inconsistent positions in the same or related litigation.")

11

_500371_1/

**A00225**

The doctrine of judicial estoppel, therefore, seeks to prevent a litigant from asserting a position inconsistent with one the litigant previously asserted in the same or prior proceeding. See *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996). This doctrine does not intend to eliminate all inconsistencies, however slight or inadvertent. *Id.* Rather, the doctrine is "designed to prevent litigants from playing 'fast and loose' with the courts." *Id.* (citations omitted). Further, "unlike the well-known reliance element for other forms of estoppel, such as equitable estoppel, detrimental reliance by the party seeking judicial estoppel is not required." *In re Coastal Plains, Inc.*, 179 F.3d 197, 210 (5th Cir. 1999) (emphasis in original). This is because "the purpose of judicial estoppel is not to protect the litigants; it is to protect the integrity of the judicial system." *Id.*

The application of the doctrine of judicial estoppel is appropriate to this action. Mercantile consented to Debtor's use of Mercantile's cash collateral in consideration for all of the terms and conditions set forth in the Cash Collateral Agreement. The Cash Collateral Agreement was presented to the Court for approval based on various representations of the Debtor to the Court. Among those explicit and implicit representations to the Court were Debtor's representations that it held no claims adverse to Mercantile, nor could it have had any adverse claims as a result of the pre-petition February 26, 2002 Agreement, which included a broad general release of Mercantile **and its agents**.

A signed release is binding unless executed through fraud, duress, accident or mutual mistake. *Three Rivers Motors Ford Co. v. Ford Motor Co.*, 522 F.2d 885 (3d Cir. 1975). NHI obtained Court imprimatur of the February 26, 2002 Agreement when it sought and obtained Court approval of the Cash Collateral Order. At that point, NHI waived all right it may have had to make any claims that the broad general release of Mercantile **and its agents** contained in the

12

_500371_1/

A00226

February 26, 2002 Agreement, was procured through fraud, duress, accident or mutual mistake. Accordingly, any deficiencies in the February 26, 2002 Agreement were cured and the terms and conditions of the February 26, 2002 Agreement ratified and reaffirmed through the Court-approved Cash Collateral Agreement.

Despite those unambiguous assertions, repeated in each of three forbearance agreements, the February 26, 2002 Agreement, representations to the Court and the Cash Collateral Agreement, the Debtor now files the Amended Complaint that is replete with contrary allegations of wrongdoing by Mercantile in both its administration of the pre-petition loan and its endeavor to collect the pre-petition loan. In short, NHI's allegations reduce to the claim that KMR as the agent for Mercantile maximized proceeds to Mercantile and KMR, and "devis[ed] a stealth plan to strip NHI of all cash and assets possible before running NHI into liquidation, all for the sole benefit of Mercantile, and to the detriment and prejudice of NHI and its shareholders and creditors." [Amended Complaint ¶60.]

The Amended Complaint, therefore, necessarily and expressly implicates Mercantile as the primary wrongdoer, yet all such claims not only have been released, but there has never been a representation that any existed, save only ¶ 117 of the Amended Complaint. NHI should not be permitted to make an end-run around its judicial admissions to the Court through inapposite assertions about the pre-petition claims and liens of Mercantile in the case *sub judice*. In direct contravention of its previous representations to the Court, Debtor is now making contrary assertions about the pre-petition conduct of Mercantile and its "agents."

At the beginning of the case, the Debtor reaped the benefit of the Cash Collateral Order by making representations without which this Court would not have approved the Cash Collateral Order. The Debtor now contends that Mercantile worked out NHI's defaults under the

13

_500371_1/

**A00227**

pre-petition loan documents and that the Defendants acted in concert with and as agents for Mercantile to precipitate the Debtor's bankruptcy. The Debtor adeptly left Mercantile out of the Amended Complaint so that the direct contradiction would not be readily apparent to the Court. The actions alleged of the Defendants inevitably run to Mercantile as party and prime benefactor of the actions alleged in the Amended Complaint.

The facts before this Court are unique, and yet they are similar to those in *In re Kindred Healthcare, Inc.,* 2003 WL 22327933 *2-3 (Bankr. D. Del. Oct. 9, 2003). The debtors in *Kindred Healthcare* made representations in their cash management motion without which the court would not have approved the cash management motion. *Id.* The debtors, having reaped the benefits of the cash management motion, then advocated a position inconsistent with what they had represented to the court in the cash management motion. *Id.* The court in *Kindred Healthcare* judicially estopped the debtors from taking these contrary positions and found that because the positions asserted in the cash management motion were necessary to its approval, "there can be no suggestion that the representations made by the [d]ebtors in the [c]ash [m]anagement [m]otion were unintentional or inadvertent." *Id.* Likewise, NHI intentionally made representations, judicial admissions, to this Court that it had no causes of action relating to its pre-petition debt with Mercantile, all in order to obtain cash collateral financing from Mercantile. NHI must now be judicially estopped from taking a contrary position about its pre-petition debt with Mercantile through the smokescreen of a suit against Mercantile's alleged agents, the Defendants in this action.

In *Okan's Foods v. Windsor Assocs. Ltd. Pshp. (In re Okan's Foods),* 217 B.R. 739, 755 (Bankr. E.D.Pa. 1998), the court, finding a debtor had acted in bad faith, judicially estopped the debtor from pursuing a civil right suit after confirmation of its plan. *Id.* The debtor had

14

A00228

previously asserted in its plan the any potential lawsuits it may have would only pay a fifteen percent dividend to the unsecured creditors. *Id.* The debtor asserted that if the plan were rejected, there would be no dividend for the unsecured creditors. *Id.* Based on the debtor's representations, the court approved the plan. *Id.* Four months later, the debtor changed its position and commenced a civil rights suit containing a demand for judgment that, if successful, would have paid the unsecured creditors in full. *Id.* The court to judicially estopped the debtor from proceeding in the subsequent lawsuit because of bad faith shown by the debtor in reaping the benefit of the confirmed plan based on one assertion and then assume a contrary position to the same court in an attempt to reap more benefits in a subsequent proceeding. *Id.* at 754.

For these very same reasons, this Court should hold NHI to its judicial admissions and find that it is estopped from pursing the claims in the Amended Complaint.

### 3.    Plaintiff's Claims have been Released.

A release that is clear and unambiguous requires that this Court dismiss the Amended Complaint on the pleadings and there is no need to look at "the purpose for which the release was executed in determining the scope of the release." *See Wilmington Trust Co. v. Calhoun (In re Geotek Communs., Inc.)*, 282 B.R. 165, 169 (Bankr. D. Del., 2002) (J. Walsh). On February 26, 2002, the Debtor released Mercantile **and its agents.**[9]

Releases are interpreted according to state law. *See Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997). Delaware law recognizes the validity of a general release. *Chakov v. Outboard Marine Corp.,* Del. Supr., 429 A.2d 984 (1981). Under Delaware law, the intent of the parties, as ascertained from the language of the document, controls interpretation of a release. *See End of the Road Trust ex rel. Fruehauf Trailer Corp. v. Terex Corp. (In re Fruehauf Trailer Corp.),* 250 B.R. 168, 194 (D. Del., 2000); *Adams v. Jankouskas,* Del. Supr., 452 A.2d 148, 155-56

---

[9] *See supra* fn. 2 citing release language contained in the February 26, 2002 Agreement.

_500371_1/

A00229

(1982). If the language of a release is clear and unambiguous then the court must follow that interpretation. *Id.* If a release is ambiguous its interpretation becomes a question of fact and the fact finder may consider extrinsic evidence. *See Tucker v. Albun, Inc.,* Del.Super., 1999 WL 1241073 (1999); *Rochen v. Huang,* Del.Super., 1989 WL 5374 (1989). Where the language of the release is clear and unambiguous, it will not lightly be set aside. *See Hob Tea Room v. Miller,* Del. Supr., 89 A.2d 851 (1952).

Here, the scope of the release and the released parties is unambiguous. The Debtor released Mercantile **and its agents.** The Debtor in the Amended Complaint alleges that Defendants acted as Mercantile's agents. According to the Amended Complaint, Mercantile threatened adverse consequences unless Debtors hired the Defendants as management consultants. [Amended Complaint ¶ 25.] Mercantile conversed with the Defendants on a daily basis. [Amended Complaint ¶ 34.] Mercantile controlled and directed the activities of the Defendants and reaped the benefit. [Amended Complaint ¶¶ 32, 33, 48, 60, 105, 111, 112.] For the purpose of the Motion to Dismiss, the Court must take such allegations of agency as true.

Based on the Amended Complaint which must be accepted as true for the purpose of considering the motion, KMR, Riesner and Justis were Mercantile's agents. As Mercantile's agents, KMR, Riesner and Justis were released in the February 26, 2002 Agreement, which release was subsequently reaffirmed by the Debtor in its judicial admissions to the Court in the Cash Collateral Agreement and which release acts to bar the instant proceedings.

## IV.     CONCLUSION

For all of the reasons set forth in this Memorandum of Law, the Court should grant the relief requested in the accompanying Motion To Dismiss and enter the Order filed herewith dismissing all claims in the Plaintiff's First Amended Complaint, with prejudice.

16

_500371_1/

**A00230**

Dated:  August 5, 2004

/s/ Stuart M. Brown
Stuart M. Brown, Esquire (No. 4050)
Denise Seastone Kraft (No. 2778)
EDWARDS & ANGELL, LLP
919 N. Market Street
Wilmington, DE 19801
Tel:  302.777.7770
Fax:  302.777.7263

Counsel for Defendants

17

_500371_1/

A00231

# EXHIBIT
# A

A00232

## AGREEMENT

THIS AGREEMENT ("AGREEMENT") is made to be effective as of the 26th day of February, 2002, by and between MERCANTILE-SAFE DEPOSIT AND TRUST COMPANY ("LENDER"); NANTICOKE HOMES, INC., a Delaware corporation ("NANTICOKE"); SHAWNEE HOMES, INC., a Delaware corporation ("SHAWNEE"); SHAWNEE ENTERPRISES MIDWEST, L.L.C., a Delaware limited liability company ("SHAWNEE MIDWEST"); TAMARAC, INC., a Delaware corporation ("TAMARAC"); PAWNEE HOMES, INC., a Delaware corporation ("PAWNEE"); JOHN M. MERVINE, SR. and PEGGY R. MERVINE ("JOHN & PEGGY"); JOHN M. MERVINE, JR. ("MCKY") and JAN L. MERVINE (together with MCKY, "MCKY & JAN"); WILLIAM H. MERVINE, III and CHARLENE MERVINE ("WILLIAM & CHARLENE"); and GREGORY O. MERVINE ("GREGORY"). Hereafter, JOHN & PEGGY, MCKY & JAN, WILLIAM & CHARLENE, and GREGORY are collectively referred to herein as the "INDIVIDUAL GUARANTORS"; NANTICOKE, SHAWNEE, SHAWNEE MIDWEST, TAMARAC and PAWNEE are collectively referred to herein as the "COMPANIES"; the INDIVIDUAL GUARANTORS and the COMPANIES are collectively referred to herein as the "OBLIGORS"; and the OBLIGORS and the LENDER are collectively referred to herein as the "PARTIES."

## RECITALS

### The Loans

NANTICOKE is indebted to the LENDER for the following loans (collectively, "NANTICOKE LOANS") provided by the LENDER to NANTICOKE: (a) a revolving line of credit ("NANTICOKE REVOLVER") evidenced by a Fourth Amended And Restated Demand Promissory Note dated July ___, 2001 in the stated principal amount of Six Million Dollars ($6,000,000.00); and (b) a term loan ("NANTICOKE TERM LOAN") evidenced by a Term Loan Promissory Note dated January 23, 1996 in the stated principal amount of Three Million Five Hundred Thousand Dollars ($3,500,000.00).

SHAWNEE is indebted to the LENDER for the following loans (collectively, "SHAWNEE LOANS") provided by the LENDER to SHAWNEE: (a) a revolving line of credit ("SHAWNEE REVOLVER") evidenced by an Amended And Restated Demand Promissory note dated March 21, 2001 in the stated principal amount of Five Hundred Fifty Thousand Dollars ($550,000.00); (b) a term loan ("SHAWNEE TERM LOAN") evidenced by a Term Loan Promissory Note dated December 18, 1998 in the stated principal amount of Five Hundred Thousand Dollars ($500,000.00); and (c) a term loan ("SHAWNEE TERM LOAN NO. 2") evidenced by a Secured Note dated March 10, 1999 in the originally stated principal amount of Six Hundred Forty-Nine Thousand Four Hundred Dollars ($649,400.00).

SHAWNEE MIDWEST is indebted to the LENDER for a term loan ("SHAWNEE MIDWEST LOAN") provided by the LENDER to SHAWNEE MIDWEST which is evidenced by a Term Loan Promissory Note dated November 13, 1998 in the originally stated principal amount of One Million Six Hundred Thousand Dollars ($1,600,000.00).

TAMARAC is indebted to the LENDER for a term loan ("TAMARAC LOAN") provided by the LENDER to TAMARAC which is evidenced by a Promissory Note dated February 12, 1997 in the originally stated principal amount of One Million Dollars ($1,000,000.00).

Nanticoke Homes Midwest Incorporated ("NANTICOKE MIDWEST") is indebted to the LENDER for the following loans (collectively, " NANTICOKE MIDWEST LOANS") provided by the LENDER to MIDWEST: (a) a revolving line of credit ("NANTICOKE MIDWEST REVOLVER") evidenced by a Demand Promissory Note dated December 18, 1998 in the originally stated principal

A00233

amount of One Million Dollars ($1,000,000.00); and (b) equipment term loans (collectively, "NANTICOKE MIDWEST EQUIPMENT LOANS") evidenced by: (i) a Term Loan Promissory Note dated December 22, 1998 in the originally stated principal amount of One Hundred Eighty-Seven Thousand Three Hundred Eighty-Seven Dollars And Sixteen Cents ($187,387.16); (ii) a Term Loan Promissory Note dated March 26, 1999 in the originally stated principal amount of Fifty Thousand Eighty-Three Dollars And Twenty-Two Cents ($50,083.22); (iii) a Term Loan Promissory Note dated April 6, 1999 in the originally stated principal amount of Twenty-Five Thousand One Hundred Sixteen Dollars ($25,116.00); and (iv) a Term Loan Promissory Note dated May 13, 1999 in the originally stated principal amount of Twenty-Two Thousand Two Hundred Seventy-Five Thousand Dollars ($22,275.00). NANTICOKE MIDWEST is a Chapter 7 Debtor in bankruptcy proceedings pending in the United States Bankruptcy Court for the Southern District of Indiana (Indianapolis Division), Case No. 00-03285-BHL-7. The NANTICOKE LOANS, the SHAWNEE LOANS, the SHAWNEE MIDWEST LOAN, the TAMARAC LOAN, and the NANTICOKE MIDWEST LOANS are collectively referred to herein as the "LOANS."

<u>The Guaranties</u>

NANTICOKE is indebted to the LENDER in accordance with the following guaranties (collectively, "NANTICOKE GUARANTIES"): (a) Guaranty Agreement dated January 23, 1996 guarantying the obligations of SHAWNEE; (b) Guaranty Agreement dated December 18, 1998 guarantying the obligations of SHAWNEE; (c) Guaranty Agreement dated November 13, 1998 guarantying the obligations of SHAWNEE MIDWEST; (d) Corporate Guaranty Agreement dated February 12, 1997 guarantying the obligations of TAMARAC; and (e) Guaranty Agreement dated December 18, 1998 guarantying the obligations of NANTICOKE MIDWEST.

SHAWNEE MIDWEST is indebted to the LENDER in accordance with the terms of a Guaranty Agreement ("SHAWNEE MIDWEST GUARANTY") dated September 6, 2000 guarantying the obligations of, *inter alia*, NANTICOKE, SHAWNEE, NANTICOKE MIDWEST and TAMARAC.

JOHN & PEGGY are indebted to the LENDER in accordance with the following guaranties (collectively, "JOHN & PEGGY GUARANTIES"): (a) Guaranty Agreement dated January 23, 1996 guarantying the obligations of NANTICOKE; (b) Guaranty Agreement dated January 23, 1996 guarantying the obligations of SHAWNEE; (c) Guaranty Agreement dated December 18, 1998 guarantying the obligations of SHAWNEE; (d) Guaranty Agreement dated February 12, 1997 guarantying the obligations of TAMARAC; (e) Guaranty Agreement dated March 21, 2000 guarantying the obligations of NANTICOKE; and (f) Guaranty Agreement dated December ___, 2000 guarantying *inter alia* the obligations of NANTICOKE, SHAWNEE, SHAWNEE ENTERPRISES, SHAWNEE MIDWEST, TAMARAC, and NANTICOKE MIDWEST.

MCKY & JAN are indebted to the LENDER in accordance with the following guaranties (collectively, "MCKY & JAN GUARANTIES"): (a) Guaranty Agreement dated December 18, 1998 guarantying the obligations of SHAWNEE; (b) Guaranty Agreement dated November 13, 1998 guarantying the obligations of SHAWNEE MIDWEST; (c) Guaranty Agreement dated December 18, 1998 guarantying the obligations of NANTICOKE MIDWEST; and (d) Guaranty Agreement dated December ___, 2000 guarantying *inter alia* the obligations of NANTICOKE, SHAWNEE, SHAWNEE ENTERPRISES, SHAWNEE MIDWEST, TAMARAC, and NANTICOKE MIDWEST.

WILLIAM & CHARLENE are indebted to the LENDER in accordance with the following guaranties (collectively, "WILLIAM & CHARLENE GUARANTIES"): (a) Guaranty Agreement dated December 18, 1998 guarantying the obligations of SHAWNEE; (b) Guaranty Agreement dated November 13, 1998 guarantying the obligations of SHAWNEE MIDWEST; (c) Guaranty Agreement dated December 18, 1998 guarantying the obligations of NANTICOKE MIDWEST; and (d) Guaranty

A00234

Agreement dated December 30, 2000 guarantying *inter alia* the obligations of NANTICOKE, SHAWNEE, SHAWNEE ENTERPRISES, SHAWNEE MIDWEST, TAMARAC, and NANTICOKE MIDWEST.

GREGORY is indebted to the LENDER in accordance with the following guaranties (collectively, "GREGORY GUARANTIES"): (a) Guaranty Agreement dated December 18, 1998 guarantying the obligations of SHAWNEE; (b) Guaranty Agreement dated November 13, 1998 guarantying the obligations of SHAWNEE MIDWEST; and (c) Guaranty Agreement dated December 18, 1998 guarantying the obligations of NANTICOKE MIDWEST.

The NANTICOKE GUARANTIES, the SHAWNEE MIDWEST GUARANTY, the JOHN & PEGGY GUARANTIES, the MCKY & JAN GUARANTIES, the WILLIAM & CHARLENE GUARANTIES, and the GREGORY GUARANTIES are collectively referred to as the "GUARANTIES."

<u>Security For The Loans And Guaranties</u>

The obligations of payment and performance owed by NANTICOKE to the LENDER arising out of the LOANS and the NANTICOKE GUARANTIES are secured by security interests and liens in and to all of the real and personal assets of NANTICOKE as evidenced by, *inter alia*, the following: (a) Loan And Security Agreement dated January 23, 1996, as amended; (b) Mortgage dated January 23, 1996 recorded among the Land Records of Kent County, Delaware in Mortgage Book 220, page 292, as amended by First Amendment To Mortgage dated January 8, 1999 recorded among the Land Records of Kent County, Delaware in Mortgage Book 294, page 287, and Second Amendment To Mortgage dated March 21, 2000 recorded among the Land Records of Kent County, Delaware in Mortgage Book 365, page 150; (c) Mortgage dated January 23, 1996 recorded among the Land Records of Sussex County, Delaware in Deed Book 2207, folio 333, as amended by First Amendment To Mortgage dated December 29, 1998 recorded among the Land Records of Sussex County, Delaware in Deed Book 2924, folio 095, and Second Amendment To Mortgage dated March 21, 2000 recorded among the Land Records of Sussex County, Delaware in Deed Book 03389, page 333; (d) Mortgage dated August 6, 2000 recorded among the Land Records of Sussex County, Delaware in Deed Book 03478, page 067; (e) Mortgage dated February 28, 2001 recorded among the Land Records of Kent County, Delaware at Mortgage Book 1011, page 208; (f) Mortgage dated February 28, 2001 recorded among the Land Records of Sussex County, Delaware in Deed Book 03674, page 267; (g) Financing Statements recorded with the Secretary of State of Delaware and bearing the following recordation references: (i) 1996003159 recorded on January 30, 1996; (ii) 1996003165 recorded on January 30, 1996; (iii) 1996003168 recorded on January 30, 1996; (iv) 1997-13250 recorded on April 22, 1997; (v) 199858394 recorded on December 24, 1998; (vi) 199858395 recorded on December 24, 1998; (vii) 199858397 recorded on December 24, 1998; (viii) 199858399 recorded on December 24, 1998; (ix) 199858405 recorded on December 24, 1998; and (x) 199936877 recorded on July 20, 1999; (h) Financing Statements recorded with Sussex and Kent Counties, Delaware, the Maryland State Department of Assessments And Taxation, and the Circuit Court of Wicomico County, Maryland; and (i) Collateral Trademark Assignment dated January 23, 1996 and recorded on January 31, 1996 with the United States Patent And Trademark office at Reel 1428, Frame 0947.

The obligations of payment and performance owed by SHAWNEE to the LENDER arising out of the SHAWNEE LOAN are secured by security interests and liens in and to all of the assets of SHAWNEE as evidenced by, *inter alia*, the following: (a) Loan And Security Agreement dated January 23, 1996; (b) Amended And Restated Loan And Security Agreement dated December 18, 1998; (c) Financing Statement recorded on January 30, 1996 with the Delaware Secretary Of State as Instrument No. 19960003160; (d) Financing Statement recorded on January 24, 1996 with the

A00235

Maryland State Department Of Assessments And Taxation as File No: 160258112; (e) Financing Statement recorded on January 29, 1996 with the Clerk of the Court of Wicomico County, Maryland at Liber 1471, Folio 122; and (f) Collateral Trademark Agreement recorded on January 31, 1996 with the United States Patent And Trademark office at Reel 1428, Frame 0946.

The obligations of payment and performance owed by SHAWNEE MIDWEST to the LENDER with respect to the SHAWNEE MIDWEST LOAN and the SHAWNEE MIDWEST GUARANTY are secured by security interests and liens in and to all of the real and personal assets of SHAWNEE MIDWEST as evidenced by, *inter alia*, the following: (a) Mortgage And Security Agreement dated November 13, 1998 and recorded among the Land Records of Henry County, Indiana on December 22, 1998 as Instrument No. 98012520; (b) Indemnity Mortgage And Security Agreement dated September 6, 2000 and recorded among the Land Records of Henry County, Indiana on September 19, 2000 as Instrument No. 20007213; (c) Financing Statement recorded with the Delaware Secretary of State on December 24, 1998 as Instrument No. 1998-58394; (d) Financing Statement recorded with the Indiana Secretary of State on February 15, 1999 as ID No. 2239385; (e) Financing Statements recorded with the Henry County, Indiana Recorder on December 22, 1998 as ID Nos. 98012520, 981686, and 981687; and (f) Financing Statement recorded with the Maryland State Department Of Assessments And Taxation on December 29, 1998 as ID No. 39100000041551.

The obligations owed by TAMARAC to the LENDER with respect to the TAMARAC LOAN are secured by any remaining assets of TAMARAC as described in a Mortgage dated February 12, 1997 and recorded among the Mortgage Records of Kent County, Delaware at Book 340, Page 1, and the following Financing Statements recorded with the Delaware Secretary of State; (a) No. 19970006947 recorded on March 3, 1997; and (b) No. 19970020255 recorded on June 16, 1997.

The obligations owed by NANTICOKE MIDWEST to the LENDER in connection with the NANTICOKE MIDWEST LOANS are secured by all of the assets of NANTICOKE MIDWEST as evidenced by the following: (a) Loan And Security Agreement dated December 18, 1998; (b) Financing Statement recorded with the Indiana Secretary of State on January 13, 1999 as Instrument No. 2233573; and (c) Financing Statement recorded with the Delaware Secretary of State on December 24, 1998 as Instrument No. 199858402.

The obligations of payment and performance owed by JOHN & PEGGY to the LENDER pursuant to the JOHN & PEGGY GUARANTIES are secured by an Indemnity Deed Of Trust And Assignment Of Leases And Rents dated December 30, 2000 and recorded on January 12, 2001 among the Land Records of Talbot County, Maryland at Liber 0987, Folio 064.

The obligations of payment and performance owed by WILLIAM & CHARLENE to the LENDER pursuant to the WILLIAM & CHARLENE GUARANTIES are secured by an Indemnity Deed Of Trust And Assignment of Leases And Rents dated February 16, 2001 and recorded among the Land Records of Wicomico County, Maryland at Liber 1796, Folio 874.

The obligations of payment and performance owed by GREGORY to the LENDER pursuant to the GREGORY GUARANTIES is secured by: (a) a Limited Recourse Indemnity Mortgage And Security Agreement dated November 29, 2001 and recorded on December 6, 2001 among the Land Records of Hamilton County, Indiana; (b) a Non-Recourse Indemnity Mortgage And Security Agreement dated November 29, 2001 from Caring Communities Of Indiana, LLC and recorded on December 5, 2001 among the Land Records of Marion County, Indiana; (c) a pledge of GREGORY'S equity interests in Caring Communities Of Indiana, LLC; and (d) a security interest in any tax refunds due to GREGORY, individually or jointly with Lacey Mervine.

D:\jms\18886\MervineAgt.doc                                    -4-

The LENDER holds the following judgments (collectively "JUDGMENTS"): (a) judgment by confession against MCKY & JAN and WILLIAM & CHARLENE in the Circuit Court for Baltimore County, Maryland (Case No. 03-C-00-010014 Civil), in the amount of Eight Hundred Three Thousand Nine Hundred Sixty-Four Dollars And Eleven Cents ($803,964.11), plus post-judgment interest and costs; and (b) judgment against GREGORY in the United States District Court for the District of Maryland (Civil Action No. MJG-00-2884), in the amount of Eight Hundred Thirty-eight Thousand Four Hundred Forty-One Dollars and Twenty-Six Cents ($838,441.26), plus post-judgment interest and costs.

<p style="text-align:center">The Forbearance Agreements And<br>The Demands For Payment</p>

The PARTIES (other than GREGORY) entered into the following agreements (collectively, "FORBEARANCE AGREEMENTS") in which the OBLIGORS acknowledged the defaults of the OBLIGORS of the obligations owed by the OBLIGORS to the LENDER to repay and perform the LOANS and the GUARANTIES and in which the LENDER agreed to forbear from immediately enforcing its default remedies: (a) Forbearance Agreement dated March 21, 2000, as amended by a Supplemental Agreement dated June 7, 2000; (b) a Second Forbearance Agreement dated July 27, 2000; (c) a Third Forbearance Agreement dated to be effective as of December 31, 2000; and (d) a Fourth Forbearance Agreement dated as of August 2001. Pursuant to the FORBEARANCE AGREEMENTS, the OBLIGORS acknowledged their obligations to the LENDER, waived any defenses thereto, guaranteed various payments, agreed to pledge assets to the LENDER as collateral in consideration of the LENDER'S agreements to forbear, and granted releases to the LENDER. Although GREGORY did not enter into the FORBEARANCE AGREEMENTS, GREGORY agreed in a Settlement And Joinder Agreement dated November 30, 2001 to be bound by the terms and conditions of the FORBEARANCE AGREEMENTS.

The last forbearance period granted by the LENDER expired by its terms on October 31, 2001. The OBLIGORS did not cure the existing defaults under the LOANS and GUARANTIES and subsequent new defaults by the OBLIGORS occurred which respect to the LOANS and the GUARANTIES. By letter agreement dated January 23, 2002, the LENDER agreed to provide on a discretionary basis limited additional advances to NANTICOKE under the NANTICOKE REVOLVER. In such letter agreement, NANTICOKE agreed to provide and comply with a weekly budget. NANTICOKE also granted the LENDER a release of all claims. NANTICOKE did not comply with the first weekly budget submitted by NANTICOKE under such letter agreement.

By letters dated February 6, 2002 ("DEMAND DATE"), the LENDER demanded payment of the LOANS (other than the NANTICOKE MIDWEST LOANS). NANTICOKE, SHAWNEE, SHAWNEE MIDWEST, and TAMARAC have ceased their business operations and have commenced liquidating their assets.

The documents evidencing or securing the LOANS or the GUARANTIES, including without limitation all promissory notes, loan agreements, security agreements, pledges, financing statements, guaranty agreements (including the GUARANTIES), the FORBEARANCE AGREEMENTS, the above-described Settlement and Joinder Agreement, and other writings, as amended or modified, are collectively referred to herein as the "LOAN DOCUMENTS," and all assets of the OBLIGORS that have been pledged to the LENDER to secure the repayment of the LOANS or the GUARANTIES and all other collateral and properties pledged to secure the repayment of the LOANS or the GUARANTIES are collectively referred to herein as the "COLLATERAL." All duties and obligations of payment and performance owed by the OBLIGORS to the LENDER with respect to the LOANS, the GUARANTIES, the LOAN DOCUMENTS, and the

A00237

COLLATERAL, including without limitation the obligation to pay all principal, accrued interest, accrued late charges and expenses, are collectively referred to as the "OBLIGATIONS."

NOW, THEREFORE, in consideration of these premises, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the PARTIES hereby agree as follows:

Section 1.    Acknowledgment Of Obligations And Events Of Defaults. The OBLIGORS acknowledge that: (a) each factual statement set forth above as a Recital to this AGREEMENT is true, accurate and complete; (b) each of the LOAN DOCUMENTS is the valid and binding obligation of the OBLIGORS which are parties thereto, and is fully enforceable in accordance with all stated terms; (c) the duties of the OBLIGORS to pay and perform their respective obligations to the LENDER in accordance with the LOAN DOCUMENTS are not subject to any set-offs, defenses or counterclaims; and (d) the OBLIGORS are in default of their respective obligations to repay the LOANS and the GUARANTIES. EACH OBLIGOR HEREBY UNCONDITIONALLY REAFFIRMS AND RATIFIES ALL OBLIGATIONS OWED TO THE LENDER IN ACCORDANCE WITH THE TERMS OF THE LOAN DOCUMENTS, INCLUDING BUT NOT LIMITED TO ALL OBLIGATIONS OWED PURSUANT TO THE TERMS OF THE GUARANTIES AND ALL OTHER AGREEMENTS, AND ALL LIENS, PLEDGES AND SECURITY INTERESTS PREVIOUSLY GRANTED BY ANY OF THE OBLIGORS TO THE LENDER, AND ALL RELEASES AND WAIVERS SET FORTH IN THE LOAN DOCUMENTS.

Section 2.    Acknowledgment Of Aggregate Unpaid Balance Of The Obligations. The OBLIGORS acknowledge and agree that the total aggregate amount of unpaid and outstanding OBLIGATIONS consisting of principal, interest, late charges and expenses as of February 19, 2002 is Nine Million Eight Hundred Seventy Thousand Eight Hundred Ninety-Eight Dollars and Twenty-Eight Cents ($9,870,898.28).

Section 3.    Liquidation Of Collateral. The OBLIGORS agree to engage in the prompt and orderly liquidation of the COLLATERAL owned by the COMPANIES in order to maximize the sums realized therefrom in a cost effective and efficient manner.

Section 4.    Obligations Owed By "Stone Harbor," "Courts," And "Cove" To Nanticoke. MCKY agrees to take such actions as may be required to cause Stone Harbor, LLC ("STONE HARBOR"), The Courts of Greenwood, LLC ("COURTS"), and The Cove, LLC ("COVE") to acknowledge and agree to pay their respective indebtedness to NANTICOKE (collectively, "CUSTOMER INDEBTEDNESS") and to execute and deliver such documents within twenty (20) business days hereof as may be required to accomplish the following:

Section 4.1.    Stone Harbor.    STONE HARBOR shall execute and deliver such documents as may be required for STONE HARBOR to: (a) acknowledge that STONE HARBOR is indebted to NANTICOKE in the amount of One Million Dollars ($1,000,000.00) ("STONE HARBOR DEBT"); (b) agree to make the following payments upon the STONE HARBOR DEBT (i) pay the sum of One Hundred Twenty-Five Thousand Dollars ($125,000.00) for each of the two (2) undelivered homes ordered by STONE HARBOR, payable upon the release thereof from NANTICOKE'S plant, with the costs of delivery to be paid by STONE HARBOR, (ii) pay the sum of Seventy-Five Thousand Dollars ($75,000.00) each upon the sale of each of the ten (10) lots and housing units thereon of STONE HARBOR upon which NANTICOKE housing units are presently set, and (iii) upon the completion of the project of STONE HARBOR, pay all excess cash flow of STONE HARBOR upon the STONE HARBOR DEBT; (c) agree to not pay distributions or salaries to MCKY or to any related parties owned, controlled by or related to MCKY until the satisfaction of the STONE HARBOR DEBT; (d) grant NANTICOKE and the LENDER a mortgage lien and security

A00238

interest upon the property of STONE HARBOR to secure the STONE HARBOR DEBT, subordinate in lien priority and rights of enforcement to Wilmington Trust Company ("WILMINGTON TRUST") and subject to the terms of an intercreditor agreement between WILMINGTON TRUST and the LENDER satisfactory to the LENDER; (e) agree to provide the LENDER with copies of all settlement statements for the sale by STONE HARBOR of each of its lots contemporaneously with each sale; and (f) agree to provide the LENDER with copies of STONE HARBOR'S monthly check registers and reconciliations and contemporaneous copies of all prepared financial statements and federal income tax returns.

        Section 4.2.   Courts.  COURTS shall execute and deliver such documents as may be required to: (a) acknowledge that COURTS is indebted to NANTICOKE in the amount of Nine Hundred Six Thousand Nine Hundred Twenty Dollars ($906,920.00) ("COURTS DEBT"); and (b) grant NANTICOKE and the LENDER a mortgage lien and security interest upon the property of COURTS to secure the COURTS DEBT, subordinate in lien priority and rights of enforcement to the Delaware Community Investment Corporation ("DCIC"); and (c) pay to the LENDER all of its "MONTHLY CASH FLOW" (net income plus interest and depreciation minus any first mortgage payments) for application to the COURTS DEBT.

        Section 4.3.   Cove.  COVE shall execute and deliver such documents as may be required to: (a) acknowledge that COVE is indebted to NANTICOKE in the amount of Sixty-One Thousand Nine Hundred Dollars ($61,900.00) ("COVE DEBT"); (b) grant NANTICOKE and the LENDER a mortgage lien and security interest upon the property of COVE to secure the COVE DEBT, subordinate in lien priority and rights of enforcement to WILMINGTON TRUST and subject to the terms of an intercreditor agreement between WILMINGTON TRUST and the LENDER; and (c) pay to the LENDER all of its MONTHLY CASH FLOW for application to the COVE DEBT.

        Section 5.   Additional Security.  MCKY further agrees to take such actions as may be required to obtain the following additional security ("ADDITIONAL SECURITY") within twenty (20) business days hereof: (a) guaranties of the LOANS from STONE HARBOR, COURTS and COVE secured by mortgage liens and security interests against their respective real and personal assets, subordinate in lien priority and right of enforcement to any existing liens of WILMINGTON TRUST and subject to the terms of intercreditor agreements between WILMINGTON TRUST and the LENDER; (b) the agreement of COURTS and COVE to immediately list their respective real properties and assets for sale; and (c) the agreement of COURTS and COVE to provide the LENDER with monthly financial statements within twenty (20) days after the end of each month and contemporaneous copies of all annual federal income tax returns.

        Section 6.   Escrow Account.  The PARTIES agree that all proceeds received from the ADDITIONAL SECURITY shall be applied first to the repayment of the CUSTOMER INDEBTEDNESS and secondly shall be paid into a non-interest bearing escrow account ("ESCROW ACCOUNT") held by the LENDER as additional COLLATERAL for the OBLIGATIONS. All proceeds received from the liquidation of the real property of SHAWNEE MIDWEST shall be applied first to the repayment of the SHAWNEE MIDWEST LOAN and secondly paid into the ESCROW ACCOUNT as additional COLLATERAL for the OBLIGATIONS. If the TERMINATION AMOUNT has been timely paid and no TERMINATION EVENT has occurred, the LENDER shall release the sums held in the ESCROW ACCOUNT to the entity originally contributing such sums. Upon the occurrence of a TERMINATION EVENT, or to the extent that the TERMINATION AMOUNT has not been satisfied during the COMPROMISE PERIOD, the LENDER shall be authorized to apply the funds in the ESCROW ACCOUNT to the repayment of the OBLIGATIONS.

        Section 7.   Additional Collateral For Mcky & Jan Guaranties.  MCKY & JAN agree to further secure their obligations under the MCKY & JAN GUARANTIES by delivering within twenty

D:\Jms\18886\MervineAgt.doc        -7-

(20) business days hereof such documents as may be required to: (a) pledge to the LENDER all of MCKY'S ownership interests in STONE HARBOR, COURTS and COVE to secure the MCKY & JAN GUARANTIES; and (b) grant to the LENDER an indemnity mortgage upon their residence to secure the MCKY & JAN GUARANTIES, subordinate to the liens of WILMINGTON TRUST. MCKY agrees to expand the present assignment of the "Fleischman Deed of Trust" to also secure the OBLIGATIONS, junior in priority to the present assignment with respect to the Salisbury Developers, Inc. Indebtedness ("Salisbury Debt").

Section 8.    Forbearance Against Individual Guarantors. The LENDER agrees to forbear from enforcing the GUARANTIES of the INDIVIDUAL GUARANTORS and the JUDGMENTS against the INDIVIDUAL GUARANTORS and the COLLATERAL owned by the INDIVIDUAL GUARANTORS which secures the GUARANTIES of the INDIVIDUAL GUARANTORS and to forbear from executing upon the existing judgment ("SALISBURY JUDGMENT") held by the LENDER against MCKY & JAN for the Salisbury Developers, Inc. Indebtedness until that date ("TERMINATION DATE") which is the earlier of: (a) August 1, 2003; or (b) the date of the occurrence of any "TERMINATION EVENT" (hereinafter defined). The LENDER agrees to forbear from enforcing against STONE HARBOR, COVE and COURTS the guaranties and mortgages to be granted by STONE HARBOR, COVE, and COURTS for the benefit of the LENDER provided that such entities: (A) execute and deliver each of the agreements and documents required above in Sections 4 and 5 of this AGREEMENT; (B) take the actions required by such agreements and documents and comply with all stated terms of such agreements and documents, and make when due the payments required by Sections 4 and 5 of this AGREEMENT; and (C) promptly list their respective assets for sale and diligently market such assets in a manner calculated to promptly liquidate such assets.

: Section 9.    Agreement Of Lender To Compromise Obligations. The LENDER agrees to compromise the amount of the OBLIGATIONS payable to LENDER and to terminate the LENDER'S liens against the COLLATERAL which secure the OBLIGATIONS and to terminate the JUDGMENTS (but not the SALISBURY JUDGMENT) and to release the OBLIGORS from further liability to pay any remaining unpaid OBLIGATIONS upon the satisfaction of all of the following conditions (collectively, "COMPROMISE CONDITIONS"): (a) the LENDER shall have received absolute, irrevocable and non-avoidable payments curtailing the unpaid balance of the OBLIGATIONS during the period of time ("COMPROMISE PERIOD") beginning on the DEMAND DATE and ending on August 1, 2003, in an aggregate net sum ("TERMINATION AMOUNT") of Seven Million Three Hundred Thousand Dollars ($7,300,000.00) plus all expenses and costs incurred by the LENDER after the DEMAND DATE arising or relating to the OBLIGATIONS or the liquidation of the COLLATERAL or the enforcement of the LOAN DOCUMENTS or any insolvency or bankruptcy proceedings involving any of the OBLIGORS or any proceedings, investigations or the like brought against the LENDER relating to the OBLIGATIONS or the administration of the LOANS, including attorneys' fees and liquidation costs, and plus all sums advanced, readvanced, or loaned by the LENDER to or for the accounts of any of the OBLIGORS after the DEMAND DATE, including any loan advances (and interest thereon) to NANTICOKE as a Chapter 11 debtor pursuant to 11. U.S.C. § 364 or otherwise, plus the amount of any payments received before or during the COMPROMISE PERIOD by the LENDER upon any of the OBLIGATIONS which the LENDER is required by court order or by the operation of law to disgorge or return, or which are otherwise avoided or set aside; (b) with respect to the compromise of the OBLIGATIONS payable by NANTICOKE (including all NANTICOKE LOANS and NANTICOKE GUARANTIES) and the termination of the LENDER'S liens against COLLATERAL owned by NANTICOKE, no NANTICOKE TERMINATION EVENTS shall have occurred (c) with respect to the compromise of the amounts of OBLIGATIONS payable by the OBLIGORS other than NANTICOKE and the termination of the LENDER'S liens against COLLATERAL owned by OBLIGORS other than NANTICOKE, no TERMINATION EVENTS shall have occurred; (d) all OBLIGORS shall have delivered releases

("FINAL RELEASES") to the LENDER in form and substance as set forth below in Section 20 of this AGREEMENT effective through and including the date of the compromise and release of the remaining balance of the OBLIGATIONS and the termination of the LENDER'S liens; (e) this AGREEMENT and the duties and obligations of the OBLIGORS hereunder (including the obligation to provide the FINAL RELEASES) shall have been approved, confirmed and ratified by any court having jurisdiction over any of the OBLIGORS in any insolvency proceedings involving any of the OBLIGORS, including without limitation, any United States Bankruptcy Court, and such approval shall include a final, unconditional and absolute release in any such insolvency proceedings of all claims by the debtor or insolvency estate or any trustee or committee against the LENDER, including without limitation the release of any claims to avoid any payments received by the LENDER upon the OBLIGATIONS; and (f) there are no pending proceedings against the LENDER for the avoidance or return of any payments previously paid to the LENDER upon the OBLIGATIONS. The PARTIES agree that the LENDER shall have no obligation to compromise the OBLIGATIONS or to terminate the JUDGMENTS or to terminate the liens of the LENDER in and to the COLLATERAL and to release the remaining claims of the LENDER against the OBLIGORS unless each of the COMPROMISE CONDITIONS has been timely and irrevocably satisfied. For purposes of calculating the TERMINATION AMOUNT, interest accruing upon the LOANS after the DEMAND DATE shall not be deemed to be an expense or cost or otherwise be included in the TERMINATION AMOUNT.

Section 10.   Nanticoke Termination Events.   The PARTIES agree that each of the following events or occurrences shall constitute a "NANTICOKE TERMINATION EVENT": (a) a failure by NANTICOKE or any bankruptcy estate of NANTICOKE to comply with the stated terms, conditions, and requirements of this AGREEMENT or any rejection of this AGREEMENT, in whole or in part, in any insolvency or bankruptcy proceedings pertaining to NANTICOKE; (b) the conversion of any Chapter 11 bankruptcy proceeding of NANTICOKE to a Chapter 7 proceeding; (c) the appointment of a trustee or receiver for NANTICOKE or NANTICOKE'S assets in any bankruptcy or insolvency proceeding; (d) the dispute by NANTICOKE, or by any insolvency estate or trustee of NANTICOKE, of the enforceability of any provisions of this AGREEMENT or of any of the LOAN DOCUMENTS in accordance with all stated terms or of the perfection or priority of any liens of the LENDER in or to any of the COLLATERAL; (e) the initiation by NANTICOKE or by any insolvency estate of NANTICOKE of any action to set aside or avoid any lien, release or payment granted or made by NANTICOKE or any of the OBLIGORS to the LENDER; (f) the occurrence of any events or defaults under any financing agreement between the LENDER and NANTICOKE in accordance with debtor-in-possession financing provided by the LENDER to NANTICOKE; (g) the occurrence of any defaults by NANTICOKE under any agreements between NANTICOKE and the LENDER authorizing the use by NANTICOKE of any "CASH COLLATERAL" (as hereinafter defined) or other proceeds of the COLLATERAL; (h) the granting of any liens or security interests against any of the COLLATERAL by NANTICOKE, or any insolvency estate of NANTICOKE, in favor of any secured creditor other than the LENDER, including without limitation the granting to any creditor of NANTICOKE other than the LENDER of any liens against any of the COLLATERAL pursuant to 11 U.S.C. § 364; (i) the failure of all of the COMPROMISE CONDITIONS to be satisfied within the COMPROMISE PERIOD, including without limitation the obtaining of all court orders and approvals which constitute COMPROMISE CONDITIONS; or (j) the initiation of any litigation by NANTICOKE or on behalf of any insolvency estate or trustee of NANTICOKE against the LENDER or any of the officers, directors or representatives of the LENDER.

Section 11.   Termination Events.   The PARTIES agree that each of the following events or occurrences shall constitute a "TERMINATION EVENT": (a) the occurrence of a NANTICOKE TERMINATION EVENT; (b) a failure by any of the OBLIGORS to comply with the stated terms, conditions, and requirements of this AGREEMENT; (c) the dispute by any OBLIGOR, or by any insolvency estate or trustee of any OBLIGOR, of the enforceability of any of the LOAN

D:\jms\18886\MervineAgt.doc                    -9-

DOCUMENTS in accordance with all stated terms or of the perfection or priority of any liens of the LENDER in or to any of the COLLATERAL; (d) the initiation by any OBLIGOR or by any insolvency estate or trustee of any OBLIGOR of any action to set aside or avoid any lien, release or payment granted or made by any of the OBLIGORS to the LENDER; (e) the institution of any voluntary or involuntary insolvency or bankruptcy proceedings against any of the INDIVIDUAL GUARANTORS within one hundred eighty (180) days after the date of the execution of this AGREEMENT by such INDIVIDUAL GUARANTORS; (f) the occurrence of any defaults under any financing agreement between the LENDER and any of the OBLIGORS in accordance with financing provided by the LENDER to such OBLIGOR pursuant to 11 U.S.C. §§ 364(c) and 364(d); (g) the granting of any liens or security interests against any of the COLLATERAL by any of the OBLIGORS, or any insolvency estate or trustee of any OBLIGOR, in favor of any secured creditor other than the LENDER, including without limitation the granting to any creditor of the OBLIGORS other than the LENDER of any liens against any of the COLLATERAL pursuant to 11 U.S.C. § 364; (h) the failure of all of the COMPROMISE CONDITIONS to be satisfied within the COMPROMISE PERIOD, including without limitation the obtaining of all court orders and approvals which constitute COMPROMISE CONDITIONS; (i) the initiation of any litigation by any of the OBLIGORS or on behalf of any insolvency estate or trustee of any OBLIGOR against the LENDER or any of the officers, directors or representatives of the LENDER or the participation or encouragement by any of the OBLIGORS of any litigation brought by any other person or entity against the LENDER; or (j) the failure of STONE HARBOR, COURTS or COVE to perform and comply with the requirements set forth in Sections 4 and 5 of this AGREEMENT or the terms of any of the guaranties or mortgages to be delivered in accordance with Sections 4 and 5 of this AGREEMENT. The institution of any voluntary or involuntary insolvency or bankruptcy proceeding against an INDIVIDUAL GUARANTOR after one hundred eighty (180) days from the date of this AGREEMENT shall constitute a TERMINATION EVENT with respect to that INDIVIDUAL GUARANTOR but not as to any of the other OBLIGORS.

   Section 12.    Limited Use Of Cash Collateral. The LENDER agrees to permit the limited use of cash proceeds ("CASH COLLATERAL") of the COLLATERAL during the Chapter 11 proceedings of NANTICOKE, provided that: (a) NANTICOKE and the LENDER mutually agree on the terms of an appropriate agreement ("CASH COLLATERAL AGREEMENT") governing the use of CASH COLLATERAL by NANTICOKE as a Chapter 11 debtor-in-possession; (b) the CASH COLLATERAL AGREEMENT is approved by the Court on terms acceptable to the LENDER or the LENDER consents in writing to such use; (c) the maximum amount of CASH COLLATERAL to be used by NANTICOKE shall not exceed Fifty Thousand Dollars ($50,000.00) each month, of which amount Twenty-Eight Thousand Dollars ($28,000.00) may be expended on salaries with the remainder to be used for other expenses; (d) the amount of CASH COLLATERAL which NANTICOKE shall be permitted to use shall not exceed Three Hundred Thousand Dollars ($300,000.00) in total aggregate amount unless the OBLIGATIONS have been permanently reduced by not less than Three Million Five Hundred Thousand Dollars ($3,500,000.00), and upon such permanent reduction, in the absence of any defaults under the CASH COLLATERAL AGREEMENT, NANTICOKE may use CASH COLLATERAL in an additional aggregate amount of up to Two Hundred Thousand Dollars ($200,000.00) until the OBLIGATIONS have been permanently reduced by not less than the total aggregate sum of Six Million Two Hundred Thousand Dollars ($6,200,000.00), and upon such additional permanent reduction and in the absence of any defaults under the CASH COLLATERAL AGREEMENT, NANTICOKE may use CASH COLLATERAL in an additional aggregate amount of up to one Hundred Thousand Dollars ($100,000.00); (e) the rights of NANTICOKE to the use of CASH COLLATERAL shall terminate immediately upon the occurrence of a NANTICOKE TERMINATION EVENT or a default under the CASH COLLATERAL AGREEMENT; and (f) the term of the CASH COLLATERAL AGREEMENT shall terminate on the TERMINATION DATE. The CASH COLLATERAL AGREEMENT shall provide that under all

A00242

circumstances the maximum aggregate amount of CASH COLLATERAL to be used by NANTICOKE shall not exceed Six Hundred Thousand Dollars ($600,000.00).

Section 13.     Preservation Of Existing Defaults.  The PARTIES acknowledge that the LENDER is not waiving or excusing the existing defaults of the OBLIGORS, or any other subsequently occurring defaults and that such defaults and the resulting rights and remedies to which the LENDER is entitled, are by the agreement of the PARTIES specifically preserved.

Section 14.     Further Assurances.  The OBLIGORS each agree to execute and deliver to the LENDER such other and further documents as may, from time to time, be reasonably requested by the LENDER in order to execute or enforce the terms and conditions of this AGREEMENT.

Section 15.     No Novation; No Impairment.  It is the intent of the PARTIES that nothing contained in this AGREEMENT shall be deemed to effect or accomplish or otherwise constitute a novation of any of the OBLIGATIONS or of any of the LOAN DOCUMENTS. Except as expressly set forth above, nothing contained herein is intended to extinguish, terminate or impair any of the OBLIGATIONS owed by any of the OBLIGORS to the LENDER.

Section 16.     Enforceability.  This AGREEMENT shall inure to the benefit of and be enforceable against each of the PARTIES and their respective successors and assigns.

Section 17.     Choice Of Law; Consent To Jurisdiction; Agreement As To Venue.  This AGREEMENT shall be construed, performed and enforced and its validity and enforceability determined in accordance with the laws of the State of Maryland (excluding, however, conflict of laws principles). Each of the OBLIGORS consents to the jurisdiction of the courts of the State of Maryland and the jurisdiction of the United States District Court for the District of Maryland, if a basis for federal jurisdiction exists. Each of the OBLIGORS waives any right to object to the maintenance of a suit in any of the state or federal courts of the State of Maryland on the basis of improper venue or inconvenience of forum.

Section 18.     Amendment.  The LENDER shall not be bound by any amendment to this AGREEMENT unless the LENDER executes such amendment.

Section 19.     Waiver.  No failure or delay by the LENDER in the exercise or enforcement of any of its rights under any LOAN DOCUMENT shall be a waiver of such right or remedy nor shall a single or partial exercise or enforcement thereof preclude any other or further exercise or enforcement thereof or the exercise or enforcement of an other right or remedy. The LENDER may at any time or from time to time waive all or any rights under this AGREEMENT or the other LOAN DOCUMENTS, but any such waiver must be specific and in writing and no such waiver shall constitute, unless. specifically so expressed by the LENDER in writing, a future waiver of performance or exact performance by the OBLIGORS. No notice to or demand upon any OBLIGOR in any instance shall entitle any OBLIGOR to any other or further notice or demand in the same, similar or other circumstance.

Section 20.     RELEASE.  IN ORDER TO INDUCE THE LENDER TO ENTER INTO THIS AGREEMENT, EACH OF THE OBLIGORS FOREVER RELEASES AND DISCHARGES THE LENDER AND THE LENDER'S OFFICERS, DIRECTORS, EMPLOYEES, ATTORNEYS, AND AGENTS (COLLECTIVELY, THE "RELEASED PARTIES") FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, SUITS AND DAMAGES (INCLUDING CLAIMS FOR ATTORNEYS' FEES AND COSTS) WHICH ANY OF THE OBLIGORS, JOINTLY OR SEVERALLY, EVER HAD OR MAY NOW HAVE OF ANY KIND OR NATURE AGAINST ANY OF THE RELEASED PARTIES ARISING OUT OF OR RELATED IN ANY WAY TO ANY OF THE LOANS, THE LOAN DOCUMENTS, THE

A00243

OBLIGATIONS OR THE COLLATERAL OR THE ADMINISTRATION THEREOF OR THIS AGREEMENT, WHETHER KNOWN OR UNKNOWN, INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS BASED UPON OR RELYING ON ANY ALLEGATIONS OR ASSERTIONS OF DURESS, ILLEGALITY, UNCONSCIONABILITY, BAD FAITH, BREACH OF CONTRACT, REGULATORY VIOLATIONS, IMPROPER CONTROL OF THE COMPANIES OR THEIR AFFAIRS, NEGLIGENCE, MISCONDUCT, OR ANY OTHER TORT, CONTRACT OR REGULATORY CLAIM OF ANY KIND OR NATURE. THIS RELEASE IS INTENDED TO BE FINAL, IRREVOCABLE AND IMMEDIATE AND IS NOT SUBJECT TO THE SATISFACTION OF ANY CONDITIONS OF ANY KIND.

Section 21.    Waiver Of Jury Trial.    Each of the PARTIES agrees that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by any PARTY, or any successor or assign of any PARTY, on or with respect to this AGREEMENT, the LOANS (or the administration thereof), the OBLIGATIONS, or any of the LOAN DOCUMENTS, or which in any way relates, directly or indirectly, to the obligations of any PARTY to any other PARTY, or the dealings of the PARTIES with respect thereto, shall be tried by a court and not by a jury. EACH OF THE PARTIES HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING.

IN WITNESS WHEREOF, the PARTIES have executed this AGREEMENT with the specific intention of creating a document under seal to be effective as of the above stated effective date of this AGREEMENT. This AGREEMENT may be executed and delivered in counterparts. Executed counterparts of this AGREEMENT may be delivered via facsimile. This AGREEMENT shall be enforceable against and binding upon each OBLIGOR that executes this AGREEMENT even if all indicated OBLIGORS fail to execute and deliver this AGREEMENT.

WITNESS:                                OBLIGORS:

                                        NANTICOKE HOMES, INC.,
                                        A Delaware Corporation

_____    By:    _____(SEAL)
                                        Name: _____
                                        Title: _____
                                        Date:  February ____, 2002

                                        SHAWNEE HOMES, INC.,
                                        A Delaware Corporation

_____    By:    _____(SEAL)
                                        Name: _____
                                        Title: _____
                                        Date:  February ____, 2002

[SIGNATURES CONTINUED ON THE FOLLOWING PAGE]

A00244

02-25-2002  18:26    From-G,F,& M, PA                    +3026521142        T-879  P.015/037  F-740

IN WITNESS WHEREOF, the PARTIES have executed this AGREEMENT with the specific intention of creating a document under seal to be effective as of the above stated effective date of this AGREEMENT. This AGREEMENT may be executed and delivered in counterparts. Executed counterparts of this AGREEMENT may be delivered via facsimile. This AGREEMENT shall be enforceable against and binding upon each OBLIGOR that executes this AGREEMENT even if all indicated OBLIGORS fail to execute and deliver this AGREEMENT.

WITNESS:                              OBLIGORS:

                                     NANTICOKE HOMES, INC.,
                                     A Delaware Corporation

                                     By:                              (SEAL)
                                          Name:
                                          Title:
                                          Date:  February ____, 2002

                                     SHAWNEE HOMES, INC.,
                                     A Delaware Corporation

                                     By:                              (SEAL)
                                          Name:
                                          Title:
                                          Date:  February ____, 2002

                                     SHAWNEE ENTERPRISES MIDWEST, L.L.C.,
                                     A Delaware Limited Liability Company


                                     By:                              (SEAL)
                                          Name:
                                          Title:
                                          Date:  February ____, 2002


                                     TAMARAC, INC.,
                                     A Delaware Corporation


                                     By:                              (SEAL)
                                          Name:

                                          -14-

H:\LAB\Mervine.JM\MervineAgt.doc

A00245

02-25-2002    16:26    From-G,F,& M. PA                    4302652114Z        T-870 ' P.016/027    F-748

Title:
Date: February _____, 2002

-16-

H:\LAW\Mervine-JM\MervineAgt.doc

A00246

02-25-2002  18:37    From-G.F.& H. PA                +302852114?        T-870   P.017/037   F-749

WITNESS:                                    OBLIGORS (Continued):

                                            PAWNEE HOMES, INC.
                                            A Delaware Corporation

                                            By:                              (SEAL)
                                                Name:
                                                Title:
                                                Date:  February ___, 2002

                                                                             (SEAL)

                                            JOHN M. MERVINE, SR.
                                            Date:  February ___, 2002

                                                                             (SEAL)

                                            PEGGY R. MERVINE
                                            Date:  February ___, 2002

                                                                             (SEAL)

                                            JOHN M. MERVINE, JR.
                                            Date:  February ___, 2002

                                                                             (SEAL)

                                            JAN L. MERVINE
                                            Date:  February ___, 2002

                                                                             (SEAL)

                                            WILLIAM H. MERVINE, III
                                            Date:  February ___, 2002

                                                                             (SEAL)

                                            CHARLENE MERVINE
                                            Date:  February ___, 2002

                                                                             (SEAL)

                                            GREGORY O. MERVINE

                                            -16-

H:\LAW\Mervine,J\MervineAgt.doc

02-27-2002  14:30    From-G,F,& M, PA                    +3026821142        T-809  P.036/037  F-816

WITNESS:                          OBLIGORS (Continued):


                                                                    (SEAL)
                                  JOHN M. MERVINE, JR.
                                  Date:  February ___, 2002


                                                                    (SEAL)
                                  JAN L. MERVINE
                                  Date:  February ___, 2002

                                                                    (SEAL)
                                  WILLIAM H. MERVINE, III
                                  Date:  February 26, 2002



                                                                    (SEAL)
                                  CHARLENE MERVINE
                                  Date:  February ___, 2002



                                                                    (SEAL)
                                  GREGORY O. MERVINE
                                  Date:  February ___, 2002



                                  LENDER:

                                  MERCANTILE-SAFE DEPOSIT AND
                                    TRUST COMPANY



                                  By:                               (SEAL)
                                        Scott H. Krieger,
                                        Senior Vice President

                                        Date:  February ___, 2002


                                        -17-

H:\LABV\Mervine.JAM\mil\022702\MERVINE.AGT-CMP.DOC

02/27/2002 WED 13:22 FAX 302 349 4818 CDH 019/038

02-27-2002 11:24 From-S,F,& W, PA +3026521142 T-882 P.018/037 F-005

To: Steve & Murray

WITNESS:

OBLIGORS (Continued):

JOHN M. MERVINE, JR. (SEAL)
Date: February ___, 2002

JAN L. MERVINE (SEAL)
Date: February ___, 2002

WILLIAM H. MERVINE, III (SEAL)
Date: February ___, 2002

CHARLENE MERVINE (SEAL)
Date: February ___, 2002

GREGORY O. MERVINE (SEAL)
Date: February 22, 2002

LENDER:

MERCANTILE-SAFE DEPOSIT AND TRUST COMPANY

By: (SEAL)
Scott H. Krieger,
Senior Vice President

Date: February ___, 2002

-17-

H:\LA\Mervine.MMB\0022702\Mervine.doc

302-652-1142
302-455-4210

A00249

WITNESS:                            OBLIGORS (Continued):

_____            _____(SEAL)
                                   JOHN M. MERVINE, JR.
                                   Date:  February ___, 2002

_____            _____(SEAL)
                                   JAN L. MERVINE
                                   Date:  February ___, 2002

_____            _____(SEAL)
                                   WILLIAM H. MERVINE, III
                                   Date:  February ___, 2002

_____            _____(SEAL)
                                   CHARLENE MERVINE
                                   Date:  February ___, 2002

_____            _____(SEAL)
                                   GREGORY O. MERVINE
                                   Date:  February ___, 2002


                                   LENDER:

                                   MERCANTILE-SAFE DEPOSIT AND
                                     TRUST COMPANY


                                   By: _____(SEAL)
                                   Scott H. Krieger,
                                   Senior Vice President

                                       Date:  February 27, 2002


D:\jms\18886\MervineAgt.doc              -14-

A00250

# EXHIBIT
# B

**ORIGINAL**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                    :

NANTICOKE HOMES, INC.                     :    Case No.: 02-10651 (PJW)

                                          :    Chapter 11

         Debtor.                          :    *related docket # 11*

CONSENT ORDER APPROVING INTERIM AGREEMENT
FOR USE OF CASH COLLATERAL AND ADEQUATE PROTECTION

Upon consideration of the Motion For The Entry Of A Consent Order Approving Interim

Agreement For Use Of Cash Collateral And Adequate Protection ("Motion") filed herein by the

Debtor, Nanticoke Homes, Inc. ("Debtor") and Mercantile-Safe Deposit And Trust Company

("Bank"), and it appearing that the Bank and the Debtor have agreed to the terms and conditions

of this Consent Order ("Consent Order") and the Interim Agreement For Use Of Cash Collateral

And Adequate Protection to be approved hereby ("Agreement"), and it further appearing that

Notice of the Motion, Agreement and all related papers has been served upon all parties entitled

to such notice pursuant to Rule 4001(b) of the Federal Rules of Bankruptcy Procedure and

otherwise, and it further appearing that the Official Committee of Unsecured Creditors (the

"Committee") also consents to the entry of this Order and it further appearing that good cause

exists for entering this Consent Order approving the Agreement, it is, therefore,

ORDERED, this _____ day of April, 2002, by the United States Bankruptcy Court for the

District of Delaware, as follows:

      1.      Except as modified in this Consent Order, the Agreement, a copy of which

is attached hereto as Exhibit "A" and incorporated herein by reference, and the Debtor's

execution of the same is hereby approved;

2.    With the consent of the Debtor, the Bank and the Committee, the "Priority Expense Cap" amount (as defined in paragraph 20 of the Agreement) is hereby increased to $60,000 from $50,000.00;

3.    With the consent of the Debtor, the Debtor shall also provide to the Committee copies of all reports provided to the Bank pursuant to the Agreement;

4.    All liens, security interests and mortgage liens granted and confirmed to the Bank in the Agreement, and all payments to be made to the Bank pursuant to the Agreement, are hereby approved as if fully set forth in this Order, subject, however, to the rights of parties-in-interest (other than the Debtor) to raise objections or challenges to existing liens, security interests and mortgage liens securing the Bank during the "Lookback Period" (as defined in paragraph 1 of the Agreement) to the extent expressly set forth in the Agreement and also subject to the rights of parties-in-interest (other than the Debtor) to challenge the application of payments as set forth in paragraph 7 of the Agreement;

5.    The restrictions provided for in the Agreement on the assessment of administrative claims against the Bank or its collateral referenced in the Agreement, pursuant to 11 U.S.C. § 506(c), are hereby approved as if fully set forth in this Order; and

6.    *Subject to the section 726 priority,* the terms and conditions of this Consent Order shall be binding upon any trustee that may be subsequently appointed in the Debtor's bankruptcy case, whether under Chapter 11, Chapter 7 or any other Chapter of the United States Bankruptcy Code.

IT IS SO ORDERED.

*April 2, 2002*

HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE
FOR THE DISTRICT OF DELAWARE

2

A00253



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                 :

                   :     Case No.: 02-10651-PJW

NANTICOKE HOMES, INC.    :

                   :     (Chapter 11)

                   :

       Debtor.          :

### INTERIM AGREEMENT FOR USE OF
### CASH COLLATERAL AND ADEQUATE PROTECTION

WHEREAS, on March 1, 2002 (the "Petition Date"), Nanticoke Homes, Inc. (the "Debtor")

filed a Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code (the

"Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the

"Court"). Since that date, the Debtor has continued to operate its business as a Debtor-in-Possession.

WHEREAS, the Debtor was indebted to Mercantile-Safe Deposit And Trust Company

("Bank") on the Petition Date for the following secured loans and secured guaranties (collectively,

the "Pre-Petition Bank Indebtedness") in the aggregate unpaid balance of Ten Million Three Hundred

Forty-Eight Thousand Six Hundred Sixty-Five Dollars And Fifty-Two Cents ($10,348,665.52)

calculated as of and including February 28, 2002, consisting of the following: (a) a revolving line

of credit evidenced by a Fourth Amended And Restated Demand Promissory Note dated July 2001

in the originally stated principal amount of Six Million Dollars ($6,000,000.00) and having a present

unpaid balance of Four Million Seven Hundred Fifty-One Thousand Eight Hundred Eleven Dollars

And Two Cents ($4,751,811.02); (b) a term loan evidenced by a Term Loan Promissory Note dated

January 23, 1996 in the stated principal amount of Three Million Five Hundred Thousand Dollars

($3,500,000.00) and having a present unpaid balance of Two Million Three Hundred Nine Thousand

Eight Hundred Sixty Dollars And One Cent ($2,309,860.01); (c) Guaranty Agreements dated

January 23, 1996 and December 18, 1998 guarantying the obligations to the Bank of Shawnee

Homes, Inc. having an aggregate present unpaid balance of Seven Hundred Eighty Thousand One

Hundred Eighty-Four Dollars And Seventy-Four Cents ($780,184.74); (d) Guaranty Agreement

dated November 13, 1998 guarantying the obligations to the Bank of Shawnee Enterprises Midwest,

L.L.C. and having an aggregate present unpaid balance of One Million One Hundred Three

Thousand Six Hundred Sixty-Six Dollars And Sixteen Cents ($1,103,666.16); (e) Corporate

Guaranty Agreement dated February 12, 1997 guarantying the obligations to the Bank of Tamarac,

Inc. and having a present unpaid balance of Four Hundred Thirty-Nine Thousand Five Hundred

Fifteen Dollars And Ninety-Nine Cents ($439,515.99); and (f) Guaranty Agreement dated

December 18, 1998 guarantying the obligations to the Bank of Nanticoke Homes Midwest

Incorporated and having a present unpaid balance of Nine Hundred Sixty-Three Thousand Six

Hundred Twenty-Seven Dollars And Sixty Cents ($963,627.60).

WHEREAS, the Pre-Petition Bank Indebtedness is secured by validly perfected first priority

security interests, liens and mortgage liens (collectively, "Pre-Petition Bank Liens") granted to and

held by the Bank in and to substantially all of the real and personal assets (collectively, "Pre-Petition

Collateral") of the Debtor, as such Pre-Petition Collateral is more fully described and evidenced by,

*inter alia*, the following: (a) Loan And Security Agreement dated January 23, 1996, as amended; (b)

Mortgage dated January 23, 1996 recorded among the Land Records of Kent County, Delaware in

Mortgage Book 220, page 292, as amended by First Amendment To Mortgage dated January 8, 1999

recorded among the Land Records of Kent County, Delaware in Mortgage Book 294, page 287, and

Second Amendment To Mortgage dated March 21, 2000 recorded among the Land Records of Kent

County, Delaware in Mortgage Book 365, page 150; (c) Mortgage dated January 23, 1996 recorded

among the Land Records of Sussex County, Delaware in Deed Book 2207, folio 333, as amended

by First Amendment To Mortgage dated December 29, 1998 recorded among the Land Records of Sussex County, Delaware in Deed Book 2924, folio 095, and Second Amendment To Mortgage dated March 21, 2000 recorded among the Land Records of Sussex County, Delaware in Deed Book 03389, page 333; (d) Mortgage dated August 6, 2000 recorded among the Land Records of Sussex County, Delaware in Deed Book 03478, page 067; (e) Mortgage dated February 28, 2001 recorded among the Land Records of Kent County, Delaware at Mortgage Book 1011, page 208; (f) Mortgage dated February 28, 2001 recorded among the Land Records of Sussex County, Delaware in Deed Book 03674, page 267; (g) Financing Statements recorded with the Secretary of State of Delaware and bearing the following recordation references: (i) 1996003159 recorded on January 30, 1996; (ii) 1996003165 recorded on January 30, 1996; (iii) 1996003168 recorded on January 30, 1996; (iv) 1997-13250 recorded on April 22, 1997; (v) 199858394 recorded on December 24, 1998; (vi) 199858395 recorded on December 24, 1998; (vii) 199858397 recorded on December 24, 1998; (viii) 199858399 recorded on December 24, 1998; (ix) 199858405 recorded on December 24, 1998; and (x) 199936877 recorded on July 20, 1999; (h) Financing Statements recorded with Sussex and Kent Counties, Delaware, the Maryland State Department of Assessments And Taxation, and the Circuit Court of Wicomico County, Maryland; and (i) Collateral Trademark Assignment dated January 23, 1996 and recorded on January 31, 1996 with the United States Patent And Trademark office at Reel 1428, Frame 0947.

WHEREAS, the Pre-Petition Bank Indebtedness is fully secured and constitutes the legal, valid and binding obligations of the Debtor, enforceable in accordance with the terms of all applicable documents, promissory notes, guaranties, mortgages, security agreements and other agreement and documentation (collectively, "Pre-Petition Bank Documents").

A00256

WHEREAS, no offsets, defenses or counterclaims to the Pre-Petition Bank Indebtedness exist, and no portion of the Pre-Petition Bank Indebtedness is subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

WHEREAS, the Debtor's cash and the proceeds of the other Collateral constitute "cash collateral" as defined in Section 363(a) the Bankruptcy Code.

WHEREAS, the Debtor has an immediate and critical need for the use of the cash collateral to pay suppliers and wages and to pay for insurance, security services and attorneys' fees, and to otherwise protect and preserve its assets.

WHEREAS, the Bank is willing to consent to the Debtor's use of the Bank's cash collateral only on the expressly stated terms and conditions expressly set forth in this Interim Agreement For Use Of Cash Collateral And Adequate Protection (the "Agreement").

NOW, THEREFORE, in consideration of the mutual promises and agreements of the parties hereto, the Bank and the Debtor do hereby agree as follows:

1.    Incorporation of Recitals. The Debtor and the Bank acknowledge, agree, and hereby stipulate that the recitals set forth above are true, accurate and complete in every respect, and are hereby incorporated into this Agreement by reference. Notwithstanding the foregoing, nothing in this Agreement shall prejudice the rights of any party in interest other than the Debtor to seek to object to or to challenge (a) the validity, extent, perfection or priority of the mortgages, security interests, liens, and the other Pre-Petition Bank Liens in and to the Pre-Petition Collateral, (b) the validity, allowability, priority, status or size of the Pre-Petition Bank Indebtedness, including the rate of interest accruing thereon as described in paragraph 13 of this Agreement, or (c) to allocate adequate protection payments as between principal, interest and fees (a "Qualifying Objection"); provided, however, that unless such a party commences, as appropriate, a contested matter or

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC        4

A00257

adversary proceeding raising such objection or challenge within sixty (60) days (the "Lookback Period") after the date of formation of the Committee for the unsecured creditors ("Committee"), all such challenges and objections shall be forever waived and the Pre-Petition Bank Indebtedness shall be allowed as a secured claim within the meaning of Section 506 of the Bankruptcy Code for all purposes in connection with this Case. No such period of limitation may be extended without the prior written consent of the Bank. Thereafter, any and all objections or challenges (including, but not limited to, those under Sections 506, 544, 547 and/or 548 of the Bankruptcy Code) by any party (including, without limitation, the Committee and any Chapter 11 or Chapter 7 Trustee appointed herein) to the validity, sufficiency, extent, perfection, priority or refinancing of, or seeking the avoidance or equitable subordination of, the Pre-Petition Bank Liens, the Pre-Petition Bank Indebtedness, and any payments thereon shall be forever barred.

2.    Use of Cash Collateral By Debtor.

2.1.    Authorized Amounts. The Bank and the Debtor agree that in the absence of an "Event of Default" (hereafter defined), the Debtor shall have the use of cash proceeds ("Cash Collateral") of the Pre-Petition Collateral in the following limited amounts during the period of time ("Interim Period") commencing on March 1, 2002 and ending on that date which is the earliest of: (a) the date of the occurrence of any Event of Default; (b) August 1, 2003; or (c) the effective date of confirmation of any plan of reorganization or liquidation for the Debtor:

2.1.1    Maximum Monthly Amount. Without the prior written consent of the Bank and subject to the limitations upon aggregate amounts set forth below in paragraph 2.1.2, the maximum aggregate amount of Cash Collateral that may be used by the Debtor during the Interim Period in any calendar month is Fifty Thousand Dollars ($50,000.00), of which no more than

A00258

Twenty-Eight Thousand Dollars ($28,000.00) may be expended on salaries or other labor-related costs.    ...

    2.1.2  <u>Maximum Aggregate Amount</u>.  The maximum aggregate amount of Cash Collateral that may be used by the Debtor during the Interim Period shall not exceed Three Hundred Thousand Dollars ($300,000.00) unless the unpaid balance of the Pre-Petition Bank Indebtedness has been permanently curtailed by payments received by the Bank of not less than Three Million Five Hundred Thousand Dollars ($3,500,000.00), and upon such permanent curtailment, the Debtor may use Cash Collateral in an additional aggregate amount of up to Two Hundred Thousand Dollars ($200,000.00) until the unpaid balance of the Pre-Petition Bank Indebtedness has been permanently curtailed by payments received by the Bank of not less than the total aggregate sum of Six Million Two Hundred Thousand Dollars ($6,200,000.00), and upon such additional permanent curtailment, the Debtor may use Cash Collateral in an additional aggregate amount of One Hundred Thousand Dollars ($100,000.00).  The parties agree that under all circumstances the maximum aggregate amount of Cash Collateral that may be used by the Debtor shall not exceed in its entirety the sum of Six Hundred Thousand Dollars ($600,000.00).

    2.2.  <u>Use Limited to Collected Funds Only</u>.  In no event shall the Debtor be entitled to use more Cash Collateral on any given day during the Interim Period than is available in collected funds on deposit in the applicable "Debtor-In-Possession Account" (hereafter defined) with the Bank at 11:00 a.m. on that day.

    2.3  <u>No Other Use</u>.  Except as expressly authorized by the terms of this Agreement, the Debtor is prohibited from using Cash Collateral.

    3.  <u>Maintenance of Debtor-In-Possession Accounts with Bank</u>.  The Debtor agrees to establish and maintain the following accounts (collectively, "Debtor-In-Possession Accounts") with

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC    6

A00259