the Bank: (a) its Debtor-In-Possession Operating Account (the " Debtor-In-Possession Operating Account"); (b) its Debtor-In-Possession Collateral Account (the "Debtor-In-Possession Collateral Account"); (c) its Debtor-In-Possession Payroll Account (the " Debtor-In-Possession Payroll Account"); and (d) its Debtor-In-Possession Payroll Tax Account (the " Debtor-In-Possession Tax Account"). The Debtor shall maintain no accounts other than the Debtor-In-Possession Accounts.

4.  Deposit of Proceeds. The Debtor shall deposit all cash, checks or monies which the Debtor now has on hand, other than funds already on deposit in the Debtor-In-Possession Operating Account, into the Debtor-In-Possession Collateral Account, which shall be in the exclusive control of the Bank, for clearance and transfer into the other Debtor-In-Possession Accounts and for payment of the Pre-Petition Bank Indebtedness. In addition, the Debtor shall deposit into the Debtor-In-Possession Collateral Account any and all cash, checks, or monies the Debtor directly collects, receives, or derives from the operation of its business or the liquidation of its assets, including, but not limited to, all cash, checks and monies received or hereafter received by the Debtor from the sale of its inventory, the collection of its accounts, the sale of its personalty or its realty, and the collection of rents. If required by the Bank, the Debtor shall direct its customers to remit payments to a post office box under the exclusive control of the Bank (the "Lock Box") for deposit to the Debtor-In-Possession Collateral Account. The rights of all parties in interest other than the Debtor with respect to the application of funds to the Pre-Petition Bank Indebtedness during the Lookback Period are reserved. After the expiration of the Lookback Period the application of funds to the Pre-Petition Bank Indebtedness shall be binding upon all parties in interest absent successful prosecution of a contested matter or adversary proceeding raising a Qualifying Objection filed prior to the expiration of the Lookback Period.

A00260

5.    Availability of Funds.  Deposits made by the Debtor into the Debtor-In-Possession Collateral Account shall not be available for transfer into any other Debtor-In-Possession Accounts until they constitute collected funds determined in accordance with the customary policies and procedures of the Bank. The Debtor acknowledges that the Bank will not honor any checks written against any of the Debtor-In-Possession Accounts which would overdraw the collected funds in any such accounts and that the Bank will dishonor and return any such checks with an NSF designation thereon. If, notwithstanding the foregoing, the Bank honors any checks against any of the Debtor-In-Possession Accounts which cause an overdraft, the Bank shall then have a first priority post-petition lien on the "Post-Petition Collateral" (hereafter defined) to the extent of the amount of said overdrafts.

6.    Transfer of Funds from Collateral Account.  Upon approval of this Agreement by the Court and provided that no Event of Default has occurred under this Agreement and subject to the limitations set forth above as to the amounts and uses of Cash Collateral, the Bank will transfer collected funds in the Debtor-In-Possession Collateral Account into the Debtor-In-Possession Operating Account, the Debtor-In-Possession Payroll Account and the Debtor-In-Possession Tax Account in amounts directed by the Debtor from time to time.

7.    Application to Pre-Petition Indebtedness.  All proceeds of the sale, collection or other disposition of the Pre-Petition Collateral shall be applied immediately to the repayment and permanent curtailment of the Pre-Petition Bank Indebtedness, other than the Cash Collateral which the Debtor is expressly permitted to use in accordance with the terms of this Agreement. The Bank is authorized, without any additional consents or instructions from the Debtor, to apply funds in the Debtor-In-Possession Accounts to the Pre-Petition Indebtedness. The rights of all parties in interest other than the Debtor with respect to the application of funds to the Pre-Petition Bank Indebtedness

during the Lookback Period are reserved. After the expiration of the Lookback Period the application of funds to the Pre-Petition Bank Indebtedness shall be binding upon all parties in interest absent successful prosecution of a contested matter or adversary proceeding raising a Qualifying Objection filed prior to the expiration of the Lookback Period.

8.    Grant of Replacement Liens. Notwithstanding the provisions of Section 552(a) of the Bankruptcy Code, and in addition to the liens and security interests preserved by Section 552(b) of the Bankruptcy Code, the Debtor hereby grants to the Bank, as security for any and all indebtedness owed by the Debtor to the Bank under the Pre-Petition Bank Documents or this Agreement, whether post or pre-petition, but only to the extent that the Bank's interest in Cash Collateral is diminished, first priority post-petition liens, security interests and mortgage liens in and to all of the Debtor's assets which are or have been acquired, generated, or received by the Debtor subsequent to the Petition Date (collectively, "Post-Petition Collateral") including, without limitation, all of the Debtor's Accounts, As-Extracted Collateral, Chattel Paper, Commodity Accounts, Commodity Contracts, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter-Of-Credit Rights, Payment Intangibles, Promissory Notes, Software, cash, the Debtor-In-Possession Accounts, real estate and all fee and leasehold interests therein, trademarks, licenses, causes of action, rights to payment, tax refund claims, insurance proceeds and tort claims (other than actions for preferences, fraudulent conveyances, and other avoidance power claims and any recoveries under Sections 506(c), 542, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code (collectively, "Avoidance Actions")), and all products, rents, and cash and non-cash proceeds thereof.

9.    Perfection of Replacement Liens. The liens, security interests and mortgage liens granted in this Agreement are deemed perfected without the necessity for filing or execution of

A00262

documents which might otherwise be required under non-bankruptcy law for the perfection of said liens, security interests and mortgage liens. Such liens, security interests and mortgage liens and perfection shall be binding, to the fullest extent available under all applicable laws, upon any subsequently appointed trustee either in Chapter 11 or any other Chapter of the Bankruptcy Code and upon all creditors of the Debtor who have extended or who may hereafter extend credit to the Debtor. Notwithstanding the foregoing, the Debtor shall execute such financing statements, mortgages, assignments, and other documents as the Bank may request to permit the Bank to file notice of the liens, security interests and mortgage liens granted herein in such public records as the Bank may select, in its sole and absolute discretion.

10.     Confirmation of Pre-Petition Liens. The Debtor hereby confirms to the Bank the validity, enforceability, and first priority lien status of the Pre-Petition Bank Liens in and to the Pre-Petition Collateral securing the Pre-Petition Bank Indebtedness and all other indebtedness owed by the Debtor to the Bank under the Pre-Petition Bank Documents or this Agreement, including interest, fees, expenses and the like which are authorized and secured by the express terms of the Pre-Petition Bank Documents and which accrued before the Petition Date, and all cash and non-cash proceeds thereof.

11.     Superpriority Claim. To the extent that the other protections granted herein are insufficient to provide adequate protection for the Bank's interests in the Pre-Petition Collateral and the Post-Petition Collateral, the Bank shall be granted a claim against the Debtor having priority over any and all administrative expenses of any kind including, but not limited to, the administrative expenses described in Sections 503(b) and 507(b) of the Bankruptcy Code. The claim granted to the Bank in this paragraph shall not be payable from Avoidance Actions or the proceeds thereof, but shall be payable only from other assets of the Debtor's estate.

12.    <u>No Surcharge of Collateral</u>. No costs or expenses of administration which have been or may be incurred in the above-captioned proceedings, or in any conversion of the above-captioned proceedings pursuant to Section 1112 of the <u>Bankruptcy Code</u>, or in any other proceeding relating thereto, and no priority claims are or will be prior to or on a parity with the claims of the Bank against the Debtor or any successor debtor-in-possession or trustee or with the Pre-Petition Liens against the Pre-Petition Collateral or the Post-Petition Collateral; and no such costs or expense of administration shall be imposed against the Bank, its claims, or the Pre-Petition Collateral or the Post-Petition Collateral pursuant to 11 U.S.C. § 506(c) or otherwise. This Section 12 shall not be binding upon any party in interest until such time, if any, as the Court enters an Order finally approving this Agreement following not less than fifteen (15) days notice to the parties entitled to notice of this Agreement pursuant to Rule 4001b(1) of the <u>Federal Rules of Bankruptcy Procedure</u> and an opportunity for a final hearing.

13.    <u>Accrual of Interest</u>. Subject to the provisions of Section 506 of the <u>Bankruptcy Code</u>, interest shall continue to accrue on the Pre-Petition Bank Indebtedness owed in accordance with the stated terms of the Pre-Petition Bank Documents at such rates as are specified therein until all amounts due to the Bank have been paid in full.

14.    <u>Insurance</u>. The Debtor agrees to obtain and maintain insurance against fire, theft or other casualty on the Pre-Petition Collateral and the Post-Petition Collateral in amounts satisfactory to the Bank and to insure that the Bank is named as a mortgagee and loss payee on all policies insuring the Pre-Petition Collateral and the Post-Petition Collateral against fire, theft or other casualty. The Bank agrees that to the extent that the premiums for such insurance exceed Eight Thousand Dollars ($8,000.00) in aggregate amount in any month, the Debtor may use Cash Collateral in an additional amount sufficient to pay such premiums not to exceed such maximum

S:\UMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC    11

amount as is mutually agreed to by the Debtor and the Bank, even if such additional amount causes the Debtor to exceed the monthly limitation upon the use of Cash Collateral set forth above in paragraph 2.1.1. of this Agreement.

 15. Bank's Right to Assert Unsecured Claims.  To the extent that the value of the Pre-Petition Collateral is less than the amount of the Pre-Petition Bank Indebtedness, the Bank shall have an allowed unsecured claim in the Debtor's bankruptcy case.  The Debtor acknowledges and agrees that nothing contained herein shall prevent or preclude the Bank from receiving a distribution in the Debtor's bankruptcy case based upon such allowed unsecured claim.

 16. Reporting by Debtor; Inspection of Collateral.  The Debtor agrees to:

  (a) Keep and maintain such accounting and financial records as are required by the Office of the United States Trustee and the Bankruptcy Court;

  (b) Permit the Bank's representatives and/or auditors to inspect the Pre-Petition Collateral and the Post-Petition Collateral and all accounting and financial records of the Debtor from time to time;

  (c) Provide the Bank with copies of all listing agreements, term sheets, offers, contracts of sale and the like which pertain to the sale, liquidation and disposal of the Debtor's assets;

  (d) Provide the Bank on or before the fifteenth (15th) day of each calendar month with the Monthly Operating Reports for the prior calendar month filed with the Court; and

  (e) Provide the Bank with such other and further financial information relating to the Debtor as the Bank may request from the Debtor from time to time.

A00265

All financial statements and financial information provided by the Debtor to the Bank pursuant to this Agreement shall have the signature of an officer of the Debtor thereon and shall contain a certification that the information contained therein is true, accurate and complete to the best of said officer's knowledge, information and belief.

17.    No Further Encumbrances of Assets.    The Debtor agrees that no further encumbrances of any kind or type, whether voluntary or involuntary, shall be placed against any real or personal property or other assets which the Debtor owns without the prior written consent of the Bank.

18.    Bank to Receive Notice of Creditor Actions.    In the event that any person or entity seeks an Order pursuant to the Bankruptcy Code or is otherwise given adequate protection of its interests in the above-captioned proceedings, the Bank shall be given an opportunity to be heard prior to the entry of said Order.

19.    Liquidation of Assets.    The Debtor agrees to commence and diligently pursue the orderly sale and liquidation of its assets.

20.    Restrictions Upon Use Of Cash Collateral.    Except for expenses paid from the "Carve Out" (as hereafter defined), no Cash Collateral or other proceeds of Pre-Petition Collateral shall be used for the purpose of: (a) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, perfection, priority, or enforceability of the Pre-Petition Bank Indebtedness, the Pre-Petition Bank Documents, or the Pre-Petition Bank Liens, or any other rights or interests of the Bank or in asserting any claims or causes of action, against the Bank or any officer, representative or agent of the Bank; (b) using Cash Collateral except as specifically permitted in this Agreement or by order of the Bankruptcy Court; (c) incurring indebtedness, including without limitation the obtaining of credit pursuant to 11 U.S.C. § 364; or (d) without its consent, attempting to modify the

A00266

Bank's rights under this Agreement. As used in this Agreement, "Carve Out" means, at any time of determination, the sum of: (a) allowed administrative expenses payable pursuant to 28 U.S.C. § 1930(a)(6); and (b) "Priority Professional Expenses" (as hereafter defined) subject to the "Priority Expense Cap" (as hereafter defined). "Priority Professional Expenses" means allowed fees, costs and reasonable expenses of professionals retained by the Committee pursuant to Section 327 of the Bankruptcy Code, but shall not include fees, costs, and expenses of third-party professionals employed by the members of the Committee. "Priority Expense Cap" means all unpaid Priority Professional Expenses (including holdbacks) up to an aggregate amount of Fifty Thousand Dollars ($50,000.00). Priority Professional Expenses shall not include fees or expenses incurred by any Person, including the Debtor or the Committee, in (a) preventing, hindering or delaying the Bank's enforcement or realization upon any of the Pre-Petition Collateral or Post-Petition Collateral once an Event of Default has occurred, (b) using or seeking to use Cash Collateral or selling any Pre-Petition Collateral or Post-Petition Collateral without the Bank's consent, (c) incurring indebtedness without the Bank's consent, or (d) objecting to or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of the Pre-Petition Bank Indebtedness or the Pre-Petition Bank Liens or any other rights or interests of the Bank, or in asserting any claims or causes of action, including, without limitation, any actions under Chapter 5 or Section 724(a) of the Bankruptcy Code or for equitable subordination against the Bank. The exclusion from Priority Professional Expenses shall not include investigation of claims or causes of action respecting whether an Event of Default has occurred.

21.    Events of Default. Each of the following shall constitute an "Event of Default":

(a)    The Debtor fails to comply with and/or to perform or satisfy or otherwise violates any terms and/or conditions set forth in this Agreement; or

(b)    The Order approving this Agreement, or any portion thereof, is vacated, reversed or modified; or

(c)    The above-captioned Chapter 11 proceedings are converted to a case under Chapter 7 of the Bankruptcy Code or is dismissed; or

(d)    A trustee is appointed for the Debtor or any of the Debtor's assets; or

(e)    The Debtor files a motion seeking to convert the above-captioned Chapter 11 proceeding to a case under Chapter 7 of the Bankruptcy Code; or

(f)    The Debtor fails to pay its post-petition tax obligations when and as due; or

(g)    The change of venue of the above-captioned proceedings; or

(h)    Any surcharge of the Pre-Petition Collateral or Post-Petition Collateral; or

(i)    The Debtor incurs any indebtedness or obtains any credit (other than unsecured credit which does not have priority over claims entitled to priority under 11 U.S.C. § 507(a)(1)) from any entity other than the Bank pursuant to 11 U.S.C. § 364; or

(j)    The Debtor initiates any litigation against the Bank.

22.    Default Rights.  Upon written notice to the Debtor of the occurrence of an Event of Default and the failure of the Debtor to cure such Event of Default within three (3) business days after notice thereof, without further order of the Court, the Debtor will immediately cease and be enjoined from using the Cash Collateral and will provide appropriate evidence to the Bank of the Debtor's cessation of the use of the Cash Collateral.  In addition, the Bank shall be entitled to freeze all of the Debtor-In-Possession Accounts, and to take such other actions as to which the Bank is entitled under applicable laws.

23.    Agreement Not Evidence of Adequate Protection.  The Bank and the Debtor agree that the terms of this Agreement shall not constitute conclusive or presumptive evidence concerning

A00268

the issues of adequate protection in the event such issues are raised or litigated between the Debtor and the Bank.

24.    No Novation.  This Agreement shall not cause a novation of any of the Pre-Petition Bank Documents, nor shall it extinguish, affect or impair the Debtor's obligations under the Pre-Petition Bank Documents or the obligations of any guarantors or co-obligors of any of the Pre-Petition Bank Indebtedness.  Nothing contained in this Agreement shall be deemed to terminate, impair or release any of the Pre-Petition Bank Liens or the priorities thereof.

25.    Bank Not Deemed Owner or Operator.  By its entry into this Agreement and its agreement to the terms hereof, the Bank shall not be deemed to have assumed any liability to any third person, and shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor or of any of the Debtor's assets.

26.    Delay Not Waiver.  The failure or delay by the Bank to insist upon strict performance of any one or more of the provisions of this Agreement or to exercise any right, power, or remedy upon default under or breach of, this Agreement shall not constitute a waiver of, or preclude the Bank from exercising, any right, power or remedy.

27.    No Waiver of Other Rights.  Except as expressly provided in this Agreement, nothing contained herein shall constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of the Bank under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the Bank to (i) request adequate protection of its interests in the Pre-Petition Collateral or relief from or modification of the automatic stay extant under Section 362 of the Bankruptcy Code, (ii) request conversion of the above-captioned Chapter 11 Case to a Chapter 7 case, (iii) request the appointment of a Chapter 11 trustee or examiner; and (iv) propose, subject to

A00269

the provisions of Section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans (and nothing herein is intended to affect Debtor's existing right to exclusivity under Section 1121); or (b) any other rights, claims or privileges (whether legal, equitable, or otherwise) of the Bank; or (c) the rights of the Debtor to seek to continue to use Cash Collateral after the termination of this Agreement.

28.    <u>Execution In Counterparts</u>.  This Agreement may be executed and delivered in counterparts.

29.    <u>Integration</u>.  The Debtor agrees that this Agreement is the complete and entire agreement between the parties with respect to the matters addressed herein and shall be binding upon the parties hereto only if it, in its entirety, and without addendum or modification not otherwise approved in writing by the Bank and the Debtor, shall be approved by an Order of the Court issued in the above-captioned proceedings and, upon such approval, shall be effective as of the Petition Date.

WITNESS the hands and seals of the parties hereto this _15th_ day of March, 2002.

WITNESS/ATTEST:                    DEBTOR:

                                   NANTICOKE HOMES, INC.

_____            By: _____ (SEAL)
                                   Name: _William H. Merwine III_
                                   Title: _Vice President_

                                   BANK:

                                   MERCANTILE-SAFE DEPOSIT AND
                                       TRUST COMPANY

_____            By: _____ (SEAL)
                                   Scott H. Krieger,
                                   Senior Vice President

A00270

# UNREPORTED CASES

A00271

Westlaw.

Not Reported in B.R.                                                                                          Page 1
2003 WL 22327933 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 280
(Cite as: 2003 WL 22327933 (Bankr.D.Del.))

H

United States Bankruptcy Court,
D. Delaware.

In re: KINDRED HEALTHCARE, INC., f/k/a
Vencor, Inc., et al., Reorganized
Debtors.

Nos. 99-3199 (MFW), 99-3327(MFW), 99-
3200(MFW), 99-3201(MFW), 99-3202(MFW), 99-
3203(MFW), 99-3204(MFW), 99-3205(MFW), 99-
3206(MFW).

Oct. 9, 2003.

OPINION [FN1]

FN1. This Opinion constitutes the findings
of fact and conclusions of law of the Court
pursuant to Federal Rule of Bankruptcy
Procedure 7052, which is made applicable to
contested matters by Federal Rule of
Bankruptcy Procedure 9014.

WALRATH, Bankruptcy J.

*1 This matter is before the Court on the Motion of
the United States Trustee ("UST") for an Order
compelling the Debtors to file amended monthly
operating reports and to pay delinquent quarterly
fees. The Debtors have opposed the Motion and the
parties have cross moved for summary judgment. For
the reasons set forth below, we grant the Motion.

I. FACTUAL BACKGROUND

On September 13, 1999, Kindred Healthcare, Inc.,
f/k/a Vencor, Inc., and its 128 direct and indirect
subsidiaries (collectively "the Debtors") filed
voluntary petitions for relief under chapter 11. On
that day, the Debtors filed, inter alia, a motion for
approval of their cash management system ("the Cash
Management Motion") which was granted. The
Debtors had established that system many years
before the chapter 11 filing to provide for the
centralization of the Debtors' collections and
disbursements. As a result of that system, the
ultimate parent of the Debtors (now known as

"Kindred") consolidated all operating revenues of the
Debtors and made all disbursements.

The Debtors operated their businesses and managed
their properties as debtors-in-possession pursuant to
sections 1107(a) and 1108 of the Bankruptcy Code.
Subsequent to the filing of their chapter 11 petitions,
the Debtors filed consolidated monthly operating
reports. Based on those reports, the UST billed the
maximum quarterly fee for Kindred ($10,000) and
the minimum fee ($250) for all the other Debtors.
During the course of the chapter 11 cases, the
Debtors have paid over $500,000 in UST fees.

Shortly before confirmation of the Debtors' plan of
reorganization, the UST advised the Debtors that the
methodology by which the quarterly fees had been
calculated was incorrect and, consequently, asserted
that additional fees were due. As a result, the UST
filed an objection to confirmation. The parties agreed
to resolve this issue by separate motion and an Order
confirming the Debtors' Plan was entered on March
19, 2001.

In its Motion, the UST asserts that the quarterly fees
should have been calculated on the disbursements
made on behalf of each individual Debtor rather than
on a consolidated basis. The Debtors disagree,
arguing that since Kindred paid all the Debtors'
expenses, it alone should pay the quarterly fees on
those disbursements. If the UST's method of
calculating the quarterly fees is accepted, the Debtors
assert that they will owe in excess of $3 million in
additional fees to the UST.

II. JURISDICTION

This Court has jurisdiction over this proceeding
pursuant to 28 U.S.C. § § 1334 and 157(b)(2)(A),
(B) & (O).

III. DISCUSSION

We recently addressed many of the same issues
raised here by the Debtors in their opposition to the
UST's Motion. See, e.g., In re Charter Behavioral
Health Sys., LLC, 292 B.R. 36 (Bankr.D.Del.2003).
In that case, we concluded that "the plain language of
the statute supports the UST argument that the word
disbursement includes, as to the individual Debtors,
the payment of their operating expenses.... [T]he

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A00272

Not Reported in B.R.
2003 WL 22327933 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 280
(Cite as: 2003 WL 22327933 (Bankr.D.Del.))

majority [of courts] have ruled that 'disbursements' include *all* payments made by or for a debtor, regardless of the source of payment." *Id. at 45.* Therefore, we concluded that, in the absence of substantive consolidation, each debtor must pay quarterly fees based on the disbursements made in the quarter to satisfy that debtor's obligations, even if all the disbursements were made through a centralized cash management system by one debtor alone. The Debtors seek an exception to that ruling for several reasons.

*A. Inability to Calculate the Fee*

**\*2** The Debtors assert that their cash management system does not have the capability of determining the amount of disbursements on a Debtor by Debtor basis and, therefore, the Debtors should be excused from doing so. The Debtors have submitted an affidavit from their Corporate Director of Accounts Payable stating that it would require a modification of their computerized accounting system and an enormous expense (in excess of $300,000) to allocate the disbursements among the Debtors.

The UST argues that the Cash Management Motion itself sheds doubt on the Debtors' belated assertions that they cannot determine the amount of disbursements on a Debtor by Debtor basis. In that Motion, the Debtors represented that "[a]ll Facility deposits into shared Depository and Sub-Concentration Accounts are electronically encoded with the facility identification number. All health insurance receipts from governmental entities that are paid directly into Concentration Accounts are accompanied by sufficient information to allow allocation of the amount received among the Facilities which provided covered service, and therefore among the Debtors to which such Facilities relate." (Cash Management Motion at ¶ 13(e).) Similarly, the Cash Management Motion stated that "The general ledger systems employed by the Debtors allow for disbursements from the Concentration Accounts, A/P Disbursement Accounts and Payroll Accounts to be properly allocated among the Facilities or other Vencor operations on whose behalf payments are made, and therefore among the Debtors to which such Facilities or other operations relate." (*Id.* at 13(i).) Thus, the UST argues that under the doctrine of judicial estoppel the Debtors cannot now, years later, assert that they are unable to determine disbursements on a per Debtor basis. [FN2]

FN2. The UST also asserts that tax information provided by the Debtors similarly suggests that the Debtors have operating information on a Debtor by Debtor basis.

The doctrine of judicial estoppel prevents a party from taking a position in litigation that is inconsistent with its prior position. The elements of judicial estoppel are:

(1) the party to be estopped must be advancing an assertion that is inconsistent with a position taken during previous litigation; (2) the position must be one of fact, rather than law or legal theory; (3) the prior position must have been accepted by the court in the first proceeding; and (4) the party to be estopped must have acted intentionally, not inadvertently.

*Devan v. CIT Group/Commer. Servs., Inc. (In re Merry-Go-Round Enters.),* 229 B.R. 337, 345 (Bankr.D.Md.1999), *citing Havird Oil Co. v. Marathon Oil Co.,* 149 F.3d 283, 292 (4th Cir.1998). *See also In re Home Health Corp. of America, Inc.,* 268 B.R. 74, 78 (Bankr.D.Del.2001).

We agree with the UST that the doctrine of judicial estoppel prevents the Debtors from now asserting that they cannot allocate their disbursements on a Debtor by Debtor basis. In their Cash Management Motion, the Debtors represented to this Court that they were able to account for transactions on a Debtor by Debtor basis. These representations were factual, not legal. Our ruling on the Cash Management Motion was predicated on those representations. It is well-established that approval of a centralized cash management system would not be approved in this Court without such representations. [FN3] Accordingly, there can be no suggestion that the representations made by the Debtors in the Cash Management Motion were unintentional or inadvertent. As a result of these representations, the Debtors were authorized to continue using their centralized system without opening new debtor-in-possession accounts for each Debtor. Having obtained this advantage by making these representations, the Debtors are now precluded from asserting that they are unable to allocate their disbursements among the various Debtors.

FN3. We also require a representation that the debtors are able to distinguish between pre and post-petition transactions in their centralized accounting system, to avoid the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in B.R.
Page 3
2003 WL 22327933 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 280
(Cite as: 2003 WL 22327933 (Bankr.D.Del.))

payment of any pre-petition claim without prior court approval.

*3 Even if the Debtors were not judicially estopped, we would still reject their argument. The statute provides no basis for the position that only the Debtor which makes the disbursements is required to pay the quarterly fees. Each of the Debtors is a separate legal entity in a separate bankruptcy case. This Court approved the joint administration of their cases for procedural purposes only. Accordingly, each Debtor must comply with the Bankruptcy Code and Rules. The Order granting the Cash Management Motion did not excuse the Debtors from the requirement that they each comply with the Bankruptcy Code and Rules. Therefore, we conclude that the cost associated with complying with the requirements of the Code is an insufficient reason to excuse such performance. [FN4]

> FN4. The UST also questions the conclusions drawn by the Debtors from the assertions in the Debtors' affidavit. The affidavit states that each of the Debtors maintains separate general ledgers, from which the UST asserts the Debtors surely should be able to determine whose expense was being paid without significant additional costs or modification of their computer system. We find it unnecessary to address this factual issue, since we conclude that additional cost to the Debtors is not an excuse for failure to comply with section 1930(a)(6).

B. *Accounting System Not Designed to Avoid UST Fees*

The Debtors also argue that Courts interpreting "disbursements", as used in section 1930(a)(6), conclude that this term should be defined in a manner which prevents debtors from manipulating their accounting systems to avoid fees. The Debtors contend that this purpose is not served in this case because the Debtors' centralized cash management system had been in place for many years before they filed their chapter 11 petitions.

This issue was raised in the *Charter* case as well. The *Charter* debtors continued to use the same cash management system that they had used for many years pre-petition. Furthermore, there was no

suggestion that they were using the system simply to avoid or reduce the UST quarterly fees. We nonetheless concluded that "that is irrelevant; the fact is that the Debtors are avoiding the payment of UST fees, whether it was intended or not." *Id.* at 22. *See also, In re Pars Leasing, Inc.,* 217 B.R. 218 (Bankr.W.D.Tex.1997) (finding that third party's payment of certain expenses constituted disbursements of the debtor although the arrangement had been in place pre-bankruptcy).

We similarly conclude in this case that the fact that the Debtors' cash management system has been in place for many years is irrelevant. Section 1930(a)(6) requires payment of fees based on disbursements made on a per Debtor basis.

C. *Section 1930(a)(6) Is Constitutional as Interpreted*

The Debtors lastly argue that our interpretation of section 1930(a)(6) is unconstitutional as applied to these Debtors. The Debtors assert that our interpretation of the statute would result in an impermissible taking of the Debtors' property in violation of the Fifth Amendment to the Constitution. The Fifth Amendment bars the taking of private property by the government without just compensation. U.S. Const. amend. V. The Debtors argue that, since it is presumed that Congress enacts legislation consistent with the Constitution, we must interpret section 1930(a)(6) to require fees only from the Debtor that wrote the check, rather than from the Debtors whose expenses were paid by that check. *See, e.g., Immigration and Naturalization Serv. v. St. Cyr,* 533 U.S. 289, 290 (2001) ("if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statue is 'fairly possible,' [courts] are obligated to construe the statute to avoid such problems").

*4 The Debtors argue that by imposing additional fees in excess of $3 million, the United States is taking their property without just compensation. They argue that the UST cannot establish that the benefits provided by the UST to these Debtors are worth an additional $3 million. The Debtors argue that such a fee clearly exceeds the costs incurred by the UST program monitoring the Debtors' cases. As such, the Debtors argue that the fees sought are not a fair approximation of the benefits conferred and thus are an unconstitutional taking of the Debtors' property.

The UST responds that the statute enjoys a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in B.R.
2003 WL 22327933 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 280
**(Cite as: 2003 WL 22327933 (Bankr.D.Del.))**

presumption of constitutionality and that the burden is on the Debtors (not the UST) to prove otherwise. *See, e.g., Mistretta v. United States, 488 U.S. 361, 384 (1989).* Further, the UST argues that the determination of whether a user fee is excessive does not depend on the specific facts of any individual case. *See, e.g., United States v. Sperry Corp., 493 U.S. 52, 60 (1989)* ("This Court has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services. Nor does the Government need to record invoices and billable hours to justify the cost of its services."). Rather, the UST argues that the Constitution simply requires that the fee charged by the Government be a "fair approximation of the cost of benefits supplied." *Massachusetts v. United States, 435 U.S. 444, 463 n. 19 (1978).*

We conclude that the Debtors' constitutional argument is without merit. The quarterly fees which the UST seeks are user fees, that is, fees associated with the Debtors' use of the bankruptcy judicial system. *See, e.g., United States Tr. v. Gryphon at Stone Mansion, 166 F.3d 552, 554 (3d Cir.1999)* ( "Historically, § 1930(a)(6) set forth a scheme to impose the costs of the United States Trustee Program on its users"); *In re Postconfirmation Fees, 224 B.R. 793, 795 (E.D.Wa.1998)* (UST system was to be self-funded whereby users, rather than the general public would pay for cost); *In re Gates Cmty. Chapel of Rochester, 212 B.R. 220, 226 (Bankr.W.D.N.Y.1997)* (UST system is fee, not a tax, as it is a benefit shared only by debtors rather than the public at large).

Congress adopted the fee schedule in section 1930(a)(6) to assure that the UST system was self-funded. (HR Rep No. 764, 99th Cong.2d Sess. 26 (1986).) In doing so, Congress assumed that larger cases tax the UST system more than smaller cases and that the size of the case can be determined by the amount of disbursements made by the particular debtor. *Id.* Both assumptions are logical. Further, Congress stated that it would "monitor the self-funding mechanism as it operates" to assure that the fees collected are sufficient to cover the costs of the UST program. *Id.* In fact, Congress did amend the fee schedule to increase the quarterly fees effective December 27, 1991. *See* Pub L 102-140, 105 Stat 782 (October 28, 1991).

*5 Consequently, we conclude that the formula adopted by Congress does calculate the "fair approximation of the cost of benefits supplied" to these Debtors by the UST system. *Massachusetts v.*

*United States, 435 U.S. at 463 n. 19.* A more precise calculation of the benefit on a case by case basis is not required. *See Sperry, 493 U.S at 60* (concluding that "the amount of a user fee [need not] be precisely calibrated to the use that a party makes of Government services").

Further, it was not inappropriate for Congress to mandate the use of a percentage user fee. *Id.* at 62 (charge of 1.5% of any award received was not impermissible fee for use of Iran-United States Claims Tribunal). Although the lower court in *Sperry* had concluded that the percentage fee was an impermissible taking, the Supreme Court held that the fee was "not so clearly excessive as to belie their purported character as user fees. This is not a situation where the Government has appropriated all, or most, of the award to itself and labeled the booty as a user fee." *Id.*

Under section 1930(a)(6), the user fees range from $250 to $10,000 depending on the disbursements made in the quarter by the debtor. This represents .16% to 3.3% of disbursements for all categories except the minimum and maximum fees. Such a fee scheme is not so excessive as to be unconstitutional. Here, the Debtors focus on the dollar amount of the fee being assessed against them (which they assert is in excess of $3.5 million). However, the fee is not outrageous when considered as a percentage of the Debtors' disbursements. [FN5]

> FN5. While the minimum fee of $250 could be in excess of 100% of disbursements, in cases where there are no disbursements, the Debtors have not argued that the minimum fee is excessive. In fact, the Debtors argue that all the Debtors, except the parent Debtor, should be charged only the minimum quarterly fee.

The Debtors also argue that the fee is excessive when the number of hours actually expended by the UST on this case is considered. Although the UST has not provided the Debtors with an analysis of the amount of time spent on this particular case, the Debtors estimate that it is no more than 400 hours. With this estimation, the Debtors contend that permitting the collection of over $3.5 million in fees would equate to an hourly rate of $8,750 for UST personnel. When asked to confirm this estimate, the UST stated it was unable to calculate how many hours it had spent on this or any other case. The

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in B.R.
2003 WL 22327933 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 280
**(Cite as: 2003 WL 22327933 (Bankr.D.Del.))**

Debtors assert that, since the facts regarding this issue are solely within the knowledge of the UST, we must make a negative inference that the fees requested far exceed the time expended. *See, e.g., U.S. v. Denver & Rio Grande R.R. Co., 191 U.S. 84, 92 (1903)* ("where the subject-matter of a negative averment lies peculiarly within the knowledge of the other party, the averment is taken as true unless disproved by that party").

Even if we were to assume this fact, we still would not conclude that the fee requested is excessive. The Supreme Court has stated that the government need not precisely determine the exact cost on the system that the fee is to cover. *Sperry, 493 U.S. at 60,* Congress need only establish a fee system that makes a reasonable approximation of what it will cost. *Id.* Guided by *Sperry,* we conclude that, by basing the fee on a portion of a debtor's disbursements, Congress constructed a reasonable approximation of the costs borne by the UST in doing its job. It need do no more. Therefore, we conclude that section 1930(a)(6) of title 28 is constitutional as we have interpreted it in the *Charter* case.

IV. *CONCLUSION*

**\*6** For the foregoing reasons, we grant the UST's Motion for an Order compelling the Debtors to file amended monthly operating reports and to pay delinquent quarterly fees.

An appropriate Order is attached.

ORDER

AND NOW, this 9th day of OCTOBER, 2003, upon consideration of the Motion of the United States Trustee ("UST") for an Order compelling the Debtors to file amended monthly operating reports and to pay delinquent quarterly fees and the Debtors' opposition thereto, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

ORDERED that the Motion is GRANTED; and it is further

ORDERED that the Debtors shall file corrected monthly operating reports reflecting disbursements made on account of each Debtor's operations and shall pay the appropriate quarterly fees due by each Debtor as a result.

2003    WL    22327933    (Bankr.D.Del.),    41 Bankr.Ct.Dec. 280

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

Slip Copy                                                                        Page 1
2004 WL 1172996 (Del.Super.)
**(Cite as: 2004 WL 1172996 (Del.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.

Victoria PESTA
v.
Gail WARREN, individually, and Gary Warren,
individually, and Gail and Gary
Warren, jointly as owners of 604 West Avenue, New
Castle, DE, an apartment
building.

No. Civ.A.03C04294SCD.

Submitted May 10, 2004.
Decided May 13, 2004.

Dear Counsel:

DEL PESCO, J.

**\*1** The plaintiff has filed a motion for partial
summary judgment seeking a ruling that her claim is
not governed by _25 Del. C. § 1501_. It states:
  No person who enters onto private residential or
  farm premises owned or occupied by another
  person, _either as a guest without payment or as a_
  _trespasser_, shall have a cause of action against the
  owner or occupier of such premises for any injuries
  or damages sustained by such person while on the
  premises unless such accident was intentional on
  the part of the owner or occupier or was caused by
  wilful or wanton disregard of the rights of others.
  [FN1]

       FN1. Del.Code Ann. tit. 25, § 1501 (2002).
       (emphasis added)

Plaintiff contends that at the time of the accident, she
was visiting a tenant of the defendant-landlord, and
thus was neither a _guest without payment_ nor a
_trespasser_. Were she either, she would be required to
prove that her injuries were the result of either
intentional or willful and wanton conduct on the part
of the owner.

On June 26, 2001, Victoria Pesta ("Plaintiff") visited
Regina Sheetz at 604 West Ave, Apartment C in New
Castle ("604 West"). As plaintiff descended the
external stairway, which was the sole means of
ingress and egress, she claims that a loose step
caused her to fall and sustain injuries. On the date in
question, the apartment building was owned by Gail
and Gary Warren ("Landlord"). Sheetz was interested
in renting the apartment and was given a key by
Landlord so that she could clean the apartment prior
to signing a lease. Landlord required that Sheetz pay
a security deposit before signing a lease which
deposit was never paid, so no lease commenced.
Landlord claims that it was not until after the incident
in question that Sheetz' presence in the apartment was
known. [FN2]

       FN2. _Bell v. Halfen_, 493 A.2d 304
       (Del.1985).

On July 20, 2001, Landlord filed an action for Debt
and Summary Possession in the Justice of the Peace
Court. A default judgment for two months rent, June
and July, and a Writ of Possession were entered on
August 24, 2001. On September 11, 2001, after the
expiration of the appeal period, the Constable posted
an Eviction Notice at 604 West. Landlord now claims
that Sheetz was not a tenant. Plaintiff argues that the
landlord made a judicial admission in the Justice of
the Peace Court action that Sheetz was a tenant, and
is now barred from taking a contrary position.

Summary judgment may be granted if there are no
material issues of fact, viewing the record in light
most favorable to the non-moving party. [FN3] A
judicial admission is a formal statement by a party in
the course of judicial proceedings, which removes an
admitted fact from the field of controversy. [FN4]
Judicial admissions are recognized in Delaware.
[FN5] The legal significance of the dispute is that if
Sheetz was a tenant, there is case law for the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy
2004 WL 1172996 (Del.Super.)
**(Cite as: 2004 WL 1172996 (Del.Super.))**

Page 2

proposition that while a tenant may be entitled to the protection of 25 Del. C. § 1501, a landlord is not. [FN6] On the other hand, if Sheetz has no legal status, i.e. was a trespasser, plaintiff is arguably a trespasser, too.

FN3. *Moore v. Sizemore,* 405 A.2d 679 (Del.1979).

FN4. 29A Am Jur 2d, Evidence § 770 (1994).

FN5. *Krauss v. State Farm Mutual Automobile Ins. Co.,* Del. Super ., C.A. No. 03C-08-252, Cooch, J. (Apr. 23, 2004) (Mem.Op.) at 11.

FN6. *Ford v. Ja-Sin,* 420 A.2d 184 (Del.1980); *Mosher v. Evans,* Del.Super., C.A. No. 96C-01-020, Terry, J. (Mar. 31, 1998)(Op.) 1998 Del.Super. LEXIS 183.

**\*2** I conclude that the doctrine of judicial estoppel is applicable to this dispute. The landlord sought the benefit of the remedies available under the landlord-tenant statute to secure a judgment against Sheetz and to have her evicted. The predicate of that complaint is the notion that Sheetz was a tenant. That assertion cannot now be repudiated.

The standard of care which is applicable to the claim against the landlord is negligence. [FN7] Thus, plaintiff's motion for partial summary judgment is GRANTED.

FN7. *New Haverford Partnership v. Stroot,* 772 A.2d 792 (Del.2001); *see also Naidu v. Laird,* 539 A.2d 1064 (Del.1988).

IT IS SO ORDERED.

2004 WL 1172996 (Del.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in A.2d                                                Page 1
1989 WL 5374 (Del.Super.)
(Cite as: 1989 WL 5374 (Del.Super.))

H

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.

Cynthia L. ROCHEN, Janis B. Smith, Gladys M.
Harding, Betty L. Langston,
Plaintiffs,
v.
Peter S. HUANG, M.D., Defendant.

Jan. 4, 1989.

Upon defendant's motion for summary judgment.
DENIED.

Roderick R. McKelvie, of Ashby, McKelvie &
Geddes, Wilmington, for plaintiffs.

Victor F. Battaglia, Wayne A. Marvel, and Francis
S. Babiarz, of Biggs & Battaglia, and Robert J.
Katzenstein, of Lassen, Smith, Katzenstein &
Furlow, Wilmington, for defendant.

MEMORANDUM OPINION

GEBELEIN, Judge.

*1 This case is before the Court on the defendant
Peter S. Huang, M.D.'s ("Dr. Huang") motion for
summary judgment. The issue before the Court is
whether a general release which releases all persons
from liability for injuries "which have resulted or
may in the future develop from an accident" or for
injuries "arising out of an occurrence" operates to
release a subsequently treating physician from an
action for an intentional tort when the physician was
treating the person only because they were involved
in an automobile accident. Dr. Huang argues that
general releases executed in other litigation by two
plaintiffs in this action operate to bar these plaintiffs'

claims against him. Since the language of each
release is slightly different, the Court will consider
each separately.

CYNTHIA ROCHEN

Plaintiff Cynthia Rochen ("Rochen") settled
litigation concerning an automobile accident which
occurred June 28, 1982 in Maryland. Rochen
executed a general release which stated the
following:

For the sole consideration of ($100,000.00) One
hundred thousand and no/100--------Dollars, the
undersigned hereby releases and forever
discharges Robert Edward Rodney [the defendant in that
action] his heirs, executors, administrators, agents and
assigns, and all other persons, firms or corporations
liable or, who might be claimed to be liable, none of
whom admit any liability to the undersigned by all
expressly deny any liability, from any and all claims,
demands, damages, actions, causes of action or suits
of any kind or nature whatsoever, and particularly on
account of all injuries, known or unknown ... which
have resulted or may in the future develop from an
accident which occurred....

Dr. Huang argues that the language of this release
expressly covers him.

Delaware Courts have long upheld general releases.
See, Adams v. Jankouskus, Del.Supr., 452 A.2d 148,
155 (1982); Chakov v. Outboard Marine Corp.,
Del.Supr., 429 A.2d 984, 985 (1981); Hob Tea Room
v. Miller, Del.Supr., 89 A.2d 851, 856 (1952).
However, in order for a release to protect a third
party as a matter of law, the language of the release
must be crystal clear and unambiguous in its
inclusion of that person among the parties released.
See, Chakov, supra; Egan & Sons Air Conditioning
Co. v. General Motors Corporation, Del.Super., C.A.
No. 86L-MY-18, Gebelein, J. (April 27, 1988). If a
release is ambiguous, the Court may admit extrinsic
evidence to determine the objective intent of the
parties to it. See, Chakov, supra at 985-86. This is
a motion for summary judgment. The Court must at
this stage of the proceedings read the facts of this
case as well as any inferences drawn from them in a
light most favorable to the non-moving parties, the
plaintiffs. Sweetman v. Strescon Ind., Inc.,
Del.Super., 398 A.2d 1319, 1324 (1978). The

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
1989 WL 5374 (Del.Super.)
(Cite as: 1989 WL 5374 (Del.Super.))

Page 2

defendant bears the initial burden of establishing that no material issue of fact exists and that he is entitled to judgment as a matter of law. *Moore v. Sizemore,* Del.Supr., 405 A.2d 679 (1979); Del.Super.Ct.Civ.R. 56(c).

**\*2** The Court finds that the release, when read in a light most favorable to Rochen, does not clearly and unambiguously include Dr. Huang within its protection. The key language is that the release applies to anybody regarding "all injuries ... which have resulted or may in the future develop from an accident...." Since the language of this release does not unambiguously include Dr. Huang or the alleged conduct of Dr. Huang, the Court or trier-of-fact must look at the objective intent of the parties to the release.

The Court notes that the facts are hotly contested; but for the purpose of this motion accepting plaintiff's allegations as true, it appears that the following facts are relevant: 1.) on October 1, 1984, while Rochen was receiving treatment from Dr. Huang for injuries suffered in the automobile accident for which the release was signed, Dr. Huang sexually assaulted her; and 2.) on February 1, 1988 Rochen executed the release referred to *supra.*

Rochen, in her testimony at deposition as cited by Dr. Huang, does not state that the settlement in that action included settlement for the alleged actions of Dr. Huang. Rochen's testimony is ambiguous, and because Rochen is the non-movant in this motion, any ambiguity at this stage of the proceedings must be resolved in her favor. Rochen's purported subjective intent is stated in her affidavit submitted in opposition to this motion. In the affidavit, Rochen states that she filed her action against Dr. Huang in June of 1987. Dr. Huang did not participate in the settlement negotiations of Rochen's automobile accident case. The objective intent which the Court could infer from the actions of Rochen is that the release signed in the previous case does not apply to Dr. Huang. In any event, it is clear that the intent of Rochen in signing the release raises a question of fact for the trier-of-fact to decide. [FN1] Since there is a material issue of fact regarding plaintiff Rochen, defendant Dr. Huang's motion for summary judgment is DENIED. Super.Ct.Civ.R. 56(c).

*JANIS SMITH*

Plaintiff Janis Smith ("Smith") settled litigation concerning an automobile accident which occurred May 9, 1981 in Delaware. Smith executed a general release which stated the following:

That Janis Smith for and in consideration of the sum of Five Hundred Thousand Dollars ($500,000.00) ... does hereby remise, release and forever discharge Merrill L. Detweiler, Hatfield Packing Co. and Hatfield Packing, Inc. [defendants in that action] ... and also any and all other persons, associations and corporations, whether herein named or referred to or not, and who, together with the above named, may be jointly or severally liable to the Undersigned, of and from any and all; and all manner of, actions and causes of action, rights, suits, covenants, contracts, agreements, judgments, claims and demands whatsoever in law or equity, ..., arising from and by reason of any and all KNOWN AND UNKNOWN, FORESEEN AND UNFORESEEN bodily and personal injuries ... which heretofore have been, and which hereafter may be sustained by the undersigned ... and especially from all liability arising out of an occurrence that happened....

**\*3** Literally read, this release states that in return for $500,000, Smith agrees that she will never sue any person again for any reason, and *especially* for any injury arising out of the automobile accident. Thus, if the Court were to give the release a literal reading, Dr. Huang would be released. But then so would any other person whom Smith ever had a cause of action against in her entire life.

If the release is ambiguous, the objective intent of the parties to it governs its scope. *See, Chakov, supra; Egan, supra.* Ambiguity is defined as language that is reasonably capable of being understood in more than one sense. *Black's Law Dictionary* at 73 (5th ed. 1979). *See also, Egan, supra* at 9-10. All factual disputes must be resolved in the non-movant's, Smith's, favor. *See, Sweetman, supra.*

Again the facts are hotly contested but for the purpose of this motion. Accepting plaintiff's allegations as true, the following facts are relevant: 1.) On March 15, 1985, while Smith was receiving treatment from Dr. Huang for injuries suffered in the automobile accident, subject to the release, Dr. Huang sexually assaulted her. 2.) On November 21, 1985, Smith executed the release referred to, *supra.* Later in 1985, Rochen contacted Smith to inquire into actions of Dr. Huang. Smith's purported subjective intent is stated in her affidavit submitted in opposition to this motion. In the affidavit, she states that she had never during that action identified or asserted any claim against Dr. Huang. She states her

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
1989 WL 5374 (Del.Super.)
**(Cite as: 1989 WL 5374 (Del.Super.))**

Page 3

subjective belief that the release she signed in that case was in return for a settlement for the injuries she sustained in the automobile accident, not for any injuries she may have suffered at the hands of Dr. Huang four years after the accident.

The release in this case can be reasonably interpreted in more than one way. This Court cannot reasonably interpret the release so that Smith may never be a plaintiff against any person ever again. Thus, the objective intent of the parties to the release must determine whether they meant it to apply to Dr. Huang. *See, Chakov, supra.* There are no facts on the record which lead this Court to believe that Smith intended to release Dr. Huang when she released the defendants in the prior action.

In any event, where ambiguity exists, the question of intent is one for the trier-of-fact. Since a material issue of fact exists as to the plaintiff Smith, defendant Dr. Huang's motion for summary judgment is DENIED. [FN2] Super.Ct.Civ.R. 56(c).

IT IS SO ORDERED.

> FN1. Likewise, there is no evidence of record to indicate that the defendant had any responsibility toward plaintiff for the actions of Dr. Huang nor that they had any intent to procure a release for him.

> FN2. *See* footnote 1, *supra.*

1989 WL 5374 (Del.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in A.2d                                                    Page 1
1999 WL 1241073 (Del.Super.)
**(Cite as: 1999 WL 1241073 (Del.Super.))**

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.

Charles W. TUCKER, Plaintiff,
v.
ALBUN, INC., trading as Seacoast Speedway, a
Delaware Corporation, Defendant.

**No. Civ.A. 97C-04-025.**

Sept. 27, 1999.

Bruce A. Rogers, Rogers & Mooney, P.A.,
Georgetown, Delaware, for the Plaintiff.

Marla L. Tocker, Marshall, Dennehey, Warner,
Coleman & Goggin, Wilmington, Delaware, for
Defendants.

MEMORANDUM OPINION

LEE, J.

Motion for Summary Judgment--Denied

*1 Charles W. Tucker ("Plaintiff") filed this suit
against the Defendant, Albun Inc., trading as
Seacoast Speedway ("Defendant"), seeking damages
for injuries that he incurred when he fell on the
Defendant's property. The Defendant's moved for
summary judgment arguing that the Plaintiff's claims
are barred under either of two theories. The
Defendant first urges that the Release the Plaintiff
signed is a complete bar to suit. Second, the
Defendant argues that if the Release does not bar suit,
then, in the alternative, the Plaintiff, in light of his
"equal knowledge" of the risks involved, assumed the
risk of the presence of holes and ruts in the infield of
the racetrack. Moreover, they urge, Seacoast had no
duty to warn the Plaintiff of these "obvious inherent
risks." This is the Court's decision on the motion.

*STATEMENT OF FACTS* [FN1]

FN1. As this matter is before the Court on
the Defendant's Motion for Summary
Judgment, the facts recited below are those
most favorable to the non-moving party, the
Plaintiff.

The Defendant, Albun, Inc., owns Seacoast
Speedway ("Speedway") near Georgetown,
Delaware. The stock of Albun, Inc. is, in turn, owned
by Mrs. Loretta G. Williams and her husband. The
Plaintiff, Charles W. Tucker, was a frequent visitor to
the racetrack. He attended most Saturday evening
races for a number of years as either a race driver, a
member of a pit crew, or a spectator.

On September 9, 1995, the Plaintiff went to the
Speedway to attend the races as a spectator. Upon
arrival, Mrs. Williams asked if he would work on a
"wrecker" in return for free admission to the
Speedway. The Plaintiff agreed to help out and
signed the Release from liability required of all
persons entering the pit or infield areas. This was the
same release he had signed on prior occasions when
entering the pit area. [FN2]

FN2. The text of the Release states:
IN CONSIDERATION of being permitted
to compete, officiate, observe, work for, or
participate in any way in the EVENT(S) or
being permitted to enter for any purpose any
RESTRICTED AREA (defined as any area
requiring special authorization, credentials,
or permission to enter or any area to which
admission by the general public is restricted
or prohibited), EACH OF THE
UNDERSIGNED, for himself, his personal
representatives, heirs, and next of kin:
1. Acknowledges, agrees, and represents that
he has or will immediately upon entering
such RESTRICTED AREAS, and will
continuously thereafter, inspect the
RESTRICTED AREAS which he enters and
he further agrees and warrants that, if at any
time, he is in or about RESTRICTED
AREAS and he feels anything to be unsafe,
he will immediately advise the officials of
such and will leave the RESTRICTED

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
1999 WL 1241073 (Del.Super.)
(Cite as: 1999 WL 1241073 (Del.Super.))

· Page 2

AREAS and/or refuse to participate further in the EVENT(S).

2. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the promoters, participants, racing associations, sanctioning organizations or any subdivision thereof, track operators, track owners, officials, car owners, drivers, pit crews, rescue personnel, any persons in any RESTRICTED AREA, promoters, sponsors, advertisers, owners and lessees of premises used to conduct the EVENT(S), premises and event inspectors, surveyors, underwriters, consultants and other who give recommendations, directions, or instructions . or engage in risk evaluation or loss control activities regarding the premises or EVENT(S) and each of them, their directors, officers, agents and employees, all for the purposes herein referred to as "Releasees," FROM ALL LIABILITY TO THE UNDERSIGNED, his personal representatives, assigns, heirs, and next of kin FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN DEATH OF THE UNDERSIGNED ARISING OUT OF OR RELATED TO THE EVENT(S), WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

3. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the Releasees and each of them FROM ANY LOSS, LIABILITY, DAMAGE, OR COST they may incur arising out of or related to the EVENT(S) WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

4. HEREBY ASSUMES · FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE arising out of or related to the EVENT(S) whether caused by the NEGLIGENCE OF RELEASEES or otherwise.

5. HEREBY acknowledges that THE ACTIVITIES OF THE EVENT(S) ARE VERY DANGEROUS and involve the risk of serious injury and/or death and/or property damage. Each of THE UNDERSIGNED also expressly. acknowledges that INJURIES RECEIVED

MAY BE COMPOUNDED OR INCREASED BY NEGLIGENT RESCUE OPERATIONS OR PROCEDURES OF THE RELEASEES.

6. HEREBY agrees that this Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the Releasees, INCLUDING NEGLIGENT RESCUE OPERATIONS and is intended to be as broad and inclusive as is permitted by the laws of the Province or State in which the Event(s) is/are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED IT FREELY AND VOLUNTARILY WITHOUT INDUCEMENT, ASSURANCE OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW. ·

His duties that evening, while on the wrecker, were to assist in the removal of wrecked or disabled race cars and any debris from the racing surface. He was to be stationed with the other wreckers in the infield area. During the race, one of the participating race cars lost its rear bumper. Before the cars could come around the track again, the Plaintiff and his partner on the wrecker that evening ran from their truck in the infield to the track so that they could retrieve the bumper from the racing surface.

The infield at the Speedway has a grassy surface that extends to the clay race track. While running to retrieve the bumper, the Plaintiff stepped in a hole and fell down. This fall injured his shoulder giving rise to the present litigation.

### DISCUSSION

I. *Standard of Review.*

In acting on a motion for summary judgment, "the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                              Page 3
1999 WL 1241073 (Del.Super.)
**(Cite as: 1999 WL 1241073 (Del.Super.))**

Court's function is to examine the record and determine whether there is a genuine issue of fact." *Battista v. Chrysler Corp.*, Del.Super., 454 A.2d 286, 290 (1982). Summary judgment is appropriate where, after viewing the record in a light most favorable to the non-moving party, the Court finds there are no genuine issues of material fact. *Camac v. Hall*, Del.Super., 698 A.2d 394, 396 (1996). A material factual dispute exists where the parties to the action disagree on the factual predicates for the legal principles they advance. *Merrill v. Crothall-American, Inc.*, Del.Supr., 606 A.2d 96, 99 (1992). Moreover, the "Court's decision must be based only on the record presented, including all pleadings, affidavits, depositions, admissions, and answers to interrogatories, not on what evidence is 'potentially possible.'" ' *Id.* (quoting *Rochester v. Katalan*, Del.Supr., 320 A.2d 704, 708, fn. 7 (1974)). "Summary judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law to the circumstances." *Camac* at 396; *Ebersole v. Lowengrub*, Del.Supr., 180 A.2d 467, 470 (1962).

II. *Application of the Law to the Facts of the Case.*

**\*2** In applying the summary judgment standard to this case, summary judgment should only be granted if there are no material issues of fact in dispute regarding both the validity and the application of the release and the potential liability of the Defendant to the Plaintiff under a negligence theory.

A. *The Release.* Delaware Courts recognize the validity of a general release of a party from liability. *Chakov v. Outboard Marine Corp.*, Del.Supr., 429 A.2d 984, 985 (1981); *see also Hollerman v. Hicks*, Del.Super., C.A. 95C-06-027, Terry, J. (April 8, 1997)(Opinion). A release is valid if it meets three requirements. First, the release must not be ambiguous. Second, the release must not be unconscionable. Finally, the release must not be against public policy. *Hallman v. Dover Downs, Inc.*, D. Del., C.A. No. 85-618-CMW, Wright, J. (Dec. 31, 1986). *See also Egan & Sons Air Conditioning Co. v. General Motors Corp.*, Del.Super., C.A. Nos. 88L-MY-18 and 88L-MY-28, Gebelein, J. (April 27, 1988) (Mem.Op.) at 6 ( [T]he Court first scrutinizes the releases for their validity, secondly for their clarity, and finally, for their scope.).

In determining whether a release is clear or ambiguous, the Delaware courts have developed an often used standard.

In construing a release, the intent of the parties as to its scope and effect are [sic] controlling, and the court will attempt to ascertain the intent from the overall language of the document. And where the language of the release is clear and unambiguous, it will not lightly be set aside. Where, however, the language of the release is ambiguous, it must be construed most strongly against the party who drafted it. (Internal citations omitted) *Judge Trucking Co. v. Estate of Cooper*, C.A. No. 92C-03-041, Graves, J. (Sept. 29, 1994) (Mem.Op.) at 8. *See also, Hollerman* at 7.

Moreover, through a release, a person may assume all risks, known or unknown, inherent in a particular situation. "However, for the release to be effective, it must appear that the plaintiff understood the terms of the agreement, or that a reasonable person in his position would have understood the terms.... The evidence must establish that the parties intended the release to apply to the particular conduct of the defendant which has caused the harm." *McDonough v. National Off-Road Bicycle Ass.*, D. Del., C.A. No. 95-504-SLR, Robinson, J. (June 2, 1997) (Mem.Op.)(Summary judgment denied where the Court found there was a material issue of fact whether a cyclist competing in a race contemplated harm occurring from a source other than the normal hazards of bicycle racing before executing a release, normal hazards being collision or rough roads and trails not necessarily death from heat stroke allegedly caused by negligent event management).

In a case relied upon by both parties in the present action, *Hallman v. Dover Downs, Inc., supra*, the United States District Court for the District of Delaware denied a motion for summary judgment in a case with facts that are almost on "all fours" with those of the current dispute. In *Hallman*, a newspaper reporter was assigned by the paper to cover a stock car race at Dover Downs International Speedway. Before he was allowed onto the premises, he was required to sign a release. *Hallman* at 2. Moreover, the reporter's press badge contained a liability release for personal injury or property damage. *Id.* at 3. While reporting on the races, the reporter leaned against a wooden railing that gave way and caused him to fall to the ground below. The Court denied Dover Downs' motion for summary judgment after finding that material issues of fact existed as to whether the release was ambiguous, unconscionable, or violated public policy. *Id.* at 5.

**\*3** Judge Wright, in *Hallman*, found the release was ambiguous after evaluating the pre-trial statements of both the reporter and the track's representatives

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
1999 WL 1241073 (Del.Super.)
(Cite as: 1999 WL 1241073 (Del.Super.))

concerning their perceptions of the release. The track representative stated that: "I am not a lawyer, and you are asking questions of me that I am not qualified to ask or answer....If you don't understand it, then I certainly am not the one to try and tell you what it says." *Id.* at 6. The reporter, when asked about his understanding of the release, stated:

A. Well, without having thought about it very much, I assumed that it was a, it indicated that I knew there was a race going on, there were some risks involved with fast cars on a race track. And that the dangers inherent with that risk, it would be my, would be reasonable for me to expect to be careful about those dangers.

Q: What, if anything, did you think it had to do with the grounds and building?

A: I wouldn't have thought it had anything to do with the grounds. *Id.* at 7.

Because these statements by the parties indicated a fundamental lack of understanding by both on the nature of the release, Judge Wright ruled that the release could not be clear and unambiguous as a matter of law. *Id.* The Court also found that the release was not clear and unambiguous because most of the release was in small print with only certain portions in bold type and the reporters may not have had adequate opportunity to digest the full import of the release at the time of execution. *Id.* at 8.

Judge Wright, in *Hallman,* also found there was an issue of fact whether the release was unconscionable. *Id.* at 9. Two issues drove this finding by the court. First, the Court found the reporter had no choice; he had to sign the release in order to do his job as a reporter. *Id.* at 9. Second, the Court found the release did not necessarily relate to the harm involved. "An uncontrollable car may be a foreseeable risk, but a defective structure is not." *Id.* at 10.

Finally, Judge Wright found that summary judgment was not appropriate because the record was not sufficiently developed to rule as a matter of law that the release did not violate public policy. The Court based this finding on two different theories. First, the law does not favor provisions relieving one from liability for harm caused by his own fault or wrong. *Id.* at 11. For such a provision to be upheld, it must be "crystal clear" in its language evincing the clear intent of the parties to absolve the protected party of liability created by that party's own actions. *Id.* at 12 (citing *J.A. Jones Const. Co. v. City of Dover,* Del.Super., 372 A.2d 540, 553 (1977)). As noted above, the Court found the scope of the release was not certain, thus, summary judgment was not

appropriate. As an alternative, Judge Wright looked to see if the release violated public policy because the person seeking the release owed a duty to the other. *Id.* at 13. On this issue, the court did not possess sufficient facts to determine whether the race track owed a duty to reporters covering the races. *Id.* at 14.

*4 In the present case, the motion for summary judgment is denied with regard to the issue of the release Mr. Tucker executed prior to his admittance to the Speedway. The motion is denied because under current Delaware law, including the *Hallman* case, there is a material issue of fact as to the nature of the terms of the release. Thus, the release is ambiguous and the legal effects of the release can only be evaluated after a full airing of the facts.

Mr. Tucker would have a difficult time arguing that he did not know he was signing a release. In his statements, he repeatedly acknowledges that a signed release was a prerequisite to admittance to the pit and infield areas. For this reason, Mr. Tucker's situation is somewhat different from that of the reporter in *Hallman* where there was some question of whether he even knew he was signing a release.

In this case, the release does not clearly define the scope of the Release's coverage. In addressing the potential harms or injuries covered by the Release, it states that it covers those harms "ARISING OUT OF OR RELATED TO THE EVENT(S)...." This language is repeated several times in the release and is used consistently. This language, however, is subject to two interpretations. A very broad interpretation could find that as soon as a person came to the track and signed the release, everything that could happen to him arises out of the events. The argument would be that for the event, the person would not be in attendance and thus subject to harm. A narrower interpretation would be that the contract language refers to only those potential harms with causes directly related to the events at the Speedway--car racing. In *Hallman,* Judge Wright appears to have subscribed to the narrower interpretation because the language in that release more clearly attempts to cover more activities. The *Hallman* release addresses harms "ARISING OUT OF OR RELATED TO ANY LOSS ... THAT MAY BE SUSTAINED ... WHILE IN, ON, ENROUTE TO, FROM, OR OUT OF SAID PREMISES FROM ANY CAUSE WHATSOEVER...." *Hallman* at 3.

This ambiguity in the language of the Release appears to have caused the parties to differ in their understanding of the Release. Like in *Hallman,* in the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
1999 WL 1241073 (Del.Super.)
**(Cite as: 1999 WL 1241073 (Del.Super.))**

Page 5

instant case, the statements of the parties indicate there may be some question concerning the parties' intent or understanding as to the scope and coverage of the release Tucker signed. Illustrative of this conflict is the testimony of both the Plaintiff and the Defendant at arbitration. The following indicates the Defendant's view of the release:

Q: What is your understanding of the release? What is your understanding of what the purpose of it is and what does it do?

A: That in return for being allowed to be in the pit area as a participant, you sign that you will not-- you sign a release waiver. You waive your right to- -I don't know how to put it in words. All the words are there. It says, "Release and Waiver of Liability." That is what you're saying. You are releasing the track and anyone associated with it; that you know that racing is a dangerous sport and you are willing to give up your rights in order to get in there.

*5 Q: And would you consider that as your understanding, that you would give up all rights no matter what happened?

A: Right. You do--you have rules. We have rules. A lot of safety rules. We're very safety conscious. And so, you know, you have rules. And the driver, when he signs in, he agrees to abide by the rules and that he will keep order in his pit, things like that. (Arbitration Transcript at 20-21, Cross-examination of Loretta G. Williams (Aug. 21, 1997)).

The plaintiff, in his testimony at arbitration states:

Q: What did you think you were signing when you signed [the release]?

A: The outtake that I have gotten off of the release forms is if you're negligent to the point where something happens and it's your fault, then they are not liable. But if you're employed by them, it's just like workmen's compensation. (Arbitration Transcript at 51, Direct Examination of Charles W. Tucker (Aug. 21, 1997)).

While both parties appear to have a general idea of the intended effect of the release signed by the Plaintiff, before the Court can rule as a matter of law that the release bars the Plaintiff's claim, several other factual issues must be developed and resolved. The most important issue would be the scope of the release. Did the parties intend that the release cover every conceivable harm-- including those not related to racing? The Defendant's testimony above seems to give the impression that the release is meant to cover only those potential harms caused by racing related actions. Further evidence of this is that only persons who were in close proximity to the cars and the racing action were required to sign a release. General spectators, in the grandstand, do not have to sign a release. Judge Wright took note of a similar fact in *Hallman.* There, Dover Downs required a release for auto racing events but not for horse racing. *Hallman* at 3.

The Defendant tries to link the Plaintiff's injury to racing activities by arguing that "it is logical that ruts or grooves in the grassy area adjacent to a race track are an inherent risk and that they could pose a potential tripping hazard for one 'working' in the racing infield." *Defendants Opening Brief in Support of Its Motion for Summary Judgment* at 10. The Defendant's theory is that ruts and grooves are caused by the emergency vehicles driving over the infield surface and debris thrown from the track. *Defendant's Opening Brief* at 10 and 13. If this theory is accepted, then holes, grooves, and ruts in the infield may be risks associated with racing and thus within the scope of the Release even under the narrow interpretation of the Release language. The question of whether those types of risks are inherent in racing activities is a question of fact and should be reserved for a trier of fact. Because there is some question concerning the scope of this release, its terms are ambiguous.

While the discussion above, concerning the ambiguities of the release, is somewhat lengthy, the remaining questions concerning unconscionability and public policy are less complex and can be dealt with summarily. In *Hallman,* Judge Wright found that the release in issue may have been unconscionable because there was an absence of meaningful choice. The reporter had no choice but to sign the release, otherwise he could not complete his assigned tasks. *Hallman* at 8-9. Judge Wright also found the release was unconscionable because the release did not "bear a reasonable relation to the risk involved." *Hallman* at 10. In the present case, the Plaintiff did have a meaningful choice. He could have paid for general admission and watched the races from the grandstand with the rest of the spectators. Thus, the Release cannot be unconscionable for that reason. However, as discussed above, there may be a question of whether the Release covers the harm that occurred to the Plaintiff. Thus, the Release may be unconscionable if it bears no relation to the risk involved.

*6 Finally, a release may be invalid if it violates public policy. A release may violate public policy if the language exempting the benefitted party from his own negligence is not "crystal clear." *Hallman* at 12 (citing *J.A. Jones Const. Co. v. City of Dover,*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A00286

Page 6
Not Reported in A.2d
1999 WL 1241073 (Del.Super.)
(Cite as: 1999 WL 1241073 (Del.Super.))

Del.Super., 372 A.2d 540, 553 (1977)). Moreover, "a term exempting a party from tort liability for harm negligently caused is unenforceable on grounds of public policy if the term exempts one charged with the duty of public service from liability to one whom that duty is owed." *Hallman* at 13. The language of this Release, "WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE," is fairly clear that even negligence of the Speedway is to be included within the purview of the release. However, to fall within this clause, the negligent acts or omissions of the Defendant must fall within the scope of activities covered by the Release. Moreover, the issue of whether the defendant owes the Plaintiff any duty, and the nature of such duty depends on the Plaintiff's classification and is discussed in the next section of this Opinion.

Ultimately, this Court finds that there are material issues of fact that must be addressed before the validity and legal effect of the Release may be evaluated. The Release may be invalid because it is ambiguous, unconscionable, or violates public policy. To properly rule on these issues, this Court needs additional facts that are either in dispute or are not in the record before the Court. Most importantly, the Court would need facts tending to show the intended scope of the Release. Once those facts are settled, the validity and effect of the release can be evaluated. For these reasons, summary judgment is not appropriate for the issue of the release.

*Defendant's Duty to the Plaintiff and Assumption of Risk.* The Defendant's Opening Brief presents a second argument for Summary Judgment. The Defendant argues that it owed the Plaintiff no duty and that the Plaintiff assumed the risk upon entering the infield area. Summary judgment is not appropriate on either issue.

In this case, the Defendant is the possessor of land upon which the Plaintiff was injured. The duty of care a possessor of land owes to one injured on the property will depend on the classification of the one injured. At any given time, a person may fall into any number of classifications designed by our society. A person may be a mother or a father or teacher or a doctor. The law also classifies people. Under the law, a person may be a master, a servant, or an independent contractor. Moreover, a person on the property of another may be either a trespasser, a licensee, or an invitee. A person's classification under the law often determines the rights and duties of that person.

In the present case, the issue of whether the Plaintiff was an employee or servant of the Defendant at the time of the injury has been decided in the negative. *Tucker v. Seacoast Speedway*, Del.Super., C.A. No. 99A-02-002, Lee, J. (July 1, 1999)(Mem.Op.). Thus, any duty the Defendant, as the possessor of the land, owed the Plaintiff will be defined by the Plaintiff's status at the time he was on the property. In determining the Plaintiff's status, "the Courts of Delaware employ the classifications set forth in the Restatement (Second) of Torts (1965)." *Absalom v. Mason-Dixon Post No. 7234*, Del.Super., C.A. No. 95C-09-022, Lee, J. (Sept. 18, 1996) (Mem.Op.) at 5. *See also, DiOSSI v. Maroney*, Del.Supr., 548 A.2d 1361, 1365 (1988).

*7 The Restatement (Second) of Torts (1965) ("Restatement") classifies persons as either Possessors, Trespassers, Licensees, or Invitees.

A Possessor of land is defined by the Restatement as:

(a) a person who is in occupation of the land with intent to control it or

(b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or

(c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b). Restatement (Second) of Torts § 328E (1965).

A trespasser is "a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." Restatement (Second) of Torts § 329 (1965). The Restatement defines a Licensee as "a person who is privileged to enter or remain on land only by virtue of possessor's consent." Restatement (Second) of Torts § 330 (1965). Three types of people are licensees:

1. One whose presence on the land is solely for his own purposes, in which the possessor has no interest, and to whom the privilege of entering is extended as a mere personal favor to the individual.

2. The members of the possessor's household, and

3. Social guests of the possessor. Restatement (Second) of Torts § 330 cmt. h (1965).

Also, in the context of licensees, "consent" and "permission" means that the person in possession of the premises is "willing that the [licensee] shall enter or remain on the land, or that his conduct is such as to give the [licensee] reason to believe that he is willing that he shall enter, if he so desires." Restatement (Second) of Torts § 330 cmt. c (1965).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
1999 WL 1241073 (Del.Super.)
(Cite as: 1999 WL 1241073 (Del.Super.))

Page 7

Finally, the Restatement uses the following definition for an Invitee:

§ 332. Invitee Defined

(1) An invitee is either a public invitee or a business visitor.

(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.

(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land. Restatement (Second) of Torts § 332 (1965).

The comments to this section on invitees are particularly helpful in fleshing out how one becomes an invitee of a landowner or possessor. For instance, "[a]n invitation differs from mere permission in this: an invitation is conduct which justifies others in believing that the possessor desires them to enter the land; permission is conduct justifying others in believing that the possessor is willing that they shall enter if they desire to do so." Restatement (Second) of Torts § 332 cmt. b (1965). Moreover, "the nature of the use to which the possessor puts his land is often sufficient to express to the reasonable understanding of the public, or classes or members of it, a willingness or unwillingness to receive them." Restatement (Second) of Torts § 332 cmt. c (1965).

*8 [T]he visitor has the status of an invitee only while he is on the part of the land to which his invitation extends--or in other words, the part of the land upon which the possessor gives him reason to believe that his presence is desired for the purpose for which he has come. In determining the area included within the invitation, the purpose for which the land is held open, or the particular business purpose for which the invitation is extended, is of great importance. Restatement (Second) of Torts § 332 cmt. l (1965).

Finally, if the invitee exceeds the scope of the invitation, the invitee becomes either a trespasser or a licensee, depending on whether he goes on that portion of the property without or with the consent of the possessor. Id.

While the parties in the present action seem to assume that the Plaintiff was a business invitee at the time of the injury, there seems to be some argument that he is something other than an invitee. For instance, the Plaintiff would not have been an invitee if by going into the infield of the track he exceeded the scope of his original invitation. The facts in the record before this Court show a discrepancy in the scope of the Plaintiff's invitation to the track. The

Defendant testified that the Plaintiff was given a "pit pass" as a favor. He had no duties and could freely enter the pit area. He would not have access to the infield area. (Arbitration Transcript pp. 9-10.) The Defendant, however, states that when he arrived at the track that night, he was given free admission in exchange for working as a "wrecker" in the infield. Id. at 45- 46. From this, the Court can discern that there exists material factual disputes concerning those facts necessary for an accurate determination of the Plaintiff's status at the time of the injury. To make this determination, the following facts would need to be developed. First, what was the scope of his invitation into the Speedway that evening? Was he supposed to be in the pits or on a wrecker? If the Plaintiff was not to be in the infield initially, did the Defendant see him there during the evening and not tell him to leave? These facts would help determine if he was an invitee, licensee, or a trespasser at the time of the injury. Because there are material issues of fact in dispute on the issue of the Plaintiff's status, I am denying summary judgment in favor of a full and complete development of the salient facts. As summary judgment is denied for this reason, this Opinion will not address the duties a landowner owes to each of the classifications of persons.

In addition to the duty issue addressed above, the Defendant, in its Opening Brief in Support of its Motion for Summary Judgment, argues that the "PLAINTIFF ASSUMED THE RISK OF HIS INJURY SINCE HE WAS EQUAL IN KNOWLEDGE TO SEACOAST OF THE RISK OF THE PRESENCE OF HOLES AND RUTS IN THE INFIELD...." Defendant's Opening Brief at 11. The affirmative defense of "assumption of risk" is "fact intensive and not susceptible to disposition, as a matter of law, through summary judgment." DiOSSI at 1368. See also Morris v. Hitchens, Del.Super., C.A. No. 91C-05-045, Lee, J.(March 18, 1993)(Mem.Op.) at 4-5.

### CONCLUSION

*9 There are material issues of fact to be developed and decided concerning several matters. First, the release is ambiguous. Second, the factual predicate for determining the Plaintiff's status while on the Defendant's land is disputed. Finally, the issue of any assumption of risk by the Plaintiff is not subject to a motion for summary judgment. Thus, the Defendant's Motion for Summary Judgment is denied.

IT IS SO ORDERED.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A00288

Not Reported in A.2d
1999 WL 1241073 (Del.Super.)
**(Cite as: 1999 WL 1241073 (Del.Super.))**

1999 WL 1241073 (Del.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A00289

## CERTIFICATE OF SERVICE

I, Stuart M. Brown, certify that on this 5th day of August, 2004, I caused true and correct copies of the **Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint** to be served on the following parties in the manner indicated:

**VIA HAND-DELIVERY**
Stephen W. Spence
Phillips, Goldman & Spence
1200 N. Broom Street
Wilmington, DE 19806

Office of the United States Trustee
844 King Street, Room 2207
Lockbox 35
Wilmington, DE 19801

**VIA U.S. FIRST-CLASS MAIL**
Scot R. Withers, Esquire
Lamb McERlane PC
24 E. Market Street
P.O. Box 565
West Chester, PA 19381-0565

/s/ Stuart M. Brown
Stuart M. Brown

A00290

## File a Court document:

04-52879-PJW NHI, Inc. v. Fleetboston Financial Corporation et al

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Brown, Stuart M. entered on 8/5/2004 at 7:00 PM EDT
and filed on 8/5/2004
**Case Name:**        NHI, Inc. v. Fleetboston Financial Corporation et al
**Case Number:**      04-52879-PJW
**Document Number:** 27

**Docket Text:**
Memorandum of Law *in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint
(Related Docket Nos. 1 and 17)* (related document(s)[26] ) Filed by Fleetboston Financial Corporation
(Attachments: # (1) Exhibit A# (2) Exhibit B# (3) Attachment Unreported Cases# (4) Certificate of
Service) (Brown, Stuart)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**U:\Wilmington Bankruptcy\NHI\Mtn to Dismiss 080504\Memo of Law in Support
of Mtn to Dismiss.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=8/5/2004] [FileNumber=2862483-0]
[96c74a6a0f1138a07b52346620ab1410073d2dbe34474cfb04dd892ff8fe70f05d85b
78e20df75a15f121a81f59400b8897a9192434ea61c3e762f461bd6df51]]
**Document description:**Exhibit A
**Original filename:**U:\Wilmington Bankruptcy\NHI\Mtn to Dismiss 080504\Exhibit A.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=8/5/2004] [FileNumber=2862483-1]
[2ff2e5b1fb846c6cdcae97bfdc2868c8e9374a50e67bfc5a762a976f6bbc2c3118079
998fdc54a91caa4069c58cd005eda70e34eab6bf2d6700582304905f4cd]]
**Document description:**Exhibit B
**Original filename:**U:\Wilmington Bankruptcy\NHI\Mtn to Dismiss 080504\Exhibit B.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=8/5/2004] [FileNumber=2862483-2]
[0f7e66b929a580c10849d6422d294f67ecce526ba0d131b86c4985dc342140e538f29
3e95a90920fc1e9c9aba664308051135093a99dd47df0c7243ca6757e23]]
**Document description:**Attachment Unreported Cases
**Original filename:**U:\Wilmington Bankruptcy\NHI\Mtn to Dismiss 080504\Unreported Cases.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=8/5/2004] [FileNumber=2862483-3]
[748590546aa122a43d2c67e63e18ccefa8cfa470f0f8a7de53555a7a0d78063bb9e7d
567c6a976344cfb2fd5082ee486e102a76562ae626657de954e32c444b2]]
**Document description:**Certificate of Service

https://ecf.deb.uscourts.gov/cgi-bin/Dispatch.pl?362881853675333                           8/5/2004

**A00291**

**Original filename:**U:\Wilmington Bankruptcy\NHI\Mtn to Dismiss 080504\COS re Memo of Law in Support of Mtn to Dismiss.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=8/5/2004] [FileNumber=2862483-4]
[35405e8b6ea93ed3e19dcf1f60860d103aaf5fdd0b042a49f496a7d4fde5ef72050b5
2bb802381ebef9735ea65953be3ff31374b1e7e695094a771e1738b3079]]

**04-52879-PJW Notice will be electronically mailed to:**

Stuart M. Brown    sbrown@edwardsangell.com, DEbankruptcy@edwardsangell.com

Denise Seastone Kraft    dkraft@edwardsangell.com

Stephen W. Spence    tap@pgslaw.com;th@pgslaw.com

**04-52879-PJW Notice will not be electronically mailed to:**

A00292