11.   "The Release" means the agreement and release dated February 26, 2002.

## INSTRUCTIONS

If any form or privilege or other protection from disclosure is claimed as a ground for withholding responsive information, set forth with respect to the information, the date, title, identity of the author, subject matter (without revealing the information for which a privilege is claimed), and all facts or bases on which you claim the privilege. The claim should contain specificity so as to permit the Court to make a full determination of its validity.

## INTERROGATORIES

1.   Please identify by name, address and relationship to the answering party, the individual or individuals answering these interrogatories.

3

A00456

2.    What documents do you contend support the contention that Fleet, KMR, Riesner or Justis were agents of Mercantile with respect to the services performed for NHI by Fleet, KMR, Riesner or Justis? Please include, but do not limit your response to:

     a.    the authors of the documents;

     b.    the recipient of the documents;

     c.    date of and location of the documents; and

     d.    the contents of the documents.

3.    Did Fleet, KMR, Riesner or Justis participate in the negotiation or drafting of the Release? I f y our a nswer t o t his q uestion i s a nything o ther t han a n u nqualified "no", please set forth all facts referring or relating to that participation.

4

4.    Please identify all communications, whether written or oral, between Mercantile and Fleet, KMR, Riesner or Justis regarding the Release. Please include, but do not limit your response to:

a.    The individuals participating in the communication;

b.    The dates of the communications;

c.    The subject areas addressed in the communications; and

d.    if in writing, any and all documents referring or relating to the communication.

5

A00458

5.    Please identify all communications, whether written or oral, between Mercantile and Fleet, KMR, Riesner or Justis regarding any agency relationship between Mercantile and Fleet, KMR, Riesner or Justis regarding NHI. Please include, but do not limit your response to:

      a.    The individuals participating in the communications;

      b.    The dates of the communications;

      c.    The subject areas addressed in the communications; and

      d.    if in writing, any and all documents referring or relating to the communication.

6.    Please set forth all facts upon which you base your allegations that Fleet, KMR, Riesner or Justis were the agents of Mercantile?

6

7.    Please set forth all facts upon which you base your allegations that Release was intended to apply to Fleet, KMR, Riesner or Justis?

10.    Since NHI's institution of the above referenced adversary proceeding, has Fleet, KMR, Riesner or Justis had any communication with Mercantile regarding the substance of the allegations made in the adversary proceeding, including but not limited to Fleet's, KMR's, Riesner's or Justis' assertion that they were agents of Mercantile. Please include, but do not limit your response to:

a.    The individuals participating in the communications;

b.    The dates of the communications;

c.    The subject areas addressed in the communications; and

7

A00460

d.    if in writing, any and all documents referring or relating to the communication.

Respectfully submitted,

OF COUNSEL

James C. Sargent, Esquire
PA Attorney I.D. No. 28642
Guy A. Donatelli, Esquire
PA Attorney I.D. No. 44205
Scot R. Withers, Esquire
PA Attorney I.D. No. 84309
LAMB MCERLANE PC
24 East Market Street
Post Office Box 565
West Chester, PA  19381-0565
(610) 430-8000

_____
Stephen W. Spence, Esquire (#2033)
PHILLIPS GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
(302) 655-4210 (fax)
Co-counsel to NHI, Inc.

A00461

# Exhibit "B"

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:                                            :

NHI, INC.,                                        :     Case No. 02-10651 (PJW)
A DELAWARE CORPORATION                            :     Chapter 11
                                                  :
                                                  :
NHI, INC.,                                        :
                                                  :
          Plaintiff                               :
                                                  :     Adversary No. 04-52879
     v.                                           :
                                                  :
FLEET BOSTON FINANCIAL                            :
COPORATION, KMR MANAGEMENT,                       :
INC., ROBERT RIESNER and WARING                   :
S. JUSTIS, JR.,                                   :
                                                  :
          Defendants                              :

### AFFIDAVIT OF JOHN M. MERVINE, JR. IN SUPPORT OF PLAINTIFF'S
### SUPPLEMENTAL RESPONSE TO DEFENDANTS' MOTION TO DISMISS

STATE OF MARYLAND              )
                               ) ss
COUNTY OF TALBOT               )

John M. Mervine, Jr., being duly sworn, deposes and says:

1.     Until November 7, 2001, I was Chairman of the Board of Directors of NHI as well as a shareholder.  I was the President of NHI until it closed in 2002.  I am familiar with the allegations made in NHI's First Amended Complaint.

2.     I am a signatory to the Agreement dated February 26, 2002, between Mercantile Safe Deposit and Trust Company "(Mercantile")  in which I and other members of my family, on their own behalf and on behalf of NHI and the businesses associated with NHI, released Mercantile from all claims which we may have had against Mercantile.

3.    The Agreement dated February 26, 2002, also released Mercantile's officers, directors, employees, attorneys and agents.

4.    I understand that the defendants in the above action, Fleet Boston Financial, KMR Management, Inc., Robert Riesner and Waring S. Justis, Jr., have asserted that they are or were agents of Mercantile so that the release provisions of the Agreement dated February 26, 2002, apply to them as a defense to the claims made against them by NHI in the above captioned action.

5.    I submit this affidavit, based upon my personal knowledge, in support of NHI's position that the defendants were not agents of Mercantile and were not intended to be the beneficiaries of any release in the Agreement dated February 26, 2002.

6.    As set forth in the complaint, I developed a growing suspicion that defendants, KMR Management, Inc., Robert Riesner and Waring S. Justis, Jr. in particular, were more intent on maximizing the recovery for Mercantile than they were concerned about solving NHI's financial problems and returning NHI to profitability.

7.    It almost appeared to me that defendants, particularly KMR Management, Inc., Robert Riesner and Waring S. Justis, Jr., were simply doing what Mercantile wanted them to do irrespective of the harm their conduct was having on NHI.

8.    After a meeting on January 22, 2002, between Robert Riesner, a representative of Mecantile Bank and me, I raised with Robert Riesner, President of KMR Management, Inc., that it appeared that KMR Management, Inc. was more interested in making the Bank happy than it was in looking out for NHI's interests and questioned who KMR Management, Inc. was serving.

9.    Mr. Riesner denied that KMR Management, Inc. was working for Merantile's benefit, and assured me that KMR Management was working for NHI and only NHI.

10.    And, by letter dated January 24, 2004, Mr. Riesner confirmed for me in writing the statements made at the January 22, 2002 conversation as follows:

> Further, allow me to reiterate my correction of your understanding of our fee payment. Mercantile Bank never did or would they pay our fees, nor would KMR accept fees from Mercantile.    Our client is Nanticoke Homes, as evidenced by various written communications on record.  We shall continue to provide the leadership and guidance that we have supplied in the past in an effort to bring the refinancing and asset sale to a successful conclusion so we may settle with the bank and continue the retail side of Nanticoke.

A copy of the January 24, 2002 letter from Mr. Riesner to me is attached hereto as Exhibit "A".

11.    None of the defendants ever took the position that they were the agents of Mercantile; to the contrary, they denied it and continued to confirm that NHI was their client and that they answered to NHI for NHI's benefit.

**A00465**

12.     Accordingly, there was no intention on my part, or on the part of any other signatory, in the Agreement dated February 26, 2002, to release Fleet Boston Financial, KMR Management, Inc., Robert Riesner and Waring S. Justis, Jr. as agents of Mercantile nor was it the intention of NHI to release Fleet Boston Financial, KMR Management, Inc., Robert Riesner and Waring S. Justis, Jr. from any claims or causes of action based upon their failure to discharge their independent contractual duties to NHI or any other failures under the law. Indeed, they were specifically excluded from the release for the purposes of suing them.


JOHN M. MERVINE, JR.


Sworn and subscribed before me this
_____ day of November, 2004.


NOTARY PUBLIC


BRENDA L. FORBES
Notary Public, State of Maryland
County of Talbot
My Commission Expires October 1, 2007

A00466

Att. Guy
Don.Telh

610 692 0877

# KMR
## MANAGEMENT

John H Mervine Jr.
Nanticoke Homes, Inc
Greenwood DE
January 24, 2002

Dear Mcky:

May I first comments about our meeting with Mercantile January 22nd 2002 at the Center Club. The two hours of preparation were certainly well worthwhile in my opinion. I feel that we presented a united front and gave the bank a concise picture of our recommendation for the resolution of our current problem. I also feel that the bank is making every effort to work with us during this difficult period.

I wish to make a matter of record that we recognize the difficulties that the Company is facing at this time as a result of the lack of cash and working capital. At this point in time KMR is billing for its services without the expectation of payment in the immediate future. Further, allow me to reiterate my correction of your understanding of our fee payment. Mercantile Bank never did nor would they pay our fees, nor would KMR accept fees from Mercantile. Our client is Nanticoke Homes, as evidenced by various written communications on record. We shall continue to provide the leadership and guidance that we have supplied in the past in an effort to bring the refinancing and asset sales to a successful conclusion so we may settle with the bank and continue the retail side of Nanticoke. We all agreed that this is the most desirable conclusion to our current situation and that it is essential for all of us to continue to work toward this goal.

With the expectation that this will be concluded in a successful manner, we wish to propose for your acceptance, a formulation of a success fee to be paid to KMR upon the achievement of the refinancing and sale of assets described in our presentation to Mercantile Bank.

The consummation of this transaction will result in the introduction of $7,300,000 to the benefit of the Company and the settlement of the Mercantile debt and the release by Mercantile of the personal obligations currently in effect as part of the Loan Documentation. Upon such an event, KMR shall be granted a success fee of 2.5% of the total value of the new funding and a release to Nanticoke Homes as regards the outstanding fee amounts owed by Nanticoke to KMR. Further, to the extent that KMR participates in and is actively engaged in the settlement of unsecured debt KMR shall be granted a fee of ½ of 1 percent of the compromise amount of forgiven outstanding debt to the unsecured creditors.

For the purposes of this transaction KMR shall support the effort by the continuation of service of Waring Justis as project manager supported by Robert Riesner are in whatever manner is appropriate for the successful conclusion of the transaction.

It should be noted that at the present time KMR is owed $103,475.11 through January 18, 2002. We shall continue to submit appropriate documentation of time and expenses expended in our continuing

Executive Quarters

1300 Computer Ave.

Suite G-30

Willow Grove,

PA 19090

Tel: 215.830.1369

Fax: 215.657.7170

A00467

**KMR MANAGEMENT**

Executive Quarters

2100 Computer Ave.

Suite G-30

Willow Grove,

PA 19090

Tel: 215.830.1369

Fax: 215.657.7140

role with Nanticoke, which amounts will be forgiven upon the successful refinancing.

In this continuing relationship Nanticoke Homes agrees to indemnify, hold harmless, and defend KMR its affiliated entities directors officers and employees and agents upon demand to the full extent lawful and from time to time from 10 against any and all losses actions claims damages liability or costs including reasonable legal fees and costs incurred in directly or indirectly caused by relating to the based upon or arising out of KMR more performing its services. Nanticoke Homes shall have no duty to indemnify or hold harmless KMR for any loss action claim or damage which is found in a final judgment by a court of competent jurisdiction to have resulted from the gross negligence willful misconduct or on lawful activities of KMR.

KMR will not be held liable for errors in judgment.

Nanticoke agree that KMR's liability tool kit to the extent not otherwise limited indemnified or held harmless his limited to the amount of fees paid by Nanticoke to KMR.

This agreement to indemnify and hold harmless shall survive termination of KMR's duties as a consultant.

This agreement shall inure to the benefit love and be binding upon the parties and their respective administrator, assigns, heirs, and successors

Sincerely,

KMR Management, Inc., by
Robert Riesner, President

Accepted by
Nanticoke Homes, Inc by

John H Mervine, Jr
Chairman

Witnessed by

## File a Court document:

04-52879-PJW NHI, Inc. v. Fleetboston Financial Corporation et al

**U.S. Bankruptcy Court**

**District of Delaware**

Notice of Electronic Filing

The following transaction was received from Spence, Stephen W. entered on 11/22/2004 at 12:51 PM EST and filed on 11/22/2004

**Case Name:**      NHI, Inc. v. Fleetboston Financial Corporation et al
**Case Number:**    04-52879-PJW
**Document Number:** 40

**Docket Text:**
Brief *Memorandum of Law of Plaintiff NHI, Inc. in Opposition to Defendants' Motion to Strike Certification of Counsel for Plaintiff, NHI, Inc. (Exhibit A and B)* (related document(s)[12], [35], [39] ) Filed by NHI, Inc. (Spence, Stephen)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** NHI brief.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=11/22/2004] [FileNumber=3192776-0
] [7840fad72e5e315f624c93669439ced1aeb5be18d93a0747c309cac64cc58a2752e
a63d76f9222dc5597452178c1c38d339fbd72e938d6918ab4b9eb7bf78ea6]]

**04-52879-PJW Notice will be electronically mailed to:**

Stuart M. Brown      sbrown@edwardsangell.com, DEbankruptcy@edwardsangell.com

Denise Seastone Kraft    dkraft@edwardsangell.com

Stephen W. Spence     tap@pgslaw.com;th@pgslaw.com

**04-52879-PJW Notice will not be electronically mailed to:**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|                                   |   |                          |
|-----------------------------------|---|--------------------------|
| IN RE:                            | : | Case No. 02-10651 (PJW)  |
| NHI, INC.,<br>A DELAWARE CORPORATION | : | Chapter 11               |
|                                   | : |                          |
| NHI, INC.,                        | : |                          |
|       Plaintiff                   | : |                          |
|    v.                             | : | Adversary No. 04-52879   |
| FLEET BOSTON FINANCIAL            | : |                          |
| COPRORATION, KMR MANAGEMENT,      | : |                          |
| INC., ROBERT RIESNER and WARING   | : |                          |
| S. JUSTIS, JR.,                   | : |                          |
|       Defendants                  | : |                          |

### PLAINTIFF'S SECOND AMENDED COMPLAINT

### I. PARTIES

1.    Plaintiff, NHI, Inc. (hereinafter "NHI"), formerly known as Nanticoke Homes, Inc., filed a voluntary petition for relief (hereinafter "Petition") with the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code on March 1, 2002. NHI was incorporated under the laws of the State of Delaware on October 7, 1971. Prior to 2002, NHI was engaged in manufacturing customized homes at its plant in Greenwood, Delaware. NHI is currently maintaining its business as a Debtor-in-Possession.

Dkt. No. __45__

Date Filed: __12-10-04__

2.        Defendant, KMR Management, Inc. (hereinafter "KMR"), on information and belief, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Blue Bell, Pennsylvania.

3.        Defendant, Fleet Boston Financial Corporation (hereinafter "Fleet"), on information and belief, is a corporation organized and existing under the laws of the State of Rhode Island, with its principal place of business in Boston, Massachusetts.  On information and belief, Fleet is successor in interest to Progress Financial Corporation (hereinafter "Progress"), which, on information and belief, was a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.   On information and belief, Defendant KMR was a wholly owned subsidiary of Progress, and is now a wholly owned subsidiary of Defendant Fleet.

4.        Defendant, Robert Riesner, on information and belief, is an adult resident of or near Willow Grove, Pennsylvania.  Defendant Riesner is the President of Defendant KMR.

5.        Defendant, Waring S. Justis, Jr., on information and belief, is an adult resident of or near Baltimore, Maryland.  Defendant Justis is the Regional Vice President of Defendant KMR.

## II. JURISDICTION AND VENUE

6.        All of the negotiations, discussions, representations and agreements out of which this case arises took place in Delaware; hence this court has jurisdiction over this matter and

2

A00471

venue is appropriate in Wilmington, Delaware.  This Court also has venue pursuant to 28 U.S.C.

§ 1409 and jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 11 U.S.C. §§ 544(B),

547, 548, 550.

      7.      This matter is a core proceeding pursuant to 28 U.S.C. § 1409.

## III. FACTUAL BACKGROUND

      8.      NHI was the first pre-manufactured home-builder in Delaware and, for more than

thirty years, conducted a successful manufacturing business.  NHI was founded by John M.

Mervine, Sr. (hereinafter "Mervine Sr.").

      9.      Prior to 2002, NHI's primary manufacturing facilities were located in Greenwood,

Delaware.  NHI constructed homes according to customers' specifications and delivered and

installed the homes on the customers' property.  NHI's customer base was comprised of

individuals and real estate developers throughout the Mid-Atlantic region, although the largest

concentration was in Delaware and Maryland.

      10.      NHI's business was highly successful.  Over three decades, it established a

reputation for manufacturing a high-quality, high-end product in an expanding market.  At the

height of NHI's business, it had a sales volume of approximately $60,000,000 a year.  In the

early 1990's, NHI decided to expand its business into the manufacturing of lower-cost homes.

A00472

11.     Thereafter, Shawnee Homes, Inc. (hereinafter "Shawnee") was incorporated under the laws of the State of Delaware on November 2, 1992. From 1992 until October 2000, Shawnee was engaged in the manufacturing of mid-range houses at a plant in Salisbury, Maryland, which was owned by Shawnee Enterprises, LLC, a Delaware Limited Liability Corporation, owned by Mervine Sr.'s three sons, John M. Mervine, Jr. (hereinafter "Mervine Jr."), William H. Mervine, III, and Gregory O. Mervine, and their children. Shawnee's customer base was comprised mostly of Mervine Family owned real estate developers. Shawnee was run by William H. Mervine, III.

12.     Pawnee Homes, Inc. (hereinafter "Pawnee") was incorporated under the laws of the State of Delaware on October 29, 1996. From 1996 to October 2000, Pawnee was engaged in the manufacturing of low-range homes at a NHI plant in Greenwood, Delaware. Pawnee's customer base was comprised mostly of mobile home dealers and mobile home communities. Pawnee was run by Mervine Jr.

13.     Nanticoke Homes Midwest, Inc. (hereinafter "Midwest"), was incorporated under the laws of the State of Indiana in 1999. From 1999 to April 2000, Midwest was engaged in the manufacturing of homes at a plant in Indianapolis, Indiana, which was owned by Shawnee Enterprises Midwest, LLC, which was owned by Shawnee Enterprises, LLC. Midwest was run by Gregory O. Mervine.

14.     In establishing Shawnee, Pawnee and Midwest, NHI greatly increased it indebtedness with the enthusiastic support of its banking institution, Mercantile Safe Deposit and

4

Trust Company (hereinafter "Mercantile"). All outstanding debt owed to Mercantile by NHI and its affiliated companies, Shawnee, Pawnee and Midwest, and its affiliated real estate holding companies and Freedom Motors, Custom Decorative Mouldings, National Concrete and Classic Carpet (hereinafter "Related Entities"), was cross collateralized.

15.    For approximately 6 years prior to 2002, NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities maintained both Term and Demand Loan Lines of Credit relationships with Mercantile. The interest rate on the Term and Demand Loan Lines of Credit with Mercantile was Mercantile's prime rate.

16.    In late 1999, NHI owned assets with an adjusted book value of approximately $26 million and NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities owed approximately $17 million in multiple loans to Mercantile. NHI had a net book value of approximately $8 million.

17.    Because of increasing cash demands, NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities borrowed on the Term and Demand Loan Lines of Credit with Mercantile in excess of the loans' collateral value, yet remained current on all payment and monetary terms under the Term and Demand Loan Lines of Credit.

18.    Because the balance of the Term and Demand Loan Lines of Credit was in excess of the collateral value, as of late 1999 all of NHI's outstanding debt to Mercantile was considered by Mercantile to be in technical default under the loan documents. All outstanding

A00474

cross collateralized debt of NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities was considered cross defaulted.

19.    On or about March 21, 2000, Mercantile and NHI entered into a Forbearance Agreement (hereinafter "First Forbearance Agreement"). Pursuant to the First Forbearance Agreement, the interest rate on NHI's Term and Demand Loan Lines of Credit with Mercantile increased from Mercantile's prime rate to Mercantile's prime rate, plus two percent, and all debt of NHI, Shawnee, Pawnee, Midwest and NHI's Related Entities, totaling approximately $17.5 million, was being monitored on a month-to-month basis by NHI's contact at Mercantile, Tim Naylon.

20.    On or about June 15, 2000, NHI agreed with Naylon that NHI would bring its outstanding debt to Mercantile down to $9 million by selling off non-operating assets.

21.    On or about July 27, 2000, Mercantile and NHI entered into a Second Forbearance Agreement.

22.    In August 2000, NHI learned that Mercantile was considering calling NHI's loans and placing NHI into liquidation, even though NHI remained current on its loan payments, but was alleged to be in default of technical, non-monetary covenants.

23.    In September 2000, NHI listed for sale various properties, divisions, related entities and other assets.

6

A00475

24.    In early October 2000, Mervine Jr. became Chief Executive Officer of NHI.

25.    On or about October 6, 2000, Scott Krieger, Mercantile's workout manager, replaced Naylon as NHI's contact at Mercantile. Krieger insisted – on the threat of calling all of Mercantile's loans – that NHI retain a management consultant and strongly suggested/urged that Defendants KMR, Riesner and Justis be hired as management consultants. Krieger assured NHI that Defendants KMR, Riesner and Justis were "turn around" consultants, as opposed to "liquidation guys."

26.    On or about October 18, 2000, Krieger indicated to NHI that Mercantile would provide an additional $1.5 million of financing for NHI if KMR, Riesner and Justis considered NHI to be a viable going concern.

27.    On or about October 19, 2000, under the threat of calling all of Mercantile's loans, NHI, Pawnee, Shawnee, Midwest and the Mervine family, entered into a Consulting Agreement with Defendants KMR, Riesner and Justis. A copy of the Consulting Agreement and the amendments thereto are attached hereto as Exhibit "A" (hereinafter the "Consulting Agreement").

28.    Under the Consulting Agreement, KMR, Riesner and Justis, who had represented themselves to be highly skilled professionals, agreed to provide NHI with professional management for the purposes of helping to stabilize NHI's financial condition and perpetuating

7

NHI's business. Under the Consulting Agreement, KMR, Riesner and Justis undertook to act as fiduciaries, assumed positions of responsibility and undertook a duty of loyalty with respect to NHI as NHI's agents. Pursuant to the Consulting Agreement, KMR, Riesner and Justis assumed the complete control, responsibility and authority for managing the business of NHI.

29.     On or about October 25, 2000, the Mervine family met with KMR, Riesner and Justis in Baltimore, Maryland. KMR proposed a plan whereby NHI would cut expenses, sell non-operating assets, close Pawnee and move Shawnee to Greenwood, Delaware, and KMR would hire a Chief Financial Officer and General Manager for NHI and approach Mercantile to request another forbearance agreement and the provision of additional funds to NHI. To effectuate the plan, the members of the Mervine family agreed to cut their own salaries by fifty percent and to give Mercantile first mortgage liens on their personal residences.

30.     Under the Consulting Agreement, NHI agreed to pay KMR certain specified hourly rates for services rendered.

31.     From March 2001 through May 2001, KMR, Riesner and Justis hired Pasqualle Petrucci as NHI's Plant Manager, Michael Cottingham as NHI's Chief Financial Officer and G. Robert Lord as NHI's Sales Manager.

32.     After assuming control of NHI, unbeknownst to any of the Mervine family, KMR, Riesner and Justis embarked on a short-sighted and result-oriented management scheme to scuttle and liquidate NHI in direct breach of the Consulting Agreement and in violation of their

8

A00477

fiduciary duties and obligations of loyalty.   KMR, Riesner and Justis made their primary priorities the paying down of NHI's debt to Mercantile and the collection of exorbitant and extorted consulting fees for KMR, while at the same time relegating NHI's business operations and viability as a going concern to distant secondary priorities, in direct contravention of the Consulting Agreement.

33.     Upon information and belief, Riesner and/or Justis were in contact with Mercantile at least daily during the term of the Consulting Agreement.

34.     Upon information and belief, Riesner and/or Justis were also in contact with Progress, predecessor to Fleet, at least daily during the term of the Consulting Agreement.

35.     Upon information and belief, Riesner and/or Justis apprised Progress, predecessor to Fleet, of the day-to-day business operations of NHI.

36.     Upon information and belief, Progress, predecessor to Fleet, participated with KMR, Riesner and Justis in the making of day-to-day business decisions at NHI.

37.     Mervine Jr. and the other members of the Mervine Family were excluded by KMR, Riesner and Justis from any and all discussions with Progress, predecessor to Fleet.

A00478

38.    All contact made by KMR and/or Riesner and/or Justis to Progress, predecessor to Fleet, was c onducted b ehind c losed d oors a nd w ithout t he p articipation o f M ervine J r. o r t he Mervine Family.

39.    When Riesner and/or Justis went behind closed doors to contact Progress, predecessor to Fleet, Riesner and/or Justis would indicate that they were going to "talk to their boss".

40.    When Mervine Jr. requested that Riesner and/or Justis put Mervine Jr. in direct contact with their "boss", Riesner and/or Justis refused to do so.

41.    When Mervine Jr. asked Riesner and/or Justis who at Progress, predecessor to Fleet, Mervine Jr. could speak to, or who was in charge at Progress, predecessor to Fleet, Riesner and/or Justis responded, "We are Progress."

42.    Accordingly, i t i s b elieved a nd t herefore a lleged t hat K MR, Riesner and J ustis took their instructions from Progress, predecessor to Fleet.

43.    Fleet is therefore liable to NHI as successor in interest to Progress.

44.    By the end of December 2000, KMR, Riesner and Justis had written approximately $500,000 in checks, which Mercantile refused to cover because a third

10

forbearance agreement had not been negotiated or signed. NHI's outstanding debt to Mercantile was reduced to $11.5 million as a result of the sale of assets by NHI.

45.    On or about January 2, 2001, Mercantile and NHI entered into a Third Forbearance Agreement made effective to December 31, 2000. Mercantile subsequently covered the approximately $500,000 in checks issued by KMR, Riesner and Justis that had not been paid by Mercantile.

46.    In 2001, KMR, Riesner and Justis continued on a concentrated course of action to pay Mercantile and KMR at the fastest possible rate without regard to the continuation of NHI's business, while stripping NHI of assets. In collaboration with Krieger, KMR, Riesner and Justis discontinued paying NHI's vendors, suppliers, health care claims and taxing authorities, removed critical employees from plant operations, shipped homes out of the plant prior to completion and with substantial defects, failed to complete homes in the field and focused on short-term returns to Mercantile and KMR, without any concern for the long-term impact on NHI, which were in fact ruinous to NHI's viability as a going concern.

47.    At the same time, although NHI was still only in technical default with Mercantile, KMR, Riesner and Justis systematically made payments to Mercantile the day after late fees and penalties were incurred. It was apparent that KMR, Riesner and Justis were not concerned with NHI's ability to continue as a going concern – rather, the sole concern of KMR, Riesner and Justis was that Mercantile and KMR be paid.

11

48.    By the beginning of September 2001, due to the systematic failure of KMR, Riesner and Justis to pay NHI's vendors and suppliers, NHI was the named defendant in approximately twenty-two lawsuits by its customers, vendors and suppliers.  By October 2001, the number of lawsuits against NHI by its customers, vendors and suppliers had increased to forty-three.  As a result, NHI was unable to secure supplies and materials from vendors, which resulted in NHI having to resort to alternate and more expensive sources of supplies and materials.

49.    On or about October 22, 2001, KMR, Riesner and Justis removed Cottingham as Chief Financial Officer of NHI.

50.    Under the management of NHI by KMR, Riesner and Justis, NHI's reputation as a manufacturer of high quality customized homes was ruined.  KMR, Riesner and Justis proved to be incompetent in running the day-to-day operations of NHI's manufacturing business. Instead of operating NHI with the intent that it continue as a viable going concern, the sole objective of KMR, Riesner and Justis was to pay down bank debt and liquidate assets to the benefit of Mercantile and KMR, and to the detriment of NHI's shareholders.

51.    In November 2001, it became apparent to Mervine Jr. that KMR, Riesner and Justis had been systematically failing to make state tax payments on behalf of NHI, failing to pay workers' compensation benefits, and failing to pay health and life insurance premiums and 401(k) contributions for NHI employees.  Mervine Jr. confronted Justis with this information and accused Justis of fraud.

12

52.    On or about November 7, 2001, KMR, Riesner and Justis fired Mervine Jr.

53.    When Mervine Jr. was fired, Riesner and Justis indicated to Mervine Jr. that their "boss told them KMR could not continue with [Mervine Jr.] in the way."

54.    On or about November 12, 2001, Justis proposed to the Mervine Family that Justis be named Chief Executive Officer and Chief Operating Officer of NHI.

55.    On or about November 20, 2001, the members of the Mervine family and the Directors of NHI decided that it was not in NHI's best interests that Justis be Chief Executive Officer and Chief Operating Officer of NHI.  Accordingly, Justis's proposal was revoked by NHI.

56.    Because it had become apparent that NHI needed to discontinue its relationship with Mercantile and find a new lender, the Mervine family initiated negotiations with various lenders.

57.    In January 2002, after already having been paid approximately $1.9 million by NHI, KMR, Riesner and Justis submitted a proposal to find a new lender to replace Mercantile in exchange for a two and one-half percent commission.

13

A00482

58.    On or about January 29, 2002, Justis abruptly "went on vacation" and did not maintain contact with NHI or the members of the Mervine family. This was the first indication to NHI and the Mervine family that KMR was pulling out. Justis never returned to work at NHI.

59.    From October 2000 through January 2002, KMR, Riesner and Justis grossly mismanaged NHI's business; made decisions which maximized cash flows to Mercantile and KMR while destroying NHI's relationships with its customers, suppliers, contractors, employees, etc., with the obvious result of destroying NHI as a viable going concern; violated the Consulting Agreement; breached their fiduciary duty and duty of loyalty by – rather than providing "turn around" management -- devising a stealth plan to strip NHI of all cash and assets possible before running NHI into liquidation, all for the sole benefit of Mercantile, KMR, Riesner and Justis, and to the extreme detriment and prejudice of NHI and its shareholders and creditors.

60.    By February 2002, as a result of the gross mismanagement of NHI by KMR, Riesner and Justis, NHI was in such dire financial straits that it was not able to re-finance or sell its operations as a going concern.

61.    From October 2000 through February 2002, a period of approximately fourteen months, KMR, Riesner and Justis caused NHI to pay KMR consulting fees of approximately $1.9 million.

62.    On or about February 6, 2002, Mercantile demanded payment on all of NHI's loans and lines of credit.

14

63.    Thereafter, on or about February 26, 2002, the members of the Mervine family found themselves in such financial duress that they entered into an agreement with Mercantile, which over the next twenty months settled NHI's debt with Mercantile, satisfied Mercantile's liens on the assets of NHI and the Mervine family members' personal residences, and released Mercantile from all liability to NHI.

64.    NHI never received the additional $1.5 million of funding from Mercantile, even though KMR, Riesner and Justis assured Mercantile that NHI was a viable going concern.

65.    NHI terminated its manufacturing operations on February 19, 2002.

66.    On March 1, 2002, NHI filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code.

## COUNT I

### NHI v. Fleet, KMR, Riesner and Justis

### Breach of Contract

67.    The allegations set forth in paragraphs 1 through 66 above are incorporated herein as though fully set forth at length.

68.    NHI engaged KMR, Riesner and Justis under the Consulting Agreement.

15

69.     As part of the Consulting Agreement, on November 12, 2001, NHI and KMR entered into an agreement whereby the parties agreed that Riesner and Justis would perform the functions which a Chief Executive Officer and Chief Operating Officer would perform.

70.     NHI engaged KMR, Riesner and Justis solely at the direction of Mercantile to serve as NHI's management consultants.

71.     KMR, Riesner and Justis knew that in the event NHI failed to execute the Consulting Agreement with KMR, Mercantile would call all of the loans and declare NHI in default thereof.

72.     Under the Consulting Agreement, KMR, Riesner and Justis were obligated to provide various services "directed to effect an improvement in the operating structure and content of Nanticoke".

73.     Under the Consulting Agreement, KMR, Riesner and Justis were obligated to provide various services "use its best efforts to cause a change in operation and conduct of the business and to structure the business to profitable operation".

74.     Under the Consulting Agreement, KMR, Riesner and Justis were obligated to "advise and consent with [NHI's] Board of Directors in the implementation of the business plan".

16

75.    Rather than complying with the above referenced terms of the Consulting Agreement, and as set forth above, KMR, Riesner and Justis failed to provide services directed to effect an improvement in the operating structure and content of NHI, failed to use their best efforts to cause a change in operation and conduct of the business and to structure the business to profitable operation, and failed to secure the advice and consent of NHI's Board of Directors in the implementation of the business plan.

76.    To the contrary, and as set forth above, KMR, Riesner and Justis engaged in a course of conduct designed to: a) destroy NHI as a going concern; b) apply NHI's assets only for the benefit of KMR and Mercantile; c) drive NHI into bankruptcy for the benefit of its secured creditors; and d) ignore the desires and wishes of NHI's Board of Directors.

77.    Under the Consulting Agreement, KMR, Riesner and Justis undertook a duty of loyalty. By their course of action, KMR, Riesner and Justis breached their duty of loyalty.

78.    The conduct of KMR, Riesner and Justis constituted a breach of the Consulting Agreement.

79.    The breach by KMR, Riesner and Justis of the Consulting Agreement caused damage to NHI.

17

80.    Fleet is liable for the above referenced damage as successor in interest to Progress.

81.    WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, and any such other and further relief as justice requires.

## COUNT II

### NHI v. Fleet, KMR, Riesner and Justis

### Breach of The Covenant of Good Faith and Fair Dealing

82.    The allegations set forth in paragraphs 1 through 81 above are incorporated herein as though fully set forth at length.

83.    Every contract imposes upon the parties thereto an obligation of good faith and fair dealing.

84.    As set forth above, the conduct of KMR, Riesner and Justis violated the covenant of good faith and fair dealing.

85.    The breach by KMR, Riesner and Justis of their obligation of good faith and fair dealing under the Consulting Agreement and amendments thereto caused damage to NHI.

18

86.    Fleet is liable for the above referenced damage as successor in interest to Progress.

87.    WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, and any such other and further relief as justice requires.

## COUNT III

### NHI v. Fleet, KMR, Riesner and Justis

### Gross Negligence

88.    The allegations set forth in paragraphs 1 through 87 above are incorporated herein as though fully set forth at length.

89.    NHI engaged KMR, Riesner and Justis as consultants to provide statistical analysis, management evaluation, asset evaluation and banking relations, and to perform the functions which a Chief Executive Officer and Chief Operating Officer would perform.

90.    KMR, Riesner and Justis, as consultants to NHI, owed a duty to NHI to act in the best interests of NHI and its shareholders and to engage in a course of conduct to place NHI into the position of operating as an ongoing, profitable concern.

19

A00488

91.    KMR, Riesner and Justis breached that duty to NHI and were grossly negligent in their efforts by failing to act in the best interests of NHI and were grossly negligent in their efforts to engage in a course of conduct to place NHI into the position of operating as an ongoing profitable concern by:

   a. knowingly failing to pay employee wages, workers' compensation benefits and other health benefits;

   b. knowingly failing to pay sales and use taxes;

   c. knowingly delaying the payments to Mercantile until after additional penalties for late payment were assessed;

   d. knowingly assuring payment of KMR's invoices over the payment of other expenses which would have enable NHI to continue in business;

   e. knowingly issuing checks which would not clear;

   f. knowingly reducing NHI's obligations to Mercantile to the point where Mercantile would compel the filing of a bankruptcy;

   g. selling assets of NHI which KMR, Riesner and Justis knew would have been better utilized in the recovery of NHI;

   h. knowingly withholding health insurance premiums from the employees and failing to remit those payments to the health plan provider; and

   i. knowingly issuing checks that would not be honored by Mercantile and which were returned "NSF."

20

A00489

92.    The gross negligence of KMR, Riesner and Justis proximately caused NHI damages.

93.    Fleet is liable for the above referenced damages as successor in interest to Progress.

94.    WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, and any such other and further relief as justice requires.

## COUNT IV

### NHI v. Fleet, KMR, Riesner and Justis

### Breach of Fiduciary Duty

95.    The allegations set forth in paragraphs 1 through 94 above are incorporated herein as though fully set forth at length.

96.    NHI engaged KMR, Riesner and Justis as consultants to provide statistical analysis, management evaluation, asset evaluation and banking relations, and to perform the functions which a Chief Executive Officer and Chief Operating Officer would perform.

21

97.    As consultants, KMR, Riesner and Justis were placed in a position of special confidence and trust, requiring the exercise of utmost discretion as fiduciaries in the protection of the interests of NHI.

98.    In complete abrogation of their fiduciary responsibilities to NHI, KMR, Riesner and Justis intentionally, unlawfully and willfully acted in a fashion that served only the interests of Mercantile and their own self-interests, including but not limited to:

    a.    knowingly failing to pay employee wages, workers' compensation benefits and other health benefits;

    b.    knowingly failing to pay sales and use taxes;

    c.    knowingly delaying the payments to Mercantile until after additional penalties for late payment were assessed;

    d.    knowingly assuring payment of KMR's invoices over the payment of other expenses which would have enable NHI to continue in business;

    e.    knowingly issuing checks which would not clear;

    f.    knowingly reducing NHI's obligations to Mercantile to the point where Mercantile would compel the filing of a bankruptcy;

    g.    selling assets of NHI which KMR, Riesner and Justis knew would have been better utilized in the recovery of NHI;

    h.    knowingly withholding health insurance premiums from the employees and failing to remit those payments to the health plan provider; and

22

i.   knowingly issuing checks that would not be honored by Mercantile and which were returned "NSF."

99.   The breaches by KMR, Riesner and Justis of their duties to NHI caused NHI damages.

100.   Fleet is liable for the above referenced damages as successor in interest to Progress.

101.   WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, and any such other and further relief as justice requires.

## VIII.  COUNT V

### NHI v. Fleet, KMR, Riesner and Justis

### Fraud

102.   The allegations set forth in paragraphs 1 through 101 above are incorporated herein as though fully set forth at length.

103.   On information and belief, KMR through Riesner and Justis engaged in a scheme to defraud and to raid NHI for the purposes of stripping assets in satisfaction of bank debt and

23

A00492

running down NHI to the point where NHI could only be liquidated for the benefit of Mercantile rather than turning the company around, as represented.

104.    KMR, Riesner and Justis took steps to implement their fraudulent purpose including: (1) Mercantile insisting on NHI's hiring KMR; (2) Riesner and Justis knowingly failing to take any action which would permit NHI to continue as a going concern; (3) placing Justis in a position to perform the duties which a Chief Executive Officer and Chief Operating Officer would perform without any intention of having him act in the best interests of NHI; (4) the making of a series of management decisions by KMR, Riesner and Justis, which had the effect of running down NHI's business; (5) insisting on the surrender of voting rights of NHI's shareholders; (6) refusing to supply the NHI Board of Directors with financial information about the company or to involve it in any way in its present operations; (7) placing NHI into an insolvent condition in a fashion designed to protect only Mercantile; and (8) siphoning off approximately $1.9 million to KMR in fees rather that utilizing those assets to assist NHI's business operations.

105.    The NHI Board of Directors relied upon the representations of KMR, Riesner and Justis as to their skill and knowledge to their detriment.

106.    The conduct of KMR, Riesner and Justis was intentional and wrongful.

107.    Fleet is liable for the above referenced conduct as successor in interest to Progress.

24

A00493

108.     WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, plus punitive damages, and any such other and further relief as justice requires.

## COUNT VI

### NHI v. Fleet, KMR, Riesner and Justis

### Waste of Corporate Assets

109.     The allegations set forth in paragraphs 1 through 108 above are incorporated herein as though fully set forth at length.

110.     On information and belief, KMR through Riesner and Justis engaged in a scheme to waste the assets of NHI to the point where NHI could only be liquidated for the benefit of Mercantile.

111.     KMR, Riesner and Justis took steps to implement their fraudulent purpose including: (1) Mercantile insisting on NHI's hiring KMR; (2) Riesner and Justis knowingly failing to take any action which would permit NHI to continue as a going concern; (3) placing Justis in a position to perform the duties which a Chief Executive Officer and Chief Operating Officer would perform without any intention of having him act in the best interests of NHI; (4) the making of a series of management decisions by KMR, Riesner and Justis, which have had the effect of running down NHI's business; (5) insisting on the surrender of voting rights of NHI's

25

A00494

shareholders; (6) refusing to supply NHI with financial information about the company or to involve it in any way in its present operations; (7) placing NHI into bankruptcy in a fashion designed to protect only Mercantile; and (8) siphoning off approximately $1.9 million to KMR in fees rather that utilizing those assets to assist NHI's business operations.

112.    The conduct of KMR, Riesner and Justis was intentional and wrongful.

113.    Fleet is liable for the above referenced conduct as successor in interest to Progress.

114.    WHEREFORE, Plaintiff NHI seeks damages of in excess of $100,000 against Defendants Fleet, KMR, Riesner and Justis, and any such other and further relief as justice requires.

## COUNT VII

### NHI v. Fleet, KMR, Riesner and Justis

### Tortious Interference with Contract and Prospective Business Advantage

115.    The allegations set forth in paragraphs 1 through 114 above are incorporated herein as though fully set forth at length.

26

A00495