# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| FLEETBOSTON FINANCIAL CORPORATION, KMR MANAGEMENT, INC., ROBERT RIESNER, and WARING S. JUSTIS, JR., | ) ) ) ) ) | |
| Appellants, | ) ) | |
| v. | ) ) | Civil Action No. 05-004 (SLR) |
| NHI, INC., | ) ) | |
| Appellee. | ) ) ) | |

## VOLUME III

## APPENDIX TO
## OPENING BRIEF OF APPELLANTS FLEETBOSTON
## FINANCIAL CORPORATION, KMR MANAGEMENT, INC.,
## ROBERT RIESNER AND WARING S. JUSTIS, JR.

Stuart M. Brown, Esq. (No. 4050)
Denise Seastone Kraft, Esq. (No. 2778)
William R. Firth, III, Esq. (No. 4356)
EDWARDS & ANGELL, LLP
919 N. Market Street, 15th Floor
Wilmington, DE 19801
Telephone (302) 777-7770
Facsimile (302) 777-7263

*Attorneys for FleetBoston Financial
Corporation, KMR Management, Inc.,
Robert Riesner and Waring S. Justis, Jr.*

Dated: October 10, 2005

WLM_502925_1/JGREGA

# TABLE OF CONTENTS

VOLUME I

Complaint [D.I. 1] ..........................................................................................................A00001

    Exhibit A – Consulting Agreement dated 10/19/00 .............................................A00030

    Exhibit B – Preference Analysis .........................................................................A00037

Motion to Dismiss by Defendant FleetBoston Financial Corporation [D.I. 12] ...................A00039

    Memorandum of Law in Support of the Motion to Dismiss by
    Defendant FleetBoston Financial Corporation ....................................................A00040

    Affidavit of Stuart M. Brown .............................................................................A00049

    Exhibit A – Pennsylvania Department of State Entity Details
    Regarding KMR Management, Inc. ......................................................................A00051

    Exhibit B – Delaware Secretary of State Merger Documents
    Regarding FleetBoston Financial Corporation .....................................................A00053

Plaintiff's First Amended Complaint [D.I. 17] ...................................................................A00078

Plaintiff's Answer to Motion to Dismiss of Defendant, FleetBoston
    Financial Corporation [D.I. 17] .........................................................................A00119

    Exhibit A – Memorandum in Support of Plaintiff's Answer
    to Motion to Dismiss of Defendant, FleetBoston Financial
    Corporation ........................................................................................................A00122

    Exhibit B – Blackline of Plaintiff's First Amended Complaint ..............................A00125

    Exhibit C – Plaintiff's First Amended Complaint ................................................A00165

Defendants' Motion to Dismiss Plaintiff's First Amended Complaint [D.I. 26] ..................A00208

Memorandum of Law in Support of Defendants' Motion to Dismiss
    Plaintiff's First Amended Complaint [D.I. 27] ...................................................A00212

    Exhibit A – Agreement dated 2/26/02 between Mercantile-Safe
    Deposit and Trust Company and Nanticoke Homes, Inc., et al. .............................A00232

    Exhibit B – Consent Order Approving Interim Agreement
    for Use of Cash Collateral and Adequate Protection .............................................A00251

    Unreported Cases ...............................................................................................A00271

WLM_502925_1/JGREGA

VOLUME II

Answering Brief of Plaintiff NHI, Inc. in Opposition to Defendants'
Motion to Dismiss Plaintiff's Amended Complaint [D.I. 29] ...................................A00293

Defendants' Reply Brief in Response to Answering Brief of
Plaintiff NHI, Inc. in Opposition to Defendants' Motion
to Dismiss Plaintiff's Amended Complaint [D.I. 30] ...............................................A00314

Unreported Decisions.........................................................................................A00326

Letter dated October 8, 2004 from the Honorable Peter J. Walsh
to Counsel [D.I. 32] .................................................................................................A00345

Certification of Counsel for Plaintiff NHI, Inc. [D.I. 34] ......................................A00348

Motion to Strike Certification of Counsel for Plaintiff NHI, Inc. [D.I. 35].........................A00355

Memorandum of Law in Support of Motion to Strike Certification
of Counsel for Plaintiff NHI, Inc. [D.I. 36] ...........................................................A00377

Exhibit 1 – Certification of Counsel for Plaintiff NHI, Inc. ....................................A00389

Exhibit 2 – Notice of Agenda of Matters Scheduled for
Hearing on October 19, 2004 at 10:30 a.m. ...............................................A00396

Unreported Decisions.........................................................................................A00403

Plaintiff's Answer to Motion to Strike Certification of Counsel
for Plaintiff NHI, Inc. [D.I. 39]...............................................................................A00409

Defendants' Reply Brief in Response to Plaintiff's Answer to
Defendants' Motion to Strike Certification of Counsel
for Plaintiff NHI, Inc. [D.I. 41].............................................................................A00415

Memorandum of Law of Plaintiff NHI, Inc. in Opposition to
Defendants' Motion to Strike Certification of Counsel
for Plaintiff NHI, Inc. [D.I. 40].............................................................................A00437

Exhibit A – Request for Production of Documents
Addressed to Defendants FleetBoston Financial
Corporation, KMR Management, Inc., Robert
Riesner and Waring Justis, Jr. of NHI, Inc. and
Interrogatories Addressed to Defendants FleetBoston
Financial Corporation, KMR Management, Inc., Robert
Riesner and Waring Justis, Jr. of NHI, Inc. ...........................................................A00449

Exhibit B – Affidavit of John M. Mervine, Jr. in
Support of Plaintiff's Supplemental Response to
Defendants' Motion to Dismiss ................................................................A00463

Plaintiff's Second Amended Complaint [D.I. 45] ..............................................A00470

    Exhibit A – Consulting Agreement dated 10/19/00 between
    Nanticoke Homes, Inc., et al. and KMR Management, Inc., et al. ............A00510

    Exhibit B – Preference Analysis ..............................................................A00517

Notice of Motion for Leave to Appeal [D.I. 46].................................................A00519

Motion for Leave to Appeal [D.I. 46].................................................................A00521

Notice of Appeal Pursuant to Federal Bankruptcy Procedures
    8001 and 28 U.S.C. Section 158(a)(3) [D.I. 47] ........................................A00532

Designation of the Record and Statement of Issues Pursuant
    to (A) Federal Rule of Appellate Procedure 6(a) and
    (B) Bankruptcy Rule 8006 [D.I. 49] ..........................................................A00535

Answer of Plaintiff NHI, Inc. in Opposition to Defendants'
    Motion for Leave to Appeal [D.I. 50] .......................................................A00541

    Exhibit A – Transcript of December 3, 2004 Hearing
    before the Honorable Peter J. Walsh.........................................................A00551

    Exhibit B – 1998 Del. Ch. LEXIS 115 (*Siegman, et al.
    v. Palomar Medical Technologies, Inc., et al.*) .........................................A00562

    Exhibit C – 1994 Del. Ch. LEXIS 20 (*Coates International,
    Ltd., et al. v. DeMott, et al.*)....................................................................A00572

<u>VOLUME III</u>

Memorandum of Law in Support of Defendants' Motion to
    Dismiss Plaintiff's Second Amended Complaint [D.I. 52].......................A00582

    Unreported Cases .....................................................................................A00608

    Exhibit A – Agreement dated 2/26/02 between Mercantile-Safe
    Deposit and Trust Company and Nanticoke Homes, Inc., et al. ................A00625

    Exhibit B – Consent Order Approving Interim Agreement
    for Use of Cash Collateral and Adequate Protection .................................A00645

WLM_502925_1/JGREGA

Memorandum of Law of Plaintiff NHI, Inc. in Opposition to
    Defendants' Motion to Dismiss Plaintiff's Second
    Amended Complaint [D.I. 54] .................................................................A00675

    Exhibit A – 1999 Del. Super. LEXIS 468 (*Tucker v. Albun, Inc.*) ............A00694

Defendants' Reply Brief in Response to Memorandum of Law of
    Plaintiff NHI, Inc. in Opposition to Defendants' Motion to
    Dismiss Plaintiff's Second Amended Complaint [D.I. 60].......................A00709

    Unreported Cases ......................................................................................A00724

Brief of Plaintiff NHI, Inc. in Opposition to Defendants' Motion
    for Stay Pending Appeal [D.I. 62] ...........................................................A00745

Brief in Reply to Brief of Plaintiff's NHI, Inc. in Opposition to
    Defendant's Motion for a Stay Pending Appeal [D.I. 63] ........................A00764

    Exhibit 1 - Transcript of December 3, 2004 Hearing
    before the Honorable Peter J. Walsh........................................................A00783

    Unreported Cases ......................................................................................A00794

VOLUME IV

Memorandum Opinion [D.I. 65].......................................................................A00807

Order [D.I. 66] ................................................................................................A00830

Notice of Motion for Leave to Appeal [D.I. 68]................................................A00831

Motion for Leave to Appeal [D.I. 68] ..............................................................A00833

    Exhibit A – Order.....................................................................................A00842

    Exhibit B – Memorandum Opinion ..........................................................A00844

Motion of FleetBoston Financial Corporation, KMR Management,
    Inc., Robert Riesner and Waring S. Justis, Jr. for a Stay
    Pending Appeal of the February 11, 2005 Order and
    Memorandum Opinion [D.I. 69]...............................................................A00872

Brief in Support of Motion of FleetBoston Financial Corporation,
    KMR Management, Inc., Robert Riesner and Waring S. Justis,
    Jr. for a Stay Pending Appeal of the February 11, 2005 Order
    and Memorandum Opinion Denying Defendants' Motion to
    Dismiss the Second Amended Complaint [D.I. 70]..................................A00878

    Unreported Cases ......................................................................................A00897

WLM_502925_1/JGREGA

Notice of Appeal Pursuant to Bankruptcy Procedures 8001 and
    28 U.S.C. Section 158(a)(3) [D.I. 156].....................................................A00908

        Exhibit A – Order.................................................................................A00910

        Exhibit B – Memorandum Opinion ......................................................A00912

Interim Agreement for Use of Cash Collateral and Adequate
    Protection [Case D.I. 34] ......................................................................A00940

Transcript of December 3, 2004 Hearing before the Honorable
    Peter J. Walsh......................................................................................A00957

Defendants' Motion to Dismiss Plaintiff's Second Amended
    Complaint [D.I. 51]...............................................................................A00967

Release Agreement dated October 30, 2003 ......................................................A00971

Nanticoke Homes, Inc. Voluntary Chapter 11 Petition .......................................A00979

Addendum Compilation of Appellee Agency Pleading Allegations .....................A00989

WLM_502925_1/JGREGA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | Case No. 02-10651 (PJW) |
| NHI, INC., | : | |
| | : | |
| _____ Debtor. | : | Chapter 11 |
| NHI, INC., | : | |
| | : | |
| Plaintiff | : | Adversary No. 04-52879 |
| | : | |
| v. | : | |
| | : | |
| FLEETBOSTON FINANCIAL | : | |
| CORPORATION, KMR MANAGEMENT, | : | Related Docket No. 45 |
| INC., ROBERT RIESNER and | : | |
| WARING S. JUSTIS, JR., | : | |
| | : | |
| Defendants. | : | |

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANTS' MOTION TO DISMISS
### PLAINTIFF'S SECOND AMENDED COMPLAINT

EDWARDS & ANGELL, LLP
Stuart M. Brown (No. 4050)
Denise Seastone Kraft (No. 2778)
Mark D. Olivere (No. 4291)
919 Market St., 14th Floor
Wilmington, DE 19801
Tel. 302-777-7770
Fax 888-325-9741

Docket # 52
Date: 12/27/04

A00582

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 1

II. PROCEDURAL HISTORY ...................................................................................... 3

III. FACTS ........................................................................................................................ 4

    NHI Released all Claims against Mercantile and its Agents, KMR, Riesner and Justis on February 26, 2002 ............................................................................................................. 8

    In Order to Obtain Mercantile's Consent to Debtor's Use of Cash Collateral, Debtor Reaffirmed to this Court that it had Released all Claims against Mercantile and its Agents, KMR, Riesner and Justis ................................................................................................. 8

    NHI Reaffirms its Release of all Claims against Mercantile and its Agents, KMR, Riesner and Justis on October 30, 2003 ......................................................................................... 10

IV. ARGUMENT ............................................................................................................ 11

    A. Standard Of Law ............................................................................................... 11

    B. The Plaintiff Fails To State A Claim Upon Which Relief Can Be Granted ..................... 12

        1. The Releases Should Not Have the Effect of Converting this Motion to One for Summary Judgment ...................................................................................................... 12

        2. The Cash Collateral Agreement Contains Judicial Admissions Upon which Defendants are Entitled to Rely and Plaintiff is Judicially Estopped from Changing its Position and Pursuing Defendants Based on Plaintiff's Pre-Petition Debt to Mercantile ........................ 13

        3. Plaintiff's Claims have been Released .................................................................... 20

        4. Plaintiff's Avoidance Claims pursuant to 11 U.S.C. § 547 Must Be Dismissed as to Defendants Fleet, Riesner and Justis. ......................................................................... 21

IV. CONCLUSION .......................................................................................................... 23

WLM_501120_1/MOLIVERE

A00583

## TABLE OF AUTHORITIES

**Cases**

Adams v. Jankouskas, Del. Supr., 452 A.2d 148 (1982) ........................................ 20

BP Amoco Chem. Co. v. Sun Oil Co., 166 F. Supp. 2d 984 (D. Del. 2001) ................................ 11

Chakov v. Outboard Marine Corp., Del. Supr., 429 A.2d 984 (1981) ..................................... 20

Conley v. Gibson, 355 U.S. 41 (1957) .................................................................. 11

Davis v. Wakelee, 156 U.S. 680, 15 S.Ct. 555 (1895) .................................................. 16

End of the Road Trust ex rel. Fruehauf Trailer Corp. v. Terex Corp. (In re Fruehauf Trailer Corp.), 250 B.R. 168, 194 (D. Del., 2000) .................................................. 20

Glick v. White Motor Co., 458 F.2d 1287, 1291 (3rd Cir.1972) ........................................ 15

Hishon v. King & Spalding, 467 U.S. 69, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984) ..................... 11

Hob Tea Room v. Miller, Del. Supr., 89 A.2d 851 (1952) .............................................. 20

In re Coastal Plains, Inc., 179 F.3d 197 (5th Cir. 1999) ............................................ 16

In re Foxmeyer Corp., 286 B.R. 546 (Bankr. D. Del. 2002) ............................................ 15

In re Kindred Healthcare, Inc., 2003 WL 22327933 *2-3 (Bankr. D. Del. Oct. 9, 2003) ...... 18, 19

New Hampshire v. Maine, 532 U.S. 742, 121 S.Ct. 1808 (2001) ......................................... 16

Okan's Foods v. Windsor Assocs. Ltd. Pshp. (In re Okan's Foods), 217 B.R. 739 (Bankr. E.D.Pa. 1998) ................................................................................................. 19

Pesta v. Warren, 2004 WL 1172996 (Del. Super. May 13, 2004) ......................................... 13

Rochen v. Huang, Del.Super., 1989 WL 5374 (1989) .................................................... 20

Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355 (3d Cir. 1996) ..................... 16

Schrob v. Catterson, 948 F.2d 1402 (3d Cir. 1991) ................................................... 11

State Farm Mutual Automobile Insurance Co. v. Worthington, 405 F.2d 683 (8th Cir.1968) ..... 15

Three Rivers Motors Ford Co. v. Ford Motor Co., 522 F.2d 885 (3d Cir. 1975) ........................ 17

Tucker v. Albun, Inc., Del.Super. Sept. 27, 1999 WL 1241073 (1999) .................................. 20

United States v. Transport Administrative Services, 260 F.3d 909, 917 (8th Cir. 2001) ............. 16

Williams v. Stone, 109 F.3d 890, 893 (3d Cir. 1997) ................................................. 20

Wilmington Trust Co. v. Calhoun (In re Geotek Communs., Inc.), 282 B.R. 165 (Bankr. D. Del., 2002) (J. Walsh) .................................................................................... 20

**Rules**

Rule 12(b)(6) of the Federal Rules of Civil Procedure ....................................... 1, 4, 11

Rule 7012(b) of the Federal Rules of Bankruptcy Procedure ....................................... 1, 11

**Other Authorities**

2 John W. Strong, McCormick on Evidence §§ 254, 257 (5th ed.1999) .................................. 15

Barry Russell, Bankruptcy Evidence Manual § 801.22 at 884 (2002 ed.2001) ........................... 15

Collier on Bankruptcy, ¶301.03 ....................................................................... 12

**Miscellaneous**

In re NHI, Inc., United States Bankruptcy Court for the District of Delaware, Case No. 02-10651 (PJW) ................................................................................................ 8

WLM_501120_1/MOLIVERE

**A00584**

## I.    **INTRODUCTION**

FleetBoston Financial Corporation ("Fleet"), KMR Management Inc. ("KMR"), Robert Reisner ("Reisner"), and Waring S. Justis ("Justis" and collectively with Fleet, KMR and Reisner the "Defendants"), through the undersigned counsel, respectfully submit this Memorandum Of Law in Support of their Motion to Dismiss Plaintiff's Second Amended Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, as made applicable to this proceeding by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.

Defendants' Motion to Dismiss is premised on three grounds: 1.) dismissal of all claims in the Plaintiff's Second Amended Complaint (the "Second Amended Complaint") based on the doctrines of judicial admission and judicial estoppel and grounded in the release of Defendants as agents of Mercantile; 2.) dismissal of all claims in the Plaintiff's Second Amended Complaint, except the preference action, based on the doctrines of judicial admission and judicial estoppel because the actions are based on the premise that Defendants, acting as Mercantile's agent and in concert with and at the direction of Mercantile, improperly caused Plaintiff to pay down its pre-petition indebtedness to Mercantile (even though Plaintiff represented to the Court in its Cash Collateral Order that no such causes of action exist); and 3.) dismissal of the preference actions against Fleet and the individuals, Riesner and Justis.

Defendants seek dismissal of all claims in the  Second Amended Complaint based on the doctrines of judicial admission and judicial estoppel because the Complaint, First Amended Complaint and Second Amended Complaint clearly alleges that Defendants were agents of Mercantile and in both pre-petition and post-petition agreements, NHI, Inc. ("NHI", "Debtor" or "Plaintiff") expressly released Mercantile **and its agents** of and from any and all claims relating to their obligations to Mercantile or Mercantile's administration of the Debtors' loan.  This

release was expressly contained in a pre-petition agreement dated February 26, 2002, between Mercantile and NHI (and the obligors to Mercantile) (the "February 26, 2002 Agreement"). The February 26, 2002 Agreement was subsequently ratified by and incorporated into a post-petition agreement and release dated October 30, 2003, between Mercantile and NHI (the "October 30, 2003 Agreement"). Since the factual allegations of agency set forth in the Second Amended Complaint state that KMR, Riesner and Justis acted as Mercantile's agents, the Defendants have been generally released by Plaintiff, come within the broad protection of the pre-petition and post-petition releases and cannot be sued by Plaintiff for pre-petition or post-petition acts or failures to act.

Further, with the exception of the preference cause of action, Plaintiffs are judicially estopped from bringing all causes of action stated in the Second Amended Complaint because the actions are based on the entire premise that Defendants, acting as Mercantile's agent and in concert with and at the direction of Mercantile, improperly caused NHI to pay down its pre-petition indebtedness to Mercantile. However, Debtor represented to the Court in the Cash Collateral Agreement and Consent Order ("Cash Collateral Order") [D.I. 34] that "no offsets, defenses or counterclaims to the [pre-petition indebtedness to Mercantile] exist...". Despite its formal representation to the Court, Debtor now attempts to contradict its previous position and asserts a contrary position in the Second Amended Complaint. Under the doctrines of judicial admission and judicial estoppel, Debtor is bound by the original position it took in the Cash Collateral Order and otherwise before this Court and can not now come after Defendants for alleged acts that occurred respecting the pre-petition indebtedness to Mercantile.

In addition, Defendant seeks dismissal of the preference actions against Fleet and the individuals, Riesner and Justis, because the Plaintiffs have not identified any transfers to them.

WLM_501120_1/MOLIVERE

Accordingly, and for all of the reasons set forth below, the claims of Debtor against the Defendants[1] should be dismissed with prejudice.

## II.     PROCEDURAL HISTORY

On March 1, 2002, NHI filed its voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the U.S. Bankruptcy Code. On February 27, 2004, NHI filed an adversary Complaint against the Defendants. [D.I. 1]. The Complaint contained counts for breach of contract, breach of covenant of good faith and fair dealing, gross negligence, breach of fiduciary duty, fraud, waste of corporate assets, tortuous interference with contract and prospective business advantage, fraudulent transfers pursuant to federal and state law (Delaware and Maryland), fraudulent conveyances pursuant to federal and state law (Delaware and Maryland), and avoidance of preferences pursuant to § 547 of the Bankruptcy Code. All acts in the Complaint were alleged to have occurred from October 2000, when KMR entered into a consulting agreement with NHI, until NHI filed for bankruptcy.

Defendants filed a Motion to Dismiss the Complaint on June 1, 2004 [D.I. 12]. NHI responded to the Motion to Dismiss and attached an Amended Complaint to the response [D.I. 17]. At the pretrial hearing on July 8, 2004, the parties orally stipulated on the record that the Amended Complaint attached as an Exhibit to Plaintiff's Answer to Fleet's Motion to Dismiss would be deemed filed as of July 8, 2004.

In both the initial Complaint, and then again through its Amended Complaint and subsequent pleadings filed by Plaintiff in this proceeding, Debtors alleged throughout the pleadings that Defendants were acting as agents of Mercantile Safe Deposit and Trust Company

---

[1] The allegations purportedly sustaining the claims against Fleet are internally inconsistent with Plaintiff's allegations that KMR, Reisner and Justis acted at the direction of Mercantile. Plaintiff has admitted that it named Fleet as a Defendant only because it has the financial wherewithal to satisfy any judgment that might be entered. Accordingly, Fleet should be dismissed if KMR, Reisner and Justis are dismissed.

WLM_501120_1/MOLIVERE

A00587

("Mercantile"). Pursuant to a February 26, 2002 release executed by Plaintiff expressly releasing Mercantile and its agents, such release being attached to numerous pleadings filed in the main bankruptcy case, including the Cash Collateral Agreement and Consent Order [D.I. 34] and stating that "no offsets, defenses or counterclaims to the [pre-petition indebtedness to Mercantile] exist . . .", Defendants filed a Motion to Dismiss the Amended Complaint. [D.I. 26].

Following briefing by both parties, in which NHI made repeated allegations of agency on the part of Defendants as agent and Mercantile as principal, counsel appeared before the Bankruptcy Court on December 3, 2004 for a "Status Conference". At the conclusion of the "Status Conference", the Court found that despite NHI's contention to the contrary, it had in fact alleged agency in paragraph 33 of its Amended Complaint. Thereafter, the Court entered a bench ruling directing Plaintiff to amend its Amended Complaint to remove all allegations of agency between Defendants and Mercantile.

Subsequently, on December 10, 2004, NHI filed Plaintiff's Second Amended Complaint [D.I. 45] (the "Second Amended Complaint"). Plaintiffs Second Amended Complaint, like the pleadings before it, is replete with numerous allegations of agency between Defendants and Mercantile. In response thereto, Defendants file this Motion to Dismiss.

III.    FACTS[2]

NHI was the first pre-manufactured home builder in Delaware, and for more than thirty years, conducted a successful manufacturing business. [Plaintiff's Second Amended Complaint ("Second Amended Complaint") ¶8.] In the early 1990s, NHI decided to expand its business into the manufacturing of lower-cost homes. [Second Amended Complaint ¶10 - 13.] To this end, NHI incorporated three other entities and expanded its real estate holdings. [Second Amended

---

[2] For the purposes of this memorandum of law, and in order to comply with the requirements of Rule 12(b)(6), Defendants will assume that the allegations in the Second Amended Complaint are true.

WLM_501120_1/MOLIVERE

**A00588**

Complaint ¶¶10, 11, 12, 13.] In expanding, NHI greatly increased its indebtedness with the enthusiastic support of its banking institution, Mercantile. [Second Amended Complaint ¶14.] All outstanding debt owed to Mercantile by NHI and its insiders and affiliates was cross collateralized. [Second Amended Complaint ¶14.]

On or about March 21, 2000 Mercantile and NHI entered into a Forbearance Agreement pursuant to which, among other things, all debt of NHI and its related affiliates was monitored on a month-to-month basis by NHI's contact at Mercantile, Tim Naylon. [Second Amended Complaint ¶19.] On or about July 27, 2000, Mercantile and NHI entered into a Second Forbearance Agreement. [Second Amended Complaint ¶21.]

In August 2000, NHI learned that Mercantile was considering calling all of NHI's loans and placing NHI into liquidation, because it believed that NHI was in default of certain technical non-monetary covenants. [Second Amended Complaint ¶22.] On or about October 6, 2000, Scott Krieger ("Krieger"), Mercantile's workout manager, replaced Naylon as NHI's contact at Mercantile and Krieger insisted – on the threat of calling all of Mercantile's loans – that NHI retain a management consultant and strongly urged that Defendants KMR, Riesner and Justis be hired as management consultants. Krieger assured NHI that Defendants KMR, Riesner and Justis were "turn around" consultants, as opposed to "liquidation guys." [Second Amended Complaint ¶25.]

On or about October 19, 2000, again, under the threat of calling all of Mercantile's loans, NHI, its principals and its affiliated companies entered into a Consulting Agreement with Defendants KMR, Riesner and Justis (the "Consulting Agreement"). A copy of the Consulting Agreement and amendments thereto were attached as Exhibit "A" to the Second Amended Complaint. [Second Amended Complaint ¶27.]

WLM_501120_1/MOLIVERE

A00589

According to the Second Amended Complaint, after assuming control of NHI, and unbeknownst to any of NHI's principals, KMR, Riesner and Justis embarked on a short-sighted and results-oriented management scheme to scuttle and liquidate NHI in direct breach of the Consulting Agreement and in violation of their fiduciary duties and obligations of loyalty. As alleged in the Second Amended Complaint, KMR, Riesner and Justis did not operate independently and for the benefit of NHI. Instead, KMR, Riesner and Justis acted as Mercantile's agents. Specifically, Debtor in its Second Amended Complaint alleges that:

- KMR, Riesner and Justis **made their primary priorities Mercantile's collateral realization** and KMR's collection of exorbitant and extorted consulting fees, while at the same time relegating NHI's business operations and viability as a going concern to distant secondary priorities, in direct contravention of the Consulting Agreement. [Second Amended Complaint ¶ 32.]

- Riesner and/or Justis were **in contact with Mercantile at least daily** during the term of the Consulting Agreement. [Second Amended Complaint ¶ 33.]

- KMR, Riesner and Justis continued on a concentrated course of action to pay Mercantile and KMR at the fastest possible rate without regard to the continuation of NHI's business, while stripping NHI of assets. **In collaboration with Krieger (Mercantile's workout manager),** KMR, Riesner and Justis discontinued paying NHI's vendors, suppliers, health care claims and taxing authorities, removed critical employees from plant operations, shipped homes out of the plant prior to completion and with substantial defects, failed to complete homes in the field and **focused on short-term returns to Mercantile** and KMR, without any concern for the long-term impact on NHI, which were in fact ruinous to NHI's viability as a going concern. [Second Amended Complaint ¶ 46.]

- At the same time, although NHI was still only in technical default with Mercantile, KMR, Riesner and Justis systematically made payments to Mercantile the day after late fees and penalties were incurred. According to NHI, it was apparent that KMR, Riesner and Justis were not concerned with NHI's ability to continue as a going concern – rather, **the sole concern of KMR, Riesner and Justis was that Mercantile and KMR be paid**. [Second Amended Complaint ¶ 47.]

- 6 -

A00590

- The Second Amended Complaint alleges that from October 2000 through January 2002, KMR, Riesner and Justis grossly mismanaged NHI's business; **made decisions which maximized cash flows to Mercantile** and KMR, while destroying NHI's relationships with its customers, suppliers, contractors, employees, etc., with the obvious result of destroying NHI as a viable going concern; violated the Consulting Agreement; breached their fiduciary duty and duty of loyalty by – rather than providing "turn around" management – **devising a stealth plan to strip NHI of all cash and assets before running NHI into liquidation, all for the sole benefit and at the direction of Mercantile**, and to the extreme detriment and prejudice of NHI and its shareholders and creditors. [Second Amended Complaint ¶ 59.]

- KMR, Riesner and Justis engaged in a scheme to defraud and to raid NHI for the purposes of stripping assets in satisfaction of bank debt and running down NHI to the point where NHI could only be liquidated **for the benefit of Mercantile** rather than turning the company around. [Second Amended Complaint ¶ 103.]

- Mercantile insisted on NHI hiring KMR, and then KMR placed NHI into an insolvent condition **in a fashion designed to protect only Mercantile.** [Second Amended Complaint ¶¶ 104, 111.]

- KMR, Riesner and Justis engaged in a scheme to waste the assets of NHI in order to liquidate it **for the benefit of Mercantile.** [Second Amended Complaint ¶ 110.]

According to the Second Amended Complaint, all of KMR's, Riesner's and Justis' relationships and contracts with NHI terminated in or before January 2002. [Second Amended Complaint ¶ 58.] By February 2002, as a result of the gross mismanagement of NHI by KMR, Riesner and Justis, **for Mercantile's benefit**, as alleged in the Second Amended Complaint, NHI was in dire financial straits and was not able to re-finance or sell its operations as a going concern. [Second Amended Complaint ¶60.] On February 6, 2002, Mercantile demanded payment on all of NHI's lines of credit. [Second Amended Complaint ¶62.]

**NHI Released all Claims against Mercantile and its Agents, KMR, Riesner and Justis on February 26, 2002**

As readily admitted and referenced in the Second Amended Complaint, NHI and the principals of NHI entered into the February 26, 2002 Agreement in order to provide a mechanism to settle NHI's debt to Mercantile and satisfy Mercantile's liens on the assets of NHI and its principals, and in doing so, released Mercantile from all liability to NHI. [Second Amended Complaint ¶63.] Although the Second Amended Complaint references the February 26, 2002 Agreement, it failed to attach the document. Accordingly, a copy of the February 26, 2002 Agreement is attached hereto as **Exhibit "A"** and incorporated herein by this reference. The February 26, 2002 Agreement is also a public record as it was attached as Exhibit "B" to the Objection of the Official Committee of Unsecured Creditors to the Debtor's Motion for, among other things, Order Approving Asset Sale and Bidding Procedures [D.I. 198].

In the February 26, 2002 Agreement, NHI and its principals agree that all action taken prior to the execution of the February 26, 2002 Agreement in relation to the loans, loan obligations, loan documents, collateral or administration thereof (as more particularly described in Plaintiff's Second Amended Complaint) gave rise to no claims or defenses.

**In Order to Obtain Mercantile's Consent to Debtor's Use of Cash Collateral, Debtor Reaffirmed to this Court that it had Released all Claims against Mercantile and its Agents, KMR, Riesner and Justis**

On March 1, 2002, NHI filed its voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the U.S. Bankruptcy Code. [Second Amended Complaint ¶66; *See also In re NHI, Inc.*, United States Bankruptcy Court for the District of Delaware, Case No. 02-10651 (PJW).] In seeking liquidity in its case, the Debtor entered into the Interim Agreement for Use of Cash Collateral and Adequate Protection with Mercantile ("Cash Collateral Agreement"). [*See*, the Consent Order, dated April 2, 2002

WLM_501120_1/MOLIVERE

A00592

("Order") and the attached Cash Collateral Agreement [D.I. 34].]  A copy of the Consent Order with attached Cash Collateral Agreement is attached hereto as **Exhibit "B"** and incorporated herein by this reference.   The Cash Collateral Agreement, signed by Debtor NHI, presented to the Court for approval through counsel for Debtor, *and approved by the Court,* contains several affirmations, including the following:

- NHI's pre-petition indebtedness to Mercantile "is secured by validly perfected first priority security interests, liens and mortgage liens." [Cash Collateral Agreement at p. 2.]

- NHI's pre-petition indebtedness is "fully secured and constitutes the legal, valid and binding obligations of the Debtor, enforceable in accordance with the terms of all applicable documents." [Cash Collateral Agreement at p. 3.]

- "no offsets, defenses or counterclaims to the [pre-petition indebtedness to Mercantile] exist, and no portion of the [pre-petition indebtedness] is subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law." [Cash Collateral Agreement at p. 4.]

The Cash Collateral Agreement was entered into *post-petition* and is dated March 15, 2002. Accordingly, the Cash Collateral Agreement ratifies and cures all defects, if any, in the pre-petition forbearance agreements and the February 26, 2002 Agreement.

Pursuant to the February 26, 2002 Agreement, NHI and the other obligors to Mercantile acknowledged and confirmed their obligations to Mercantile [February 26, 2002 Agreement at pp. 1 - 5 and Section 1], recited that in each of the preceding three forbearance agreements with Mercantile they waived all claims against Mercantile and defenses to Mercantile's claims against them [February 26, 2002 Agreement at p. 5 and Section 1], agreed to liquidate Mercantile's collateral [February 26, 2002 Agreement Section 2], and gave a broad general release to Mercantile **and its agents** [February 26, 2002 Agreement Section 20].  Section 20 of the February 26, 2002 Agreement provides:

WLM_501120_1/MOLIVERE

**A00593**

IN ORDER TO INDUCE [MERCANTILE] TO ENTER INTO THIS AGREEMENT, [NHI] FOREVER RELEASES AND DISCHARGES [MERCANTILE] AND [MERCANTILE'S] … AGENTS (COLLECTIVELY, THE "RELEASED PARTIES") FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, SUITS AND DAMAGES (INCLUDING CLAIMS FOR ATTORNEYS' FEES AND COSTS) WHICH [NHI] … EVER HAD OR MAY NOW HAVE OF ANY KIND OR NATURE AGAINST ANY OF THE RELEAED PARTIES ARSING OUT OF OR RELATED IN ANY WAY TO ANY OF THE LOANS, THE LOAN DOCUMENTS, THE OBLIGATIONS OR THE COLLATERAL OR THE ADMINISTRATION THEREOF OR THIS AGREEMENT, WHETHER KNOW OR UNKNOWN, INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS BASED UPON OR RELYING ON ANY ALLEGATIONS OR ASSERTIONS OF DURESS, ILLEGALITY, UNCONSCIONABILITY, BAD FAITH, BREACH OF CONTRACT, REGULATORY VIOLATIONS, IMPROPER CONTROL OF THE COMPANIES OR THEIR AFFAIRS, NEGLIGENCE, MISCONDUCT, OR ANY OTHER TORT, CONTRACT OR REGULATORY CLAIM OF ANY KIND OR NATURE.  THIS RELEASE IS INTENDED TO BE FINAL, IRREVOCABLE AND IMMEDIATE AND IS NOT SUBJECT TO THE SATISFACTION OF ANY CONDITIONS OF ANY KIND.

### NHI Reaffirms its Release of all Claims against Mercantile and its Agents, KMR, Riesner and Justis on October 30, 2003

On October 30, 2003, NHI and the principals of NHI reaffirmed the February 26, 2002 Agreement post-petition and reiterated its release of Mercantile and its agents from all liability to NHI.  A copy of the October 30, 2003 Agreement is attached hereto as **Exhibit "C"** and incorporated herein by reference.  The October 30, 2003 Agreement specifically references the February 26, 2002 Agreement and provides that:

each of the OBLIGORS hereby forever releases and discharges the LENDER and the LENDER'S officers, directors, employees, attorneys **and agents** (collectively the "RELEASED PARTIES") from any and all claims, causes of action, suits and damages (including claims for attorneys' fees and costs), which any of the OBLIGORS, jointly or severally, ever had or may now have of any kind or nature against any of the RELEASED PARTIES arising out of or related in any way to any of the LOANS, the LOAN DOCUMENTS, the AGREEMENT, the OBLIGATIONS or the COLLATERAL or the administration thereof or this RELEASE AGREEMENT, whether known or unknown, including but not limited to any and all claims based upon or relying on any allegations or assertions of duress, illegality, unconscionability, bad faith, breach of contract, regulatory violations, improper control of the COMPANIES or their affairs, negligence, misconduct, or any other tort, contract or regulatory claim of any kind or nature.

*See* **Exhibit "C"** (emphasis added).

WLM_501120_1/MOLIVERE

A00594

Despite the terms and conditions of the several forbearance agreements entered into by NHI and Mercantile, the February 26, 2002 Agreement, and the October 30, 2003 Agreement, all confirming and acknowledging that NHI holds no claims against Mercantile and no defenses to Mercantile's claims and liens, Plaintiff NHI alleges in the Second Amended Complaint that at all times NHI held claims against Mercantile and bases its claims against Defendants on the premise that Defendants, acting as Mercantile's agent and in concert with and at the direction of Mercantile, improperly caused Plaintiff to pay down its pre-petition indebtedness to Mercantile.[3]

## IV.  ARGUMENT

### A.  Standard Of Law

In considering a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6) and Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, this Court must accept as true all of the allegations pled in the complaint and view the facts in the pleadings and all reasonable inferences in favor of the Debtor, the non-moving party. *See Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir. 1991); *BP Amoco Chem. Co. v. Sun Oil Co.,* 166 F. Supp. 2d 984, 989 (D. Del. 2001). This Court may dismiss a complaint for failure to state a claim only when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations in the Complaint. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

---

[3] "At all times relevant to the instant case, NHI had contractual rights under all loans with Mercantile, and was ready, willing and able to institute, an actionable and meritorious lender liability claim against Mercantile." [Amended Complaint ¶ 116.]

WLM_501120_1/MOLIVERE

A00595

**B.**  **The Plaintiff Fails To State A Claim Upon Which Relief Can Be Granted**

**1.**  **The Releases Should Not Have the Effect of Converting this Motion to One for Summary Judgment**

The introduction of the February 26, 2002 Agreement and the October 30, 2003 Agreement, containing the releases of Mercantile and its agents, should not have the effect of converting this Motion to Dismiss into a Motion for Summary Judgment since Paragraph 63 of the Second Amended Complaint references the releases contained in the February 26, 2002 Agreement and October 30, 2003 Agreement, but Plaintiff simply failed to attach the documents. The Court may take judicial notice of, and consider "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading … Documents that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim" without converting a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) into a motion for summary judgment pursuant to Fed.R.Civ.P. 56. *See Pryor v. National Collegiate Athletic Assoc.*, 288 F.3d 548, 560 (3d Cir. 2002) (citations omitted).

In addition, the Cash Collateral Agreement was attached to the Consent Order entered on the docket of the Bankruptcy case and approved by the Court [*See* Order, dated April 2, 2002, [D.I. 34]] and the February 26, 2002 Agreement was attached to a pleading filed by the Committee in the contested matter concerning sale procedures [D.I. 198] (Discussed *infra* in "Fact" section). As such, the Court may take judicial notice of the Cash Collateral Agreement, the February 26, 2002 Agreement and the October 30, 2003 Agreement, by virtue of the fact that they are filings in the same case. *See In re Ameriserve Food Distribution, Inc.*, 315 B.R. 24, 32-33 (Bankr.D.Del. 2004); Collier on Bankruptcy, ¶301.03 ("The term [bankruptcy] case, therefore, refers to the overall spectrum of legal action taken under one of the debtor relief

- 12 -

A00596

chapters: . . .[t]he term 'proceeding,' by contrast, refers to any particular action raised or commenced within the case, including motions and adversary proceedings[.]"); *see, e.g. United States v. Wolfson*, 294 F. Supp. 267, 273 (D. Del. 1968) (where documents and testimony are filed with the Court, they become a matter of public record); ;*Lum v. Bank of America*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (for the purposes of a motion to dismiss, a court can generally consider matters of public record, allegations in the complaint, exhibits to the Complaint, and documents that form the basis of the claim); *Pension Benefit Guaranty Corp. v. White Consolidated Industries*, 998 F.2d 1192 (3d Cir. 1993) (where public has access to documents filed with the court, they are generally considered to be public records). *See also Caleb v. CRST, Inc.*, 2002 WL 1986499 *1 n.6 (3d Cir. Aug. 28, 2002) (on a motion to dismiss court may look to matters of public record, including the judgments and Orders entered in an underlying action), *citing S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999).

Viewed either way, therefore, the Defendants' reference to the February 26, 2002 Agreement, October 30, 2003 Agreement and the Cash Collateral Agreement should not have the effect of converting the Defendants' Motion to Dismiss into a Motion For Summary Judgment.

2.    **The Cash Collateral Agreement Contains Judicial Admissions Upon which Defendants are Entitled to Rely and Plaintiff is Judicially Estopped from Changing its Position and Pursuing Defendants Based on Plaintiff's Pre-Petition Debt to Mercantile.**

A judicial admission is a formal statement by a party in the course of judicial proceedings, which removes an admitted fact from the field of controversy. *Pesta v. Warren*, 2004 WL 1172996 (Del. Super. May 13, 2004). NHI's claims must be dismissed as to all Defendants, because NHI is judicially estopped by the admissions that it made in the Cash Collateral Agreement.

- 13 -

The Debtor asserts, acknowledges and reaffirms in the Cash Collateral Agreement that "no offsets, defenses or counterclaims to the [pre-petition indebtedness to Mercantile] exist." Such statements are judicial admissions and a reaffirmation of the release contained in the February 26, 2002 Agreement – the same release that was later ratified and subsequently repeated post-petition in the October 30, 2003 Agreement.

At the very heart of NHI's Second Amended Complaint is the claim that the Defendants acted as the agent for Mercantile in the collection of its pre-petition claims for Mercantile's ultimate benefit and in so doing engaged in acts of bad faith, and breaches of contract and of fiduciary duties.[4] In stark contrast to those allegations, however, the February 26, 2002 Agreement, the Cash Collateral Agreement, and the October 30, 2003 Agreement make clear that NHI has no such claims. Prior to the institution of this proceeding and for the nearly two years that NHI's bankruptcy case has been administered, NHI admitted to this Court that its debt to Mercantile – which is the basis for its claims against the Defendants – is completely free of any taint that is ascribed to it in the Second Amended Complaint. As a result of those admissions, the allegations in the Second Amended Complaint are subject to judicial estoppel and NHI's claims against the Defendants must be dismissed with prejudice.

The Cash Collateral Agreement entered into by NHI and Mercantile affirms that NHI's pre-petition debt to Mercantile is enforceable, legal, binding, and NHI has no claims against Mercantile. NHI states that its pre-petition indebtedness to Mercantile "is secured by validly perfected first priority security interests, liens and mortgage liens." [Cash Collateral Agreement at p. 2.] NHI also states that its pre-petition indebtedness is "fully secured and constitutes the

---

[4]    Plaintiff alleges that Defendants acted as Mercantile's agent and acted in concert with Mercantile. For the purposes of the Motion to Dismiss only, Defendants take Plaintiff's allegations of agency as true. Defendants reserve the right to deny they acted as Mercantile's agent or in concert with Mercantile.

WLM_501120_1/MOLIVERE

A00598

legal, valid and binding obligations of the Debtor, enforceable in accordance with the terms of all applicable documents." [Cash Collateral Agreement at p. 3.] Finally, NHI admits that "no offsets, defenses or counterclaims to the [pre-petition indebtedness to Mercantile] exist, and no portion of the [pre-petition indebtedness to Mercantile] is subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law." [Cash Collateral Agreement at p. 4.][5]

The representations, acknowledgements and reaffirmations of Debtor in the Cash Collateral Agreement constitute binding and conclusive judicial admissions by the Debtor and its estate as to the validity of, and lack of wrongdoing associated with, the pre-petition loan, the pre-petition administration of the loans and the circumstances leading up to the commencement of the within case. *See In re Foxmeyer Corp.*, 286 B.R. 546, 567 (Bankr. D. Del. 2002); *See also* 2 John W. Strong, McCormick on Evidence §§ 254, 257 (5th ed.1999) (effective pleadings in a case constitute binding and conclusive judicial admissions within such case but only nonbinding, nonconclusive evidentiary admissions within other litigation); Barry Russell, Bankruptcy Evidence Manual § 801.22 at 884 (2002 ed.2001); *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3rd Cir.1972) (*citing State Farm Mutual Automobile Insurance Co. v. Worthington*, 405 F.2d 683, 686 (8th Cir.1968)). Because the Debtor makes such binding and conclusive judicial admissions, the Court necessarily must conclude, and without even the presentation of proof, that Mercantile and the Defendants are free from wrongdoing and that the Plaintiff is judicially estopped from pursuing Defendants for causes of action based on the alleged improper collection by Defendants of Plaintiff's pre-petition debt to Mercantile.

---

[5] The Cash Collateral Agreement permits parties-in-interest in the Debtor's estate to challenge the extent, validity, enforceability and perfection of Mercantile's claims and liens within specified periods of time, but the Debtor was at all times bound. Cash Collateral Agreement at ¶ 1. Upon information and belief, all parties' rights to challenge the claims and liens of Mercantile or assert claims against Mercantile have expired and Debtor's representations and admissions are binding on its estate and all parties-in-interest in its case.

WLM_501120_1/MOLIVERE

A00599

NHI is judicially estopped from claiming wrongdoing on the part of any of the Defendants. "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 1814 (2001) (*quoting Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555 (1895).) *See also United States v. Transport Administrative Services*, 260 F.3d 909, 917 (8th Cir. 2001) ("[t]he doctrine of judicial estoppel prohibits a party from taking inconsistent positions in the same or related litigation.")

The doctrine of judicial estoppel, therefore, seeks to prevent a litigant from asserting a position inconsistent with one the litigant previously asserted in the same or prior proceeding. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996). This doctrine does not intend to eliminate all inconsistencies, however slight or inadvertent. *Id.* Rather, the doctrine is "designed to prevent litigants from playing 'fast and loose' with the courts." *Id.* (citations omitted). Further, "unlike the well-known reliance element for other forms of estoppel, such as equitable estoppel, detrimental reliance by the party seeking judicial estoppel is not required." *In re Coastal Plains, Inc.*, 179 F.3d 197, 210 (5th Cir. 1999) (emphasis in original). This is because "the purpose of judicial estoppel is not to protect the litigants; it is to protect the integrity of the judicial system." *Id.*

The application of the doctrine of judicial estoppel is appropriate to this action. Mercantile consented to Debtor's use of Mercantile's cash collateral in consideration for all of the terms and conditions set forth in the Cash Collateral Agreement. The Cash Collateral Agreement was presented to the Court for approval based on various representations of the Debtor to the Court. Among those explicit and implicit representations to the Court were

WLM_501120_1/MOLIVERE

A00600

Debtor's representations that it held no claims adverse to Mercantile, nor could it have had any adverse claims as a result of the pre-petition February 26, 2002 Agreement, which included a broad general release of Mercantile **and its agents.**

A signed release is binding unless executed through fraud, duress, accident or mutual mistake. *Three Rivers Motors Ford Co. v. Ford Motor Co.,* 522 F.2d 885 (3d Cir. 1975). NHI obtained Court imprimatur of the February 26, 2002 Agreement when it sought and obtained Court approval of the Cash Collateral Order. At that point, NHI waived all right it may have had to make any claims that the broad general release of Mercantile **and its agents** contained in the February 26, 2002 Agreement, was procured through fraud, duress, accident or mutual mistake. Accordingly, any deficiencies in the February 26, 2002 Agreement were cured and the terms and conditions of the February 26, 2002 Agreement ratified and reaffirmed through the Court-approved Cash Collateral Agreement. Likewise, NHI again reaffirmed its release of Mercantile **and its agents** when it again entered into a release in the October 30, 2003 Agreement. This reaffirmation and ratification occurred post-petition.

Despite those unambiguous assertions, repeated in each of three forbearance agreements, the February 26, 2002 Agreement, representations to the Court and the Cash Collateral Agreement, as well as the October 30, 2003 Agreement, the Debtor now files the Second Amended Complaint that is replete with contrary allegations of wrongdoing by Mercantile, and the Defendants as Mercantile's agent, in both its administration of the pre-petition loan and its endeavor to collect the pre-petition loan. In short, NHI's allegations reduce to the claim that KMR as the agent for Mercantile maximized proceeds to Mercantile and KMR, and "devis[ed] a stealth plan to strip NHI of all cash and assets possible before running NHI into liquidation, **all**

WLM_501120_1/MOLIVERE

A00601

**for the sole benefit of Mercantile**, and to the detriment and prejudice of NHI and its shareholders and creditors." [Second Amended Complaint ¶59.]

The Second Amended Complaint, therefore, necessarily and expressly implicates Mercantile as the primary wrongdoer, yet all such claims not only have been released, but there has never been a representation that any existed, save only ¶ 116 of the Second Amended Complaint. NHI should not be permitted to make an end-run around its judicial admissions to the Court through inapposite assertions about the pre-petition claims and liens of Mercantile in the case *sub judice*. In direct contravention of its previous representations to the Court, Debtor is now making contrary assertions about the pre-petition conduct of Mercantile and its "agents."

At the beginning of the case, the Debtor reaped the benefit of the Cash Collateral Order by making representations without which this Court would not have approved the Cash Collateral Order. The Debtor now contends that Mercantile worked out NHI's defaults under the pre-petition loan documents and that the Defendants acted in concert with and as agents for Mercantile to precipitate the Debtor's bankruptcy. The Debtor adeptly left Mercantile out of the Second Amended Complaint so that the direct contradiction would not be readily apparent to the Court. The actions alleged of the Defendants inevitably run to Mercantile as party and prime benefactor of the actions alleged in the Second Amended Complaint.

The facts before this Court are similar to those in *In re Kindred Healthcare, Inc.*, 2003 WL 22327933 *2-3 (Bankr. D. Del. Oct. 9, 2003). The debtors in *Kindred Healthcare* made representations in their cash management motion without which the court would not have approved the cash management motion. *Id.* The debtors, having reaped the benefits of the cash management motion, then advocated a position inconsistent with what they had represented to the court in the cash management motion. *Id.* The court in *Kindred Healthcare* judicially

- 18 -

WLM_501120_1/MOLIVERE

**A00602**

estopped the debtors from taking these contrary positions and found that because the positions asserted in the cash management motion were necessary to its approval, "there can be no suggestion that the representations made by the [d]ebtors in the [c]ash [m]anagement [m]otion were unintentional or inadvertent." *Id.* Likewise, NHI intentionally made representations amounting to judicial admissions, to this Court that it had no causes of action relating to its pre-petition debt with Mercantile, all in order to obtain cash collateral financing from Mercantile. NHI must now be judicially estopped from taking a contrary position about its pre-petition debt with Mercantile through the smokescreen of a suit against Mercantile's alleged agents, the Defendants in this action.

In *Okan's Foods v. Windsor Assocs. Ltd. Pshp. (In re Okan's Foods),* 217 B.R. 739, 755 (Bankr. E.D.Pa. 1998), the court, finding a debtor had acted in bad faith, judicially estopped the debtor from pursuing a civil rights suit after confirmation of its plan. *Id.* The debtor had previously asserted in its plan that any potential lawsuits it may have would only pay a fifteen percent dividend to the unsecured creditors. *Id.* The debtor asserted that if the plan were rejected, there would be no dividend for the unsecured creditors. *Id.* Based on the debtor's representations, the court approved the plan. *Id.* Four months later, the debtor changed its position and commenced a civil rights suit containing a demand for judgment that, if successful, would have paid the unsecured creditors in full. *Id.* The court judicially estopped the debtor from proceeding in the subsequent lawsuit because of bad faith shown by the debtor in reaping the benefit of the confirmed plan based on one assertion and then assume a contrary position to the same court in an attempt to reap more benefits in a subsequent proceeding. *Id.* at 754.

For these very same reasons, this Court should hold NHI to its judicial admissions and find that it is estopped from pursing the claims in the Second Amended Complaint.

WLM_501120_1/MOLIVERE

A00603

### 3.    Plaintiff's Claims have been Released.

A release that is clear and unambiguous requires that this Court dismiss the Second

Amended Complaint on the pleadings and there is no need to look at "the purpose for which the

release was executed in determining the scope of the release." *See Wilmington Trust Co. v.*

*Calhoun (In re Geotek Communs., Inc.),* 282 B.R. 165, 169 (Bankr. D. Del., 2002) (J. Walsh).

On February 26, 2002, for the second time the Debtor released Mercantile **and its agents**. This

release was ratified and approved by the parties by the subsequent October 30, 2003 Agreement,

whereby they reaffirmed the original February 26, 2002 Agreement, and again further

specifically released Mercantile and its agents: *See* **Exhibit "C"**.

Releases are interpreted according to state law. *See Williams v. Stone,* 109 F.3d 890, 893

(3d Cir. 1997). Delaware law recognizes the validity of a general release. *Chakov v. Outboard*

*Marine Corp.,* Del. Supr., 429 A.2d 984 (1981). Under Delaware law, the intent of the parties,

as ascertained from the language of the document, controls interpretation of a release. *See End*

*of the Road Trust ex rel. Fruehauf Trailer Corp. v. Terex Corp. (In re Fruehauf Trailer Corp.),*

250 B.R. 168, 194 (D. Del., 2000); *Adams v. Jankouskas,* Del. Supr., 452 A.2d 148, 155-56

(1982). If the language of a release is clear and unambiguous then the court must follow that

interpretation. *Id.* If a release is ambiguous its interpretation becomes a question of fact and the

fact finder may consider extrinsic evidence. *See Tucker v. Albun, Inc.,* Del.Super., 1999 WL

1241073 (Del.Super. Sept. 27, 1999); *Rochen v. Huang,* Del.Super., 1989 WL 5374 (Del. Super.

Jan. 4, 1989). Where the language of the release is clear and unambiguous, it will not lightly be

set aside. *See Hob Tea Room v. Miller,* Del. Supr., 89 A.2d 851 (1952).

Here, the scope of the release and the released parties is unambiguous. The Debtor

released Mercantile **and its agents**. The Debtor in the Second Amended Complaint repeatedly

A00604

alleges in paragraph after paragraph that Defendants acted as Mercantile's agents in collaboration with Krieger (Mercantile's workout manager), by consulting with Mercantile on a daily basis, acting for Mercantile's benefit, focusing on short-term returns to Mercantile, making their primary priorities Mercantile's collateral realization, made decisions which maximized cash flows to Mercantile, all in a manner designed to protect Mercantile. [Second Amended Complaint ¶¶ 32, 33, 47, 59, 104, 110, 111]. According to the Second Amended Complaint, Mercantile threatened adverse consequences unless Debtors hired the Defendants as management consultants. [Second Amended Complaint ¶ 25.] For the purpose of the Motion to Dismiss, the Court must take such allegations of agency as true.

Based on the Second Amended Complaint that must be accepted as true for the purpose of considering the motion, KMR, Riesner and Justis were Mercantile's agents. As Mercantile's agents, KMR, Riesner and Justis were released in the February 26, 2002 Agreement, which release was subsequently reaffirmed by the Debtor in its judicial admissions to the Court in the Cash Collateral Agreement and which release acts to bar the instant proceedings. Finally, KMR, Riesner and Justis, as Mercantile's agents, were again released in the October 30, 2003 Agreement. Debtor's actions in releasing Mercantile **and its agents** were deliberate and repeated again and again over an almost 2 year period of time.

4.    **Plaintiff's Avoidance Claims pursuant to 11 U.S.C. § 547 Must Be Dismissed as to Defendants Fleet, Riesner and Justis.**

Federal Rule of Civil Procedure 8, made applicable to this proceeding by Rule 7008 of the Federal Rules of Bankruptcy Procedure, provides in relevant part that "[a] pleading which sets for a claim for relief ... shall contain ... (2) a short and plain statement showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Furthermore, Section 547(b)(1) provides in relevant part that "the trustee may avoid any transfer of an interest of the debtor in property – (1)

WLM_501120_1/MOLIVERE

to or for the benefit of a creditor...." *See* 11 U.S.C. § 547(b)(1). The Second Amended Complaint, however, fails to show that the alleged transfers were for the benefit of Fleet, Riesner or Justis, and has failed to show that the Plaintiff is entitled to relief from defendants Fleet, Riesner or Justis.

Plaintiff's avoidance claim in Count XII identifies fifty-two alleged transfers totaling approximately $1,060,144.00 as set forth in Exhibit B to the Second Amended Complaint. The Second Amended Complaint, however, generally pleads that KMR, Riesner and Justis received one or more of the alleged transfers and that the transfers were to or for their benefit. However, Exhibit B to the Second Amended Complaint identifies "KMR Management" as the recipient of each alleged transfer.[6] Consequently, because the Second Amended Complaint fails to show that any of the alleged preferential transfers were "to or for the benefit of" Fleet, Riesner and/or Justis, individually, and because the Second Amended Complaint fails to identify or adequately plead that Fleet, Riesner and/or Justis were creditors, or received the alleged transfers identified in Exhibit B, Count XII must be dismiss as to Fleet and the individual defendants Riesner and Justis.

Moreover, this Court has provided guidance in preference actions by requiring that specific factors be included in a preferential transfer claim, namely: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) *name of transferee* and (iv) the amount of the transfer." *See In re APF Co.*, 308 B.R. 183, 188 (Bankr.D.Del. 2004) (emphasis added) (quoting (*In re Valley Media*), 288 B.R. 189, 192 (Bankr.D.Del.2003). Thus, accepting as true all of the allegations pled in the Second Amended Complaint, Count XII must be dismissed as to

---

[6] The single exception is transfer identified as Check No. 8728, which identifies "KMR ???" as the vendor. *See* Exhibit B to the Second Amended Complaint.

WLM_501120_1/MOLIVERE

A00606

defendants Fleet, Riesner and Justis as the Second Amended Complaint names KMR

Management as the transferee.

## V.    <u>CONCLUSION</u>

For all of the reasons set forth in this Memorandum of Law, the Court should grant the

relief requested in the accompanying Motion To Dismiss and enter the Order filed herewith

dismissing all claims in the Plaintiff's Second Amended Complaint, with prejudice.

Dated:  December 27, 2004                  /s/ Stuart M. Brown
                                             Stuart M. Brown, Esquire (No. 4050)
                                             Denise Seastone Kraft (No. 2778)
                                             Mark D. Olivere (No. 4291)
                                             EDWARDS & ANGELL, LLP
                                             919 N. Market Street
                                             Wilmington, DE 19801
                                             Tel:  302.777.7770
                                             Fax:  302.777.7263

                                             Counsel for Defendants

WLM_501120_1/MOLIVERE

A00607

Westlaw.

Not Reported in B.R.                                                              Page 1
2003 WL 22327933 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 280
(Cite as: 2003 WL 22327933 (Bankr.D.Del.))

H

United States Bankruptcy Court,
D. Delaware.

In re: KINDRED HEALTHCARE, INC., f/k/a
Vencor, Inc., et al., Reorganized
Debtors.

Nos. 99-3199 (MFW), 99-3327(MFW), 99-
3200(MFW), 99-3201(MFW), 99-3202(MFW), 99-
3203(MFW), 99-3204(MFW), 99-3205(MFW), 99-
3206(MFW).

Oct. 9, 2003.

OPINION [FN1]

FN1. This Opinion constitutes the findings
of fact and conclusions of law of the Court
pursuant to Federal Rule of Bankruptcy
Procedure 7052, which is made applicable to
contested matters by Federal Rule of
Bankruptcy Procedure 9014.

WALRATH, Bankruptcy J.

*1 This matter is before the Court on the Motion of
the United States Trustee ("UST") for an Order
compelling the Debtors to file amended monthly
operating reports and to pay delinquent quarterly
fees. The Debtors have opposed the Motion and the
parties have cross moved for summary judgment. For
the reasons set forth below, we grant the Motion.

I. FACTUAL BACKGROUND

On September 13, 1999, Kindred Healthcare, Inc.,
f/k/a Vencor, Inc., and its 128 direct and indirect
subsidiaries (collectively "the Debtors") filed
voluntary petitions for relief under chapter 11. On
that day, the Debtors filed, inter alia, a motion for
approval of their cash management system ("the Cash
Management Motion") which was granted. The
Debtors had established that system many years
before the chapter 11 filing to provide for the
centralization of the Debtors' collections and
disbursements. As a result of that system, the
ultimate parent of the Debtors (now known as
"Kindred") consolidated all operating revenues of the

Debtors and made all disbursements.

The Debtors operated their businesses and managed
their properties as debtors-in-possession pursuant to
sections 1107(a) and 1108 of the Bankruptcy Code.
Subsequent to the filing of their chapter 11 petitions,
the Debtors filed consolidated monthly operating
reports. Based on those reports, the UST billed the
maximum quarterly fee for Kindred ($10,000) and
the minimum fee ($250) for all the other Debtors.
During the course of the chapter 11 cases, the
Debtors have paid over $500,000 in UST fees.

Shortly before confirmation of the Debtors' plan of
reorganization, the UST advised the Debtors that the
methodology by which the quarterly fees had been
calculated was incorrect and, consequently, asserted
that additional fees were due. As a result, the UST
filed an objection to confirmation. The parties agreed
to resolve this issue by separate motion and an Order
confirming the Debtors' Plan was entered on March
19, 2001.

In its Motion, the UST asserts that the quarterly fees
should have been calculated on the disbursements
made on behalf of each individual Debtor rather than
on a consolidated basis. The Debtors disagree,
arguing that since Kindred paid all the Debtors'
expenses, it alone should pay the quarterly fees on
those disbursements. If the UST's method of
calculating the quarterly fees is accepted, the Debtors
assert that they will owe in excess of $3 million in
additional fees to the UST.

II. JURISDICTION

This Court has jurisdiction over this proceeding
pursuant to 28 U.S.C. § § 1334 and 157(b)(2)(A),
(B) & (0).

III. DISCUSSION

We recently addressed many of the same issues
raised here by the Debtors in their opposition to the
UST's Motion. See, e.g., In re Charter Behavioral
Health Sys., LLC, 292 B.R. 36 (Bankr.D.Del.2003).
In that case, we concluded that "the plain language of
the statute supports the UST argument that the word
disbursement includes, as to the individual Debtors,
the payment of their operating expenses.... [T]he
majority [of courts] have ruled that 'disbursements'

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
2003 WL 22327933 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 280
(Cite as: 2003 WL 22327933 (Bankr.D.Del.))

include *all* payments made by or for a debtor, regardless of the source of payment." *Id.* at 45. Therefore, we concluded that, in the absence of substantive consolidation, each debtor must pay quarterly fees based on the disbursements made in the quarter to satisfy that debtor's obligations, even if all the disbursements were made through a centralized cash management system by one debtor alone. The Debtors seek an exception to that ruling for several reasons.

### A. *Inability to Calculate the Fee*

\*2 The Debtors assert that their cash management system does not have the capability of determining the amount of disbursements on a Debtor by Debtor basis and, therefore, the Debtors should be excused from doing so. The Debtors have submitted an affidavit from their Corporate Director of Accounts Payable stating that it would require a modification of their computerized accounting system and an enormous expense (in excess of $300,000) to allocate the disbursements among the Debtors.

The UST argues that the Cash Management Motion itself sheds doubt on the Debtors' belated assertions that they cannot determine the amount of disbursements on a Debtor by Debtor basis. In that Motion, the Debtors represented that "[a]ll Facility deposits into shared Depository and Sub-Concentration Accounts are electronically encoded with the facility identification number. All health insurance receipts from governmental entities that are paid directly into Concentration Accounts are accompanied by sufficient information to allow allocation of the amount received among the Facilities which provided covered service, and therefore among the Debtors to which such Facilities relate." (Cash Management Motion at ¶ 13(e).) Similarly, the Cash Management Motion stated that "The general ledger systems employed by the Debtors allow for disbursements from the Concentration Accounts, A/P Disbursement Accounts and Payroll Accounts to be properly allocated among the Facilities or other Vencor operations on whose behalf payments are made, and therefore among the Debtors to which such Facilities or other operations relate." (*Id.* at 13(i).) Thus, the UST argues that under the doctrine of judicial estoppel the Debtors cannot now, years later, assert that they are unable to determine disbursements on a per Debtor basis. [FN2]

FN2. The UST also asserts that tax information provided by the Debtors

similarly suggests that the Debtors have operating information on a Debtor by Debtor basis.

The doctrine of judicial estoppel prevents a party from taking a position in litigation that is inconsistent with its prior position. The elements of judicial estoppel are:

(1) the party to be estopped must be advancing an assertion that is inconsistent with a position taken during previous litigation; (2) the position must be one of fact, rather than law or legal theory; (3) the prior position must have been accepted by the court in the first proceeding; and (4) the party to be estopped must have acted intentionally, not inadvertently.

*Devan v. CIT Group/Commer. Servs., Inc. (In re Merry-Go-Round Enters.),* 229 B.R. 337, 345 (Bankr.D.Md.1999), *citing Havird Oil Co. v. Marathon Oil Co.,* 149 F.3d 283, 292 (4th Cir.1998). *See also In re Home Health Corp. of America, Inc.,* 268 B.R. 74, 78 (Bankr.D.Del.2001).

We agree with the UST that the doctrine of judicial estoppel prevents the Debtors from now asserting that they cannot allocate their disbursements on a Debtor by Debtor basis. In their Cash Management Motion, the Debtors represented to this Court that they were able to account for transactions on a Debtor by Debtor basis. These representations were factual, not legal. Our ruling on the Cash Management Motion was predicated on those representations. It is well-established that approval of a centralized cash management system would not be approved in this Court without such representations. [FN3] Accordingly, there can be no suggestion that the representations made by the Debtors in the Cash Management Motion were unintentional or inadvertent. As a result of these representations, the Debtors were authorized to continue using their centralized system without opening new debtor-in-possession accounts for each Debtor. Having obtained this advantage by making these representations, the Debtors are now precluded from asserting that they are unable to allocate their disbursements among the various Debtors.

FN3. We also require a representation that the debtors are able to distinguish between pre and post-petition transactions in their centralized accounting system, to avoid the payment of any pre-petition claim without prior court approval.

\*3 Even if the Debtors were not judicially estopped,

A00609

Not Reported in B.R.
2003 WL 22327933 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 280
(Cite as: 2003 WL 22327933 (Bankr.D.Del.))

we would still reject their argument. The statute provides no basis for the position that only the Debtor which makes the disbursements is required to pay the quarterly fees. Each of the Debtors is a separate legal entity in a separate bankruptcy case. This Court approved the joint administration of their cases for procedural purposes only. Accordingly, each Debtor must comply with the Bankruptcy Code and Rules. The Order granting the Cash Management Motion did not excuse the Debtors from the requirement that they each comply with the Bankruptcy Code and Rules. Therefore, we conclude that the cost associated with complying with the requirements of the Code is an insufficient reason to excuse such performance. [FN4]

> FN4. The UST also questions the conclusions drawn by the Debtors from the assertions in the Debtors' affidavit. The affidavit states that each of the Debtors maintains separate general ledgers, from which the UST asserts the Debtors surely should be able to determine whose expense was being paid without significant additional costs or modification of their computer system. We find it unnecessary to address this factual issue, since we conclude that additional cost to the Debtors is not an excuse for failure to comply with section 1930(a)(6).

### B. Accounting System Not Designed to Avoid UST Fees

The Debtors also argue that Courts interpreting "disbursements", as used in section 1930(a)(6), conclude that this term should be defined in a manner which prevents debtors from manipulating their accounting systems to avoid fees. The Debtors contend that this purpose is not served in this case because the Debtors' centralized cash management system had been in place for many years before they filed their chapter 11 petitions.

This issue was raised in the *Charter* case as well. The *Charter* debtors continued to use the same cash management system that they had used for many years pre-petition. Furthermore, there was no suggestion that they were using the system simply to avoid or reduce the UST quarterly fees. We nonetheless concluded that "that is irrelevant; the fact is that the Debtors are avoiding the payment of UST fees, whether it was intended or not." *Id.* at 22. *See also, In re Pars Leasing, Inc., 217 B.R. 218* (Bankr.W.D.Tex.1997) (finding that third party's

payment of certain expenses constituted disbursements of the debtor although the arrangement had been in place pre-bankruptcy).

We similarly conclude in this case that the fact that the Debtors' cash management system has been in place for many years is irrelevant. Section 1930(a)(6) requires payment of fees based on disbursements made on a per Debtor basis.

### C. Section 1930(a)(6) Is Constitutional as Interpreted

The Debtors lastly argue that our interpretation of section 1930(a)(6) is unconstitutional as applied to these Debtors. The Debtors assert that our interpretation of the statute would result in an impermissible taking of the Debtors' property in violation of the Fifth Amendment to the Constitution. The Fifth Amendment bars the taking of private property by the government without just compensation. U.S. Const. amend. V. The Debtors argue that, since it is presumed that Congress enacts legislation consistent with the Constitution, we must interpret section 1930(a)(6) to require fees only from the Debtor that wrote the check, rather than from the Debtors whose expenses were paid by that check. *See, e.g., Immigration and Naturalization Serv. v. St. Cyr, 533 U.S. 289, 290 (2001)* ("if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statue is 'fairly possible,' [courts] are obligated to construe the statute to avoid such problems").

*4 The Debtors argue that by imposing additional fees in excess of $3 million, the United States is taking their property without just compensation. They argue that the UST cannot establish that the benefits provided by the UST to these Debtors are worth an additional $3 million. The Debtors argue that such a fee clearly exceeds the costs incurred by the UST program monitoring the Debtors' cases. As such, the Debtors argue that the fees sought are not a fair approximation of the benefits conferred and thus are an unconstitutional taking of the Debtors' property.

The UST responds that the statute enjoys a presumption of constitutionality and that the burden is on the Debtors (not the UST) to prove otherwise. *See, e.g., Mistretta v. United States, 488 U.S. 361, 384 (1989).* Further, the UST argues that the determination of whether a user fee is excessive does not depend on the specific facts of any individual case. *See, e.g., United States v. Sperry Corp., 493*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                    Page 4
2003 WL 22327933 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 280
(Cite as: 2003 WL 22327933 (Bankr.D.Del.))

U.S. 52, 60 (1989) ("This Court has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services. Nor does the Government need to record invoices and billable hours to justify the cost of its services."). Rather, the UST argues that the Constitution simply requires that the fee charged by the Government be a "fair approximation of the cost of benefits supplied." *Massachusetts v. United States*, 435 U.S. 444, 463 n. 19 (1978).

We conclude that the Debtors' constitutional argument is without merit. The quarterly fees which the UST seeks are user fees, that is, fees associated with the Debtors' use of the bankruptcy judicial system. *See, e.g., United States Tr. v. Gryphon at Stone Mansion,* 166 F.3d 552, 554 (3d Cir.1999) ( "Historically, § 1930(a)(6) set forth a scheme to impose the costs of the United States Trustee Program on its users"); *In re Postconfirmation Fees,* 224 B.R. 793, 795 (E.D.Wa.1998) (UST system was to be self-funded whereby users, rather than the general public would pay for cost); *In re Gates Cmty. Chapel of Rochester,* 212 B.R. 220, 226 (Bankr.W.D.N.Y.1997) (UST system is fee, not a tax, as it is a benefit shared only by debtors rather than the public at large).

Congress adopted the fee schedule in section 1930(a)(6) to assure that the UST system was self-funded. (HR Rep No. 764, 99th Cong.2d Sess. 26 (1986).) In doing so, Congress assumed that larger cases tax the UST system more than smaller cases and that the size of the case can be determined by the amount of disbursements made by the particular debtor. *Id.* Both assumptions are logical. Further, Congress stated that it would "monitor the self-funding mechanism as it operates" to assure that the fees collected are sufficient to cover the costs of the UST program. *Id.* In fact, Congress did amend the fee schedule to increase the quarterly fees effective December 27, 1991. *See* Pub.L 102-140, 105 Stat 782 (October 28, 1991).

*5 Consequently, we conclude that the formula adopted by Congress does calculate the "fair approximation of the cost of benefits supplied" to these Debtors by the UST system. *Massachusetts v. United States,* 435 U.S. at 463 n. 19. A more precise calculation of the benefit on a case by case basis is not required. *See Sperry,* 493 U.S at 60 (concluding that "the amount of a user fee [need not] be precisely calibrated to the use that a party makes of Government services").

Further, it was not inappropriate for Congress to mandate the use of a percentage user fee. *Id.* at 62 (charge of 1.5% of any award received was not impermissible fee for use of Iran-United States Claims Tribunal). Although the lower court in *Sperry* had concluded that the percentage fee was an impermissible taking, the Supreme Court held that the fee was "not so clearly excessive as to belie their purported character as user fees. This is not a situation where the Government has appropriated all, or most, of the award to itself and labeled the booty as a user fee." *Id.*

Under section 1930(a)(6), the user fees range from $250 to $10,000 depending on the disbursements made in the quarter by the debtor. This represents .16% to 3.3% of disbursements for all categories except the minimum and maximum fee. Such a fee scheme is not so excessive as to be unconstitutional. Here, the Debtors focus on the dollar amount of the fee being assessed against them (which they assert is in excess of $3.5 million). However, the fee is not outrageous when considered as a percentage of the Debtors' disbursements. [FN5]

> FN5. While the minimum fee of $250 could be in excess of 100% of disbursements, in cases where there are no disbursements, the Debtors have not argued that the minimum fee is excessive. In fact, the Debtors argue that all the Debtors, except the parent Debtor, should be charged only the minimum quarterly fee.

The Debtors also argue that the fee is excessive when the number of hours actually expended by the UST on this case is considered. Although the UST has not provided the Debtors with an analysis of the amount of time spent on this particular case, the Debtors estimate that it is no more than 400 hours. With this estimation, the Debtors contend that permitting the collection of over $3.5 million in fees would equate to an hourly rate of $8,750 for UST personnel. When asked to confirm this estimate, the UST stated it was unable to calculate how many hours it had spent on this or any other case. The Debtors assert that, since the facts regarding this issue are solely within the knowledge of the UST, we must make a negative inference that the fees requested far exceed the time expended. *See, e.g., U.S. v. Denver & Rio Grande R.R. Co.,* 191 U.S. 84, 92 (1903) ("where the subject-matter of a negative averment lies peculiarly within the knowledge of the other party, the averment is taken as true unless disproved by that party").

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
2003 WL 22327933 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 280
(Cite as: 2003 WL 22327933 (Bankr.D.Del.))

Page 5

Even if we were to assume this fact, we still would not conclude that the fee requested is excessive. The Supreme Court has stated that the government need not precisely determine the exact cost on the system that the fee is to cover. *Sperry*, 493 U.S. at 60. Congress need only establish a fee system that makes a reasonable approximation of what it will cost. *Id.* Guided by *Sperry*, we conclude that, by basing the fee on a portion of a debtor's disbursements, Congress constructed a reasonable approximation of the costs borne by the UST in doing its job. It need do no more. Therefore, we conclude that section 1930(a)(6) of title 28 is constitutional as we have interpreted it in the *Charter* case.

IV. *CONCLUSION*

*6 For the foregoing reasons, we grant the UST's Motion for an Order compelling the Debtors to file amended monthly operating reports and to pay delinquent quarterly fees.

An appropriate Order is attached.

*ORDER*

AND NOW, this 9th day of OCTOBER, 2003, upon consideration of the Motion of the United States Trustee ("UST") for an Order compelling the Debtors to file amended monthly operating reports and to pay delinquent quarterly fees and the Debtors' opposition thereto, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

ORDERED that the Motion is GRANTED; and it is further

ORDERED that the Debtors shall file corrected monthly operating reports reflecting disbursements made on account of each Debtor's operations and shall pay the appropriate quarterly fees due by each Debtor as a result.

2003 WL 22327933 (Bankr.D.Del.), 41 Bankr.Ct.Dec. 280

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

A00612

Westlaw.

Not Reported in A.2d
2004 WL 1172996 (Del.Super.)
(Cite as: 2004 WL 1172996 (Del.Super.))

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

Victoria PESTA

v.

Gail WARREN, individually, and Gary Warren, individually, and Gail and Gary Warren, jointly as owners of 604 West Avenue, New Castle, DE, an apartment building.

No. Civ.A.03C04294SCD.

Submitted May 10, 2004.
Decided May 13, 2004.

Dear Counsel:

DEL PESCO, J.

*1 The plaintiff has filed a motion for partial summary judgment seeking a ruling that her claim is not governed by 25 Del. C. § 1501. It states:
No person who enters onto private residential or farm premises owned or occupied by another person, *either as a guest without payment or as a trespasser*, shall have a cause of action against the owner or occupier of such premises for any injuries or damages sustained by such person while on the premises unless such accident was intentional on the part of the owner or occupier or was caused by wilful or wanton disregard of the rights of others. [FN1]

FN1. Del.Code Ann. tit. 25, § 1501 (2002). (emphasis added)

Plaintiff contends that at the time of the accident, she was visiting a tenant of the defendant-landlord, and thus was neither a *guest without payment* nor a *trespasser*. Were she either, she would be required to prove that her injuries were the result of either intentional or willful and wanton conduct on the part of the owner.

On June 26, 2001, Victoria Pesta ("Plaintiff") visited Regina Sheetz at 604 West Ave, Apartment C in New Castle ("604 West"). As plaintiff descended the external stairway, which was the sole means of ingress and egress, she claims that a loose step caused her to fall and sustain injuries. On the date in question, the apartment building was owned by Gail and Gary Warren ("Landlord"). Sheetz was interested in renting the apartment and was given a key by Landlord so that she could clean the apartment prior to signing a lease. Landlord required that Sheetz pay a security deposit before signing a lease which deposit was never paid, so no lease commenced. Landlord claims that it was not until after the incident in question that Sheetz' presence in the apartment was known. [FN2]

FN2. *Bell v. Halfen,* 493 A.2d 304 (Del.1985).

On July 20, 2001, Landlord filed an action for Debt and Summary Possession in the Justice of the Peace Court. A default judgment for two months rent, June and July, and a Writ of Possession were entered on August 24, 2001. On September 11, 2001, after the expiration of the appeal period, the Constable posted an Eviction Notice at 604 West. Landlord now claims that Sheetz was not a tenant. Plaintiff argues that the landlord made a judicial admission in the Justice of the Peace Court action that Sheetz was a tenant, and is now barred from taking a contrary position.

Summary judgment may be granted if there are no material issues of fact, viewing the record in light most favorable to the non-moving party. [FN3] A judicial admission is a formal statement by a party in the course of judicial proceedings, which removes an admitted fact from the field of controversy. [FN4] Judicial admissions are recognized in Delaware. [FN5] The legal significance of the dispute is that if Sheetz was a tenant, there is case law for the proposition that while a tenant may be entitled to the protection of 25 Del. C. § 1501, a landlord is not. [FN6] On the other hand, if Sheetz has no legal status, i.e. was a trespasser, plaintiff is arguably a trespasser, too.

FN3. *Moore v. Sizemore,* 405 A.2d 679 (Del.1979).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2004 WL 1172996 (Del.Super.)

**(Cite as: 2004 WL 1172996 (Del.Super.))**

    FN4. 29A Am Jur 2d, Evidence § 770 (1994).

    FN5. *Krauss v. State Farm Mutual Automobile Ins. Co.,* Del. Super ., C.A. No. 03C-08-252, Cooch, J. (Apr. 23, 2004) (Mem.Op.) at 11.

    FN6. *Ford v. Ja-Sin,* 420 A.2d 184 (Del.1980); *Mosher v. Evans,* Del.Super., C.A. No. 96C-01-020, Terry, J. (Mar. 31, 1998)(Op.) 1998 Del.Super. LEXIS 183.

    **\*2** I conclude that the doctrine of judicial estoppel is applicable to this dispute. The landlord sought the benefit of the remedies available under the landlord-tenant statute to secure a judgment against Sheetz and to have her evicted. The predicate of that complaint is the notion that Sheetz was a tenant. That assertion cannot now be repudiated.

The standard of care which is applicable to the claim against the landlord is negligence. [FN7] Thus, plaintiff's motion for partial summary judgment is GRANTED.

    FN7. *New Haverford Partnership v. Stroot,* 772 A.2d 792 (Del.2001); *see also Naidu v. Laird,* 539 A.2d 1064 (Del.1988).

IT IS SO ORDERED.

2004 WL 1172996 (Del.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                    Page 1
1989 WL 5374 (Del.Super.)
(Cite as: 1989 WL 5374 (Del.Super.))

**H**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.

Cynthia L. ROCHEN, Janis B. Smith, Gladys M.
Harding, Betty L. Langston,
Plaintiffs,
v.
Peter S. HUANG, M.D., Defendant.

Jan. 4, 1989.

Upon defendant's motion for summary judgment.
DENIED.

Roderick R. McKelvie, of Ashby, McKelvie &
Geddes, Wilmington, for plaintiffs.

Victor F. Battaglia, Wayne A. Marvel, and Francis
S. Babiarz, of Biggs & Battaglia, and Robert J.
Katzenstein, of Lassen, Smith, Katzenstein &
Furlow, Wilmington, for defendant.

*MEMORANDUM OPINION*

GEBELEIN, Judge.

*1 This case is before the Court on the defendant
Peter S. Huang, M.D.'s ("Dr. Huang") motion for
summary judgment. The issue before the Court is
whether a general release which releases all persons
from liability for injuries "which have resulted or
may in the future develop from an accident" or for
injuries "arising out of an occurrence" operates to
release a subsequently treating physician from an
action for an intentional tort when the physician was
treating the person only because they were involved
in an automobile accident. Dr. Huang argues that
general releases executed in other litigation by two
plaintiffs in this action operate to bar these plaintiffs'
claims against him. Since the language of each
release is slightly different, the Court will consider
each separately.

*CYNTHIA ROCHEN*

Plaintiff Cynthia Rochen ("Rochen") settled
litigation concerning an automobile accident which
occurred June 28, 1982 in Maryland. Rochen
executed a general release which stated the
following:

For the sole consideration of ($100,000.00) One
hundred thousand and no/100--------Dollars, the
undersigned hereby releases and forever discharges
Robert Edward Rodney [the defendant in that action]
his heirs, executors, administrators, agents and
assigns, and all other persons, firms or corporations
liable or, who might be claimed to be liable, none of
whom admit any liability to the undersigned by all
expressly deny any liability, from any and all claims,
demands, damages, actions, causes of action or suits
of any kind or nature whatsoever, and particularly on
account of all injuries, known or unknown ... which
have resulted or may in the future develop from an
accident which occurred....

Dr. Huang argues that the language of this release
expressly covers him.

Delaware Courts have long upheld general releases.
*See, Adams v. Jankouskus*, Del.Supr., 452 A.2d 148,
155 (1982); *Chakov v. Outboard Marine Corp.*,
Del.Supr., 429 A.2d 984, 985 (1981); *Hob Tea Room
v. Miller*, Del.Supr., 89 A.2d 851, 856 (1952).
However, in order for a release to protect a third
party as a matter of law, the language of the release
must be crystal clear and unambiguous in its
inclusion of that person among the parties released.
*See, Chakov, supra*; *Egan & Sons Air Conditioning
Co. v. General Motors Corporation*, Del.Super., C.A.
No. 86L-MY-18, Gebelein, J. (April 27, 1988). If a
release is ambiguous, the Court may admit extrinsic
evidence to determine the objective intent of the
parties to it. *See, Chakov, supra at 985-86*. This is
a motion for summary judgment. The Court must at
this stage of the proceedings read the facts of this
case as well as any inferences drawn from them in a
light most favorable to the non-moving parties, the
plaintiffs. *Sweetman v. Strescon Ind., Inc.*,
Del.Super., 398 A.2d 1319, 1324 (1978). The
defendant bears the initial burden of establishing that
no material issue of fact exists and that he is entitled
to judgment as a matter of law. *Moore v. Sizemore*,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.