Not Reported in A.2d
1989 WL 5374 (Del.Super.)
(Cite as: 1989 WL 5374 (Del.Super.))

Del.Supr., 405 A.2d 679 (1979); Del.Super.Ct.Civ.R. 56(c).

*2 The Court finds that the release, when read in a light most favorable to Rochen, does not clearly and unambiguously include Dr. Huang within its protection. The key language is that the release applies to anybody regarding "all injuries ... which have resulted or may in the future develop from an accident...." Since the language of this release does not unambiguously include Dr. Huang or the alleged conduct of Dr. Huang, the Court or trier-of-fact must look at the objective intent of the parties to the release.

The Court notes that the facts are hotly contested; but for the purpose of this motion accepting plaintiff's allegations as true, it appears that the following facts are relevant: 1.) on October 1, 1984, while Rochen was receiving treatment from Dr. Huang for injuries suffered in the automobile accident for which the release was signed, Dr. Huang sexually assaulted her; and 2.) on February 1, 1988 Rochen executed the release referred to *supra*.

Rochen, in her testimony at deposition as cited by Dr. Huang, does not state that the settlement in that action included settlement for the alleged actions of Dr. Huang. Rochen's testimony is ambiguous, and because Rochen is the non-movant on this motion, any ambiguity at this stage of the proceedings must be resolved in her favor. Rochen's purported subjective intent is stated in her affidavit submitted in opposition to this motion. In the affidavit, Rochen states that she filed her action against Dr. Huang in June of 1987. Dr. Huang did not participate in the settlement negotiations of Rochen's automobile accident case. The objective intent which the Court could infer from the actions of Rochen is that the release signed in the previous case does not apply to Dr. Huang. In any event, it is clear that the intent of Rochen in signing the release raises a question of fact for the trier-of-fact to decide. [FN1] Since there is a material issue of fact regarding plaintiff Rochen, defendant Dr. Huang's motion for summary judgment is DENIED. Super.Ct.Civ.R. 56(c).

*JANIS SMITH*

Plaintiff Janis Smith ("Smith") settled litigation concerning an automobile accident which occurred May 9, 1981 in Delaware. Smith executed a general release which stated the following:

That Janis Smith for and in consideration of the sum

of Five Hundred Thousand Dollars ($500,000.00) ... does hereby remise, release and forever discharge Merrill L. Detweiler, Hatfield Packing Co. and Hatfield Packing, Inc. [defendants in that action] ... and also any and all other persons, associations and corporations, whether herein named or referred to or not, and who, together with the above named, may be jointly or severally liable to the Undersigned, of and from any and all; and all manner of, actions and causes of action, rights, suits, covenants, contracts, agreements, judgments, claims and demands whatsoever in law or equity, ..., arising from and by reason of any and all KNOWN AND UNKNOWN, FORESEEN AND UNFORESEEN bodily and personal injuries ... which heretofore have been, and which hereafter may be sustained by the undersigned ... and especially from all liability arising out of an occurrence that happened....

*3 Literally read, this release states that in return for $500,000, Smith agrees that she will never sue any person again for any reason, and *especially* for any injury arising out of the automobile accident. Thus, if the Court were to give the release a literal reading, Dr. Huang would be released. But then so would any other person whom Smith ever had a cause of action against in her entire life.

If the release is ambiguous, the objective intent of the parties to it governs its scope. *See, Chakov, supra; Egan, supra.* Ambiguity is defined as language that is reasonably capable of being understood in more than one sense. *Black's Law Dictionary* at 73 (5th ed. 1979). *See also, Egan, supra* at 9-10. All factual disputes must be resolved in the non-movant's, Smith's, favor. *See, Sweetman, supra.*

Again the facts are hotly contested but for the purpose of this motion. Accepting plaintiff's allegations as true, the following facts are relevant: 1.) On March 15, 1985, while Smith was receiving treatment from Dr. Huang for injuries suffered in the automobile accident, subject to the release, Dr. Huang sexually assaulted her. 2.) On November 21, 1985, Smith executed the release referred to, *supra.* Later in 1985, Rochen contacted Smith to inquire into actions of Dr. Huang. Smith's purported subjective intent is stated in her affidavit submitted in opposition to this motion. In the affidavit, she states that she had never during that action identified or asserted any claim against Dr. Huang. She states her subjective belief that the release she signed in that case was in return for a settlement for the injuries she sustained in the automobile accident, not for any

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1989 WL 5374 (Del.Super.)
(Cite as: 1989 WL 5374 (Del.Super.))

injuries she may have suffered at the hands of Dr. Huang four years after the accident.

The release in this case can be reasonably interpreted in more than one way. This Court cannot reasonably interpret the release so that Smith may never be a plaintiff against any person ever again. Thus, the objective intent of the parties to the release must determine whether they meant it to apply to Dr. Huang. *See, Chakov, supra.* There are no facts on the record which lead this Court to believe that Smith intended to release Dr. Huang when she released the defendants in the prior action.

In any event, where ambiguity exists, the question of intent is one for the trier-of-fact. Since a material issue of fact exists as to the plaintiff Smith, defendant Dr. Huang's motion for summary judgment is DENIED. [FN2] Super.Ct.Civ.R. 56(c).

IT IS SO ORDERED.

> FN1. Likewise, there is no evidence of record to indicate that the defendant had any responsibility toward plaintiff for the actions of Dr. Huang nor that they had any intent to procure a release for him.

> FN2. *See* footnote 1, *supra.*

1989 WL 5374 (Del.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

A00617

Westlaw.

Not Reported in A.2d
1999 WL 1241073 (Del.Super.)
(Cite as: 1999 WL 1241073 (Del.Super.))

Page 1

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

Charles W. TUCKER, Plaintiff,

v.

ALBUN, INC., trading as Seacoast Speedway, a Delaware Corporation, Defendant.

No. Civ.A. 97C-04-025.

Sept. 27, 1999.

Bruce A. Rogers, Rogers & Mooney, P.A., Georgetown, Delaware, for the Plaintiff.

Marla L. Tucker, Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, Delaware, for Defendants.

MEMORANDUM OPINION

LEE, J.

Motion for Summary Judgment--Denied
*1 Charles W. Tucker ("Plaintiff") filed this suit against the Defendant, Albun Inc., trading as Seacoast Speedway ("Defendant"), seeking damages for injuries that he incurred when he fell on the Defendant's property. The Defendant's moved for summary judgment arguing that the Plaintiff's claims are barred under either of two theories. The Defendant first urges that the Release the Plaintiff signed is a complete bar to suit. Second, the Defendant argues that if the Release does not bar suit, then, in the alternative, the Plaintiff, in light of his "equal knowledge" of the risks involved, assumed the risk of the presence of holes and ruts in the infield of the racetrack. Moreover, they urge, Seacoast had no duty to warn the Plaintiff of these "obvious inherent risks." This is the Court's decision on the motion.

*STATEMENT OF FACTS* [FN1]

FN1. As this matter is before the Court on the Defendant's Motion for Summary Judgment, the facts recited below are those most favorable to the non-moving party, the Plaintiff.

The Defendant, Albun, Inc., owns Seacoast Speedway ("Speedway") near Georgetown, Delaware. The stock of Albun, Inc. is, in turn, owned by Mrs. Loretta G. Williams and her husband. The Plaintiff, Charles W. Tucker, was a frequent visitor to the racetrack. He attended most Saturday evening races for a number of years as either a race driver, a member of a pit crew, or a spectator.

On September 9, 1995, the Plaintiff went to the Speedway to attend the races as a spectator. Upon arrival, Mrs. Williams asked if he would work on a "wrecker" in return for free admission to the Speedway. The Plaintiff agreed to help out and signed the Release from liability required of all persons entering the pit or infield areas. This was the same release he had signed on prior occasions when entering the pit area. [FN2]

FN2. The text of the Release states:
IN CONSIDERATION of being permitted to compete, officiate, observe, work for, or participate in any way in the EVENT(S) or being permitted to enter for any purpose any RESTRICTED AREA (defined as any area requiring special authorization, credentials, or permission to enter or any area to which admission by the general public is restricted or prohibited), EACH OF THE UNDERSIGNED, for himself, his personal representatives, heirs, and next of kin:
1. Acknowledges, agrees, and represents that he has or will immediately upon entering such RESTRICTED AREAS, and will continuously thereafter, inspect the RESTRICTED AREAS which he enters and he further agrees and warrants that, if at any time, he is in or about RESTRICTED AREAS and he feels anything to be unsafe, he will immediately advise the officials of such and will leave the RESTRICTED AREAS and/or refuse to participate further in the EVENT(S).
2. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the promoters, participants, racing

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 2
1999 WL 1241073 (Del.Super.)
(Cite as: 1999 WL 1241073 (Del.Super.))

associations, sanctioning organizations or any subdivision thereof, track operators, track owners, officials, car owners, drivers, pit crews, rescue personnel, any persons in any RESTRICTED AREA, promoters, sponsors, advertisers, owners and lessees of premises used to conduct the EVENT(S), premises and event inspectors, surveyors, underwriters, consultants and other who give recommendations, directions, or instructions or engage in risk evaluation or loss control activities regarding the premises or EVENT(S) and each of them, their directors, officers, agents and employees, all for the purposes herein referred to as "Releasees," FROM ALL LIABILITY TO THE UNDERSIGNED, his personal representatives, assigns, heirs, and next of kin FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN DEATH OF THE UNDERSIGNED ARISING OUT OF OR RELATED TO THE EVENT(S), WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

3. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the Releasees and each of them FROM ANY LOSS, LIABILITY, DAMAGE, OR COST. they may incur arising out of or related to the EVENT(S) WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

4. HEREBY ASSUMES FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE arising out of or related to the EVENT(S) whether caused by the NEGLIGENCE OF RELEASEES or otherwise.

5. HEREBY acknowledges that THE ACTIVITIES OF THE EVENT(S) ARE VERY DANGEROUS and involve the risk of serious injury and/or death and/or property damage. Each of THE UNDERSIGNED also expressly acknowledges that INJURIES RECEIVED MAY BE COMPOUNDED OR INCREASED BY NEGLIGENT RESCUE OPERATIONS OR PROCEDURES OF THE RELEASEES.

6. HEREBY agrees that this Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the Releasees, INCLUDING NEGLIGENT RESCUE OPERATIONS and is intended to be as broad and inclusive as is permitted by the laws of the Province or State in which the Event(s) is/are conducted. and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED IT FREELY AND VOLUNTARILY WITHOUT INDUCEMENT, ASSURANCE OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW.

His duties that evening, while on the wrecker, were to assist in the removal of wrecked or disabled race cars and any debris from the racing surface. He was to be stationed with the other wreckers in the infield area. During the race, one of the participating race cars lost its rear bumper. Before the cars could come around the track again, the Plaintiff and his partner on the wrecker that evening ran from their truck in the infield to the track so that they could retrieve the bumper from the racing surface.

The infield at the Speedway has a grassy surface that extends to the clay race track. While running to retrieve the bumper, the Plaintiff stepped in a hole and fell down. This fall injured his shoulder giving rise to the present litigation.

*DISCUSSION*

I. *Standard of Review.*

In acting on a motion for summary judgment, "the Court's function is to examine the record and determine whether there is a genuine issue of fact." *Battista v. Chrysler Corp.*, Del.Super., 454 A.2d 286, 290 (1982). Summary judgment is appropriate where, after viewing the record in a light most favorable to the non-moving party, the Court finds there are no

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1999 WL 1241073 (Del.Super.)
(Cite as: 1999 WL 1241073 (Del.Super.))

genuine issues of material fact. *Camac v. Hall,* Del.Super., 698 A.2d 394, 396 (1996). A material factual dispute exists where the parties to the action disagree on the factual predicates for the legal principles they advance. *Merrill v. Crothall-American, Inc.,* Del.Supr., 606 A.2d 96, 99 (1992). Moreover, the "Court's decision must be based only on the record presented, including all pleadings, affidavits, depositions, admissions, and answers to interrogatories, not on what evidence is 'potentially possible." ¹ *Id.* (quoting *Rochester v. Katalan,* Del.Supr., 320 A.2d 704, 708, fn. 7 (1974)). "Summary judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law to the circumstances." *Camac* at 396; *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 470 (1962).

II. *Application of the Law to the Facts of the Case.*

*2 In applying the summary judgment standard to this case, summary judgment should only be granted if there are no material issues of fact in dispute regarding both the validity and the application of the release and the potential liability of the Defendant to the Plaintiff under a negligence theory.

A. *The Release.* Delaware Courts recognize the validity of a general release of a party from liability. *Chakov v. Outboard Marine Corp.,* Del.Supr., 429 A.2d 984, 985 (1981); *see also Hollerman v. Hicks,* Del.Super., C.A. 95C-06-027, Terry, J. (April 8, 1997)(Opinion). A release is valid if it meets three requirements. First, the release must not be ambiguous. Second, the release must not be unconscionable. Finally, the release must not be against public policy. *Hallman v. Dover Downs, Inc.,* D. Del., C.A. No. 85-618-CMW, Wright, J. (Dec. 31, 1986). *See also Egan & Sons Air Conditioning Co. v. General Motors Corp.,* Del.Super., C.A. Nos. 88L-MY-18 and 88L-MY-28, Gebelein, J. (April 27, 1988) (Mem.Op.) at 6 ( [T]he Court first scrutinizes the releases for their validity, secondly for their clarity, and finally, for their scope.).

In determining whether a release is clear or ambiguous, the Delaware courts have developed an often used standard.

> In construing a release, the intent of the parties as to its scope and effect are [sic] controlling, and the court will attempt to ascertain the intent from the overall language of the document. And where the language of the release is clear and unambiguous, it will not lightly be set aside. Where, however, the

language of the release is ambiguous, it must be construed most strongly against the party who drafted it. (Internal citations omitted) *Judge Trucking Co. v. Estate of Cooper,* C.A. No. 92C-03-041, Graves, J. (Sept. 29, 1994) (Mem.Op.) at 8. *See also,* Hollerman at 7.

Moreover, through a release, a person may assume all risks, known or unknown, inherent in a particular situation. "However, for the release to be effective, it must appear that the plaintiff understood the terms of the agreement, or that a reasonable person in his position would have understood the terms.... The evidence must establish that the parties intended the release to apply to the particular conduct of the defendant which has caused the harm." *McDonough v. National Off-Road Bicycle Ass.,* D. Del., C.A. No. 95-504-SLR, Robinson, J. (June 2, 1997) (Mem.Op.)(Summary judgment denied where the Court found there was a material issue of fact whether a cyclist competing in a race contemplated harm occurring from a source other than the normal hazards of bicycle racing before executing a release, normal hazards being collision or rough roads and trails not necessarily death from heat stroke allegedly caused by negligent event management).

In a case relied upon by both parties in the present action, *Hallman v. Dover Downs, Inc., supra,* the United States District Court for the District of Delaware denied a motion for summary judgment in a case with facts that are almost on "all fours" with those of the current dispute. In *Hallman,* a newspaper reporter was assigned by the paper to cover a stock car race at Dover Downs International Speedway. Before he was allowed onto the premises, he was required to sign a release. *Hallman* at 2. Moreover, the reporter's press badge contained a liability release for personal injury or property damage. *Id.* at 3. While reporting on the races, the reporter leaned against a wooden railing that gave way and caused him to fall to the ground below. The Court denied Dover Downs' motion for summary judgment after finding that material issues of fact existed as to whether the release was ambiguous, unconscionable, or violated public policy. *Id.* at 5.

*3 Judge Wright, in *Hallman,* found the release was ambiguous after evaluating the pre-trial statements of both the reporter and the track's representatives concerning their perceptions of the release. The track representative stated that: "I am not a lawyer, and you are asking questions of me that I am not qualified to ask or answer....If you don't understand it, then I certainly am not the one to try and tell you what it says." *Id.* at 6. The reporter, when asked about his

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1999 WL 1241073 (Del.Super.)
(Cite as: 1999 WL 1241073 (Del.Super.))

Page 4

understanding of the release, stated:

> A. Well, without having thought about it very much, I assumed that it was a, it indicated that I knew there was a race going on, there were some risks involved with fast cars on a race track. And that the dangers inherent with that risk, it would be my, would be reasonable for me to expect to be careful about those dangers.
>
> Q: What, if anything, did you think it had to do with the grounds and building?
>
> A: I wouldn't have thought it had anything to do with the grounds. *Id.* at 7.

Because these statements by the parties indicated a fundamental lack of understanding by both on the nature of the release, Judge Wright ruled that the release could not be clear and unambiguous as a matter of law. *Id.* The Court also found that the release was not clear and unambiguous because most of the release was in small print with only certain portions in bold type and the reporters may not have had adequate opportunity to digest the full import of the release at the time of execution. *Id.* at 8.

Judge Wright, in *Hallman*, also found there was an issue of fact whether the release was unconscionable. *Id.* at 9. Two issues drove this finding by the court. First, the Court found the reporter had no choice; he had to sign the release in order to do his job as a reporter. *Id.* at 9. Second, the Court found the release did not necessarily relate to the harm involved. "An uncontrollable car may be a foreseeable risk, but a defective structure is not." *Id.* at 10.

Finally, Judge Wright found that summary judgment was not appropriate because the record was not sufficiently developed to rule as a matter of law that the release did not violate public policy. The Court based this finding on two different theories. First, the law does not favor provisions relieving one from liability for harm caused by his own fault or wrong. *Id.* at 11. For such a provision to be upheld, it must be "crystal clear" in its language evincing the clear intent of the parties to absolve the protected party of liability created by that party's own actions. *Id.* at 12 (citing *J.A. Jones Const. Co. v. City of Dover, Del.Super., 372 A.2d 540, 553 (1977)*). As noted above, the Court found the scope of the release was not certain, thus, summary judgment was not appropriate. As an alternative, Judge Wright looked to see if the release violated public policy because the person seeking the release owed a duty to the other. *Id.* at 13. On this issue, the court did not possess sufficient facts to determine whether the race track owed a duty to reporters covering the races. *Id.* at 14.

*4 In the present case, the motion for summary judgment is denied with regard to the issue of the release Mr. Tucker executed prior to his admittance to the Speedway. The motion is denied because under current Delaware law, including the *Hallman* case, there is a material issue of fact as to the nature of the terms of the release. Thus, the release is ambiguous and the legal effects of the release can only be evaluated after a full airing of the facts.

Mr. Tucker would have a difficult time arguing that he did not know he was signing a release. In his statements, he repeatedly acknowledges that a signed release was a prerequisite to admittance to the pit and infield areas. For this reason, Mr. Tucker's situation is somewhat different from that of the reporter in *Hallman* where there was some question of whether he even knew he was signing a release.

In this case, the release does not clearly define the scope of the Release's coverage. In addressing the potential harms or injuries covered by the Release, it states that it covers those harms "ARISING OUT OF OR RELATED TO THE EVENT(S)...." This language is repeated several times in the release and is used consistently. This language, however, is subject to two interpretations. A very broad interpretation could find that as soon as a person came to the track and signed the release, everything that could happen to him arises out of the events. The argument would be that but for the event, the person would not be in attendance and thus subject to harm. A narrower interpretation would be that the contract language refers to only those potential harms with causes directly related to the events at the Speedway--car racing. In *Hallman*, Judge Wright appears to have subscribed to the narrower interpretation because the language in that release more clearly attempts to cover more activities. The *Hallman* release addresses harms "ARISING OUT OF OR RELATED TO ANY LOSS ... THAT MAY BE SUSTAINED ... WHILE IN, ON, ENROUTE TO, FROM, OR OUT OF SAID PREMISES FROM ANY CAUSE WHATSOEVER...." *Hallman* at 3.

This ambiguity in the language of the Release appears to have caused the parties to differ in their understanding of the Release. Like in *Hallman*, in the instant case, the statements of the parties indicate there may be some question concerning the parties' intent or understanding as to the scope and coverage of the release Tucker signed. Illustrative of this conflict is the testimony of both the Plaintiff and the Defendant at arbitration. The following indicates the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1999 WL 1241073 (Del.Super.)
(Cite as: 1999 WL 1241073 (Del.Super.))

Page 5

Defendant's view of the release:

Q: What is your understanding of the release? What is your understanding of what the purpose of it is and what does it do?

A: That in return for being allowed to be in the pit area as a participant, you sign that you will not-- you sign a release waiver. You waive your right to--I don't know how to put it in words. All the words are there. It says, "Release and Waiver of Liability." That is what you're saying. You are releasing the track and anyone associated with it; that you know that racing is a dangerous sport and you are willing to give up your rights in order to get in there.

*5 Q: And would you consider that as your understanding, that you would give up all rights no matter what happened?

A: Right. You do--you have rules. We have rules. A lot of safety rules. We're very safety conscious. And so, you know, you have rules. And the driver, when he signs in, he agrees to abide by the rules and that he will keep order in his pit, things like that. (Arbitration Transcript at 20-21, Cross-examination of Loretta G. Williams (Aug. 21, 1997)).

The plaintiff, in his testimony at arbitration states:

Q: What did you think you were signing when you signed [the release]?

A: The outtake that I have gotten off of the release forms is if you're negligent to the point where something happens and it's your fault, then they are not liable. But if you're employed by them, it's just like workmen's compensation. (Arbitration Transcript at 51, Direct Examination of Charles W. Tucker (Aug. 21, 1997)).

While both parties appear to have a general idea of the intended effect of the release signed by the Plaintiff, before the Court can rule as a matter of law that the release bars the Plaintiff's claim, several other factual issues must be developed and resolved. The most important issue would be the scope of the release. Did the parties intend that the release cover every conceivable harm-- including those not related to racing? The Defendant's testimony above seems to give the impression that the release is meant to cover only those potential harms caused by racing related actions. Further evidence of this is that only persons who were in close proximity to the cars and the racing action were required to sign a release. General spectators, in the grandstand, do not have to sign a release. Judge Wright took note of a similar fact in *Hallman*. There, Dover Downs required a release for auto racing events but not for horse racing. *Hallman* at 3.

The Defendant tries to link the Plaintiff's injury to racing activities by arguing that "it is logical that ruts or grooves in the grassy area adjacent to a race track are an inherent risk and that they could pose a potential tripping hazard for one 'working' in the racing infield." *Defendants Opening Brief in Support of Its Motion for Summary Judgment* at 10. The Defendant's theory is that ruts and grooves are caused by the emergency vehicles driving over the infield surface and debris thrown from the track. *Defendant's Opening Brief* at 10 and 13. If this theory is accepted, then holes, grooves, and ruts in the infield may be risks associated with racing and thus within the scope of the Release even under the narrow interpretation of the Release language. The question of whether those types of risks are inherent in racing activities is a question of fact and should be reserved for a trier of fact. Because there is some question concerning the scope of this release, its terms are ambiguous.

While the discussion above, concerning the ambiguities of the release, is somewhat lengthy, the remaining questions concerning unconscionability and public policy are less complex and can be dealt with summarily. In *Hallman*, Judge Wright found that the release in issue may have been unconscionable because there was an absence of meaningful choice. The reporter had no choice but to sign the release, otherwise he could not complete his assigned tasks. *Hallman* at 8-9. Judge Wright also found the release was unconscionable because the release did not "bear a reasonable relation to the risk involved." *Hallman* at 10. In the present case, the Plaintiff did have a meaningful choice. He could have paid for general admission and watched the races from the grandstand with the rest of the spectators. Thus, the Release cannot be unconscionable for that reason. However, as discussed above, there may be a question of whether the Release covers the harm that occurred to the Plaintiff. Thus, the Release may be unconscionable if it bears no relation to the risk involved.

*6 Finally, a release may be invalid if it violates public policy. A release may violate public policy if the language exempting the benefitted party from his own negligence is not "crystal clear." *Hallman* at 12 (citing *J.A. Jones Const. Co. v. City of Dover*, Del.Super., 372 A.2d 540, 553 (1977)). Moreover, "a term exempting a party from tort liability for harm negligently caused is unenforceable on grounds of public policy if the term exempts one charged with the duty of public service from liability to one whom that duty is owed." *Hallman* at 13. The language of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1999 WL 1241073 (Del.Super.)
(Cite as: 1999 WL 1241073 (Del.Super.))

Page 6

this Release, "WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES, OR OTHERWISE," is fairly clear that even negligence of the Speedway is to be included within the purview of the release. However, to fall within this clause, the negligent acts or omissions of the Defendant must fall within the scope of activities covered by the Release. Moreover, the issue of whether the defendant owes the Plaintiff any duty, and the nature of such duty depends on the Plaintiff's classification and is discussed in the next section of this Opinion.

Ultimately, this Court finds that there are material issues of fact that must be addressed before the validity and legal effect of the Release may be evaluated. The Release may be invalid because it is ambiguous, unconscionable, or violates public policy. To properly rule on these issues, this Court needs additional facts that are either in dispute or are not in the record before the Court. Most importantly, the Court would need facts tending to show the intended scope of the Release. Once those facts are settled, the validity and effect of the release can be evaluated. For these reasons, summary judgment is not appropriate for the issue of the release.

*Defendant's Duty to the Plaintiff and Assumption of Risk.* The Defendant's Opening Brief presents a second argument for Summary Judgment. The Defendant argues that it owed the Plaintiff no duty and that the Plaintiff assumed the risk upon entering the infield area. Summary judgment is not appropriate on either issue.

In this case, the Defendant is the possessor of land upon which the Plaintiff was injured. The duty of care a possessor of land owes to one injured on the property will depend on the classification of the one injured. At any given time, a person may fall into any number of classifications designed by our society. A person may be a mother or a father or teacher or a doctor. The law also classifies people. Under the law, a person may be a master, a servant, or an independent contractor. Moreover, a person on the property of another may be either a trespasser, a licensee, or an invitee. A person's classification under the law often determines the rights and duties of that person.

In the present case, the issue of whether the Plaintiff was an employee or servant of the Defendant at the time of the injury has been decided in the negative. *Tucker v. Seacoast Speedway,* Del.Super., C.A. No. 99A-02-002, Lee, J. (July 1, 1999)(Mem.Op.). Thus, any duty the Defendant, as the possessor of the land,

owed to the Plaintiff will be defined by the Plaintiff's status at the time he was on the property. In determining the Plaintiff's status, "the Courts of Delaware employ the classifications set forth in the Restatement (Second) of Torts (1965)." *Absalom v. Mason-Dixon Post No. 7234,* Del.Super., C.A. No. 95C-09-022, Lee, J. (Sept. 18, 1996) (Mem.Op.) at 5. *See also, DiOSSI v. Maroney,* Del.Supr., 548 A.2d 1361, 1365 (1988).

*7 The Restatement (Second) of Torts (1965) ("Restatement") classifies persons as either Possessors, Trespassers, Licensees, or Invitees.

A Possessor of land is defined by the Restatement as:

(a) a person who is in occupation of the land with intent to control it or

(b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or

(c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b). Restatement (Second) of Torts § 328E (1965).

A trespasser is "a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." Restatement (Second) of Torts § 329 (1965). The Restatement defines a Licensee as "a person who is privileged to enter or remain on land only by virtue of possessor's consent." Restatement (Second) of Torts § 330 (1965). Three types of people are licensees:

1. One whose presence on the land is solely for his own purposes, in which the possessor has no interest, and to whom the privilege of entering is extended as a mere personal favor to the individual.

2. The members of the possessor's household, and

3. Social guests of the possessor. Restatement (Second) of Torts § 330 cmt. h (1965).

Also, in the context of licensees, "consent" and "permission" means that the person in possession of the premises is "willing that the [licensee] shall enter or remain on the land, or that his conduct is such as to give the [licensee] reason to believe that he is willing that he shall enter, if he so desires." Restatement (Second) of Torts § 330 cmt. c (1965).

Finally, the Restatement uses the following definition for an Invitee:

§ 332. Invitee Defined

(1) An invitee is either a public invitee or a business visitor.

(2) A public invitee is a person who is invited to

A00623

enter or remain on land as a member of the public for a purpose for which the land is held open to the public.

(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land. Restatement (Second) of Torts § 332 (1965).

The comments to this section on invitees are particularly helpful in fleshing out how one becomes an invitee of a landowner or possessor. For instance, "[a]n invitation differs from mere permission in this: an invitation is conduct which justifies others in believing that the possessor desires them to enter the land; permission is conduct justifying others in believing that the possessor is willing that they shall enter if they desire to do so." Restatement (Second) of Torts § 332 cmt. b (1965). Moreover, "the nature of the use to which the possessor puts his land is often sufficient to express to the reasonable understanding of the public, or classes or members of it, a willingness or unwillingness to receive them." Restatement (Second) of Torts § 332 cmt. c (1965).

*8 [T]he visitor has the status of an invitee only while he is on the part of the land to which his invitation extends--or in other words, the part of the land upon which the possessor gives him reason to believe that his presence is desired for the purpose for which he has come. In determining the area included within the invitation, the purpose for which the land is held open, or the particular business purpose for which the invitation is extended, is of great importance. Restatement (Second) of Torts § 332 cmt. l (1965).

Finally, if the invitee exceeds the scope of the invitation, the invitee becomes either a trespasser or a licensee, depending on whether he goes on that portion of the property without or with the consent of the possessor. Id.

While the parties in the present action seem to assume that the Plaintiff was a business invitee at the time of the injury, there seems to be some argument that he is something other than an invitee. For instance, the Plaintiff would not have been an invitee if by going into the infield of the track he exceeded the scope of his original invitation. The facts in the record before this Court show a discrepancy in the scope of the Plaintiff's invitation to the track. The Defendant testified that the Plaintiff was given a "pit pass" as a favor. He had no duties and could freely enter the pit area. He would not have access to the infield area. (Arbitration Transcript pp. 9-10.) The Defendant, however, states that when he arrived at the track that night, he was given free admission in exchange for working as a "wrecker" in the infield. Id. at 45- 46. From this, the Court can discern that there exists material factual disputes concerning those facts necessary for an accurate determination of the Plaintiff's status at the time of the injury. To make this determination, the following facts would need to be developed. First, what was the scope of his invitation into the Speedway that evening? Was he supposed to be in the pits or on a wrecker? If the Plaintiff was not to be in the infield initially, did the Defendant see him there during the evening and not tell him to leave? These facts would help determine if he was an invitee, licensee, or a trespasser at the time of the injury. Because there are material issues of fact in dispute on the issue of the Plaintiff's status, I am denying summary judgment in favor of a full and complete development of the salient facts. As summary judgment is denied for this reason, this Opinion will not address the duties a landowner owes to each of the classifications of persons.

In addition to the duty issue addressed above, the Defendant, in its Opening Brief in Support of its Motion for Summary Judgment, argues that the "PLAINTIFF ASSUMED THE RISK OF HIS INJURY SINCE HE WAS EQUAL IN KNOWLEDGE TO SEACOAST OF THE RISK OF THE PRESENCE OF HOLES AND RUTS IN THE INFIELD...." Defendant's Opening Brief at 11. The affirmative defense of "assumption of risk" is "fact intensive and not susceptible to disposition, as a matter of law, through summary judgment." DiOSSI at 1368. See also Morris v. Hitchens, Del.Super., C.A. No. 91C-05-045, Lee, J.(March 18, 1993)(Mem.Op.) at 4-5.

### CONCLUSION

*9 There are material issues of fact to be developed and decided concerning several matters. First, the release is ambiguous. Second, the factual predicate for determining the Plaintiff's status while on the Defendant's land is disputed. Finally, the issue of any assumption of risk by the Plaintiff is not subject to a motion for summary judgment. Thus, the Defendant's Motion for Summary Judgment is denied.

IT IS SO ORDERED.

1999 WL 1241073 (Del.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# A

A00625

## AGREEMENT

THIS AGREEMENT ("AGREEMENT") is made to be effective as of the 26th day of February, 2002, by and between MERCANTILE-SAFE DEPOSIT AND TRUST COMPANY ("LENDER"); NANTICOKE HOMES, INC., a Delaware corporation ("NANTICOKE"); SHAWNEE HOMES, INC., a Delaware corporation ("SHAWNEE"); SHAWNEE ENTERPRISES MIDWEST, L.L.C., a Delaware limited liability company ("SHAWNEE MIDWEST"); TAMARAC, INC., a Delaware corporation ("TAMARAC"); PAWNEE HOMES, INC., a Delaware corporation ("PAWNEE"); JOHN M. MERVINE, SR. and PEGGY R. MERVINE ("JOHN & PEGGY"); JOHN M. MERVINE, JR. ("MCKY") and JAN L. MERVINE (together with MCKY, "MCKY & JAN"); WILLIAM H. MERVINE, III and CHARLENE MERVINE ("WILLIAM & CHARLENE"); and GREGORY O. MERVINE ("GREGORY "). Hereafter, JOHN & PEGGY, MCKY & JAN, WILLIAM & CHARLENE, and GREGORY are collectively referred to herein as the "INDIVIDUAL GUARANTORS"; NANTICOKE, SHAWNEE, SHAWNEE MIDWEST, TAMARAC and PAWNEE are collectively referred to herein as the "COMPANIES"; the INDIVIDUAL GUARANTORS and the COMPANIES are collectively referred to herein as the "OBLIGORS"; and the OBLIGORS and the LENDER are collectively referred to herein as the "PARTIES."

## RECITALS

### The Loans

NANTICOKE is indebted to the LENDER for the following loans (collectively, "NANTICOKE LOANS") provided by the LENDER to NANTICOKE: (a) a revolving line of credit ("NANTICOKE REVOLVER") evidenced by a Fourth Amended And Restated Demand Promissory Note dated July ___, 2001 in the stated principal amount of Six Million Dollars ($6,000,000.00); and (b) a term loan ("NANTICOKE TERM LOAN") evidenced by a Term Loan Promissory Note dated January 23, 1996 in the stated principal amount of Three Million Five Hundred Thousand Dollars ($3,500,000.00).

SHAWNEE is indebted to the LENDER for the following loans (collectively, "SHAWNEE LOANS") provided by the LENDER to SHAWNEE: (a) a revolving line of credit ("SHAWNEE REVOLVER") evidenced by an Amended And Restated Demand Promissory note dated March 21, 2001 in the stated principal amount of Five Hundred Fifty Thousand Dollars ($550,000.00); (b) a term loan ("SHAWNEE TERM LOAN") evidenced by a Term Loan Promissory Note dated December 18, 1998 in the stated principal amount of Five Hundred Thousand Dollars ($500,000.00); and (c) a term loan ("SHAWNEE TERM LOAN NO. 2") evidenced by a Secured Note dated March 10, 1999 in the originally stated principal amount of Six Hundred Forty-Nine Thousand Four Hundred Dollars ($649,400.00).

SHAWNEE MIDWEST is indebted to the LENDER for a term loan ("SHAWNEE MIDWEST LOAN") provided by the LENDER to SHAWNEE MIDWEST which is evidenced by a Term Loan Promissory Note dated November 13, 1998 in the originally stated principal amount of One Million Six Hundred Thousand Dollars ($1,600,000.00).

TAMARAC is indebted to the LENDER for a term loan ("TAMARAC LOAN") provided by the LENDER to TAMARAC which is evidenced by a Promissory Note dated February 12, 1997 in the originally stated principal amount of One Million Dollars ($1,000,000.00).

Nanticoke Homes Midwest Incorporated ("NANTICOKE MIDWEST") is indebted to the LENDER for the following loans (collectively, " NANTICOKE MIDWEST LOANS") provided by the LENDER to MIDWEST: (a) a revolving line of credit ("NANTICOKE MIDWEST REVOLVER") evidenced by a Demand Promissory Note dated December 18, 1998 in the originally stated principal

amount of One Million Dollars ($1,000,000.00); and (b) equipment term loans (collectively, "NANTICOKE MIDWEST EQUIPMENT LOANS") evidenced by: (i) a Term Loan Promissory Note dated December 22, 1998 in the originally stated principal amount of One Hundred Eighty-Seven Thousand Three Hundred Eighty-Seven Dollars And Sixteen Cents ($187,387.16); (ii) a Term Loan Promissory Note dated March 26, 1999 in the originally stated principal amount of Fifty Thousand Eighty-Three Dollars And Twenty-Two Cents ($50,083.22); (iii) a Term Loan Promissory Note dated April 6, 1999 in the originally stated principal amount of Twenty-Five Thousand One Hundred Sixteen Dollars ($25,116.00); and (iv) a Term Loan Promissory Note dated May 13, 1999 in the originally stated principal amount of Twenty-Two Thousand Two Hundred Seventy-Five Thousand Dollars ($22,275.00). NANTICOKE MIDWEST is a Chapter 7 Debtor in bankruptcy proceedings pending in the United States Bankruptcy Court for the Southern District of Indiana (Indianapolis Division), Case No. 00-03285-BHL-7. The NANTICOKE LOANS, the SHAWNEE LOANS, the SHAWNEE MIDWEST LOAN, the TAMARAC LOAN, and the NANTICOKE MIDWEST LOANS are collectively referred to herein as the "LOANS."

<u>The Guaranties</u>

NANTICOKE is indebted to the LENDER in accordance with the following guaranties (collectively, "NANTICOKE GUARANTIES"): (a) Guaranty Agreement dated January 23, 1996 guarantying the obligations of SHAWNEE; (b) Guaranty Agreement dated December 18, 1998 guarantying the obligations of SHAWNEE; (c) Guaranty Agreement dated November 13, 1998 guarantying the obligations of SHAWNEE MIDWEST; (d) Corporate Guaranty Agreement dated February 12, 1997 guarantying the obligations of TAMARAC; and (e) Guaranty Agreement dated December 18, 1998 guarantying the obligations of NANTICOKE MIDWEST.

SHAWNEE MIDWEST is indebted to the LENDER in accordance with the terms of a Guaranty Agreement ("SHAWNEE MIDWEST GUARANTY") dated September 6, 2000 guarantying the obligations of, *inter alia*, NANTICOKE, SHAWNEE, NANTICOKE MIDWEST and TAMARAC.

JOHN & PEGGY are indebted to the LENDER in accordance with the following guaranties (collectively, "JOHN & PEGGY GUARANTIES"): (a) Guaranty Agreement dated January 23, 1996 guarantying the obligations of NANTICOKE; (b) Guaranty Agreement dated January 23, 1996 guarantying the obligations of SHAWNEE; (c) Guaranty Agreement dated December 18, 1998 guarantying the obligations of SHAWNEE; (d) Guaranty Agreement dated February 12, 1997 guarantying the obligations of TAMARAC; (e) Guaranty Agreement dated March 21, 2000 guarantying the obligations of NANTICOKE; and (f) Guaranty Agreement dated December __, 2000 guarantying *inter alia* the obligations of NANTICOKE, SHAWNEE, SHAWNEE ENTERPRISES, SHAWNEE MIDWEST, TAMARAC, and NANTICOKE MIDWEST.

MCKY & JAN are indebted to the LENDER in accordance with the following guaranties (collectively, "MCKY & JAN GUARANTIES"): (a) Guaranty Agreement dated December 18, 1998 guarantying the obligations of SHAWNEE; (b) Guaranty Agreement dated November 13, 1998 guarantying the obligations of SHAWNEE MIDWEST; (c) Guaranty Agreement dated December 18, 1998 guarantying the obligations of NANTICOKE MIDWEST; and (d) Guaranty Agreement dated December __, 2000 guarantying *inter alia* the obligations of NANTICOKE, SHAWNEE, SHAWNEE ENTERPRISES, SHAWNEE MIDWEST, TAMARAC, and NANTICOKE MIDWEST.

WILLIAM & CHARLENE are indebted to the LENDER in accordance with the following guaranties (collectively, "WILLIAM & CHARLENE GUARANTIES"): (a) Guaranty Agreement dated December 18, 1998 guarantying the obligations of SHAWNEE; (b) Guaranty Agreement dated November 13, 1998 guarantying the obligations of SHAWNEE MIDWEST; (c) Guaranty Agreement dated December 18, 1998 guarantying the obligations of NANTICOKE MIDWEST; and (d) Guaranty

A00627

Agreement dated December 30, 2000 guarantying *inter alia* the obligations of NANTICOKE, SHAWNEE, SHAWNEE ENTERPRISES, SHAWNEE MIDWEST, TAMARAC, and NANTICOKE MIDWEST.

GREGORY is indebted to the LENDER in accordance with the following guaranties (collectively, "GREGORY GUARANTIES"): (a) Guaranty Agreement dated December 18, 1998 guarantying the obligations of SHAWNEE; (b) Guaranty Agreement dated November 13, 1998 guarantying the obligations of SHAWNEE MIDWEST; and (c) Guaranty Agreement dated December 18, 1998 guarantying the obligations of NANTICOKE MIDWEST.

The NANTICOKE GUARANTIES, the SHAWNEE MIDWEST GUARANTY, the JOHN & PEGGY GUARANTIES, the MCKY & JAN GUARANTIES, the WILLIAM & CHARLENE GUARANTIES, and the GREGORY GUARANTIES are collectively referred to as the "GUARANTIES."

<u>Security For The Loans And Guaranties</u>

The obligations of payment and performance owed by NANTICOKE to the LENDER arising out of the LOANS and the NANTICOKE GUARANTIES are secured by security interests and liens in and to all of the real and personal assets of NANTICOKE as evidenced by, *inter alia*, the following: (a) Loan And Security Agreement dated January 23, 1996, as amended; (b) Mortgage dated January 23, 1996 recorded among the Land Records of Kent County, Delaware in Mortgage Book 220, page 292, as amended by First Amendment To Mortgage dated January 8, 1999 recorded among the Land Records of Kent County, Delaware in Mortgage Book 294, page 287, and Second Amendment To Mortgage dated March 21, 2000 recorded among the Land Records of Kent County, Delaware in Mortgage Book 365, page 150; (c) Mortgage dated January 23, 1996 recorded among the Land Records of Sussex County, Delaware in Deed Book 2207, folio 333, as amended by First Amendment To Mortgage dated December 29, 1998 recorded among the Land Records of Sussex County, Delaware in Deed Book 2924, folio 095, and Second Amendment To Mortgage dated March 21, 2000 recorded among the Land Records of Sussex County, Delaware in Deed Book 03389, page 333; (d) Mortgage dated August 6, 2000 recorded among the Land Records of Sussex County, Delaware in Deed Book 03478, page 067; (e) Mortgage dated February 28, 2001 recorded among the Land Records of Kent County, Delaware at Mortgage Book 1011, page 208; (f) Mortgage dated February 28, 2001 recorded among the Land Records of Sussex County, Delaware in Deed Book 03674, page 267; (g) Financing Statements recorded with the Secretary of State of Delaware and bearing the following recordation references: (i) 1996003159 recorded on January 30, 1996; (ii) 1996003165 recorded on January 30, 1996; (iii) 1996003168 recorded on January 30, 1996; (iv) 1997-13250 recorded on April 22, 1997; (v) 199858394 recorded on December 24, 1998; (vi) 199858395 recorded on December 24, 1998; (vii) 199858397 recorded on December 24, 1998; (viii) 199858399 recorded on December 24, 1998; (ix) 199858405 recorded on December 24, 1998; and (x) 199936877 recorded on July 20, 1999; (h) Financing Statements recorded with Sussex and Kent Counties, Delaware, the Maryland State Department of Assessments And Taxation, and the Circuit Court of Wicomico County, Maryland; and (i) Collateral Trademark Assignment dated January 23, 1996 and recorded on January 31, 1996 with the United States Patent And Trademark office at Reel 1428, Frame 0947.

The obligations of payment and performance owed by SHAWNEE to the LENDER arising out of the SHAWNEE LOAN are secured by security interests and liens in and to all of the assets of SHAWNEE as evidenced by, *inter alia*, the following: (a) Loan And Security Agreement dated January 23, 1996; (b) Amended And Restated Loan And Security Agreement dated December 18, 1998; (c) Financing Statement recorded on January 30, 1996 with the Delaware Secretary Of State as Instrument No. 19960003160; (d) Financing Statement recorded on January 24, 1996 with the

A00628

Maryland State Department Of Assessments And Taxation as File No: 160258112; (e) Financing Statement recorded on January 29, 1996 with the Clerk of the Court of Wicomico County, Maryland at Liber 1471, Folio 122; and (f) Collateral Trademark Agreement recorded on January 31,1996 with the United States Patent And Trademark office at Reel 1428, Frame 0946.

The obligations of payment and performance owed by SHAWNEE MIDWEST to the LENDER with respect to the SHAWNEE MIDWEST LOAN and the SHAWNEE MIDWEST GUARANTY are secured by security interests and liens in and to all of the real and personal assets of SHAWNEE MIDWEST as evidenced by, inter alia, the following: (a) Mortgage And Security Agreement dated November 13, 1998 and recorded among the Land Records of Henry County, Indiana on December 22, 1998 as Instrument No. 98012520; (b) Indemnity Mortgage And Security Agreement dated September 6, 2000 and recorded among the Land Records of Henry County, Indiana on September 19, 2000 as Instrument No. 20007213; (c) Financing Statement recorded with the Delaware Secretary of State on December 24, 1998 as Instrument No. 1998-58394; (d) Financing Statement recorded with the Indiana Secretary of State on February 15, 1999 as ID No. 2239385; (e) Financing Statements recorded with the Henry County, Indiana Recorder on December 22, 1998 as ID Nos. 98012520, 981686, and 981687; and (f) Financing Statement recorded with the Maryland State Department Of Assessments And Taxation on December 29, 1998 as ID No. 39100000041551.

The obligations owed by TAMARAC to the LENDER with respect to the TAMARAC LOAN are secured by any remaining assets of TAMARAC as described in a Mortgage dated February 12, 1997 and recorded among the Mortgage Records of Kent County, Delaware at Book 340, Page 1, and the following Financing Statements recorded with the Delaware Secretary of State: (a) No. 19970006947 recorded on March 3, 1997; and (b) No. 19970020255 recorded on June 16, 1997.

The obligations owed by NANTICOKE MIDWEST to the LENDER in connection with the NANTICOKE MIDWEST LOANS are secured by all of the assets of NANTICOKE MIDWEST as evidenced by the following: (a) Loan And Security Agreement dated December 18, 1998; (b) Financing Statement recorded with the Indiana Secretary of State on January 13, 1999 as Instrument No. 2233573; and (c) Financing Statement recorded with the Delaware Secretary of State on December 24, 1998 as Instrument No. 199858402.

The obligations of payment and performance owed by JOHN & PEGGY to the LENDER pursuant to the JOHN & PEGGY GUARANTIES are secured by an Indemnity Deed Of Trust And Assignment Of Leases And Rents dated December 30, 2000 and recorded on January 12, 2001 among the Land Records of Talbot County, Maryland at Liber 0987, Folio 064.

The obligations of payment and performance owed by WILLIAM & CHARLENE to the LENDER pursuant to the WILLIAM & CHARLENE GUARANTIES are secured by an Indemnity Deed Of Trust And Assignment Of Leases And Rents dated February 16, 2001 and recorded among the Land Records of Wicomico County, Maryland at Liber 1796, Folio 874.

The obligations of payment and performance owed by GREGORY to the LENDER pursuant to the GREGORY GUARANTIES is secured by: (a) a Limited Recourse Indemnity Mortgage And Security Agreement dated November 29, 2001 and recorded on December 6, 2001 among the Land Records of Hamilton County, Indiana; (b) a Non-Recourse Indemnity Mortgage And Security Agreement dated November 29, 2001 from Caring Communities Of Indiana, LLC and recorded on December 5, 2001 among the Land Records of Marion County, Indiana; (c) a pledge of GREGORY'S equity interests in Caring Communities Of Indiana, LLC; and (d) a security interest in any tax refunds due to GREGORY, individually or jointly with Lacey Mervine.

D:\tjms\18886\MervineAgt.doc

-4-

A00629

The LENDER holds the following judgments (collectively "JUDGMENTS"): (a) judgment by confession against MCKY & JAN and WILLIAM & CHARLENE in the Circuit Court for Baltimore County, Maryland (Case No. 03-C-00-010014 Civil), in the amount of Eight Hundred Three Thousand Nine Hundred Sixty-Four Dollars And Eleven Cents ($803,964.11), plus post-judgment interest and costs; and (b) judgment against GREGORY in the United States District Court for the District of Maryland (Civil Action No. MJG-00-2884), in the amount of Eight Hundred Thirty-eight Thousand Four Hundred Forty-One Dollars and Twenty-Six Cents ($838,441.26), plus post-judgment interest and costs.

The Forbearance Agreements And
The Demands For Payment

The PARTIES (other than GREGORY) entered into the following agreements (collectively, "FORBEARANCE AGREEMENTS") in which the OBLIGORS acknowledged the defaults of the OBLIGORS of the obligations owed by the OBLIGORS to the LENDER to repay and perform the LOANS and the GUARANTIES and in which the LENDER agreed to forbear from immediately enforcing its default remedies: (a) Forbearance Agreement dated March 21, 2000, as amended by a Supplemental Agreement dated June 7, 2000; (b) a Second Forbearance Agreement dated July 27, 2000; (c) a Third Forbearance Agreement dated to be effective as of December 31, 2000; and (d) a Fourth Forbearance Agreement dated as of August 2001.   Pursuant to the FORBEARANCE AGREEMENTS, the OBLIGORS acknowledged their obligations to the LENDER, waived any defenses thereto, guaranteed various payments, agreed to pledge assets to the LENDER as collateral in consideration of the LENDER'S agreements to forbear, and granted releases to the LENDER.   Although GREGORY did not enter into the FORBEARANCE AGREEMENTS, GREGORY agreed in a Settlement And Joinder Agreement dated November 30, 2001 to be bound by the terms and conditions of the FORBEARANCE AGREEMENTS.

The last forbearance period granted by the LENDER expired by its terms on October 31, 2001.  The OBLIGORS did not cure the existing defaults under the LOANS and GUARANTIES and subsequent new defaults by the OBLIGORS occurred which respect to the LOANS and the GUARANTIES. By letter agreement dated January 23, 2002, the LENDER agreed to provide on a discretionary basis limited additional advances to NANTICOKE under the NANTICOKE REVOLVER. In such letter agreement, NANTICOKE agreed to provide and comply with a weekly budget.  NANTICOKE also granted the LENDER a release of all claims.  NANTICOKE did not comply with the first weekly budget submitted by NANTICOKE under such letter agreement.

By letters dated February 6, 2002 ("DEMAND DATE"), the LENDER demanded payment of the LOANS (other than the NANTICOKE MIDWEST LOANS).  NANTICOKE, SHAWNEE, SHAWNEE MIDWEST, and TAMARAC have ceased their business operations and have commenced liquidating their assets.

The documents evidencing or securing the LOANS or the GUARANTIES, including without limitation all promissory notes, loan agreements, security agreements, pledges, financing statements, guaranty agreements (including the GUARANTIES), the FORBEARANCE AGREEMENTS, the above-described Settlement and Joinder Agreement, and other writings, as amended or modified, are collectively referred to herein as the "LOAN DOCUMENTS," and all assets of the OBLIGORS that have been pledged to the LENDER to secure the repayment of the LOANS or the GUARANTIES and all other collateral and properties pledged to secure the repayment of the LOANS or the GUARANTIES are collectively referred to herein as the "COLLATERAL." All duties and obligations of payment and performance owed by the OBLIGORS to the LENDER with respect to the LOANS, the GUARANTIES, the LOAN DOCUMENTS, and the

A00630

COLLATERAL, including without limitation the obligation to pay all principal, accrued interest, accrued late charges and expenses, are collectively referred to as the "OBLIGATIONS."

NOW, THEREFORE, in consideration of these premises, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the PARTIES hereby agree as follows:

Section 1.    Acknowledgment Of Obligations And Events Of Defaults. The OBLIGORS acknowledge that: (a) each factual statement set forth above as a Recital to this AGREEMENT is true, accurate and complete; (b) each of the LOAN DOCUMENTS is the valid and binding obligation of the OBLIGORS which are parties thereto, and is fully enforceable in accordance with all stated terms; (c) the duties of the OBLIGORS to pay and perform their respective obligations to the LENDER in accordance with the LOAN DOCUMENTS are not subject to any set-offs, defenses or counterclaims; and (d) the OBLIGORS are in default of their respective obligations to repay the LOANS and the GUARANTIES. EACH OBLIGOR HEREBY UNCONDITIONALLY REAFFIRMS AND RATIFIES ALL OBLIGATIONS OWED TO THE LENDER IN ACCORDANCE WITH THE TERMS OF THE LOAN DOCUMENTS, INCLUDING BUT NOT LIMITED TO ALL OBLIGATIONS OWED PURSUANT TO THE TERMS OF THE GUARANTIES AND ALL OTHER AGREEMENTS, AND ALL LIENS, PLEDGES AND SECURITY INTERESTS PREVIOUSLY GRANTED BY ANY OF THE OBLIGORS TO THE LENDER, AND ALL RELEASES AND WAIVERS SET FORTH IN THE LOAN DOCUMENTS.

Section 2.    Acknowledgment Of Aggregate Unpaid Balance Of The Obligations. The OBLIGORS acknowledge and agree that the total aggregate amount of unpaid and outstanding OBLIGATIONS consisting of principal, interest, late charges and expenses as of February 19, 2002 is Nine Million Eight Hundred Seventy Thousand Eight Hundred Ninety-Eight Dollars and Twenty-Eight Cents ($9,870,898.28).

Section 3.    Liquidation Of Collateral. The OBLIGORS agree to engage in the prompt and orderly liquidation of the COLLATERAL owned by the COMPANIES in order to maximize the sums realized therefrom in a cost effective and efficient manner.

Section 4.    Obligations Owed By "Stone Harbor," "Courts," And "Cove" To Nanticoke. MCKY agrees to take such actions as may be required to cause Stone Harbor, LLC ("STONE HARBOR"), The Courts of Greenwood, LLC ("COURTS"), and The Cove, LLC ("COVE") to acknowledge and agree to pay their respective indebtedness to NANTICOKE (collectively, "CUSTOMER INDEBTEDNESS") and to execute and deliver such documents within twenty (20) business days hereof as may be required to accomplish the following:

Section 4.1.    Stone Harbor. STONE HARBOR shall execute and deliver such documents as may be required for STONE HARBOR to: (a) acknowledge that STONE HARBOR is indebted to NANTICOKE in the amount of One Million Dollars ($1,000,000.00) ("STONE HARBOR DEBT"); (b) agree to make the following payments upon the STONE HARBOR DEBT (i) pay the sum of One Hundred Twenty-Five Thousand Dollars ($125,000.00) for each of the two (2) undelivered homes ordered by STONE HARBOR, payable upon the release thereof from NANTICOKE'S plant, with the costs of delivery to be paid by STONE HARBOR, (ii) pay the sum of Seventy-Five Thousand Dollars ($75,000.00) each upon the sale of each of the ten (10) lots and housing units thereon of STONE HARBOR upon which NANTICOKE housing units are presently set, and (iii) upon the completion of the project of STONE HARBOR, pay all excess cash flow of STONE HARBOR upon the STONE HARBOR DEBT; (c) agree to not pay distributions or salaries to MCKY or to any related parties owned, controlled by or related to MCKY until the satisfaction of the STONE HARBOR DEBT; (d) grant NANTICOKE and the LENDER a mortgage lien and security

A00631

interest upon the property of STONE HARBOR to secure the STONE HARBOR DEBT, subordinate in lien priority and rights of enforcement to Wilmington Trust Company ("WILMINGTON TRUST") and subject to the terms of an intercreditor agreement between WILMINGTON TRUST and the LENDER satisfactory to the LENDER; (e) agree to provide the LENDER with copies of all settlement statements for the sale by STONE HARBOR of each of its lots contemporaneously with each sale; and (f) agree to provide the LENDER with copies of STONE HARBOR'S monthly check registers and reconciliations and contemporaneous copies of all prepared financial statements and federal income tax returns.

Section 4.2.    Courts.  COURTS shall execute and deliver such documents as may be required to: (a) acknowledge that COURTS is indebted to NANTICOKE in the amount of Nine Hundred Six Thousand Nine Hundred Twenty Dollars ($906,920.00) ("COURTS DEBT"); and (b) grant NANTICOKE and the LENDER a mortgage lien and security interest upon the property of COURTS to secure the COURTS DEBT, subordinate in lien priority and rights of enforcement to the Delaware Community Investment Corporation ("DCIC"); and (c) pay to the LENDER all of its "MONTHLY CASH FLOW" (net income plus interest and depreciation minus any first mortgage payments) for application to the COURTS DEBT.

Section 4.3.    Cove.  COVE shall execute and deliver such documents as may be required to: (a) acknowledge that COVE is indebted to NANTICOKE in the amount of Sixty-One Thousand Nine Hundred Dollars ($61,900.00) ("COVE DEBT"); (b) grant NANTICOKE and the LENDER a mortgage lien and security interest upon the property of COVE to secure the COVE DEBT, subordinate in lien priority and rights of enforcement to WILMINGTON TRUST and subject to the terms of an intercreditor agreement between WILMINGTON TRUST and the LENDER; and (c) pay to the LENDER all of its MONTHLY CASH FLOW for application to the COVE DEBT.

Section 5.    Additional Security.  MCKY further agrees to take such actions as may be required to obtain the following additional security ("ADDITIONAL SECURITY") within twenty (20) business days hereof: (a) guaranties of the LOANS from STONE HARBOR, COURTS and COVE secured by mortgage liens and security interests against their respective real and personal assets, subordinate in lien priority and right of enforcement to any existing liens of WILMINGTON TRUST and subject to the terms of intercreditor agreements between WILMINGTON TRUST and the LENDER; (b) the agreement of COURTS and COVE to immediately list their respective real properties and assets for sale; and (c) the agreement of COURTS and COVE to provide the LENDER with monthly financial statements within twenty (20) days after the end of each month and contemporaneous copies of all annual federal income tax returns.

Section 6.    Escrow Account.  The PARTIES agree that all proceeds received from the ADDITIONAL SECURITY shall be applied first to the repayment of the CUSTOMER INDEBTEDNESS and secondly shall be paid into a non-interest bearing escrow account ("ESCROW ACCOUNT") held by the LENDER as additional COLLATERAL for the OBLIGATIONS. All proceeds received from the liquidation of the real property of SHAWNEE MIDWEST shall be applied first to the repayment of the SHAWNEE MIDWEST LOAN and secondly paid into the ESCROW ACCOUNT as additional COLLATERAL for the OBLIGATIONS. If the TERMINATION AMOUNT has been timely paid and no TERMINATION EVENT has occurred, the LENDER shall release the sums held in the ESCROW ACCOUNT to the entity originally contributing such sums. Upon the occurrence of a TERMINATION EVENT, or to the extent that the TERMINATION AMOUNT has not been satisfied during the COMPROMISE PERIOD, the LENDER shall be authorized to apply the funds in the ESCROW ACCOUNT to the repayment of the OBLIGATIONS.

Section 7.    Additional Collateral For Mcky & Jan Guaranties.  MCKY & JAN agree to further secure their obligations under the MCKY & JAN GUARANTIES by delivering within twenty

A00632

(20) business days hereof such documents as may be required to: (a) pledge to the LENDER all of MCKY'S ownership interests in STONE HARBOR, COURTS and COVE to secure the MCKY & JAN GUARANTIES; and (b) grant to the LENDER an indemnity mortgage upon their residence to secure the MCKY & JAN GUARANTIES, subordinate to the liens of WILMINGTON TRUST. MCKY agrees to expand the present assignment of the "Fleischman Deed of Trust" to also secure the OBLIGATIONS, junior in priority to the present assignment with respect to the Salisbury Developers, Inc. Indebtedness ("Salisbury Debt").

Section 8.    Forbearance Against Individual Guarantors. The LENDER agrees to forbear from enforcing the GUARANTIES of the INDIVIDUAL GUARANTORS and the JUDGMENTS against the INDIVIDUAL GUARANTORS and the COLLATERAL owned by the INDIVIDUAL GUARANTORS which secures the GUARANTIES of the INDIVIDUAL GUARANTORS and to forbear from executing upon the existing judgment ("SALISBURY JUDGMENT") held by the LENDER against MCKY & JAN for the Salisbury Developers, Inc. Indebtedness until that date ("TERMINATION DATE") which is the earlier of: (a) August 1, 2003; or (b) the date of the occurrence of any "TERMINATION EVENT" (hereinafter defined). The LENDER agrees to forbear from enforcing against STONE HARBOR, COVE and COURTS the guaranties and mortgages to be granted by STONE HARBOR, COVE, and COURTS for the benefit of the LENDER provided that such entities: (A) execute and deliver each of the agreements and documents required above in Sections 4 and 5 of this AGREEMENT; (B) take the actions required by such agreements and documents and comply with all stated terms of such agreements and documents, and make when due the payments required by Sections 4 and 5 of this AGREEMENT; and (C) promptly list their respective assets for sale and diligently market such assets in a manner calculated to promptly liquidate such assets.

Section 9.    Agreement Of Lender To Compromise Obligations. The LENDER agrees to compromise the amount of the OBLIGATIONS payable to LENDER and to terminate the LENDER'S liens against the COLLATERAL which secure the OBLIGATIONS and to terminate the JUDGMENTS (but not the SALISBURY JUDGMENT) and to release the OBLIGORS from further liability to pay any remaining unpaid OBLIGATIONS upon the satisfaction of all of the following conditions (collectively, "COMPROMISE CONDITIONS"): (a) the LENDER shall have received absolute, irrevocable and non-avoidable payments curtailing the unpaid balance of the OBLIGATIONS during the period of time ("COMPROMISE PERIOD") beginning on the DEMAND DATE and ending on August 1, 2003, in an aggregate net sum ("TERMINATION AMOUNT") of Seven Million Three Hundred Thousand Dollars ($7,300,000.00) plus all expenses and costs incurred by the LENDER after the DEMAND DATE arising or relating to the OBLIGATIONS or the liquidation of the COLLATERAL or the enforcement of the LOAN DOCUMENTS or any insolvency or bankruptcy proceedings involving any of the OBLIGORS or any proceedings, investigations or the like brought against the LENDER relating to the OBLIGATIONS or the administration of the LOANS, including attorneys' fees and liquidation costs, and plus all sums advanced, readvanced, or loaned by the LENDER to or for the accounts of any of the OBLIGORS after the DEMAND DATE, including any loan advances (and interest thereon) to NANTICOKE as a Chapter 11 debtor pursuant to 11. U.S.C. § 364 or otherwise, plus the amount of any payments received before or during the COMPROMISE PERIOD by the LENDER upon any of the OBLIGATIONS which the LENDER is required by court order or by the operation of law to disgorge or return, or which are otherwise avoided or set aside; (b) with respect to the compromise of the OBLIGATIONS payable by NANTICOKE (including all NANTICOKE LOANS and NANTICOKE GUARANTIES) and the termination of the LENDER'S liens against COLLATERAL owned by NANTICOKE, no NANTICOKE TERMINATION EVENTS shall have occurred (c) with respect to the compromise of the amounts of OBLIGATIONS payable by the OBLIGORS other than NANTICOKE and the termination of the LENDER'S liens against COLLATERAL owned by OBLIGORS other than NANTICOKE, no TERMINATION EVENTS shall have occurred; (d) all OBLIGORS shall have delivered releases

A00633

("FINAL RELEASES") to the LENDER in form and substance as set forth below in Section 20 of this AGREEMENT effective through and including the date of the compromise and release of the remaining balance of the OBLIGATIONS and the termination of the LENDER'S liens; (e) this AGREEMENT and the duties and obligations of the OBLIGORS hereunder (including the obligation to provide the FINAL RELEASES) shall have been approved, confirmed and ratified by any court having jurisdiction over any of the OBLIGORS in any insolvency proceedings involving any of the OBLIGORS, including without limitation, any United States Bankruptcy Court, and such approval shall include a final, unconditional and absolute release in any such insolvency proceedings of all claims by the debtor or insolvency estate or any trustee or committee against the LENDER, including without limitation the release of any claims to avoid any payments received by the LENDER upon the OBLIGATIONS; and (f) there are no pending proceedings against the LENDER for the avoidance or return of any payments previously paid to the LENDER upon the OBLIGATIONS. The PARTIES agree that the LENDER shall have no obligation to compromise the OBLIGATIONS or to terminate the JUDGMENTS or to terminate the liens of the LENDER in and to the COLLATERAL and to release the remaining claims of the LENDER against the OBLIGORS unless each of the COMPROMISE CONDITIONS has been timely and irrevocably satisfied. For purposes of calculating the TERMINATION AMOUNT, interest accruing upon the LOANS after the DEMAND DATE shall not be deemed to be an expense or cost or otherwise be included in the TERMINATION AMOUNT.

Section 10.    Nanticoke Termination Events.  The PARTIES agree that each of the following events or occurrences shall constitute a "NANTICOKE TERMINATION EVENT": (a) a failure by NANTICOKE or any bankruptcy estate of NANTICOKE to comply with the stated terms, conditions, and requirements of this AGREEMENT or any rejection of this AGREEMENT, in whole or in part, in any insolvency or bankruptcy proceedings pertaining to NANTICOKE; (b) the conversion of any Chapter 11 bankruptcy proceeding of NANTICOKE to a Chapter 7 proceeding; (c) the appointment of a trustee or receiver for NANTICOKE or NANTICOKE'S assets in any bankruptcy or insolvency proceeding; (d) the dispute by NANTICOKE, or by any insolvency estate or trustee of NANTICOKE, of the enforceability of any provisions of this AGREEMENT or of any of the LOAN DOCUMENTS in accordance with all stated terms or of the perfection or priority of any liens of the LENDER in or to any of the COLLATERAL; (e) the initiation by NANTICOKE or by any insolvency estate of NANTICOKE of any action to set aside or avoid any lien, release or payment granted or made by NANTICOKE or any of the OBLIGORS to the LENDER; (f) the occurrence of any events or defaults under any financing agreement between the LENDER and NANTICOKE in accordance with debtor-in-possession financing provided by the LENDER to NANTICOKE; (g) the occurrence of any defaults by NANTICOKE under any agreements between NANTICOKE and the LENDER authorizing the use by NANTICOKE of any "CASH COLLATERAL" (as hereinafter defined) or other proceeds of the COLLATERAL; (h) the granting of any liens or security interests against any of the COLLATERAL by NANTICOKE, or any insolvency estate of NANTICOKE, in favor of any secured creditor other than the LENDER, including without limitation the granting to any creditor of NANTICOKE other than the LENDER of any liens against any of the COLLATERAL pursuant to 11 U.S.C. § 364; (i) the failure of all of the COMPROMISE CONDITIONS to be satisfied within the COMPROMISE PERIOD, including without limitation the obtaining of all court orders and approvals which constitute COMPROMISE CONDITIONS; or (j) the initiation of any litigation by NANTICOKE or on behalf of any insolvency estate or trustee of NANTICOKE against the LENDER or any of the officers, directors or representatives of the LENDER.

Section 11.    Termination Events.  The PARTIES agree that each of the following events or occurrences shall constitute a "TERMINATION EVENT": (a) the occurrence of a NANTICOKE TERMINATION EVENT; (b) a failure by any of the OBLIGORS to comply with the stated terms, conditions, and requirements of this AGREEMENT; (c) the dispute by any OBLIGOR, or by any insolvency estate or trustee of any OBLIGOR, of the enforceability of any of the LOAN

A00634

DOCUMENTS in accordance with all stated terms or of the perfection or priority of any liens of the LENDER in or to any of the COLLATERAL; (d) the initiation by any OBLIGOR or by any insolvency estate or trustee of any OBLIGOR of any action to set aside or avoid any lien, release or payment granted or made by any of the OBLIGORS to the LENDER; (e) the institution of any voluntary or involuntary insolvency or bankruptcy proceedings against any of the INDIVIDUAL GUARANTORS within one hundred eighty (180) days after the date of the execution of this AGREEMENT by such INDIVIDUAL GUARANTORS; (f) the occurrence of any defaults under any financing agreement between the LENDER and any of the OBLIGORS in accordance with financing provided by the LENDER to such OBLIGOR pursuant to 11 U.S.C. §§ 364(c) and 364(d); (g) the granting of any liens or security interests against any of the COLLATERAL by any of the OBLIGORS, or any insolvency estate or trustee of any OBLIGOR, in favor of any secured creditor other than the LENDER, including without limitation the granting to any creditor of the OBLIGORS other than the LENDER of any liens against any of the COLLATERAL pursuant to 11 U.S.C. § 364; (h) the failure of all of the COMPROMISE CONDITIONS to be satisfied within the COMPROMISE PERIOD, including without limitation the obtaining of all court orders and approvals which constitute COMPROMISE CONDITIONS; (i) the initiation of any litigation by any of the OBLIGORS or on behalf of any insolvency estate or trustee of any OBLIGOR against the LENDER or any of the officers, directors or representatives of the LENDER or the participation or encouragement by any of the OBLIGORS of any litigation brought by any other person or entity against the LENDER; or (j) the failure of STONE HARBOR, COURTS or COVE to perform and comply with the requirements set forth in Sections 4 and 5 of this AGREEMENT or the terms of any of the guaranties or mortgages to be delivered in accordance with Sections 4 and 5 of this AGREEMENT. The institution of any voluntary or involuntary insolvency or bankruptcy proceeding against an INDIVIDUAL GUARANTOR after one hundred eighty (180) days from the date of this AGREEMENT shall constitute a TERMINATION EVENT with respect to that INDIVIDUAL GUARANTOR but not as to any of the other OBLIGORS.

Section 12.    Limited Use Of Cash Collateral.  The LENDER agrees to permit the limited use of cash proceeds ("CASH COLLATERAL") of the COLLATERAL during the Chapter 11 proceedings of NANTICOKE, provided that: (a) NANTICOKE and the LENDER mutually agree on the terms of an appropriate agreement ("CASH COLLATERAL AGREEMENT") governing the use of CASH COLLATERAL by NANTICOKE as a Chapter 11 debtor-in-possession; (b) the CASH COLLATERAL AGREEMENT is approved by the Court on terms acceptable to the LENDER or the LENDER consents in writing to such use; (c) the maximum amount of CASH COLLATERAL to be used by NANTICOKE shall not exceed Fifty Thousand Dollars ($50,000.00) each month, of which amount Twenty-Eight Thousand Dollars ($28,000.00) may be expended on salaries with the remainder to be used for other expenses; (d) the amount of CASH COLLATERAL which NANTICOKE shall be permitted to use shall not exceed Three Hundred Thousand Dollars ($300,000.00) in total aggregate amount unless the OBLIGATIONS have been permanently reduced by not less than Three Million Five Hundred Thousand Dollars ($3,500,000.00), and upon such permanent reduction, in the absence of any defaults under the CASH COLLATERAL AGREEMENT, NANTICOKE may use CASH COLLATERAL in an additional aggregate amount of up to Two Hundred Thousand Dollars ($200,000.00) until the OBLIGATIONS have been permanently reduced by not less than the total aggregate sum of Six Million Two Hundred Thousand Dollars ($6,200,000.00), and upon such additional permanent reduction and in the absence of any defaults under the CASH COLLATERAL AGREEMENT, NANTICOKE may use CASH COLLATERAL in an additional aggregate amount of up to one Hundred Thousand Dollars ($100,000.00); (e) the rights of NANTICOKE to the use of CASH COLLATERAL shall terminate immediately upon the occurrence of a NANTICOKE TERMINATION EVENT or a default under the CASH COLLATERAL AGREEMENT; and (f) the term of the CASH COLLATERAL AGREEMENT shall terminate on the TERMINATION DATE. The CASH COLLATERAL AGREEMENT shall provide that under all

A00635

circumstances the maximum aggregate amount of CASH COLLATERAL to be used by NANTICOKE shall not exceed Six Hundred Thousand Dollars ($600,000.00).

Section 13.    Preservation Of Existing Defaults.  The PARTIES acknowledge that the LENDER is not waiving or excusing the existing defaults of the OBLIGORS, or any other subsequently occurring defaults and that such defaults and the resulting rights and remedies to which the LENDER is entitled, are by the agreement of the PARTIES specifically preserved.

Section 14.    Further Assurances.  The OBLIGORS each agree to execute and deliver to the LENDER such other and further documents as may, from time to time, be reasonably requested by the LENDER in order to execute or enforce the terms and conditions of this AGREEMENT.

Section 15.    No Novation; No Impairment.  It is the intent of the PARTIES that nothing contained in this AGREEMENT shall be deemed to effect or accomplish or otherwise constitute a novation of any of the OBLIGATIONS or of any of the LOAN DOCUMENTS.  Except as expressly set forth above, nothing contained herein is intended to extinguish, terminate or impair any of the OBLIGATIONS owed by any of the OBLIGORS to the LENDER.

Section 16.    Enforceability.  This AGREEMENT shall inure to the benefit of and be enforceable against each of the PARTIES and their respective successors and assigns.

Section 17.    Choice Of Law; Consent To Jurisdiction; Agreement As To Venue.  This AGREEMENT shall be construed, performed and enforced and its validity and enforceability determined in accordance with the laws of the State of Maryland (excluding, however, conflict of laws principles).  Each of the OBLIGORS consents to the jurisdiction of the courts of the State of Maryland and the jurisdiction of the United States District Court for the District of Maryland, if a basis for federal jurisdiction exists.  Each of the OBLIGORS waives any right to object to the maintenance of a suit in any of the state or federal courts of the State of Maryland on the basis of improper venue or inconvenience of forum.

Section 18.    Amendment.  The LENDER shall not be bound by any amendment to this AGREEMENT unless the LENDER executes such amendment.

Section 19.    Waiver.  No failure or delay by the LENDER in the exercise or enforcement of any of its rights under any LOAN DOCUMENT shall be a waiver of such right or remedy nor shall a single or partial exercise or enforcement thereof preclude any other or further exercise or enforcement thereof or the exercise or enforcement of an other right or remedy.  The LENDER may at any time or from time to time waive all or any rights under this AGREEMENT or the other LOAN DOCUMENTS, but any such waiver must be specific and in writing and no such waiver shall constitute, unless specifically so expressed by the LENDER in writing, a future waiver of performance or exact performance by the OBLIGORS.  No notice to or demand upon any OBLIGOR in any instance shall entitle any OBLIGOR to any other or further notice or demand in the same, similar or other circumstance.

Section 20.    RELEASE.  IN ORDER TO INDUCE THE LENDER TO ENTER INTO THIS AGREEMENT, EACH OF THE OBLIGORS FOREVER RELEASES AND DISCHARGES THE LENDER AND THE LENDER'S OFFICERS, DIRECTORS, EMPLOYEES, ATTORNEYS, AND AGENTS (COLLECTIVELY, THE "RELEASED PARTIES") FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, SUITS AND DAMAGES (INCLUDING CLAIMS FOR ATTORNEYS' FEES AND COSTS) WHICH ANY OF THE OBLIGORS, JOINTLY OR SEVERALLY, EVER HAD OR MAY NOW HAVE OF ANY KIND OR NATURE AGAINST ANY OF THE RELEASED PARTIES ARISING OUT OF OR RELATED IN ANY WAY TO ANY OF THE LOANS, THE LOAN DOCUMENTS, THE

A00636

OBLIGATIONS OR THE COLLATERAL OR THE ADMINISTRATION THEREOF OR THIS AGREEMENT, WHETHER KNOWN OR UNKNOWN, INCLUDING BUT NOT LIMITED TO ANY AND ALL CLAIMS BASED UPON OR RELYING ON ANY ALLEGATIONS OR ASSERTIONS OF DURESS, ILLEGALITY, UNCONSCIONABILITY, BAD FAITH, BREACH OF CONTRACT, REGULATORY VIOLATIONS, IMPROPER CONTROL OF THE COMPANIES OR THEIR AFFAIRS, NEGLIGENCE, MISCONDUCT, OR ANY OTHER TORT, CONTRACT OR REGULATORY CLAIM OF ANY KIND OR NATURE. THIS RELEASE IS INTENDED TO BE FINAL, IRREVOCABLE AND IMMEDIATE AND IS NOT SUBJECT TO THE SATISFACTION OF ANY CONDITIONS OF ANY KIND.

Section 21.    Waiver Of Jury Trial.  Each of the PARTIES agrees that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by any PARTY, or any successor or assign of any PARTY, on or with respect to this AGREEMENT, the LOANS (or the administration thereof), the OBLIGATIONS, or any of the LOAN DOCUMENTS, or which in any way relates, directly or indirectly, to the obligations of any PARTY to any other PARTY, or the dealings of the PARTIES with respect thereto, shall be tried by a court and not by a jury. EACH OF THE PARTIES HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING.

IN WITNESS WHEREOF, the PARTIES have executed this AGREEMENT with the specific intention of creating a document under seal to be effective as of the above stated effective date of this AGREEMENT.  This AGREEMENT may be executed and delivered in counterparts.  Executed counterparts of this AGREEMENT may be delivered via facsimile.  This AGREEMENT shall be enforceable against and binding upon each OBLIGOR that executes this AGREEMENT even if all indicated OBLIGORS fail to execute and deliver this AGREEMENT.

WITNESS:                                OBLIGORS:

                                        NANTICOKE HOMES, INC.,
                                        A Delaware Corporation

_____          By: _____ (SEAL)
                                        Name: _____
                                        Title: _____
                                        Date:  February ____, 2002


                                        SHAWNEE HOMES, INC.,
                                        A Delaware Corporation


_____          By: _____ (SEAL)
                                        Name: _____
                                        Title: _____
                                        Date:  February ____, 2002


[SIGNATURES CONTINUED ON THE FOLLOWING PAGE]

D:\jms\18886\MervineAgt.doc                    -12-

A00637

02-25-2002   18:28   From-G,F,& M, PA                    +3028321142      T-870  P.015/037  F-748

IN WITNESS WHEREOF, the PARTIES have executed this AGREEMENT with the specific intention of creating a document under seal to be effective as of the above stated effective date of this AGREEMENT. This AGREEMENT may be executed and delivered in counterparts. Executed counterparts of this AGREEMENT may be delivered via facsimile. This AGREEMENT shall be enforceable against and binding upon each OBLIGOR that executes this AGREEMENT even if all indicated OBLIGORS fail to execute and deliver this AGREEMENT.

WITNESS:                                OBLIGORS:

                                        NANTICOKE HOMES, INC.,
                                        A Delaware Corporation

                                        By:                          (SEAL)
                                                Name:
                                                Title:
                                                Date:  February ___, 2002

                                        SHAWNEE HOMES, INC.,
                                        A Delaware Corporation

                                        By:                          (SEAL)
                                                Name:
                                                Title:
                                                Date:  February ___, 2002

                                        SHAWNEE ENTERPRISES MIDWEST, L.L.C.,
                                        A Delaware Limited Liability Company

                                        By:                          (SEAL)
                                                Name:
                                                Title:
                                                Date:  February ___, 2002

                                        TAMARAC, INC.,
                                        A Delaware Corporation

                                        By:                          (SEAL)
                                                Name:

-14-

H:\LAB\Mervine.JM\MervineAgt.doc

02-25-2002  16:26   From-G,F,& M, PA                43026521142        T-870   P.018/037   F-748

Title:
Date:  February _____, 2002

-15-

H:\LAW\Mervine_JM\Mervine Agt.doc

A00639

02-25-2002   15:27   From-G,F,& M, PA               +3028521142      T-870   P.017/037   F-749

WITNESS:                          OBLIGORS (Continued):

                                  PAWNEE HOMES, INC.
                                  A Delaware Corporation

                                  By:                           (SEAL)
                                       Name:
                                       Title:
                                       Date:  February ___, 2002


                                                                (SEAL)

                                  JOHN M. MERVINE, SR.
                                  Date:  February ___, 2002

                                                                (SEAL)

                                  PEGGY R. MERVINE
                                  Date:  February ___, 2002

                                                                (SEAL)

                                  JOHN M. MERVINE, JR.
                                  Date:  February ___, 2002

                                                                (SEAL)

                                  JAN L. MERVINE
                                  Date:  February ___, 2002

                                                                (SEAL)

                                  WILLIAM H. MERVINE, III
                                  Date:  February ___, 2002

                                                                (SEAL)

                                  CHARLENE MERVINE
                                  Date:  February ___, 2002


                                                                (SEAL)

                                  GREGORY O. MERVINE


                                       -16-

H:\LAB\Mervine.JM\MervineAgt.dos

WITNESS:                          OBLIGORS (Continued):

                                                                  (SEAL)

                                 JOHN M. MERVINE, JR.
                                 Date:  February ___, 2002

                                                                  (SEAL)

                                 JAN L. MERVINE
                                 Date:  February ___, 2002

                                                                  (SEAL)
                                 WILLIAM H. MERVINE, III
                                 Date:  February 25, 2002

                                                                  (SEAL)

                                 CHARLENE MERVINE
                                 Date:  February ___, 2002

                                                                  (SEAL)

                                 GREGORY O. MERVINE
                                 Date:  February ___, 2002


                                 LENDER:

                                 MERCANTILE-SAFE DEPOSIT AND
                                  TRUST COMPANY



                                 By:                              (SEAL)
                                      Scott H. Krieger,
                                      Senior Vice President

                                      Date:  February ___, 2002


                                     -17-

H:\LAB\Mervine,JM\Mail022702\MERVINE-AGT-CNP.DOC

WITNESS:

OBLIGORS (Continued):

_____ (SEAL)
JOHN M. MERVINE, JR.
Date: February ___, 2002

_____ (SEAL)
JAN L. MERVINE
Date: February ___, 2002

_____ (SEAL)
WILLIAM H. MERVINE, III
Date: February ___, 2002

_____ (SEAL)
CHARLENE MERVINE
Date: February ___, 2002

_____ (SEAL)
GREGORY O. MERVINE
Date: February ___, 2002

LENDER:

MERCANTILE-SAFE DEPOSIT AND
TRUST COMPANY

By: _____ (SEAL)
      Scott N. Krieger,
      Senior Vice President

      Date: February ___, 2002

-17-

A00642

WITNESS:                                    OBLIGORS (Continued):

_____          _____(SEAL)
                                 JOHN M. MERVINE, JR.
                                 Date:  February ____, 2002


_____          _____(SEAL)
                                 JAN L. MERVINE
                                 Date:  February ____, 2002


_____          _____(SEAL)
                                 WILLIAM H. MERVINE, III
                                 Date:  February ____, 2002


_____          _____(SEAL)
                                 CHARLENE MERVINE
                                 Date:  February ____, 2002


_____          _____(SEAL)
                                 GREGORY O. MERVINE
                                 Date:  February ____, 2002



                                 LENDER:

                                 MERCANTILE-SAFE DEPOSIT AND
                                    TRUST COMPANY


                                 By: _____(SEAL)
                                     Scott H. Krieger,
                                     Senior Vice President

                                     Date:  February 27, 2002

D:\jmst18886\MervineAgt.doc                -14-

**A00643**

# B

**ORIGINAL**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                        :        Case No.: 02-10651 (PJW)

NANTICOKE HOMES, INC.                         :
                                              :        Chapter 11
                                              :
        Debtor.                               :        *related docket # 11*

CONSENT ORDER APPROVING INTERIM AGREEMENT
<u>FOR USE OF CASH COLLATERAL AND ADEQUATE PROTECTION</u>

Upon consideration of the Motion For The Entry Of A Consent Order Approving Interim Agreement For Use Of Cash Collateral And Adequate Protection ("Motion") filed herein by the Debtor, Nanticoke Homes, Inc. ("Debtor") and Mercantile-Safe Deposit And Trust Company ("Bank"), and it appearing that the Bank and the Debtor have agreed to the terms and conditions of this Consent Order ("Consent Order") and the Interim Agreement For Use Of Cash Collateral And Adequate Protection to be approved hereby ("Agreement"), and it further appearing that Notice of the Motion, Agreement and all related papers has been served upon all parties entitled to such notice pursuant to Rule 4001(b) of the <u>Federal Rules of Bankruptcy Procedure</u> and otherwise, and it further appearing that the Official Committee of Unsecured Creditors (the "Committee") also consents to the entry of this Order and it further appearing that good cause exists for entering this Consent Order approving the Agreement, it is, therefore,

ORDERED, this _____ day of April, 2002, by the United States Bankruptcy Court for the District of Delaware, as follows:

1.      Except as modified in this Consent Order, the Agreement, a copy of which is attached hereto as Exhibit "A" and incorporated herein by reference, and the Debtor's execution of the same is hereby approved;

2.      With the consent of the Debtor, the Bank and the Committee, the "Priority Expense Cap" amount (as defined in paragraph 20 of the Agreement) is hereby increased to $60,000 from $50,000.00;

3.      With the consent of the Debtor, the Debtor shall also provide to the Committee copies of all reports provided to the Bank pursuant to the Agreement;

4.      All liens, security interests and mortgage liens granted and confirmed to the Bank in the Agreement, and all payments to be made to the Bank pursuant to the Agreement, are hereby approved as if fully set forth in this Order, subject, however, to the rights of parties-in-interest (other than the Debtor) to raise objections or challenges to existing liens, security interests and mortgage liens securing the Bank during the "Lookback Period" (as defined in paragraph 1 of the Agreement) to the extent expressly set forth in the Agreement and also subject to the rights of parties-in-interest (other than the Debtor) to challenge the application of payments as set forth in paragraph 7 of the Agreement;

5.      The restrictions provided for in the Agreement on the assessment of administrative claims against the Bank or its collateral referenced in the Agreement, pursuant to 11 U.S.C. § 506(c), are hereby approved as if fully set forth in this Order; and

*P/W*  *Subject to the section 726 priority,*

6.      The terms and conditions of this Consent Order shall be binding upon any trustee that may be subsequently appointed in the Debtor's bankruptcy case, whether under Chapter 11, Chapter 7 or any other Chapter of the United States Bankruptcy Code.

IT IS SO ORDERED.

*April 2, 2002*

HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE
FOR THE DISTRICT OF DELAWARE

2

A00646



**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

IN RE:                                    :

                                          :        Case No.: 02-10651-PJW

NANTICOKE HOMES, INC.                     :

                                          :        (Chapter 11)

                                          :

         Debtor.                          :

## INTERIM AGREEMENT FOR USE OF
## CASH COLLATERAL AND ADEQUATE PROTECTION

WHEREAS, on March 1, 2002 (the "Petition Date"), Nanticoke Homes, Inc. (the "Debtor")

filed a Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code (the

"Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the

"Court"). Since that date, the Debtor has continued to operate its business as a Debtor-in-Possession.

WHEREAS, the Debtor was indebted to Mercantile-Safe Deposit And Trust Company

("Bank") on the Petition Date for the following secured loans and secured guaranties (collectively,

the "Pre-Petition Bank Indebtedness") in the aggregate unpaid balance of Ten Million Three Hundred

Forty-Eight Thousand Six Hundred Sixty-Five Dollars And Fifty-Two Cents ($10,348,665.52)

calculated as of and including February 28, 2002, consisting of the following: (a) a revolving line

of credit evidenced by a Fourth Amended And Restated Demand Promissory Note dated July 2001

in the originally stated principal amount of Six Million Dollars ($6,000,000.00) and having a present

unpaid balance of Four Million Seven Hundred Fifty-One Thousand Eight Hundred Eleven Dollars

And Two Cents ($4,751,811.02); (b) a term loan evidenced by a Term Loan Promissory Note dated

January 23, 1996 in the stated principal amount of Three Million Five Hundred Thousand Dollars

($3,500,000.00) and having a present unpaid balance of Two Million Three Hundred Nine Thousand

Eight Hundred Sixty  Dollars And One Cent ($2,309,860.01); (c) Guaranty Agreements dated

A00647

January 23, 1996 and December 18, 1998 guarantying the obligations to the Bank of Shawnee Homes, Inc. having an aggregate present unpaid balance of Seven Hundred Eighty Thousand One Hundred Eighty-Four Dollars And Seventy-Four Cents ($780,184.74); (d) Guaranty Agreement dated November 13, 1998 guarantying the obligations to the Bank of Shawnee Enterprises Midwest, L.L.C. and having an aggregate present unpaid balance of One Million One Hundred Three Thousand Six Hundred Sixty-Six Dollars And Sixteen Cents ($1,103,666.16); (e) Corporate Guaranty Agreement dated February 12, 1997 guarantying the obligations to the Bank of Tamarac, Inc. and having a present unpaid balance of Four Hundred Thirty-Nine Thousand Five Hundred Fifteen Dollars And Ninety-Nine Cents ($439,515.99); and (f) Guaranty Agreement dated December 18, 1998 guarantying the obligations to the Bank of Nanticoke Homes Midwest Incorporated and having a present unpaid balance of Nine Hundred Sixty-Three Thousand Six Hundred Twenty-Seven Dollars And Sixty Cents ($963,627.60).

WHEREAS, the Pre-Petition Bank Indebtedness is secured by validly perfected first priority security interests, liens and mortgage liens (collectively, "Pre-Petition Bank Liens") granted to and held by the Bank in and to substantially all of the real and personal assets (collectively, "Pre-Petition Collateral") of the Debtor, as such Pre-Petition Collateral is more fully described and evidenced by, *inter alia*, the following: (a) Loan And Security Agreement dated January 23, 1996, as amended; (b) Mortgage dated January 23, 1996 recorded among the Land Records of Kent County, Delaware in Mortgage Book 220, page 292, as amended by First Amendment To Mortgage dated January 8, 1999 recorded among the Land Records of Kent County, Delaware in Mortgage Book 294, page 287, and Second Amendment To Mortgage dated March 21, 2000 recorded among the Land Records of Kent County, Delaware in Mortgage Book 365, page 150; (c) Mortgage dated January 23, 1996 recorded among the Land Records of Sussex County, Delaware in Deed Book 2207, folio 333, as amended

A00648

by First Amendment To Mortgage dated December 29, 1998 recorded among the Land Records of Sussex County, Delaware in Deed Book 2924, folio 095, and Second Amendment To Mortgage dated March 21, 2000 recorded among the Land Records of Sussex County, Delaware in Deed Book 03389, page 333; (d) Mortgage dated August 6, 2000 recorded among the Land Records of Sussex County, Delaware in Deed Book 03478, page 067; (e) Mortgage dated February 28, 2001 recorded among the Land Records of Kent County, Delaware at Mortgage Book 1011, page 208; (f) Mortgage dated February 28, 2001 recorded among the Land Records of Sussex County, Delaware in Deed Book 03674, page 267; (g) Financing Statements recorded with the Secretary of State of Delaware and bearing the following recordation references: (i) 1996003159 recorded on January 30, 1996; (ii) 1996003165 recorded on January 30, 1996; (iii) 1996003168 recorded on January 30, 1996; (iv) 1997-13250 recorded on April 22, 1997; (v) 199858394 recorded on December 24, 1998; (vi) 199858395 recorded on December 24, 1998; (vii) 199858397 recorded on December 24, 1998; (viii) 199858399 recorded on December 24, 1998; (ix) 199858405 recorded on December 24, 1998; and (x) 199936877 recorded on July 20, 1999; (h) Financing Statements recorded with Sussex and Kent Counties, Delaware, the Maryland State Department of Assessments And Taxation, and the Circuit Court of Wicomico County, Maryland; and (i) Collateral Trademark Assignment dated January 23, 1996 and recorded on January 31, 1996 with the United States Patent And Trademark office at Reel 1428, Frame 0947.

WHEREAS, the Pre-Petition Bank Indebtedness is fully secured and constitutes the legal, valid and binding obligations of the Debtor, enforceable in accordance with the terms of all applicable documents, promissory notes, guaranties, mortgages, security agreements and other agreement and documentation (collectively, "Pre-Petition Bank Documents").

WHEREAS, no offsets, defenses or counterclaims to the Pre-Petition Bank Indebtedness exist, and no portion of the Pre-Petition Bank Indebtedness is subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

WHEREAS, the Debtor's cash and the proceeds of the other Collateral constitute "cash collateral" as defined in Section 363(a) the Bankruptcy Code.

WHEREAS, the Debtor has an immediate and critical need for the use of the cash collateral to pay suppliers and wages and to pay for insurance, security services and attorneys' fees, and to otherwise protect and preserve its assets.

WHEREAS, the Bank is willing to consent to the Debtor's use of the Bank's cash collateral only on the expressly stated terms and conditions expressly set forth in this Interim Agreement For Use Of Cash Collateral And Adequate Protection (the "Agreement").

NOW, THEREFORE, in consideration of the mutual promises and agreements of the parties hereto, the Bank and the Debtor do hereby agree as follows:

1.     Incorporation of Recitals.  The Debtor and the Bank acknowledge, agree, and hereby stipulate that the recitals set forth above are true, accurate and complete in every respect, and are hereby incorporated into this Agreement by reference.  Notwithstanding the foregoing, nothing  in this Agreement shall prejudice the rights of any party in interest other than the Debtor to seek to object to or to challenge (a) the validity, extent, perfection or priority of the mortgages, security interests, liens, and the other Pre-Petition Bank Liens in and to the Pre-Petition Collateral, (b) the validity, allowability, priority, status or size of the Pre-Petition Bank Indebtedness, including the rate of interest accruing thereon as described in paragraph 13 of this Agreement, or (c) to allocate adequate protection payments as between principal, interest and fees (a "Qualifying Objection"); provided, however, that unless such a party commences, as appropriate, a contested matter or

S:\MS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC     4

A00650

adversary proceeding raising such objection or challenge within sixty (60) days (the "Lookback Period") after the date of formation of the Committee for the unsecured creditors ("Committee"), all such challenges and objections shall be forever waived and the Pre-Petition Bank Indebtedness shall be allowed as a secured claim within the meaning of Section 506 of the <u>Bankruptcy Code</u> for all purposes in connection with this Case. No such period of limitation may be extended without the prior written consent of the Bank. Thereafter, any and all objections or challenges (including, but not limited to, those under Sections 506, 544, 547 and/or 548 of the <u>Bankruptcy Code</u>) by any party (including, without limitation, the Committee and any Chapter 11 or Chapter 7 Trustee appointed herein) to the validity, sufficiency, extent, perfection, priority or refinancing of, or seeking the avoidance or equitable subordination of, the Pre-Petition Bank Liens, the Pre-Petition Bank Indebtedness, and any payments thereon shall be forever barred.

    2.    <u>Use of Cash Collateral By Debtor.</u>

    2.1.    <u>Authorized Amounts.</u> The Bank and the Debtor agree that in the absence of an "Event of Default" (hereafter defined), the Debtor shall have the use of cash proceeds ("Cash Collateral") of the Pre-Petition Collateral in the following limited amounts during the period of time ("Interim Period") commencing on March 1, 2002 and ending on that date which is the earliest of: (a) the date of the occurrence of any Event of Default; (b) August 1, 2003; or (c) the effective date of confirmation of any plan of reorganization or liquidation for the Debtor.

    2.1.1    <u>Maximum Monthly Amount.</u> Without the prior written consent of the Bank and subject to the limitations upon aggregate amounts set forth below in paragraph 2.1.2, the maximum aggregate amount of Cash Collateral that may be used by the Debtor during the Interim Period in any calendar month is Fifty Thousand Dollars ($50,000.00), of which no more than

A00651

Twenty-Eight Thousand Dollars ($28,000.00) may be expended on salaries or other labor-related costs.  ...

2.1.2  <u>Maximum Aggregate Amount.</u>  The maximum aggregate amount of Cash Collateral that may be used by the Debtor during the Interim Period shall not exceed Three Hundred Thousand Dollars ($300,000.00) unless the unpaid balance of the Pre-Petition Bank Indebtedness has been permanently curtailed by payments received by the Bank of not less than Three Million Five Hundred Thousand Dollars ($3,500,000.00), and upon such permanent curtailment, the Debtor may use Cash Collateral in an additional aggregate amount of up to Two Hundred Thousand Dollars ($200,000.00) until the unpaid balance of the Pre-Petition Bank Indebtedness has been permanently curtailed by payments received by the Bank of not less than the total aggregate sum of Six Million Two Hundred Thousand Dollars ($6,200,000.00), and upon such additional permanent curtailment, the Debtor may use Cash Collateral in an additional aggregate amount of One Hundred Thousand Dollars ($100,000.00).  The parties agree that under all circumstances the maximum aggregate amount of Cash Collateral that may be used by the Debtor shall not exceed in its entirety the sum of Six Hundred Thousand Dollars ($600,000.00).

2.2.  <u>Use Limited to Collected Funds Only.</u>  In no event shall the Debtor be entitled to use more Cash Collateral on any given day during the Interim Period than is available in collected funds on deposit in the applicable "Debtor-In-Possession Account" (hereafter defined) with the Bank at 11:00 a.m. on that day.

2.3  <u>No Other Use.</u>  Except as expressly authorized by the terms of this Agreement, the Debtor is prohibited from using Cash Collateral.

3.  <u>Maintenance of Debtor-In-Possession Accounts with Bank.</u>  The Debtor agrees to establish and maintain the following accounts (collectively, "Debtor-In-Possession Accounts") with

A00652

the Bank: (a) its Debtor-In-Possession Operating Account (the " Debtor-In-Possession Operating Account"); (b) its Debtor-In-Possession Collateral Account (the "Debtor-In-Possession Collateral Account"); (c) its Debtor-In-Possession Payroll Account (the " Debtor-In-Possession Payroll Account"); and (d) its Debtor-In-Possession Payroll Tax Account (the " Debtor-In-Possession Tax Account"). The Debtor shall maintain no accounts other than the Debtor-In-Possession Accounts.

     4.    Deposit of Proceeds. The Debtor shall deposit all cash, checks or monies which the Debtor now has on hand, other than funds already on deposit in the Debtor-In-Possession Operating Account, into the Debtor-In-Possession Collateral Account, which shall be in the exclusive control of the Bank, for clearance and transfer into the other Debtor-In-Possession Accounts and for payment of the Pre-Petition Bank Indebtedness. In addition, the Debtor shall deposit into the Debtor-In-Possession Collateral Account any and all cash, checks, or monies the Debtor directly collects, receives, or derives from the operation of its business or the liquidation of its assets, including, but not limited to, all cash, checks and monies received or hereafter received by the Debtor from the sale of its inventory, the collection of its accounts, the sale of its personalty or its realty, and the collection of rents. If required by the Bank, the Debtor shall direct its customers to remit payments to a post office box under the exclusive control of the Bank (the "Lock Box") for deposit to the Debtor-In-Possession Collateral Account. The rights of all parties in interest other than the Debtor with respect to the application of funds to the Pre-Petition Bank Indebtedness during the Lookback Period are reserved. After the expiration of the Lookback Period the application of funds to the Pre-Petition Bank Indebtedness shall be binding upon all parties in interest absent successful prosecution of a contested matter or adversary proceeding raising a Qualifying Objection filed prior to the expiration of the Lookback Period.

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC    7

A00653

5.    <u>Availability of Funds</u>. Deposits made by the Debtor into the Debtor-In-Possession Collateral Account shall not be available for transfer into any other Debtor-In-Possession Accounts until they constitute collected funds determined in accordance with the customary policies and procedures of the Bank. The Debtor acknowledges that the Bank will not honor any checks written against any of the Debtor-In-Possession Accounts which would overdraw the collected funds in any such accounts and that the Bank will dishonor and return any such checks with an NSF designation thereon. If, notwithstanding the foregoing, the Bank honors any checks against any of the Debtor-In-Possession Accounts which cause an overdraft, the Bank shall then have a first priority post-petition lien on the "Post-Petition Collateral" (hereafter defined) to the extent of the amount of said overdrafts.

6.    <u>Transfer of Funds from Collateral Account</u>. Upon approval of this Agreement by the Court and provided that no Event of Default has occurred under this Agreement and subject to the limitations set forth above as to the amounts and uses of Cash Collateral, the Bank will transfer collected funds in the Debtor-In-Possession Collateral Account into the Debtor-In-Possession Operating Account, the Debtor-In-Possession Payroll Account and the Debtor-In-Possession Tax Account in amounts directed by the Debtor from time to time.

7.    <u>Application to Pre-Petition Indebtedness</u>. All proceeds of the sale, collection or other disposition of the Pre-Petition Collateral shall be applied immediately to the repayment and permanent curtailment of the Pre-Petition Bank Indebtedness, other than the Cash Collateral which the Debtor is expressly permitted to use in accordance with the terms of this Agreement. The Bank is authorized, without any additional consents or instructions from the Debtor, to apply funds in the Debtor-In-Possession Accounts to the Pre-Petition Indebtedness. The rights of all parties in interest other than the Debtor with respect to the application of funds to the Pre-Petition Bank Indebtedness

S:\JMS\US886\CASHCOLLAGR-NEW (W CARVEOUT).DOC          8

A00654

during the Lookback Period are reserved.   After the expiration of the Lookback Period the application of funds to the Pre-Petition Bank Indebtedness shall be binding upon all parties in interest absent successful prosecution of a contested matter or adversary proceeding raising a Qualifying Objection filed prior to the expiration of the Lookback Period.

8.    Grant of Replacement Liens. Notwithstanding the provisions of Section 552(a) of the Bankruptcy Code, and in addition to the liens and security interests preserved by Section 552(b) of the Bankruptcy Code, the Debtor hereby grants to the Bank, as security for any and all indebtedness owed by the Debtor to the Bank under the Pre-Petition Bank Documents or this Agreement, whether post or pre-petition, but only to the extent that the Bank's interest in Cash Collateral is diminished, first priority post-petition liens, security interests and mortgage liens in and to all of the Debtor's assets which are or have been acquired, generated, or received by the Debtor subsequent to the Petition Date (collectively, "Post-Petition Collateral") including, without limitation, all of the Debtor's Accounts, As-Extracted Collateral, Chattel Paper, Commodity Accounts, Commodity Contracts, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter-Of-Credit Rights, Payment Intangibles, Promissory Notes, Software, cash, the Debtor-In-Possession Accounts, real estate and all fee and leasehold interests therein, trademarks, licenses, causes of action, rights to payment, tax refund claims, insurance proceeds and tort claims (other than actions for preferences, fraudulent conveyances, and other avoidance power claims and any recoveries under Sections 506(c), 542, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code (collectively, "Avoidance Actions")), and all products, rents, and cash and non-cash proceeds thereof.

9.    Perfection of Replacement Liens. The liens, security interests and mortgage liens granted in this Agreement are deemed perfected without the necessity for filing or execution of

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC       9

A00655