documents which might otherwise be required under non-bankruptcy law for the perfection of said liens, security interests and mortgage liens. Such liens, security interests and mortgage liens and perfection shall be binding, to the fullest extent available under all applicable laws, upon any subsequently appointed trustee either in Chapter 11 or any other Chapter of the <u>Bankruptcy Code</u> and upon all creditors of the Debtor who have extended or who may hereafter extend credit to the Debtor. Notwithstanding the foregoing, the Debtor shall execute such financing statements, mortgages, assignments, and other documents as the Bank may request to permit the Bank to file notice of the liens, security interests and mortgage liens granted herein in such public records as the Bank may select, in its sole and absolute discretion.

10.    <u>Confirmation of Pre-Petition Liens</u>.  The Debtor hereby confirms to the Bank the validity, enforceability, and first priority lien status of the Pre-Petition Bank Liens in and to the Pre-Petition Collateral securing the Pre-Petition Bank Indebtedness and all other indebtedness owed by the Debtor to the Bank under the Pre-Petition Bank Documents or this Agreement, including interest, fees, expenses and the like which are authorized and secured by the express terms of the Pre-Petition Bank Documents and which accrued before the Petition Date, and all cash and non-cash proceeds thereof.

11.    <u>Superpriority Claim</u>.  To the extent that the other protections granted herein are insufficient to provide adequate protection for the Bank's interests in the Pre-Petition Collateral and the Post-Petition Collateral, the Bank shall be granted a claim against the Debtor having priority over any and all administrative expenses of any kind including, but not limited to, the administrative expenses described in Sections 503(b) and 507(b) of the <u>Bankruptcy Code</u>.  The claim granted to the Bank in this paragraph shall not be payable from Avoidance Actions or the proceeds thereof, but shall be payable only from other assets of the Debtor's estate.

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC        10

12.   No Surcharge of Collateral.  No costs or expenses of administration which have been

or may be incurred in the above-captioned proceedings, or in any conversion of the above-captioned

proceedings pursuant to Section 1112 of the Bankruptcy Code, or in any other proceeding relating

thereto, and no priority claims are or will be prior to or on a parity with the claims of the Bank

against the Debtor or any successor debtor-in-possession or trustee or with the Pre-Petition Liens

against the Pre-Petition Collateral or the Post-Petition Collateral; and no such costs or expense of

administration shall be imposed against the Bank, its claims, or the Pre-Petition Collateral or the

Post-Petition Collateral pursuant to 11 U.S.C. § 506(c) or otherwise.  This Section 12 shall not be

binding upon any party in interest until such time, if any, as the Court enters an Order finally

approving this Agreement following not less than fifteen (15) days notice to the parties entitled to

notice of this Agreement pursuant to Rule 4001b(1) of the Federal Rules of Bankruptcy Procedure

and an opportunity for a final hearing.

13.   Accrual of Interest.  Subject to the provisions of Section 506 of the Bankruptcy Code,

interest shall continue to accrue on the Pre-Petition Bank Indebtedness owed in accordance with the

stated terms of the Pre-Petition Bank Documents at such rates as are specified therein until all

amounts due to the Bank have been paid in full.

14.   Insurance.  The Debtor agrees to obtain and maintain insurance against fire, theft or

other casualty on the Pre-Petition Collateral and the Post-Petition Collateral in amounts satisfactory

to the Bank and to insure that the Bank is named as a mortgagee and loss payee on all policies

insuring the Pre-Petition Collateral and the Post-Petition Collateral against fire, theft or other

casualty.  The Bank agrees that to the extent that the premiums for such insurance exceed Eight

Thousand Dollars ($8,000.00) in aggregate amount in any month, the Debtor may use Cash

Collateral in an additional amount sufficient to pay such premiums not to exceed such maximum

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC     11

A00657

amount as is mutually agreed to by the Debtor and the Bank, even if such additional amount causes the Debtor to exceed the monthly limitation upon the use of Cash Collateral set forth above in paragraph 2.1.1. of this Agreement.

15. <u>Bank's Right to Assert Unsecured Claims</u>. To the extent that the value of the Pre-Petition Collateral is less than the amount of the Pre-Petition Bank Indebtedness, the Bank shall have an allowed unsecured claim in the Debtor's bankruptcy case. The Debtor acknowledges and agrees that nothing contained herein shall prevent or preclude the Bank from receiving a distribution in the Debtor's bankruptcy case based upon such allowed unsecured claim.

16. <u>Reporting by Debtor; Inspection of Collateral</u>. The Debtor agrees to:

        (a)   Keep and maintain such accounting and financial records as are required by the Office of the United States Trustee and the Bankruptcy Court;

        (b)   Permit the Bank's representatives and/or auditors to inspect the Pre-Petition Collateral and the Post-Petition Collateral and all accounting and financial records of the Debtor from time to time;

        (c)   Provide the Bank with copies of all listing agreements, term sheets, offers, contracts of sale and the like which pertain to the sale, liquidation and disposal of the Debtor's assets;

        (d)   Provide the Bank on or before the fifteenth (15th) day of each calendar month with the Monthly Operating Reports for the prior calendar month filed with the Court; and

        (e)   Provide the Bank with such other and further financial information relating to the Debtor as the Bank may request from the Debtor from time to time.

A00658

All financial statements and financial information provided by the Debtor to the Bank pursuant to this Agreement shall have the signature of an officer of the Debtor thereon and shall contain a certification that the information contained therein is true, accurate and complete to the best of said officer's knowledge, information and belief.

17.    No Further Encumbrances of Assets.    The Debtor agrees that no further encumbrances of any kind or type, whether voluntary or involuntary, shall be placed against any real or personal property or other assets which the Debtor owns without the prior written consent of the Bank.

18.    Bank to Receive Notice of Creditor Actions.    In the event that any person or entity seeks an Order pursuant to the Bankruptcy Code or is otherwise given adequate protection of its interests in the above-captioned proceedings, the Bank shall be given an opportunity to be heard prior to the entry of said Order.

19.    Liquidation of Assets.    The Debtor agrees to commence and diligently pursue the orderly sale and liquidation of its assets.

20.    Restrictions Upon Use Of Cash Collateral.    Except for expenses paid from the "Carve Out" (as hereafter defined), no Cash Collateral or other proceeds of Pre-Petition Collateral shall be used for the purpose of: (a) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, perfection, priority, or enforceability of the Pre-Petition Bank Indebtedness, the Pre-Petition Bank Documents, or the Pre-Petition Bank Liens, or any other rights or interests of the Bank or in asserting any claims or causes of action, against the Bank or any officer, representative or agent of the Bank; (b) using Cash Collateral except as specifically permitted in this Agreement or by order of the Bankruptcy Court; (c) incurring indebtedness, including without limitation the obtaining of credit pursuant to 11 U.S.C. § 364; or (d) without its consent, attempting to modify the

Bank's rights under this Agreement. As used in this Agreement, "Carve Out" means, at any time of determination, the sum of: (a) allowed administrative expenses payable pursuant to 28 U.S.C. § 1930(a)(6); and (b) "Priority Professional Expenses" (as hereafter defined) subject to the "Priority Expense Cap" (as hereafter defined). "Priority Professional Expenses" means allowed fees, costs and reasonable expenses of professionals retained by the Committee pursuant to Section 327 of the Bankruptcy Code, but shall not include fees, costs, and expenses of third-party professionals employed by the members of the Committee. "Priority Expense Cap" means all unpaid Priority Professional Expenses (including holdbacks) up to an aggregate amount of Fifty Thousand Dollars ($50,000.00). Priority Professional Expenses shall not include fees or expenses incurred by any Person, including the Debtor or the Committee, in (a) preventing, hindering or delaying the Bank's enforcement or realization upon any of the Pre-Petition Collateral or Post-Petition Collateral once an Event of Default has occurred, (b) using or seeking to use Cash Collateral or selling any Pre-Petition Collateral or Post-Petition Collateral without the Bank's consent, (c) incurring indebtedness without the Bank's consent, or (d) objecting to or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of the Pre-Petition Bank Indebtedness or the Pre-Petition Bank Liens or any other rights or interests of the Bank, or in asserting any claims or causes of action, including, without limitation, any actions under Chapter 5 or Section 724(a) of the Bankruptcy Code or for equitable subordination against the Bank. The exclusion from Priority Professional Expenses shall not include investigation of claims or causes of action respecting whether an Event of Default has occurred.

21.     Events of Default. Each of the following shall constitute an "Event of Default":

(a)     The Debtor fails to comply with and/or to perform or satisfy or otherwise violates any terms and/or conditions set forth in this Agreement; or

A00660

(b)     The Order approving this Agreement, or any portion thereof, is vacated, reversed or modified; or

(c)     The above-captioned Chapter 11 proceedings are converted to a case under Chapter 7 of the Bankruptcy Code or is dismissed; or

(d)     A trustee is appointed for the Debtor or any of the Debtor's assets; or

(e)     The Debtor files a motion seeking to convert the above-captioned Chapter 11 proceeding to a case under Chapter 7 of the Bankruptcy Code; or

(f)     The Debtor fails to pay its post-petition tax obligations when and as due; or

(g)     The change of venue of the above-captioned proceedings; or

(h)     Any surcharge of the Pre-Petition Collateral or Post-Petition Collateral; or

(i)     The Debtor incurs any indebtedness or obtains any credit (other than unsecured credit which does not have priority over claims entitled to priority under 11 U.S.C. § 507(a)(1)) from any entity other than the Bank pursuant to 11 U.S.C. § 364; or

(j)     The Debtor initiates any litigation against the Bank.

22.     Default Rights.  Upon written notice to the Debtor of the occurrence of an Event of Default and the failure of the Debtor to cure such Event of Default within three (3) business days after notice thereof, without further order of the Court, the Debtor will immediately cease and be enjoined from using the Cash Collateral and will provide appropriate evidence to the Bank of the Debtor's cessation of the use of the Cash Collateral.  In addition, the Bank shall be entitled to freeze all of the Debtor-In-Possession Accounts, and to take such other actions as to which the Bank is entitled under applicable laws.

23.     Agreement Not Evidence of Adequate Protection.  The Bank and the Debtor agree that the terms of this Agreement shall not constitute conclusive or presumptive evidence concerning

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC        15

the issues of adequate protection in the event such issues are raised or litigated between the Debtor and the Bank.

24.    No Novation.  This Agreement shall not cause a novation of any of the Pre-Petition Bank Documents, nor shall it extinguish, affect or impair the Debtor's obligations under the Pre-Petition Bank Documents or the obligations of any guarantors or co-obligors of any of the Pre-Petition Bank Indebtedness.  Nothing contained in this Agreement shall be deemed to terminate, impair or release any of the Pre-Petition Bank Liens or the priorities thereof.

25.    Bank Not Deemed Owner or Operator.  By its entry into this Agreement and its agreement to the terms hereof, the Bank shall not be deemed to have assumed any liability to any third person, and shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor or of any of the Debtor's assets.

26.    Delay Not Waiver.  The failure or delay by the Bank to insist upon strict performance of any one or more of the provisions of this Agreement or to exercise any right, power, or remedy upon default under or breach of, this Agreement shall not constitute a waiver of, or preclude the Bank from exercising, any right, power or remedy.

27.    No Waiver of Other Rights.  Except as expressly provided in this Agreement, nothing contained herein shall constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of the Bank under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the Bank to (i) request adequate protection of its interests in the Pre-Petition Collateral or relief from or modification of the automatic stay extant under Section 362 of the Bankruptcy Code, (ii) request conversion of the above-captioned Chapter 11 Case to a Chapter 7 case, (iii) request the appointment of a Chapter 11 trustee or examiner; and (iv) propose, subject to

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC        16

the provisions of Section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans (and nothing herein is intended to affect Debtor's existing right to exclusivity under Section 1121); or (b) any other rights, claims or privileges (whether legal, equitable, or otherwise) of the Bank; or (c) the rights of the Debtor to seek to continue to use Cash Collateral after the termination of this Agreement.

  28. Execution In Counterparts.  This Agreement may be executed and delivered in counterparts.

  29. Integration.  The Debtor agrees that this Agreement is the complete and entire agreement between the parties with respect to the matters addressed herein and shall be binding upon the parties hereto only if it, in its entirety, and without addendum or modification not otherwise approved in writing by the Bank and the Debtor, shall be approved by an Order of the Court issued in the above-captioned proceedings and, upon such approval, shall be effective as of the Petition Date.

  WITNESS the hands and seals of the parties hereto this _15th_ day of March, 2002.

WITNESS/ATTEST:    DEBTOR:

         NANTICOKE HOMES, INC.

         By: _William H. Marvinetti_ (SEAL)
         Name: William H. Marvinetti
         Title: Vice President

         BANK:

         MERCANTILE-SAFE DEPOSIT AND
         TRUST COMPANY

         By: _____ (SEAL)
         Scott H. Krieger,
         Senior Vice President

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC  17

# C

A00664

COPY

## RELEASE AGREEMENT

THIS RELEASE AGREEMENT ("RELEASE AGREEMENT") is made to be effective as of the 30th day of October, 2003, by and between MERCANTILE-SAFE DEPOSIT AND TRUST COMPANY ("LENDER"); NHI, INC., formerly known as Nanticoke Homes, Inc., a Delaware corporation that is a debtor-in-possession ("NHI"); SHAWNEE HOMES, INC., a Delaware corporation ("SHAWNEE"); SHAWNEE ENTERPRISES MIDWEST, L.L.C., a Delaware limited liability company ("SHAWNEE MIDWEST"); TAMARAC, INC., a Delaware corporation ("TAMARAC"); PAWNEE HOMES, INC., a Delaware corporation ("PAWNEE"); JOHN M. MERVINE, SR. and PEGGY R. MERVINE ("JOHN & PEGGY"); JOHN M. MERVINE, JR. ("MCKY") and JAN L. MERVINE (together with MCKY, "MCKY & JAN"); WILLIAM H. MERVINE, III and CHARLENE MERVINE ("WILLIAM & CHARLENE"); and GREGORY O. MERVINE ("GREGORY "). Hereafter, JOHN & PEGGY, MCKY & JAN, WILLIAM & CHARLENE, and GREGORY are collectively referred to herein as the "INDIVIDUAL GUARANTORS"; NHI, SHAWNEE, SHAWNEE MIDWEST, TAMARAC and PAWNEE are collectively referred to herein as the "COMPANIES"; the INDIVIDUAL GUARANTORS and the COMPANIES are collectively referred to herein as the "OBLIGORS"; and the OBLIGORS and the LENDER are collectively referred to herein as the "PARTIES."

## RECITALS

The PARTIES entered into an Agreement dated February 26, 2002 ("AGREEMENT"). By Order dated September 23, 2003, the United States Bankruptcy Court for the District of Delaware authorized NHI to assume and perform the obligations which it owes to the LENDER in accordance with the AGREEMENT, and further ordered various other additional relief.

Hereafter, all terms defined in the AGREEMENT shall have the same definitions in this RELEASE AGREEMENT.

NOW, THEREFORE, in consideration of these premises, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the PARTIES hereby agree as follows:

Section 1:    Release Of Obligors From Liability To Pay Obligations. In accordance with the provisions of Section 9 of the AGREEMENT, and subject to the execution and delivery of this AGREEMENT by all of the OBLIGORS, the LENDER hereby releases and forever discharges the OBLIGORS from all further liability to pay any remaining unpaid OBLIGATIONS and all future liability to pay and perform all duties and liabilities arising out of or relating to the LOAN DOCUMENTS.

Section 2.    Release Of Lender. In satisfaction of the requirements of Section 9(d) of the AGREEMENT, each of the OBLIGORS hereby forever releases and discharges the LENDER and the LENDER'S officers, directors, employees, attorneys, and agents (collectively, the "RELEASED PARTIES") from any and all claims, causes of action, suits and damages (including claims for attorneys' fees and costs) which any of the OBLIGORS, jointly or severally, ever had or may now have of any kind or nature against any of the RELEASED PARTIES arising out of or related in any way to any of the LOANS, the LOAN DOCUMENTS, the AGREEMENT, the OBLIGATIONS or the COLLATERAL or the administration thereof or this RELEASE AGREEMENT, whether known or unknown, including but not limited to any and all claims based upon or relying on any allegations or assertions of duress, illegality, unconscionability, bad faith, breach of contract, regulatory violations, improper control of the COMPANIES or their affairs, negligence, misconduct, or any other tort, contract or regulatory claim of any kind or nature.

A00665

Section 3.    Termination Of Liens.  The LENDER agrees to deliver releases of the lien and mortgage filings of public record securing the OBLIGATIONS within ten (10) business days after the receipt by the LENDER of a fully executed copy of this RELEASE AGREEMENT.  The OBLIGORS agree to cooperate with the LENDER and assist the LENDER in coordinating the preparation and delivery of such releases and terminations.  The OBLIGORS shall have the sole responsibility of recording such releases and terminations.

Section 16.    Enforceability.  This RELEASE AGREEMENT shall inure to the benefit of and be enforceable against each of the PARTIES and their respective successors and assigns.

Section 17.    Choice Of Law; Consent To Jurisdiction; Agreement As To Venue.  This RELEASE AGREEMENT shall be construed, performed and enforced and its validity and enforceability determined in accordance with the laws of the State of Maryland (excluding, however, conflict of laws principles).  Each of the OBLIGORS consents to the jurisdiction of the courts of the State of Maryland and the jurisdiction of the United States District Court for the District of Maryland, if a basis for federal jurisdiction exists.  Each of the OBLIGORS waives any right to object to the maintenance of a suit in any of the state or federal courts of the State of Maryland on the basis of improper venue or inconvenience of forum.

Section 21.    Waiver Of Jury Trial.  Each of the PARTIES agrees that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by any PARTY, or any successor or assign of any PARTY, on or with respect to this RELEASE AGREEMENT, shall be tried by a court and not by a jury.  EACH OF THE PARTIES HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING.

IN WITNESS WHEREOF, the PARTIES have executed this RELEASE AGREEMENT with the specific intention of creating a document under seal to be effective as of the above stated effective date of this RELEASE AGREEMENT.  This RELEASE AGREEMENT may be executed and delivered in counterparts.

WITNESS:                               OBLIGORS:

                                       NHI, INC., formerly known as Nanticoke Homes, Inc.,
                                       A Delaware Corporation

                                       By: _____(SEAL)
                                       Name: _John Marvin Jr._
                                       Title: _Pres._
                                       Date:  October _7_, 2003


[SIGNATURES CONTINUED ON THE FOLLOWING PAGE]

A00666

Signature Page to Release Agreement – Continued:

WITNESS:                                    OBLIGORS (Continued):

SHAWNEE HOMES, INC.,
A Delaware Corporation

By: _____ (SEAL)
Name: _William H. Menninette_
Title: _President_
Date:  October _15_, 2003

SHAWNEE ENTERPRISES MIDWEST, L.L.C.,
A Delaware Limited Liability Company

By: _____ (SEAL)
Name: _____
Title: _____
Date:  October ____, 2003

TAMARAC, INC.,
A Delaware Corporation

By: _____ (SEAL)
Name: _____
Title: _____
Date:  October ____, 2003

[SIGNATURES CONTINUED ON THE FOLLOWING PAGE}

A00667

Signature Page to Release Agreement – Continued:

WITNESS:                                    OBLIGORS (Continued):


SHAWNEE HOMES, INC.,
A Delaware Corporation


_____        By:    _____(SEAL)
                                   Name:    _____
                                   Title:    _____
                                   Date:    October ____, 2003


SHAWNEE ENTERPRISES MIDWEST, L.L.C.,
A Delaware Limited Liability Company


By:    _____(SEAL)
       Name:    _Greg Minne_____
       Title:    _President_____
       Date:    October _8_, 2003


TAMARAC, INC.,
A Delaware Corporation


_____        By:    _____(SEAL)
                                   Name:    _____
                                   Title:    _____
                                   Date:    October ____, 2003


[SIGNATURES CONTINUED ON THE FOLLOWING PAGE]


D:\Jms\18886\ReleaseAgt.doc                    -3-

A00668

Signature Page to Release Agreement -- Continued:

WITNESS:                          OBLIGORS (Continued):

                                  SHAWNEE HOMES, INC.,
                                  A Delaware Corporation

_____           By:  _____(SEAL)
                                       Name: _____
                                       Title: _____
                                       Date:  October ___, 2003


                                  SHAWNEE ENTERPRISES MIDWEST, L.L.C.,
                                  A Delaware Limited Liability Company

_____           By:  _____(SEAL)
                                       Name: _____
                                       Title: _____
                                       Date:  October ___, 2003


                                  TAMARAC, INC.,
                                  A Delaware Corporation

                                  By:  _____(SEAL)
                                       Name: _____
                                       Title: _____
                                       Date:  October ___, 2003


                [SIGNATURES CONTINUED ON THE FOLLOWING PAGE}

A00669

Signature Page to ReleaseAgreement -- Continued:

WITNESS:                                OBLIGORS (Continued):

                                        PAWNEE HOMES, INC.,
                                        A Delaware Corporation

                                        By: _____ (SEAL)
                                            Name: John Mervine Jr
                                            Title: Pres
                                            Date:  October 3, 2003

                                        _____ (SEAL)
                                        JOHN M. MERVINE, SR.
                                        Date:  October ___, 2003

                                        _____ (SEAL)
                                        PEGGY R. MERVINE
                                        Date:  October ___, 2003

                                        _____ (SEAL)
                                        JOHN M. MERVINE, JR.
                                        Date:  October 3, 2003

                                        _____ (SEAL)
                                        JAN L. MERVINE
                                        Date:  October 3, 2003

                                        _____ (SEAL)
                                        WILLIAM H. MERVINE, III
                                        Date:  October ___, 2003

                                        _____ (SEAL)
                                        CHARLENE MERVINE
                                        Date:  October ___, 2003

[SIGNATURES CONTINUED ON THE FOLLOWING PAGE}

A00670

Signature Page to ReleaseAgreement – Continued:

WITNESS:                                    OBLIGORS (Continued):

                                            PAWNEE HOMES, INC.,
                                            A Delaware Corporation

_____         By: _____(SEAL)
                                            Name: _____
                                            Title: _____
                                            Date:  October ___, 2003


_____         _____(SEAL)
                                            JOHN M. MERVINE, SR.
                                            Date:  October ___, 2003


_____         _____(SEAL)
                                            PEGGY R. MERVINE
                                            Date:  October ___, 2003


_____         _____(SEAL)
                                            JOHN M. MERVINE, JR.
                                            Date:  October ___, 2003


_____         _____(SEAL)
                                            JAN L. MERVINE
                                            Date:  October ___, 2003


_____         _____(SEAL)
                                            WILLIAM H. MERVINE, III
                                            Date:  October ___, 2003


_____         _____(SEAL)
                                            CHARLENE MERVINE
                                            Date:  October 15, 2003


[SIGNATURES CONTINUED ON THE FOLLOWING PAGE}

D:\jms\18886\ReleaseAgt.doc                 -4-

A00671

Signature Page to ReleaseAgreement – Continued:

_____        _____ (SEAL)
                               GREGORY O. MERVINE
                               Date:   October 8 , 2003


                               LENDER:

                               MERCANTILE-SAFE DEPOSIT AND
                                 TRUST COMPANY


_____        By: _____ (SEAL)
                                   Scott H. Krieger,
                                   Senior Vice President

                                   Date:   October 30 , 2003


D:\jms\18886\ReleaseAgt.doc                    -5-

A00672

## CERTIFICATE OF SERVICE

I, Stuart M. Brown, certify that on this 27th day of December, 2004, I caused true and correct copies of the **Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint** to be served on the following parties in the manner indicated:

**VIA HAND-DELIVERY**
Stephen W. Spence
Phillips, Goldman & Spence
1200 N. Broom Street
Wilmington, DE 19806

Office of the United States Trustee
844 King Street, Room 2207
Lockbox 35
Wilmington, DE 19801

**VIA U.S. FIRST-CLASS MAIL**
Scot R. Withers, Esquire
Lamb McERlane PC
24 E. Market Street
P.O. Box 565
West Chester, PA 19381-0565

/s/ Stuart M. Brown
Stuart M. Brown

_501139_1/

A00673

## File a Court document:
04-52879-PJW NHI, Inc. v. Fleetboston Financial Corporation et al

**U.S. Bankruptcy Court**

**District of Delaware**

Notice of Electronic Filing

The following transaction was received from Brown, Stuart M. entered on 12/27/2004 at 6:15 PM EST and filed on 12/27/2004

**Case Name:**       NHI, Inc. v. Fleetboston Financial Corporation et al
**Case Number:**    04-52879-PJW
**Document Number:** 52

**Docket Text:**
Memorandum of Law *in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint* (related document(s)[51] ) Filed by Fleetboston Financial Corporation, Waring Justis, Jr., KMR Management, Inc., Robert Riesner (Attachments: # (1) Attachment Unreported Cases# (2) Exhibit A# (3) Exhibit B# (4) Exhibit C# (5) Certificate of Service) (Brown, Stuart)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** U:\Wilmington Bankruptcy\NHI\Motion to Dismiss Second Amended Complaint\Memo of Law in Support of Mtn to Dismiss.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=12/27/2004] [FileNumber=3303201-0
] [33c99fc2b2c81a80c8d1e9a683a86f79be5ce2e86bfa55e657f93426988dfd506ca
68fe4c07237795886935cddbe8cb024d2522127de0b34aa580bc1a873412f]]
**Document description:** Attachment Unreported Cases
**Original filename:** U:\Wilmington Bankruptcy\NHI\Motion to Dismiss Second Amended Complaint\Unreported Cases.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=12/27/2004] [FileNumber=3303201-1
] [76e7cc4fa12b6711a3a1f9cd55ea4ae1931a35f400ba3605d2975472b97f8d8aa14
3377c1a3156325947e9c9a098ca1b0d0b1611acfdfceef7c2fb26af42e512]]
**Document description:** Exhibit A
**Original filename:** U:\Wilmington Bankruptcy\NHI\Motion to Dismiss Second Amended Complaint\Exhibit A - 022602 Agreement.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=12/27/2004] [FileNumber=3303201-2
] [2d07a6d278976d600531b5ef51bca65e434436d139eb26708e8f985e07dc0f334fb
906b2be8c7b5b46fd5083d9a4db4d2df6d6174c926f893a5a5620ead334b4]]
**Document description:** Exhibit B
**Original filename:** U:\Wilmington Bankruptcy\NHI\Motion to Dismiss Second Amended Complaint\Exhibit B - Consent Order.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=12/27/2004] [FileNumber=3303201-3

A00674

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | : | Case No. 02-10651 (PJW) |
| NHI, INC., | : | |
| A DELAWARE CORPORATION | : | Chapter 11 |
|  | : | |
| NHI, INC., | : | |
|  | : | |
| Plaintiff | : | Adversary No. 04-52879 |
|  | : | |
| v. | : | |
|  | : | |
| FLEET BOSTON FINANCIAL | : | |
| COPRORATION, KMR MANAGEMENT, | : | |
| INC., ROBERT RIESNER and WARING | : | |
| S. JUSTIS, JR., | : | |
|  | : | |
| Defendants | : | |

MEMORANDUM OF LAW OF PLAINTIFF NHI, INC.
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND
AMENDED COMPLAINT

James C. Sargent, Esquire
PA Attorney I.D. No. 28642
Guy A. Donatelli, Esquire
PA Attorney I.D. No. 44205
Scot R. Withers, Esquire
PA Attorney I.D. No. 84309
LAMB MCERLANE PC
24 East Market Street
Post Office Box 565
West Chester, PA  19381-0565
(610) 430-8000
Of Counsel
January 6, 2004

Stephen W. Spence, Esquire (#2033)
PHILLIPS GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
(302) 655-4210 (fax)
Counsel to NHI, Inc.

$\frac{54}{1/6/05}$

A00675

# TABLE OF CONTENTS

TABLE OF CITATIONS ........................................................................................................ ii

I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS ................... 1

      A.  Introduction ................................................................................................................. 1

      B.  Procedural Overview .................................................................................................. 2

II.   CONCISE STATEMENT OF THE FACTS ......................................................................... 4

III.  SUMMARY OF ARGUMENT ............................................................................................ 9

IV.   ARGUMENT ........................................................................................................................ 10

      A.    THE AFFIRMATIVE DEFENSE OF RELEASE IS NOT AVAILABLE
            TO DEFENDANTS ................................................................................................. 10

            1.    Defendants Are Not "Agents" of Mercantile ............................................. 11

            2.    The Doctrine Of Judicial Estoppel Is Inapplicable To The Facts
                  Of This Case ..................................................................................................... 11

      B.    NHI'S ALLEGATIONS IN COUNT XII, THE PREFERENCE COUNT,
            ARE AS SPECIFIC AS THEY CAN BE AT THIS STAGE ............................... 14

V.    CONCLUSION .................................................................................................................... 15

i

A00676

# TABLE OF CITATIONS

## CASES

Chakov v. Outboard Marine Corp., 429 A.2d 984 (Del. Super. Ct. 1981).....................................10

Coates Int'l, Ltd. v. DeMott, 1994 Del. Ch. LEXIS 20 (Del. Ch. 1994) ....................................12

Fisher v. Townsends, Inc., 695 A.2d 53 (Del. 1997).....................................................................11

Heller v. Kiernen, 2002 Del. Ch. LEXIS 17 (Del. Ch. 2002).......................................................13

H-M Wexford, LLC v. Encorp, Inc., 832 A.2d 129 (Del. Ch. 2003) ............................................13

National Labor Relations Bd. v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 19, 154 F.3d 137 (3d Cir. 1998)..........................................................................................................11

Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir. 1988).......................12

Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355 (3d Cir. 1996).............12, 14

Scarano v. Central R. Co. of New Jersey, 203 F.2d 510 (3d Cir. 1953).......................................12

Seigman v. Palomar Med. Techs., Inc., 1998 Del. Ch. LEXIS 115 (Del. Ch. 1998) ...................12

Sutter Opportunity Fund 2 LLC v. Cede & Co., 838 A.2d 1123 (Del. Ch. 2003)..........................11

Tucker v. Albun, Inc., 1999 Del. Super. LEXIS 468 (Del. Super. Ct. 1999)................................10

## STATUTES

11 U.S.C. § 544 ("Trustee as lien creditor and as successor to certain creditors and purchasers") ..........................13

11 U.S.C. § 547 ("Preferences").......................................................................................................13

11 U.S.C. § 548 ("Fraudulent transfers and obligations")...............................................................13

11 U.S.C. § 550 ("Liability of transferee of avoided transfer") ......................................................13

## RULES

Federal Rule of Civil Procedure 12(b)(6) ..........................................................................................1

ii

A00677

# I. STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

### A.    Introduction

Defendants, KMR Management, Inc. ("KMR"), Robert Riesner ("Riesner") and Waring Justis, Jr. ("Justis"), and KMR's parent, Fleet Boston Financial ("Fleet") have filed a Motion to Dismiss Plaintiff, NHI, Inc.'s (hereinafter "NHI") Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion is based upon the exact arguments that this Court has previously discredited, namely that NHI has admitted that Defendants were agents of Mercantile and that, as agents of Mercantile, Defendants are entitled under the doctrine of judicial estoppel to take advantage of a release that NHI gave to Mercantile. This Court, for all practical purposes, removed this "defense" from this case during the conference held before the Court on December 3, 2004. At the December 3, 2004 conference, the Court noted that paragraph 33 of the first amended complaint was an assertion of an agency relationship. Because NHI's other pleadings took the position that Defendants were not the agents of Mercantile, the Court wanted to know "which is it"? (Colloquy, pp. 4-5) NHI agreed to amend the complaint to withdraw paragraph 33 and the Court permitted that narrow amendment. The Court also determined that none of the other allegations in the first amended complaint "supports a finding by me that there was an agency relationship". (Colloquy, pp. 7). The Second Amended Complaint, removing paragraph 33, was filed on December 10, 2004, thus resolving this issue.

Defendants are raising the same agency relationship as a defense to the Second Amended Compliant. This is truly remarkable, as Defendants **admitted** at the December 3, 2004

A00678

conference that "it is not [Defendants'] intention to argue that the defendants were agents of Mercantile" to bring themselves within the release. (Colloquy, p. 6).    The trial judge, not surprisingly, concluded "this whole agency is a nonissue at this point". (Colloquy, p. 6).

Accordingly, as a simple matter of common sense, Defendants' motion should be summarily denied as the defenses of agency and release are not present in the instant case.

B.    Procedural Overview

Plaintiff, NHI, Inc. (hereinafter "NHI"), formerly known as Nanticoke Homes, Inc., filed a voluntary petition for relief (hereinafter "Petition") with the United States Bankruptcy Court for the District of Delaware under Chapter 11 of the Bankruptcy Code on March 1, 2002. Prior to 2002, NHI was engaged in manufacturing customized homes at its plant in Greenwood, Delaware. NHI is a Debtor-in-Possession.

This adversary proceeding is an action by NHI, seeking to recover the losses suffered as a result of the failure of the Defendants to comply with the terms set forth in a consulting agreement between Plaintiff and Defendants. Under the consulting agreement, Defendants represented themselves to be highly skilled professionals and agreed to provide NHI with professional management for the purposes of helping to stabilize NHI's financial condition and perpetuating NHI's business. Defendants undertook to act as fiduciaries, assumed positions of responsibility and undertook a duty of loyalty with respect to NHI. They assumed the complete control, responsibility and authority for managing the business of NHI. However, instead of

2

taking actions to improve NHI's position, Defendants undertook a course of conduct designed to assure NHI's insolvency and ultimate liquidation of NHI.

With permission from the Court, and as set forth above, NHI was given leave to file a Second Amended Complaint. The Second Amended Complaint sets forth twelve causes of action including theories based upon breach of contract, breach of the covenant of good faith and fair dealing, gross negligence, breach of fiduciary duty, fraud, waste of corporate assets, tortious interference with contract and prospective business advantage, fraudulent transfer, fraudulent conveyance and avoidance of preferences under the Bankruptcy Code. These actions were not asserted against Mercantile Safe Deposit and Trust Company; indeed, Mercantile is not even named as a defendant. The claims are made against Defendants based upon the independent obligations flowing from Defendants to NHI.

On December 27, 2004, Defendants filed a 12(b)(6) Motion to Dismiss Plaintiff's Second Amended Complaint based upon a claim to a release as agents of Mercantile, even though the issue of agency and release was determined by the Court on December 3, 2004 and even though Defendants have conceded they are **not** agents of Mercantile. Because these defenses have no merit, NHI files this response to that Motion.

3

A00680

## II. CONCISE STATEMENT OF THE FACTS

Defendants' motion to dismiss is based upon Rule 12(b)(6) of the Federal Rules of Civil Procedure. Accordingly, all facts of the Second Amended Complaint must be accepted as true, and all reasonable inferences therefrom must be construed in favor of NHI. The facts set forth in the Second Amended Complaint as they are relevant to the instant motion to dismiss are as follows. NHI was the first pre-manufactured home-builder in Delaware and, for more than thirty years, conducted a successful manufacturing business. (Second Amended Complaint ¶ 8.) NHI was founded by John Mervine, Sr. Over three decades, NHI established a reputation for manufacturing a high-quality, high-end product in an expanding market. At the height of NHI's business, it had a sales volume of approximately $60,000,000 a year. (Second Amended Complaint ¶ 8.)

Over time, NHI, its affiliated companies and its related entities greatly increased its indebtedness to its banking institution, Mercantile Safe Deposit and Trust Company ("Mercantile"). All outstanding debt owed to Mercantile by NHI and its affiliated companies, was cross collateralized. (Second Amended Complaint ¶ 14.) On or about March 21, 2000, Mercantile and NHI, due to a technical default under the loan documents entered into two Forbearance Agreements. In August 2000, NHI learned that Mercantile was considering calling NHI's loans and placing NHI into liquidation, even though NHI remained current on its loan payments, but was alleged to be in default of technical, non-monetary covenants. (Second Amended Complaint ¶ 22.) On or about October 6, 2000, Mercantile insisted—on the threat of calling all of Mercantile's loans—that NHI retain a management consultant and strongly

4

A00681

suggested/urged that Defendants KMR, Riesner and Justis be hired as management consultants. (Second Amended Complaint ¶ 25.) Scott Krieger, Mercantile's workout manager, assured NHI that Defendants KMR, Riesner and Justis were "turn around" consultants, as opposed to "liquidation guys." (Second Amended Complaint ¶ 25.)

On or about October 18, 2000, Mercantile indicated it would provide an additional $1.5 million of financing for NHI if KMR, Riesner and Justis considered NHI to be a viable going concern. On or about October 19, 2000, under the threat of calling all of Mercantile's loans, NHI entered into a Consulting Agreement with Defendants KMR, Riesner and Justis. (Second Amended Complaint ¶ 27.) Under the Consulting Agreement, KMR, Riesner and Justis, who had represented themselves to be highly skilled professionals, agreed to provide NHI with professional management for the purposes of helping to stabilize NHI's financial condition and perpetuating NHI's business. Under the Consulting Agreement, KMR, Riesner and Justis undertook to act as fiduciaries, assumed positions of responsibility and undertook a duty of loyalty with respect to NHI as NHI's agents. Pursuant to the Consulting Agreement, KMR, Riesner and Justis assumed the complete control, responsibility and authority for managing the business of NHI. (Second Amended Complaint ¶ 28.) Under the Consulting Agreement, NHI agreed to pay KMR certain specified hourly rates for services rendered. (Second Amended Complaint ¶ 32.)

After assuming control of NHI, KMR, Riesner and Justis embarked on a short-sighted and result-oriented management scheme to scuttle and liquidate NHI in direct breach of the Consulting Agreement and in violation of their fiduciary duties and obligations of loyalty. (Second Amended Complaint ¶¶ 32, 33-36.) KMR, Riesner and Justis made their primary priorities the paying down of NHI's debt to Mercantile and the collection of exorbitant and

5

extorted consulting fees for KMR, while at the same time relegating NHI's business operations and viability as a going concern to distant secondary priorities, in direct contravention of the Consulting Agreement. (Second Amended Complaint ¶ 32.)

In 2001, Riesner and Justis continued on a concentrated course of action to pay Mercantile and KMR at the fastest possible rate without regard to the continuation of NHI's business, while stripping NHI of assets. In collaboration with Krieger, Riesner and Justis discontinued paying NHI's vendors, suppliers, health care claims and taxing authorities, removed critical employees from plant operations, shipped homes out of the plant prior to completion and with substantial defects, failed to complete homes in the field and focused on short-term returns to Mercantile and KMR, without any concern for the long-term impact on NHI, which were in fact ruinous to NHI's viability as a going concern. (Second Amended Complaint ¶ 40.)

At the same time, although NHI was still only in technical default with Mercantile, Riesner and Justis systematically made payments to Mercantile the day after late fees and penalties were incurred. It was apparent that Riesner and Justis were not concerned with NHI's ability to continue as a going concern—rather, the sole concern of Riesner and Justis was that Mercantile and KMR be paid. (Second Amended Complaint ¶ 47.)

By the beginning of September 2001, due to the systematic failure of Riesner and Justis to pay NHI's vendors and suppliers, NHI was the named defendant in approximately twenty-two lawsuits by its customers, vendors and suppliers. By October 2001, the number of lawsuits against NHI by its customers, vendors and suppliers had increased to forty-three. As a result, NHI was unable to secure supplies and materials from vendors, which resulted in NHI having to resort to alternate and more expensive sources of supplies and materials. (Second Amended Complaint ¶ 48.)

6

Under the management of NHI by KMR, Riesner and Justis, NHI's reputation as a manufacturer of high quality customized homes was ruined. Riesner and Justis proved to be incompetent in running the day-to-day operations of NHI's manufacturing business. Instead of operating NHI with the intent that it continue as a viable going concern, the sole objective of KMR, Riesner and Justis was to liquidate assets of NHI all to the detriment of NHI's shareholders.

In November 2001, it became apparent to John M. Mervine, Jr. that Riesner and Justis had been systematically failing to make state tax payments on behalf of NHI, failing to pay workers' compensation benefits, and failing to pay health and life insurance premiums and 401(k) contributions for NHI employees. (Second Amended Complaint ¶ 51.)

On or about January 29, 2002, Justis abruptly "went on vacation" and did not maintain contact with NHI or the members of the Mervine family. (Second Amended Complaint ¶ 58.)

From October 2000 through January 2002, KMR, Riesner and Justis grossly mismanaged NHI's business; made decisions which maximized cash flows to Mercantile and KMR while destroying NHI's relationships with its customers, suppliers, contractors, employees, etc., with the obvious result of destroying NHI as a viable going concern; violated the Consulting Agreement; breached their fiduciary duty and duty of loyalty by—rather than providing "turn around" management—devising a stealth plan to strip NHI of all cash and assets possible before running NHI into liquidation, all for the sole benefit of Mercantile, KMR, Riesner and Justis, and to the extreme detriment and prejudice of NHI and its shareholders and creditors. (Second Amended Complaint ¶ 59.)

By February 2002, as a result of the gross mismanagement of NHI by KMR, Riesner and Justis, NHI was in such dire financial straits that it was not able to re-finance or sell its

7

operations as a going concern. From October 2000 through February 2002, a period of approximately fourteen months, Riesner and Justis caused NHI to pay KMR consulting fees of approximately $1.9 million. (Second Amended Complaint ¶¶ 66, 61.) On or about February 6, 2002, Mercantile demanded payment on all of NHI's loans and lines of credit. (Second Amended Complaint ¶ 62.) Thereafter, on or about February 26, 2002, the members of the Mervine family found themselves in such financial duress that they entered into an agreement with Mercantile, which over the next twenty months settled NHI's debt with Mercantile, satisfied Mercantile's liens on the assets of NHI and the Mervine family members' personal residences, and released Mercantile from all liability to NHI. (Second Amended Complaint ¶ 63.)

NHI terminated its manufacturing operations on February 19, 2002. (Second Amended Complaint ¶ 65.)

8

## III. SUMMARY OF ARGUMENT

Defendants' motion to dismiss should be denied. First, Defendants have already conceded that they are not agents of Mercantile. Therefore, any issue of agency and the release of claims against Mercantile and its agents are of no moment. And, to the extent that the Court determined that paragraph 33 was the sole allegation in the first amended complaint that suggested that Defendants were agents of Mercantile, the Court permitted NHI to file an amended pleading, removing paragraph 33, which mooted this issue.

Second, Defendants efforts to dismiss the preference actions in Count XII against Fleet, Riesner and Justis are premature. At this stage of the litigation, NHI has pleaded its preference count with the most factual specificity it has available.

For these reasons, Defendants' motion to dismiss should be denied.

9

A00686

## IV. ARGUMENT

The Cash Collateral Agreement does not contain a judicial admission as it relates to Defendants. The February 26, 2002 Cash Collateral Agreement between the members of the Mervine family and Mercantile released Mercantile and Mercantile's "officers, directors, employees, attorneys, and agents" from all liability to NHI. Because Defendants do not assert that they are agents of Mercantile, because NHI does not contend that Defendants are agents of Mercantile and because this Court has permitted NHI in its Second Amended Complaint to remove the one assertion that could be deemed an agency allegation by NHI, Defendants' instant motion must be denied.

### A.    THE AFFIRMATIVE DEFENSE OF RELEASE IS NOT AVAILABLE TO DEFENDANTS.

Delaware Courts recognize the validity of a general release of a party from liability. Chakov v. Outboard Marine Corp., 429 A.2d 984, 985 (Del. Super. Ct. 1981). A release is valid if it meets three requirements: (1) the release must not be ambiguous; (2) the release must not be unconscionable; and (3) the release must not be against public policy. Tucker v. Albun, Inc., 1999 Del. Super. LEXIS 468, *6 (Del. Super. Ct. 1999). A copy of this opinion is attached hereto as Exhibit "A".

Defendants assert the affirmative defense of release arguing that the Cash Collateral Agreement confirmed a release to Mercantile, which Defendants themselves should be permitted to use. However, the release was not given to Defendants—it was given to Mercantile. Defendants are not named in the Release, nor are the causes of action derivative of Defendants' relationship with Mercantile.

10

1.     Defendants Are Not "Agents" of Mercantile.

NHI does not contend that Defendants are agents of Mercantile. Defendants have admitted they are not agents of Mercantile. This Court has determined that the allegations which make up the Second Amended Complaint are not allegations of agency. That should end the inquiry. "An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." Fisher v. Townsends, Inc., 695 A.2d 53, 57-58 (Del. 1997); accord National Labor Relations Bd. v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 19, 154 F.3d 137, 142-43 (3d Cir. 1998). "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Sutter Opportunity Fund 2 LLC v. Cede & Co., 838 A.2d 1123, 1128 (Del. Ch. 2003) (quoting RESTATEMENT (FIRST) OF AGENCY § 1(1) (1933)). Defendants cannot meet this standard. They have admitted they are not agents of Mercantile, and therefore could never establish that they consented to such a status.

2.     The Doctrine Of Judicial Estoppel Is Inapplicable To The Facts Of This Case.

"Judicial estoppel, sometimes called the 'doctrine against the assertion of inconsistent positions,' is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding. It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from 'playing 'fast and loose with the courts.'" Ryan Operations

11

A00688

G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d Cir. 1996) (quoting Scarano v. Central R. Co. of New Jersey, 203 F.2d 510, 513 (3d Cir. 1953)); accord Seigman v. Palomar Med. Techs., Inc., 1998 Del. Ch. LEXIS 115, *2 (Del. Ch. 1998) (under the doctrine of judicial estoppel, "a party may be precluded from asserting in a legal proceeding, a position inconsistent with a position previously taken by him in the same or in an earlier legal proceeding.") (quoting Coates Int'l, Ltd. v. DeMott, 1994 Del. Ch. LEXIS 20, *5 (Del. Ch. 1994)).

Under Ryan Operations, whether a litigant asserts inconsistent positions within the meaning of the judicial estoppel doctrine entails a two part inquiry: (1) whether the party's present position is inconsistent with a position it asserted in its prior judicial proceeding; and (2) if so, whether the party asserted the inconsistent position in bad faith. Ryan Operations, 81 F.3d at 361. Both prongs must be satisfied to apply judicial estoppel as an appropriate remedy. Id. at 364 (judicial estoppel is an "extraordinary remedy to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice") (quoting Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 424 (3d Cir. 1988) (Stapleton, J., dissenting)).

In bringing this action against Defendants, NHI is not attempting to play "fast and loose with the courts." Pursuant to the Cash Collateral Agreement, NHI confirmed the release of Mercantile from any liability arising out of the loans, loan documents, obligations, collateral or the administration of such by Mercantile, which were the subjects of the Cash Collateral Agreement between Mercantile and NHI. This action does not allege wrongdoing by Mercantile and alleges no cause of action against Mercantile. Therefore the Cash Collateral Agreement is of no moment to the issue at bar. The Cash Collateral Agreement, however, did not release Defendants from NHI's claims against Defendants based upon Defendants' independent contractual and fiduciary duties to NHI under theories of contract, tort and bankruptcy law.

12

The Second Amended Complaint sets forth twelve causes of action including theories based upon breach of contract, breach of the covenant of good faith and fair dealing, gross negligence, breach of fiduciary duty, fraud, waste of corporate assets, tortious interference with contract and prospective business advantage, fraudulent transfer, fraudulent conveyance and avoidance of preferences under the Bankruptcy Code. The causes of action set forth in the Second Amended Complaint have as their foundation the independent contractual and fiduciary duties undertaken[1] by Defendants to NHI, and the fraudulent transfers and avoidance of preferences by Defendants in violation of the Bankruptcy Code, 11 U.S.C. §§ 544, 547, 548, 550.[2] These causes of action are wholly separate and distinct from the Cash Collateral Agreement between Mercantile and NHI. The Cash Collateral Agreement, and the related release, did not encompass any of the claims set forth in the Second Amended Complaint and cannot form the bases of any defenses to such claims.

The claims set forth in the Second Amended Complaint, therefore, are NHI's claims against Defendants based upon Defendants' independent contractual and fiduciary duties to NHI under theories of contract, tort and bankruptcy law. The Cash Collateral Agreement does not and could not excuse Defendants' independent contractual and fiduciary duties to NHI.

---

[1] NHI has pleaded all the elements of the causes of action identified. See, e.g., H-M Wexford, LLC v. Encorp, Inc., 832 A.2d 129, 140 (Del. Ch. 2003) (the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff); Heller v. Kiernen, 2002 Del. Ch. LEXIS 17, *9 (Del. Ch. 2002) (the elements of breach of fiduciary duty are: (1) that a fiduciary duty exists; and (2) that a fiduciary breached that duty).

[2] Irrespective of any alleged release of Defendants by NHI through the Cash Collateral Agreement, the Bankruptcy Code specifically allows NHI's claims against Defendants for fraudulent transfer and avoidance of preferences.

13

A00690

NHI does not seek to violate the release contained in the Cash Collateral Agreement and it has not named Mercantile as a defendant. In this action, NHI therefore, cannot assert a position inconsistent with the Cash Collateral Agreement—the doctrine of judicial estoppel is therefore inapplicable. See Ryan Operations, 81 F.3d at 361. Furthermore, there is no colorable argument to be made that allowing the instant action by NHI against Defendants will result in a miscarriage of justice. See id. at 364; indeed, Defendants themselves admit that such a defense is not available to them. For these reasons, Defendants' use of the doctrine of judicial estoppel is without merit.

B.   **NHI'S ALLEGATIONS IN COUNT XII, THE PREFERENCE COUNT, ARE AS SPECIFIC AS THEY CAN BE AT THIS STAGE.**

NHI attached as Exhibit "B" to its Second Amended Complaint a preference analysis for the purpose of establishing its right to relief under 11 U.S.C. §§ 547 and 550. The payments reflected on Exhibit "B" were directed to and received by KMR. Defendants Fleet, Reisner and Justis assert that because there is no allegation that any of these funds were for their benefit (and only for the benefit of KMR) the Second Amended Complaint is not specific enough to sustain a preference cause of action against Fleet, Reisner and Justis. The Second Amended Complaint pleads, upon information and belief that "KMR, Riesner and Justis received from NHI one or more transfers by check, wire transfer, or their equivalent (the "Transfers"), in the amounts and on or before the clear dates identified in Exhibit "B", attached hereto", and that "Fleet is liable for the above referenced transfers as successor in interest to Progress". It is also alleged in Paragraph 169 of the Second Amended Complaint that NHI is entitled to recover the transfers from KMR, Reisner and Justis under 11 U.S.C. §550. Section 550 allows recovery from initial,

14

immediate and mediate transferees.  Upon information and belief, Reisner and Justis are immediate or mediate transferees from KMR.  The Motion to Dismiss as to Reisner and Justis should be denied.  Accordingly, in the event that this Court grants any relief requested relating to Count XII regarding Fleet, it should be without prejudice.

## V. CONCLUSION

Defendants have already conceded that the defenses they attempt to raise improperly in their instant motion, agency and release, are ones that they will not attempt to prove as this action proceeds.  NHI has removed the only allegation in the pleadings that could be construed as an allegation of agency.  And this Court has already observed that none of the other allegations in the pleadings rise to the level of an assertion of an agency relationship between Defendants and Mercantile.  The causes of action set forth in the Amended Complaint are separate and distinct from the Cash Collateral Agreement between Mercantile and NHI, and the Cash Collateral Agreement does not encompass any of the claims set forth in the Second Amended Complaint.  Accordingly it provides no defense to such claims.  Furthermore, NHI has pleaded Count XII, preference with the greatest specificity as it can at this stage of the proceeding.  For the foregoing reasons, Plaintiff, NHI, Inc., respectfully requests that the Court DENY Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint.

15

A00692

PHILLIPS, GOLDMAN & SPENCE, P.A.

*[signature]*

STEPHEN W. SPENCE, ESQUIRE (#2033)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
(302) 655-4210 (fax)
Counsel to NHI, Inc.

LAMB MCERLANE PC
JAMES C. SARGENT, ESQUIRE
PA Attorney I.D. No. 28642
GUY A. DONATELLI, ESQUIRE
PA Attorney I.D. No. 44205
SCOT R. WITHERS, ESQUIRE
PA Attorney I.D. No. 84309
24 East Market Street
Post Office Box 565
West Chester, PA  19381-0565
(610) 430-8000
Co-counsel to NHI, Inc.

Date:   January 6, 2005

16

A00693

# EXHIBIT "A"

Get a Document - by Party Name - Tucker AND Albun
1/6/05 2:38 PM

*1999 Del. Super. LEXIS 468, \**

Charles W. Tucker, Plaintiff, v. Albun, Inc., trading as SEACOAST SPEEDWAY, a Delaware Corporation, Defendant.

Civil Action No. 97C-04-025

SUPERIOR COURT OF DELAWARE, SUSSEX

1999 Del. Super. LEXIS 468

August 4, 1999, Date Submitted
September 27, 1999, Date Decided

**DISPOSITION:** [*1] Motion for Summary Judgment Denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant filed a motion for summary judgment in plaintiff's action that was brought seeking money damages for injuries sustained by plaintiff after a fall on defendant's land.

**OVERVIEW:** Plaintiff filed suit against defendant, seeking damages for injuries that he incurred when he fell on defendant's property. Defendant moved for summary judgment, arguing that plaintiff's claims were barred under either of two theories; first, defendant urged that the release plaintiff signed was a complete bar to suit; and second, defendant alleged that if the release did not bar suit, then in the alternative plaintiff assumed the risk of the presence of holes and ruts in the infield of the racetrack. The court denied defendant's motion, holding that the release was ambiguous and plaintiff's status on defendant's land was disputed. In particular, the court held that factual disputes were present with respect to plaintiff's status as a business invitee. Thus, summary judgment was inappropriate.

**OUTCOME:** The motion was denied because there were material issues of fact to be developed and decided concerning several matters, including the ambiguity of the release plaintiff signed and plaintiff's status while on defendant's land.

**CORE TERMS:** summary judgment, invitee, infield, possessor, duty, racing, track, reporter, pit, invitation, ambiguous, licensee, unconscionable, classification, wrecker, public policy, owed, issues of fact, trespasser, evening, matter of law, assumption of risk, race track, signing, spectator, surface, ruts, unambiguous, hazard, owes

**LexisNexis(R) Headnotes**

Civil Procedure > Summary Judgment > Supporting Papers & Affidavits
Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN1* In acting on a motion for summary judgment, the court's function is to examine the record and determine whether there is a genuine issue of fact. Summary judgment is appropriate where, after viewing the record in a light most favorable to the non-moving party, the court finds there are no genuine issues of material fact. A material factual dispute exists where the parties to the action disagree on the factual predicates for the legal principles they advance. Moreover, the court's decision must be based only on the record presented, including all pleadings, affidavits, depositions, admissions, and answers to interrogatories, not on what evidence is potentially possible. Summary judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law to the circumstances.

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses

*HN2* In construing a release, the intent of the parties as to its scope and effect is controlling, and the court will attempt to ascertain the intent from the overall language of the document. Where the language of the release is clear and unambiguous, it will not lightly be set aside. Where, however, the language of the release is ambiguous, it must be construed most strongly against the party who drafted it.

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses

A00695