*HN3* Through a release, a person may assume all risks, known or unknown, inherent in a particular situation. However, for the release to be effective, it must appear that the plaintiff understood the terms of the agreement, or that a reasonable person in his position would have understood the terms. The evidence must establish that the parties intended the release to apply to the particular conduct of the defendant which has caused the harm.

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses

*HN4* A release may be invalid if it violates public policy. A release may violate public policy if the language exempting the benefitted party from his own negligence is not crystal clear. Moreover, a term exempting a party from tort liability for harm negligently caused is unenforceable on grounds of public policy if the term exempts one charged with the duty of public service from liability to one whom that duty is owed.

Torts > Real Property Torts > General Premises Liability

*HN5* The duty of care a possessor of land owes to one injured on the property will depend on the classification of the one injured. At any given time, a person may fall into any number of classifications designed by our society. A person may be a mother or a father or teacher or a doctor. The law also classifies people. Under the law, a person may be a master, a servant, or an independent contractor. Moreover, a person on the property of another may be either a trespasser, a licensee, or an invitee. A person's classification under the law often determines the rights and duties of that person.

Torts > Real Property Torts > General Premises Liability

*HN6* A possessor of land is defined as a person who is in occupation of the land with intent to control it, or a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or a person who is entitled to immediate occupation of the land, if no other person is in possession.

Torts > Real Property Torts > General Premises Liability

*HN7* A trespasser is a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise.

Torts > Real Property Torts > General Premises Liability

*HN8* A licensee is a person who is privileged to enter or remain on land only by virtue of possessor's consent. Three types of people are licensees: one whose presence on the land is solely for his own purposes, in which the possessor has no interest, and to whom the privilege of entering is extended as a mere personal favor to the individual; members of the possessor's household, and social guests of the possessor.

Torts > Real Property Torts > General Premises Liability

*HN9* In the context of licensees, "consent" and "permission" means that the person in possession of the premises is willing that the licensee shall enter or remain on the land, or that his conduct is such as to give the licensee reason to believe that he is willing that he shall enter, if he so desires.

Torts > Real Property Torts > General Premises Liability

*HN10* An invitee is either a public invitee or a business visitor. A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public. A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.

Torts > Real Property Torts > General Premises Liability

*HN11* An invitation differs from mere permission in this: an invitation is conduct which justifies others in believing that the possessor desires them to enter the land; permission is conduct justifying others in believing that the possessor is willing that they shall enter if they desire to do so. Moreover, the nature of the use to which the possessor puts his land is often sufficient to express to the reasonable understanding of the public, or classes or members of it, a willingness or unwillingness to receive them.

Torts > Real Property Torts > General Premises Liability

*HN12* The visitor has the status of an invitee only while he is on the part of the land to which his invitation extends--or, in other words, the part of the land upon which the possessor gives him reason to believe that his presence is desired for the purpose for which he has come. In determining the area included within the invitation, the purpose for which the land is held open, or the particular business purpose for which the invitation is extended, is of great importance.

Torts > Real Property Torts > General Premises Liability

*HN13* If an invitee exceeds the scope of the invitation, the invitee becomes either a trespasser or a licensee, depending on whether he goes on that portion of the property without or with the consent of the possessor.

**COUNSEL:** Bruce A. Rogers, Esquire, Rogers & Mooney, P.A., Georgetown, Delaware, Attorney for the Plaintiff.

Marla L. Tocker, Esquire, Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, Delaware, Attorney for Defendants.

**JUDGES:** Lee, Judge.

**OPINIONBY:** Lee

**OPINION: MEMORANDUM OPINION**

Lee, Judge

Charles W. Tucker ("Plaintiff") filed this suit against the Defendant, Albun Inc., trading as Seacoast Speedway ("Defendant"), seeking damages for injuries that he incurred when he fell on the Defendant's property. The Defendant's moved for summary judgment arguing that the Plaintiff's claims are barred under either of two theories. The Defendant first urges that the Release the Plaintiff signed is a complete bar to suit. Second, the Defendant argues that if the Release does not bar suit, then, in the alternative, the Plaintiff, in light of his "equal knowledge" of the risks involved, assumed the risk of the presence of holes and ruts in the infield of the racetrack. Moreover, they urge, Seacoast had no duty to warn the Plaintiff of these "obvious inherent risks." This is the Court's decision on the motion.

**STATEMENT OF FACTS n1**

- - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 As this matter is before the Court on the Defendant's Motion for Summary Judgment, the facts recited below are those most favorable to the non-moving party, the Plaintiff.

- - - - - - - - - - - End Footnotes - - - - - - - - - - - - - **[*2]**

The Defendant, Albun, Inc., owns Seacoast Speedway ("Speedway") near Georgetown, Delaware. The stock of Albun, Inc. is, in turn, owned by Mrs. Loretta G. Williams and her husband. The Plaintiff, Charles W. Tucker, was a frequent visitor to the racetrack. He attended most Saturday evening races for a number of years as either a race driver, a member of a pit crew, or a spectator.

On September 9, 1995, the Plaintiff went to the Speedway to attend the races as a spectator. Upon arrival, Mrs. Williams asked if he would work on a "wrecker" in return for free admission to the Speedway. The Plaintiff agreed to help out and signed the Release from liability required of all persons entering the pit or infield areas. This was the same release he had signed on prior occasions when entering the pit area. n2

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The text of the Release states:

A00697

IN CONSIDERATION of being permitted to compete, officiate, observe, work for, or participate in any way in the EVENT(S) or being permitted to enter for any purpose any RESTRICTED AREA (defined as any area requiring special authorization, credentials, or permission to enter or any area to which admission by the general public is restricted or prohibited), EACH OF THE UNDERSIGNED, for himself, his personal representatives, heirs, and next of kin:

1. Acknowledges, agrees, and represents that he has or will immediately upon entering such RESTRICTED AREAS, and will continuously thereafter, inspect the RESTRICTED AREAS which he enters and he further agrees and warrants that, if at any time, he is in or about RESTRICTED AREAS and he feels anything to be unsafe, he will immediately advise the officials of such and will leave the RESTRICTED AREAS and/or refuse to participate further in the EVENT(S).

2. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the promoters, participants, racing associations, sanctioning organizations or any subdivision thereof, track operators, track owners, officials, car owners, drivers, pit crews, rescue personnel, any persons in any RESTRICTED AREA, promoters, sponsors, advertisers, owners and lessees of premises used to conduct the EVENT(S), premises and event inspectors, surveyors, underwriters, consultants and other who give recommendations, directions, or instructions or engage in risk evaluation or loss control activities regarding the premises or EVENT(S) and each of them, their directors, officers, agents and employees, all for the purposes herein referred to as "Releasees," FROM ALL LIABILITY TO THE UNDERSIGNED, his personal representatives, assigns, heirs, and next of kin FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN DEATH OF THE UNDERSIGNED ARISING OUT OF OR RELATED TO THE EVENT(S), WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

3. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the Releasees and each of them FROM ANY LOSS, LIABILITY, DAMAGE, OR COST they may incur arising out of or related to the EVENT(S) WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

4. HEREBY ASSUMES FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE arising out of or related to the EVENT(S) whether caused by the NEGLIGENCE OF RELEASEES or otherwise.

5. HEREBY acknowledges that THE ACTIVITIES OF THE EVENT(S) ARE VERY DANGEROUS and involve the risk of serious injury and/or death and/or property damage. Each of THE UNDERSIGNED also expressly acknowledges that INJURIES RECEIVED MAY BE COMPOUNDED OR INCREASED BY NEGLIGENT RESCUE OPERATIONS OR PROCEDURES OF THE RELEASEES.

6. HEREBY agrees that this Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the Releasees, INCLUDING NEGLIGENT RESCUE OPERATIONS and is intended to be as broad and inclusive as is permitted by the laws of the Province or State in which the Event(s) is/are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED IT FREELY AND VOLUNTARILY WITHOUT INDUCEMENT, ASSURANCE OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [*3]

His duties that evening, while on the wrecker, were to assist in the removal of wrecked or disabled race cars and any debris from the racing surface. He was to be stationed with the other wreckers in the infield area. During the race, one of the participating race cars lost its rear bumper. Before the cars could come around the track again, the Plaintiff and his partner on the wrecker that evening ran from their truck in the infield to the track so that they could retrieve the bumper from the racing surface.

The infield at the Speedway has a grassy surface that extends to the clay race track. While running to retrieve the bumper, the Plaintiff stepped in a hole and fell down. This fall injured his shoulder giving rise to the present litigation.

## DISCUSSION

### I. Standard of Review.

HN1 ⊕ In acting on a motion for summary judgment, "the Court's function is to examine the record and determine whether there is a genuine issue of fact." Battista v. Chrysler Corp., Del. Super., 454 A.2d 286, 290 (1982). Summary judgment is appropriate where, after viewing the record in a light most favorable to the non-moving party, the Court finds there are no genuine issues [*4] of material fact. Camac v. Hall, Del. Super., 698 A.2d 394, 396 (1996). A material factual dispute exists where the parties to the action disagree on the factual predicates for the legal principles they advance. Merrill v. Crothall-American, Inc., Del. Supr., 606 A.2d 96, 99 (1992). Moreover, the "Court's decision must be based only on the record presented, including all pleadings, affidavits, depositions, admissions, and answers to interrogatories, not on what evidence is 'potentially possible.'" Id. (quoting Rochester v. Katalan, Del. Supr., 320 A.2d 704, 708, fn. 7 (1974)). "Summary judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law to the circumstances." Camac at 396; Ebersole v. Lowengrub, Del. Supr., 54 Del. 463, 180 A.2d 467, 470 (1962).

### II. Application of the Law to the Facts of the Case.

In applying the summary judgment standard to this case, summary judgment should only be granted if there are no material issues of fact in dispute regarding both the [*5] validity and the application of the release and the potential liability of the Defendant to the Plaintiff

A00698

Get a Document - by Party Name - Tucker AND Album                                                                                      1/6/05 2:38 PM

under a negligence theory.

**A. The Release.** Delaware Courts recognize the validity of a general release of a party from liability. Chakov v. Outboard Marine Corp., Del. Supr., 429 A.2d 984, 985 (1981); see also Hollerman v. Hicks, 1997 Del. Super. LEXIS 177, Del. Super., C.A. 95C-06-027, Terry, J. (April 8, 1997)(Opinion). A release is valid if it meets three requirements. First, the release must not be ambiguous. Second, the release must not be unconscionable. Finally, the release must not be against public policy. Hallman v. Dover Downs, Inc., 1986 U.S. Dist. LEXIS 15708, D. Del., C.A. No. 85-648-CMW, Wright, J. (Dec. 31, 1986). See also Egan & Sons Air Conditioning Co. v. General Motors Corp., 1988 Del. Super. LEXIS 166, *8, Del. Super., C.A. Nos. 88L-MY-18 and 88L-MY-28, Gebelein, J. (April 27, 1988) (Mem. Op.) (The Court first scrutinizes the releases for their validity, secondly for their clarity, and finally, for their scope.).

In determining whether a release is clear or ambiguous, the Delaware courts have developed an often used standard.

HN2⊕In construing a release, the intent of the parties as to its scope and [*6] effect are [sic] controlling, and the court will attempt to ascertain the intent from the overall language of the document. And where the language of the release is clear and unambiguous, it will not lightly be set aside. Where, however, the language of the release is ambiguous, it must be construed most strongly against the party who drafted it. (Internal citations omitted) Judge Trucking Co. v. Estate of Cooper, 1994 Del. Super. LEXIS 492, * 12, C.A. No. 92C-03-041, Graves, J. (Sept. 29, 1994) (Mem. Op.). See also, Hollerman[, 1997 Del. Super. LEXIS 177, * 10].

HN3⊕Moreover, through a release, a person may assume all risks, known or unknown, inherent in a particular situation. "However, for the release to be effective, it must appear that the plaintiff understood the terms of the agreement, or that a reasonable person in his position would have understood the terms . . . . The evidence must establish that the parties intended the release to apply to the particular conduct of the defendant which has caused the harm." McDonough v. National Off-Road Bicycle Ass., 1997 U.S. Dist. LEXIS 8036, D. Del., C.A. No. 95-504-SLR, Robinson, J. (June 2, 1997) (Mem. Op.)(Summary judgment denied where the Court found there was a material issue of fact whether a [*7] cyclist competing in a race contemplated harm occurring from a source other than the normal hazards of bicycle racing before executing a release, normal hazards being collision or rough roads and trails not necessarily death from heat stroke allegedly caused by negligent event management).

In a case relied upon by both parties in the present action, Hallman v. Dover Downs, Inc., supra, the United States District Court for the District of Delaware denied a motion for summary judgment in a case with facts that are almost on "all fours" with those of the current dispute. In Hallman, a newspaper reporter was assigned by the paper to cover a stock car race at Dover Downs International Speedway. Before he was allowed onto the premises, he was required to sign a release. Hallman at 2. Moreover, the reporter's press badge contained a liability release for personal injury or property damage. 1986 U.S. Dist. LEXIS 15708, * 2. While reporting on the races, the reporter leaned against a wooden railing that gave way and caused him to fall to the ground below. The Court denied Dover Downs' motion for summary judgment after finding that material issues of fact existed as to whether the release was ambiguous, [*8] unconscionable, or violated public policy. 1986 U.S. Dist. LEXIS 15708, * 6.

Judge Wright, in Hallman, found the release was ambiguous after evaluating the pre-trial statements of both the reporter and the track's representatives concerning their perceptions of the release. The track representative stated that: "I am not a lawyer, and you are asking questions of me that I am not qualified to ask or answer. . . . If you don't understand it, then I certainly am not the one to try and tell you what it says." 1986 U.S. Dist. LEXIS 15708, * 7. The reporter, when asked about his understanding of the release, stated:

A. Well, without having thought about it very much, I assumed that it was a, it indicated that I knew there was a race going on, there were some risks involved with fast cars on a race track. And that the dangers inherent with that risk, it would be my, would be reasonable for me to expect to be careful about those dangers.

Q: What, if anything, did you think it had to do with the grounds and building?

A: I wouldn't have thought it had anything to do with the grounds. 1986 U.S. Dist. LEXIS 15708, * 8.

Because these statements by the parties indicated a fundamental lack of understanding by both on the nature of the release, [*9] Judge Wright ruled that the release could not be clear and unambiguous as a matter of law. Id. The Court also found that the release was not clear and unambiguous because most of the release was in small print with only certain portions in bold type and the reporters may not have had adequate opportunity to digest the full import of the release at the time of execution. 1986 U.S. Dist. LEXIS 15708, * 8.

Judge Wright, in Hallman, also found there was an issue of fact whether the release was unconscionable. 1986 U.S. Dist. LEXIS 15708, * 9. Two issues drove this finding by the court. First, the Court found the reporter had no choice; he had to sign the release in order to do his job as a reporter. 1986 U.S. Dist. LEXIS 15708, * 9. Second, the Court held the release did not necessarily relate to the harm involved. "An uncontrollable car may be a foreseeable risk, but a defective structure is not." 1986 U.S. Dist. LEXIS 15708, * 12.

Finally, Judge Wright found that summary judgment was not appropriate because the record was not sufficiently developed to rule as a matter of law that the release did not violate public policy. The Court based this finding on two different theories. First, the law does not

A00699

favor provisions relieving one from liability for harm [*10] caused by his own fault or wrong. 1986 U.S. Dist. LEXIS 15708, * 11. For such a provision to be upheld, it must be "crystal clear" in its language evincing the clear intent of the parties to absolve the protected party of liability created by that party's own actions. 1986 U.S. Dist. LEXIS 15708, * 12 (citing J.A. Jones Const. Co. v. City of Dover, Del. Super., 372 A.2d 540, 553 (1977)). As noted above, the Court found the scope of the release was not certain, thus, summary judgment was not appropriate. As an alternative, Judge Wright looked to see if the release violated public policy because the person seeking the release owed a duty to the other. 1986 U.S. Dist. LEXIS 15708, * 13. On this issue, the court did not possess sufficient facts to determine whether the race track owed a duty to reporters covering the races. 1986 U.S. Dist. LEXIS 15708, * 14.

In the present case, the motion for summary judgment is denied with regard to the issue of the release Mr. Tucker executed prior to his admittance to the Speedway. The motion is denied because under current Delaware law, including the Hallman case, there is a material issue of fact as to the nature of the terms of the release. Thus, the release is ambiguous and the legal effects of the release [*11] can only be evaluated after a full airing of the facts.

Mr. Tucker would have a difficult time arguing that he did not know he was signing a release. In his statements, he repeatedly acknowledges that a signed release was a prerequisite to admittance to the pit and infield areas. For this reason, Mr. Tucker's situation is somewhat different from that of the reporter in Hallman where there was some question of whether he even knew he was signing a release.

In this case, the release does not clearly define the scope of the Release's coverage. In addressing the potential harms or injuries covered by the Release, it states that it covers those harms "ARISING OUT OF OR RELATED TO THE EVENT(S) . . . ." This language is repeated several times in the release and is used consistently. This language, however, is subject to two interpretations. A very broad interpretation could find that as soon as a person came to the track and signed the release, everything that could happen to him arises out of the events. The argument would be that but for the event, the person would not be in attendance and thus subject to harm. A narrower interpretation would be that the contract language refers to [*12] only those potential harms with causes directly related to the events at the Speedway -- car racing. In Hallman, Judge Wright appears to have subscribed to the narrower interpretation because the language in that release more clearly attempts to cover more activities. The Hallman release addresses harms "ARISING OUT OF OR RELATED TO ANY LOSS . . . THAT MAY BE SUSTAINED . . . WHILE IN, ON, ENROUTE TO, FROM, OR OUT OF SAID PREMISES FROM ANY CAUSE WHATSOEVER . . . ." Hallman at 3.

This ambiguity in the language of the Release appears to have caused the parties to differ in their understanding of the Release. Like in Hallman, in the instant case, the statements of the parties indicate there may be some question concerning the parties' intent or understanding as to the scope and coverage of the release Tucker signed. Illustrative of this conflict is the testimony of both the Plaintiff and the Defendant at arbitration. The following indicates the Defendant's view of the release:

> Q: What is your understanding of the release? What is your understanding of what the purpose of it is and what does it do?

> A: That in return for being allowed to be in the pit area as a participant, [*13] you sign that you will not -- you sign a release waiver. You waive your right to -- I don't know how to put it in words. All the words are there. It says, "Release and Waiver of Liability." That is what you're saying. You are releasing the track and anyone associated with it; that you know that racing is a dangerous sport and you are willing to give up your rights in order to get in there.

> Q: And would you consider that as your understanding, that you would give up all rights no matter what happened?

> A: Right. You do -- you have rules. We have rules. A lot of safety rules. We're very safety conscious. And so, you know, you have rules, and the driver, when he signs in, he agrees to abide by the rules and that he will keep order in his pit, things like that. (Arbitration Transcript at 20-21, Cross-examination of Loretta G. Williams (Aug. 21, 1997)).

The plaintiff, in his testimony at arbitration states:

> Q: What did you think you were signing when you signed [the release]?

> A: The outtake that I have gotten off of the release forms is if you're negligent to the point where something happens and it's your fault, then they are not liable. But if you're employed by them, [*14] it's just like workmen's compensation. (Arbitration Transcript at 51, Direct Examination of Charles W. Tucker (Aug. 21, 1997)).

While both parties appear to have a general idea of the intended effect of the release signed by the Plaintiff, before the Court can rule as a matter of law that the release bars the Plaintiff's claim, several other factual issues must be developed and resolved. The most important issue would be the scope of the release. Did the parties intend that the release cover every conceivable harm -- including those not related to racing? The Defendant's testimony above seems to give the impression that the release is meant to cover only those potential harms caused by racing related actions. Further evidence of this is that only persons who are in close proximity to the cars and the racing action were required to sign a release. General spectators, in the grandstand, do not have to sign a release. Judge Wright took note of a similar fact in Hallman. There, Dover Downs required a release for auto racing events but not for horse racing. Hallman at 3.

A00700

The Defendant tries to link the Plaintiff's injury to racing activities by arguing that "it is logical [*15] that ruts or grooves in the grassy area adjacent to a race track are an inherent risk and that they could pose a potential tripping hazard for one 'working' in the racing infield." Defendants Opening Brief in Support of Its Motion for Summary Judgment at 10. The Defendant's theory is that ruts and grooves are caused by the emergency vehicles driving over the infield surface and debris thrown from the track. Defendant's Opening Brief at 10 and 13. If this theory is accepted, then holes, grooves, and ruts in the infield may be risks associated with racing and thus within the scope of the Release even under the narrow interpretation of the Release language. The question of whether those types of risks are inherent in racing activities is a question of fact and should be reserved for a trier of fact. Because there is some question concerning the scope of this release, its terms are ambiguous.

While the discussion above, concerning the ambiguities of the release, is somewhat lengthy, the remaining questions concerning unconscionability and public policy are less complex and can be dealt with summarily. In Hallman, Judge Wright found that the release in issue may have been unconscionable [*16] because there was an absence of meaningful choice. The reporter had no choice but to sign the release, otherwise he could not complete his assigned tasks, Hallman at 8-9. Judge Wright also found the release was unconscionable because the release did not "bear a reasonable relation to the risk involved." Hallman at 10. In the present case, the Plaintiff did have a meaningful choice. He could have paid for general admission and watched the races from the grandstand with the rest of the spectators. Thus, the Release cannot be unconscionable for that reason. However, as discussed above, there may be a question of whether the Release covers the harm that occurred to the Plaintiff. Thus, the Release may be unconscionable if it bears no relation to the risk involved.

HN4 Finally, a release may be invalid if it violates public policy. A release may violate public policy if the language exempting the benefitted party from his own negligence is not "crystal clear." Hallman at 12 (citing J.A. Jones Const. Co. v. City of Dover, Del. Super., 372 A.2d 540, 553 (1977)). Moreover, "a term exempting a party from tort liability for harm negligently caused is unenforceable on [*17] grounds of public policy if the term exempts one charged with the duty of public service from liability to one whom that duty is owed." Hallman at 13. The language of this Release, "WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE," is fairly clear that even negligence of the Speedway is to be included within the purview of the release. However, to fall within this clause, the negligent acts or omissions of the Defendant must fall within the scope of activities covered by the Release. Moreover, the issue of whether the defendant owes the Plaintiff any duty, and the nature of such duty depends on the Plaintiff's classification and is discussed in the next section of this Opinion.

Ultimately, this Court finds that there are material issues of fact that must be addressed before the validity and legal effect of the Release may be evaluated. The Release may be invalid because it is ambiguous, unconscionable, or violates public policy. To properly rule on these issues, this Court needs additional facts that are either in dispute or are not in the record before the Court. Most importantly, the Court would need facts tending to show the intended scope of the Release. Once [*18] those facts are settled, the validity and effect of the release can be evaluated. For these reasons, summary judgment is not appropriate for the issue of the release.

**Defendant's Duty to the Plaintiff and Assumption of Risk.** The Defendant's Opening Brief presents a second argument for Summary Judgment. The Defendant argues that it owed the Plaintiff no duty and that the Plaintiff assumed the risk upon entering the infield area. Summary judgment is not appropriate on either issue.

In this case, the Defendant is the possessor of land upon which the Plaintiff was injured. HN5 The duty of care a possessor of land owes to one injured on the property will depend on the classification of the one injured. At any given time, a person may fall into any number of classifications designed by our society. A person may be a mother or a father or teacher or a doctor. The law also classifies people. Under the law, a person may be a master, a servant, or an independent contractor. Moreover, a person on the property of another may be either a trespasser, a licensee, or an invitee. A person's classification under the law often determines the rights and duties of that person.

In the present case, [*19] the issue of whether the Plaintiff was an employee or servant of the Defendant at the time of the injury has been decided in the negative. Tucker v. Seacoast Speedway, 1999 Del. Super. LEXIS 540, Del. Super., C.A. No. 99A-02-002, Lee, J. (July 1, 1999)(Mem. Op.). Thus, any duty the Defendant, as the possessor of the land, owed to the Plaintiff will be defined by the Plaintiff's status at the time he was on the property. In determining the Plaintiff's status, "the Courts of Delaware employ the classifications set forth in the Restatement (Second) of Torts (1965)." Absalom v. Mason-Dixon Post No. 7234, 1996 Del. Super. LEXIS 393, * 7, Del. Super., C.A. No. 95C-09-022, Lee, J. (Sept. 18, 1996) (Mem. Op.). See also, DIOSSI v. Maroney, Del. Supr., 548 A.2d 1361, 1365 (1988).

The Restatement (Second) of Torts (1965) ("Restatement") classifies persons as either Possessors, Trespassers, Licensees, or Invitees.

HN6 A Possessor of land is defined by the Restatement as:

> (a) a person who is in occupation of the land with intent to control it or
>
> (b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or
>
> (c) a person who is entitled [*20] to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b). Restatement (Second) of Torts § 328E (1965).

HN7

A trespasser is "a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." Restatement (Second) of Torts § 329 (1965). [HN8] The Restatement defines a Licensee as "a person who is privileged to enter or remain on land only by virtue of possessor's consent." Restatement (Second) of Torts § 330 (1965). Three types of people are licensees:

    1. One whose presence on the land is solely for his own purposes, in which the possessor has no interest, and to whom the privilege of entering is extended as a mere personal favor to the individual.
    2. The members of the possessor's household, and
    3. Social guests of the possessor. Restatement (Second) of Torts § 330 cmt. h (1965).

Also, [HN9] in the context of licensees, "consent" and "permission" means that the person in possession of the premises is "willing that the [licensee] shall enter or remain on the land, or that his conduct is such as to give the [licensee] reason to believe that he is [*21] willing that he shall enter, if he so desires." Restatement (Second) of Torts § 330 cmt. c (1965).

[HN10] Finally, the Restatement uses the following definition for an Invitee:

    § 332. Invitee Defined

        (1) An invitee is either a public invitee or a business visitor.
        (2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.
        (3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land. Restatement (Second) of Torts § 332 (1965).

The comments to this section on invitees are particularly helpful in fleshing out how one becomes an invitee of a landowner or possessor. For instance, [HN11] "an invitation differs from mere permission in this: an invitation is conduct which justifies others in believing that the possessor desires them to enter the land; permission is conduct justifying others in believing that the possessor is willing that they shall enter if they desire to do so." Restatement (Second) of Torts § 332 cmt. b (1965). Moreover, "the nature of the [*22] use to which the possessor puts his land is often sufficient to express to the reasonable understanding of the public, or classes or members of it, a willingness or unwillingness to receive them." Restatement (Second) of Torts § 332 cmt. c (1965).

[HN12] The visitor has the status of an invitee only while he is on the part of the land to which his invitation extends -- or in other words, the part of the land upon which the possessor gives him reason to believe that his presence is desired for the purpose for which he has come. In determining the area included within the invitation, the purpose for which the land is held open, or the particular business purpose for which the invitation is extended, is of great importance. Restatement (Second) of Torts § 332 cmt. l (1965).

[HN13] Finally, if the invitee exceeds the scope of the invitation, the invitee becomes either a trespasser or a licensee, depending on whether he goes on that portion of the property without or with the consent of the possessor. Id.

While the parties in the present action seem to assume that the Plaintiff was a business invitee at the time of the injury, there seems to be some argument that he is something [*23] other than an invitee. For instance, the Plaintiff would not have been an invitee if by going into the infield of the track he exceeded the scope of his original invitation. The facts in the record before this Court show a discrepancy in the scope of the Plaintiff's invitation to the track. The Defendant testified that the Plaintiff was given a "pit pass" as a favor. He had no duties and could freely enter the pit area. He would not have access to the infield area. (Arbitration Transcript pp. 9-10.) The Defendant, however, states that when he arrived at the track that night, he was given free admission in exchange for working as a "wrecker" in the infield. Id. at 45-46. From this, the Court can discern that there exists material factual disputes concerning those facts necessary for an accurate determination of the Plaintiff's status at the time of the injury. To make this determination, the following facts would need to be developed. First, what was the scope of his invitation into the Speedway that evening? Was he supposed to be in the pits or on a wrecker? If the Plaintiff was not to be in the infield initially, did the Defendant see him there during the evening and not tell [*24] him to leave? These facts would help determine if he was an invitee, licensee, or a trespasser at the time of the injury. Because there are material issues of fact in dispute on the issue of the Plaintiff's status, I am denying summary judgment in favor of a full and complete development of the salient facts. As summary judgment is denied for this reason, this Opinion will not address the duties a landowner owes to each of the classifications of persons.

In addition to the duty issue addressed above, the Defendant, in its Opening Brief in Support of its Motion for Summary Judgment, argues that the "PLAINTIFF ASSUMED THE RISK OF HIS INJURY SINCE HE WAS EQUAL IN KNOWLEDGE TO SEACOAST OF THE RISK OF THE PRESENCE OF HOLES AND RUTS IN THE INFIELD . . . ." Defendant's Opening Brief at 11. The affirmative defense of "assumption of risk" is "fact intensive and not susceptible to disposition, as a matter of law, through summary judgment." DIOSSI at 1368. See also Morris v. Hitchens, 1993 Del. Super. LEXIS 122, * 6, Del. Super., C.A. No. 91C-05-045, Lee, J. (March 18, 1993)(Mem. Op.).

## CONCLUSION

There are material issues of fact to be developed and decided concerning several matters. First, the release [*25] is ambiguous. Second, the factual predicate for determining the Plaintiff's status while on the Defendant's land is disputed. Finally, the issue of any assumption

of risk by the Plaintiff is not subject to a motion for summary judgment. Thus, the Defendant's Motion for Summary Judgment is denied.

**IT IS SO ORDERED.**

Source: Legal > / . . . / > Federal & State Cases, Combined
Terms: name(tucker and album) (Edit Search)
View: Full
Date/Time: Thursday, January 6, 2005 - 2:38 PM EST

* Signal Legend:
- Warning: Negative treatment is indicated
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

A00703

**LexisNexis** *Total Research System*

Switch Client | Preferences | Feedback | Sign Off | Help

Search | Research Tasks | Search Advisor | Get a Document | Shepard's

Practice Area Pages | ECLIPSE | History

Shepardize®: [              ] Go

View: KWIC | Full                        ◄◄◄◄ 1 - 2 of 2 Total Cites ►►►►        Print | Download | Fax | Email | Text Only
Display Options                          Unrestricted | All Neg | All Pos | Custom | FOCUS™

*Shepard's®* ⓘ  Tucker v. Albun, Inc., 1999 Del. Super. LEXIS 468 (TOA)

Signal: ⓘ  Citation Information available
Trail: Unrestricted

Tucker v. Albun, Inc., 1999 Del. Super. LEXIS 468 (Del. Super. Ct. Sept. 27, 1999)

**SHEPARD'S SUMMARY** ✦ Hide Summary

*Shepard's* FULL Summary: ⓘ - Citation Information Available        Legend

No subsequent appellate history.
Citing References:
    Citing Decisions:        Citing decisions with no analysis assigned (2)

PRIOR HISTORY ( 0 citing references ) ✦ Hide Prior History

▷ (CITATION YOU ENTERED):
    Tucker v. Albun, Inc., 1999 Del. Super. LEXIS 468 (Del. Super. Ct. Sept. 27, 1999)

---

CITING DECISIONS ( 2 citing decisions )

OTHER DELAWARE DECISIONS

1. Cited by:
   Kovach v. Brandywine Innkeepers, 2000 Del. Super. LEXIS 126 (Del. Super. Ct. Apr. 20, 2000)

3RD CIRCUIT - U.S. DISTRICT COURTS

2. Cited by:
   End of the Road Trust ex rel. Fruehauf Trailer Corp. v. Terex Corp. (In re Fruehauf Trailer Corp.), 250 B.R. 168, 2000 U.S. Dist. LEXIS 8467 (D. Del. 2000)

        250 B.R. 168 p.194

View: KWIC | Full                        ◄◄◄◄ 1 - 2 of 2 Total Cites ►►►►        Print | Download | Fax | Email | Text Only
Display Options                          Unrestricted | All Neg | All Pos | Custom | FOCUS™

*Shepard's®* ⓘ  Tucker v. Albun, Inc., 1999 Del. Super. LEXIS 468 (TOA)

A00704

Check a Citation - Shepard's® - 1999 Del. Super. LEXIS 468

Signal:  ⊕  Citation information available
Citation: 1999 Del. Super. LEXIS 468 (Get this Document, Table of Authorities)
View: Full
Trail: Unrestricted
Location: 1 - 2 of 2 Total Cites
Date/Time: Thursday, January 6, 2005 - 2:39 PM EST

* Signal Legend:
⊗ -  Warning: Negative treatment is indicated
⚠ -  Caution: Possible negative treatment
✦ -  Positive treatment is indicated
Ⓐ -  Citing Refs. With Analysis Available
⊕ -  Citation information available
* Click on any *Shepard's* editorial treatment code (e.g., distinguished, questioned) to view its definition

Search | Research Tasks | Search Advisor | Get a Document | *Shepard's* ®
Eclipse ™ | History | Delivery Manager | Practice Area Pages | Switch Client | Preferences | Feedback | Sign Off | Help
About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

A00705

CERTIFICATE OF SERVICE

I, CELESTE A. HARTMAN, Senior Paralegal, do hereby certify that I am over the age of 18, and that on January 6, 2005, I caused the foregoing document to be served upon the following persons via U.S. First Class Mail.

Stuart M. Brown, Esquire
Denise Seastone Kraft, Esquire
Edwards & Angell, LLP
919 Market Street, 14 Floor
Wilmington, DE   19801

Richard Shepacarter, Esquire
Office of the U.S. Trustee
844 King Street, Suite 2313,
Lockbox 35
Wilmington, DE   19801-3519

Morton R. Branzburg, Esquire
Nicole Nigrelli, Esquire
Klehr, Harrison, Harvey, Branzburg & Ellers
260 S. Broad Street
Philadelphia, PA 19102-5003

Guy A. Donatelli, Esquire
James C. Sargent, Esquire
Scot R. Withers, Esquire
Lamb McErlane PC
24 East Market Street
Post Office Box 565
West Chester, PA  19381-0565

Under penalty of perjury, I certify the foregoing to be true and correct.

_CELESTE A. Hartman_

CELESTE A. HARTMAN

17

A00706



DEBdb_ECF_Reply@d
eb.uscourts.gov
01/06/2005 04:14 PM

To: dummail@deb.uscourts.gov
cc:
Subject: CH- 04-52879-PJW "Brief" NHI, Inc.

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

## U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Spence, Stephen W. entered on 1/6/2005 at 4:14 PM EST and filed on 1/6/2005

| | |
|---|---|
| **Case Name:** | NHI, Inc. v. Fleetboston Financial Corporation et al |
| **Case Number:** | 04-52879-PJW |
| **Document Number:** | 54 |

**Docket Text:**
Brief *Memorandum of Law of Plaintiff NHI, Inc. in Opposition to Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (Exhibit A, Certificate of Service)* (related document(s)[51] ) Filed by NHI, Inc. (Spence, Stephen)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** NHI brief.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=1/6/2005] [FileNumber=3333969-0]
[00cdbe3ac9d8ea8ec843be5aa8f2357c6aebd0c4b570a48f18880a8c543a562dbde5
0
e5c33e76e54924dea560985701aca14fe6746a9ea673022eb317224ab0b]]

**04-52879-PJW Notice will be electronically mailed to:**

Stuart M. Brown     sbrown@edwardsangell.com, DEbankruptcy@edwardsangell.com

Denise Seastone Kraft     dkraft@edwardsangell.com

Stephen W. Spence     tap@pgslaw.com;th@pgslaw.com

**04-52879-PJW Notice will not be electronically mailed to:**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | Case No. 02-10651 (PJW) |
| NHI, INC., | : | |
| | : | |
| _____Debtor._____ | : | Chapter 11 |
| NHI, INC., | : | |
| | : | |
| Plaintiff | : | Adversary No. 04-52879 |
| | : | |
| v. | : | |
| | : | |
| FLEETBOSTON FINANCIAL | : | |
| CORPORATION, KMR MANAGEMENT, | : | Related Docket No. 45 |
| INC., ROBERT RIESNER and | : | |
| WARING S. JUSTIS, JR., | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' REPLY BRIEF IN RESPONSE TO MEMORANDUM OF LAW OF PLAINTIFF NHI, INC. IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

EDWARDS & ANGELL, LLP
Stuart M. Brown (No. 4050)
Denise Seastone Kraft (No. 2778)
Mark D. Olivere (No. 4291)
919 Market St., 14th Floor
Wilmington, DE 19801
Tel. 302-777-7770
Fax 888-325-9741

Docket# 60
Date: 1/13/05

A00709

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................iii

I.    INTRODUCTION ..............................................................................................1

II.   ARGUMENT......................................................................................................2

      A.    Defendants Have Not Conceded That They Are Not Agents
           of Mercantile...................................................................................................2

      B.    NHI's Second Amended Complaint Establishes That The
           Defendants Were Agents of Mercantile...........................................................5

      C.    By NHI's Own Assertions, Defendants' Alleged Wrongdoing
           Arose Out Of The Loans To Mercantile, And So, Defendants
           Were Released ..................................................................................................8

      D.    Count XII Must Be Dismissed As Plaintiffs Have Not
           Adequately Pled That Defendants Fleet, Riesner and
           Justis Received Any Preferential Transfers .......................................................10

WLM_501201_1/MOLIVERE

A00710

## TABLE OF AUTHORITIES

### Cases

*BP Amoco Chem. Co. v. Sun Oil Co.,*
    166 F. Supp. 2d 984, 989 (D. Del. 2001) ........................................................................... 3

*Brooks v. Euclid Systems Corp.,*
    151 Md. App. 487, 827 A.2d 887 (2003) ......................................................................... 5

*Citibank, N.A. v. Data Lease Financial Corp.,*
    828 F.2d 686 (11th Cir. 1987) ................................................................................. 7, 8

*Corporate Property Associates v. Hallwood Group Inc.,*
    Del. Supr., 817 A.2d 777 (2003) ................................................................................. 9

*Fisher v. Townsends, Inc.,*
    Del. Supr., 695 A.2d 53 (1997) .......................................................................... 5, 6, 7

*Golub v. Cohen,*
    138 Md. App. 508, 772 A.2d 880 (2001) ......................................................................... 9

*HLI Creditor Trust v. Export Corp.,*
    313 B.R. 189 (Bankr.D.Del. 2004) ............................................................................. 11

*In re APF Co.,*
    308 B.R. 183, 188 (Bankr.D.Del. 2004) ......................................................................... 11

*In re The IT Group, Inc.,*
    313 B.R. 370 (Bankr.D.Del. 2004) ............................................................................. 11

*In re Valley Media,*
    288 B.R. 189, 192 (Bankr.D.Del.2003) ......................................................................... 11

*J.E. Rhoads & Sons, Inc. v. Ammeral, Inc.,*
    Del. Super., C.A. No. 83C-NO-98, 1988 WL 32012 (March 30, 1988) ........................ 5, 6

*Schrob v. Catterson,*
    948 F.2d 1402, 1405 (3d Cir. 1991) ............................................................................. 2

*Shear v. Motel Mgmt. Corp. of Amer.,*
    61 Md. App. 670, 487 A.2d 1240 (1985) .................................................................. 5, 6, 7

### Statutes

*11 U.S.C. § 547(b)(1)* ....................................................................................................... 10

WLM_501201_1/MOLIVERE

A00711

**Rules**

*Fed.R.Civ.P. 8(a)(2)*.................................................................................................. 10

*Federal Rules of Bankruptcy Procedure 7008*.......................................................... 10

WLM_501201_1/MOLIVERE

A00712

## I.    INTRODUCTION

In an astounding attempt to divert the Court's attention from the proper pleadings, issues and legal standard, the response of NHI, Inc. ("NHI" or "Plaintiff"), to the Defendants' Motion to Dismiss Second Amended Complaint (the "Motion") fails to address the repeated allegations of agency, and instead, attempts to distract the court by introducing irrelevant colloquy between counsel and the Court.  In order to properly refocus the issues currently before the Court, defendants Fleet Boston Financial Corporation ("Fleet"), KMR Management Inc. ("KMR"), Robert Reisner ("Reisner"), and Waring S. Justis ("Justis" and collectively with Fleet, KMR and Reisner the "Defendants"), hereby file this Reply Brief in Support of their Motion to Dismiss Second Amended Complaint.

As NHI states in their answering brief, Defendants Motion is premised upon many of the exact same arguments as their initial motion to dismiss the Amended Complaint.  Simply stated, this is because NHI has alleged Defendants are agents of Mercantile in their *third* attempt to file a complaint.  Had Plaintiffs removed the agency allegations before filing the Second Amended Complaint, none of this would be necessary.

Plaintiff's primary argument in its Answering Brief is based on the resolution of the previous Motion to Dismiss the Amended Complaint, as converted into a Motion for Summary Judgment by the Court, and the related colloquy at what was supposed to be a "Status Conference" as noted on the Plaintiff's agenda submitted to the Court.  At the "Status Conference", the Court directed Plaintiff to file a Second Amended Complaint that did not contain agency allegations.  Nonetheless, the Plaintiff filed a Second Amended Complaint with numerous agency allegations.

The present Motion to Dismiss focuses *only* on the allegations contained in the Second Amended Complaint and introduces an additional release discovered by Defendants since the previous motion to dismiss was filed. Although the Second Amended Complaint actually references the fact of a release of Mercantile, Plaintiff did not attach the agreements upon which the release was grounded. By not attaching the agreements upon which the release was grounded, Plaintiff thereby forced the Defendants to bring to the Court's attention the exact wording of the agreements upon which the release was grounded. Significantly, the exact wording of the release includes a release of Mercantile *and the agents of Mercantile*. Such a release of the agents, combined with the Plaintiff's allegations in the Second Amended Complaint that Defendants were agents of Mercantile, leaves no legal basis to bring this action against Defendants.

Plaintiff, NHI must stand behind and rely on the agency allegations contained in its Second Amended Complaint since the sufficiency of Plaintiff's claims have been challenged in the form of a motion to dismiss, the legal standard of which mandates that all well-plead facts are assumed to be true under a Rule 12(b)(6) motion to dismiss standard.

## II.     ARGUMENT

### A)     Defendants Have Not Conceded That They Are Not Agents Of Mercantile

Plaintiff's Answering Brief asserts that Defendants admitted they are not agents of Mercantile, premised on colloquy between the Court and counsel, and thus cannot establish that Defendants consented to an agency relationship. Once again, Plaintiff attempts to misdirect the Court. In a motion to dismiss, it is plaintiff's allegation in the complaint – not the allegations of the defendant – that are assumed to be true and all reasonable inferences are taken in favor of the plaintiff. *See Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir. 1991); BP Amoco Chem. Co. v.*

- 2 -

A00714

*Sun Oil Co., 166 F. Supp. 2d 984, 989 (D. Del. 2001). For purposes of their Motion to Dismiss,*

*Defendants and the Court are bound to accept as true NHI's allegations.*

The Second Amended Complaint is replete with instances whereby NHI alleges that

Defendants acted as Mercantile's agents. As alleged in the Second Amended Complaint, KMR,

Riesner and Justis did not operate independently and for the benefit of NHI. Instead, KMR,

Riesner and Justis acted as Mercantile's agents. Specifically, the Second Amended Complaint

alleges that:

- KMR, Riesner and Justis **made their primary priorities Mercantile's collateral realization** and KMR's collection of exorbitant and extorted consulting fees, while at the same time relegating NHI's business operations and viability as a going concern to distant secondary priorities, in direct contravention of the Consulting Agreement. [Second Amended Complaint ¶ 32.]

- Riesner and/or Justis were **in contact with Mercantile at least daily** during the term of the Consulting Agreement. [Second Amended Complaint ¶ 33.]

- KMR, Riesner and Justis continued on a concentrated course of action to pay Mercantile and KMR at the fastest possible rate without regard to the continuation of NHI's business, while stripping NHI of assets. **In collaboration with Krieger (Mercantile's workout manager)**, KMR, Riesner and Justis discontinued paying NHI's vendors, suppliers, health care claims and taxing authorities, removed critical employees from plant operations, shipped homes out of the plant prior to completion and with substantial defects, failed to complete homes in the field and **focused on short-term returns to Mercantile** and KMR, without any concern for the long-term impact on NHI, which were in fact ruinous to NHI's viability as a going concern. [Second Amended Complaint ¶ 46.]

- At the same time, although NHI was still only in technical default with Mercantile, KMR, Riesner and Justis systematically made payments to Mercantile the day after late fees and penalties were incurred. According to NHI, it was apparent that KMR, Riesner and Justis were not concerned with NHI's ability to continue as a going concern – rather, **the sole concern of KMR, Riesner and Justis was that Mercantile and KMR be paid.** [Second Amended Complaint ¶ 47.]

WLM_501201_1/MOLIVERE

**A00715**

- From October 2000 through January 2002, KMR, Riesner and Justis grossly mismanaged NHI's business; **made decisions which maximized cash flows to Mercantile and KMR**, while destroying NHI's relationships with its customers, suppliers, contractors, employees, etc., with the obvious result of destroying NHI as a viable going concern; violated the Consulting Agreement; breached their fiduciary duty and duty of loyalty by – rather than providing "turn around" management – **devising a stealth plan to strip NHI of all cash and assets before running NHI into liquidation, all for the sole benefit and at the direction of Mercantile,** and to the extreme detriment and prejudice of NHI and its shareholders and creditors. [Second Amended Complaint ¶ 59.]

- KMR, Riesner and Justis engaged in a scheme to defraud and to raid NHI for the purposes of stripping assets in satisfaction of bank debt and running down NHI to the point where NHI could only be liquidated **for the benefit of Mercantile** rather than turning the company around. [Second Amended Complaint ¶ 103.]

- Mercantile insisted on NHI hiring KMR, and then KMR placed NHI into an insolvent condition **in a fashion designed to protect only Mercantile.** [Second Amended Complaint ¶¶ 104, 111.]

- KMR, Riesner and Justis engaged in a scheme to waste the assets of NHI in order to liquidate it **for the benefit of Mercantile.** [Second Amended Complaint ¶ 110.]

As such, the Second Amended Complaint on its face can be construed in no way other than that

NHI alleges that Defendants acted as Mercantile's agents. Consequently, accepting NHI's

allegations as true, the Court must conclude that Defendants acted as Mercantile's agents and as

such, were released by NHI.

Further, for purposes of the motion to dismiss, the Court must look to the allegations

contained in the Second Amended Complaint. Plaintiff's reliance on colloquy is irrelevant and

out of context. At the December 3, 2004 "status conference" because Plaintiff made obvious

allegations of agency in repeated pleadings filed with the Court, yet stood before the Court and

contradicted these pleadings, the Court demanded that Plaintiff clarify for the record what they

were alleging in the Amended Complaint. In the Amended Complaint, Plaintiff unquestionably

- 4 -

A00716

alleged Defendants were agents of Mercantile, as noted by the Court. Subsequently, having

essentially forced the motion to dismiss the Amended Complaint to become moot, the Court

asked Defendants if they had anything further regarding the issue of agency. To that end,

Defendants stated that they did not wish to argue they were agents of Mercantile. This was

consistent with every pleading filed by Defendants in this matter, in which it was clearly set forth

that Defendants were accepting Plaintiff's agency allegations as true only for the purpose of

challenging the Amended Complaint under the required standard of accepting the pled facts as

true. The Court should not be led astray by Plaintiff focusing on issues not before the Court on

this Motion.

**B)** **NHI's Second Amended Complaint Establishes That The Defendants Were Agents of Mercantile**

When the focus is squarely on the actual Second Amended Complaint, and not the

potential unplead defenses of the Defendants, it is clear that NHI alleges that Defendants' were

agents of Mercantile. The essential elements of agency are that (1) the agent has the power to act

on behalf of the principal with third persons; (2) the agent acts at the behest and for the benefit of

the principal; and (3) the agent is subject to the principal's control. *See J.E. Rhoads & Sons, Inc.*

*v. Ammeral, Inc., Del. Super., C.A. No. 83C-NO-98, 1988 WL 32012 (March 30, 1988); accord*

*Brooks v. Euclid Systems Corp., 151 Md. App. 487, 827 A.2d 887 (2003).* Thus "[a]n agency

relationship is created when one party consents to have another act on its behalf, with the

principal controlling and directing the acts of the agent." *Fisher v. Townsends, Inc., Del. Supr.,*

*695 A.2d 53 (1997); see also Shear v. Motel Mgmt. Corp. of Amer., 61 Md. App. 670, 487 A.2d*

*1240 (1985)* (citing to the Restatement (Second) of Agency as explaining that "[i]t is the element

of continuous subjection to the will of the principal which distinguishes the...agency

agreement").

- 5 -

WLM_501201_1/MOLIVERE

**A00717**

Like the Amended Complaint, NHI's Second Amended Complaint is wholly premised on an agency relationship between Mercantile and the Defendants. Not only does NHI make express allegations that the Defendants were Mercantile's agents, but inherent in the wrongdoing for which NHI seeks relief is the allegation throughout the Second Amended Complaint that the Defendants acted under Mercantile's control and for their benefit.

The allegations in NHI's Second Amended Complaint clearly establish, if such allegations are taken as true, that the Defendants had "the power to act on behalf of the principal (Mercantile)." *J.E. Rhoads & Sons, Inc., 1998 WL 32012* at *4. NHI's claims against the Defendants are premised on the very notion that they acted "at the behest and for the benefit of the principal (Mercantile)." *J.E. Rhoads & Sons, Inc., 1988 WL 32012* at *4. The crux of NHI's claims that the Defendants breached their duties to NHI, is the allegation that the Defendants "were not concerned with NHI's ability to continue as a going concern – rather, the sole concern of KMR, Riesner and Justis was that Mercantile and KMR be paid," and that they devised a plan of wrongdoing "all for the sole benefit of Mercantile, KMR, Riesner and Justis." (Second Amended Complaint at ¶¶47, 59.) Thus the alleged wrongdoing for which NHI seeks relief is based upon the claim that the Defendants acted "for the sole benefit" of Mercantile. NHI cannot now deny the existence of this fundamental element of the alleged agency relationship.

Finally, the Second Amended Complaint contains express affirmation of the element of control that is crucial to the agency relationship. *See Fisher, 695 A.2d at 57; Shear, 487 A.2d at 1248 – 49.* For example, NHI's description of the relationship between the Defendants and Mercantile, in which "Riesner and/or Justis were in contact with Mercantile at least daily during the term of the Consulting Agreement," (Second Amended Complaint at ¶34) is consistent with

WLM_501201_1/MOLIVERE

A00718

an agency relationship. *See Fisher, 695 A.2d at 57; Shear, 487 A.2d at 1248 – 49; see also Citibank, N.A. v. Data Lease Financial Corp., 828 F.2d 686 (11th Cir. 1987).*

In *Citibank,* a debtor company pledged a voting block of stock in Miami Bank as collateral on a loan from *Citibank. 828 F.2d at 689.* After the company defaulted on the loan, Citibank exercised its rights to vote the Miami National stock, using them to change the composition of the company's board. *Id.* The stock was sold pursuant to a foreclosure action by Citibank, and the company made several affirmative defenses to the foreclosure alleging that the individuals Citibank installed on the Miami National board mismanaged the company, bringing about a dramatic decline in the value of the stock, and also named the individuals as third party defendants in its counterclaim. *Id.* After applying the Restatement (Second) of Agency, the Court overturned the district court's determination that the individual board members were not agents of Citibank, holding that "the agency relationship may be implied from a course of dealing," and that the evidence suggested that the board members were there "at the wishes of Citibank," and that they "worked in close coordination with Citibank." *Id. at 691.* Because the individuals were chosen by Citibank and because Citibank controlled their activities during their tenure on the board, the court held that they were Citibank's agents. *Id.*

Here, NHI has plainly alleged that the Defendants were present at the wishes of Mercantile, and that Mercantile controlled their activities. (Second Amended Complaint at ¶33, 47, 59.) Like the Board members in *Citibank,* the Defendants here are charged with their own individual wrongdoing in managing the company, but as in Citibank, this does nothing to diminish the fact that they allegedly served on behalf of a principal, and are therefore its agents. *Citibank, N.A., 828 F.2d at 692.* Like the board members in *Citibank,* the Defendants' worked closely with Mercantile, and had "contact with Mercantile at least daily," (Second Amended

- 7 -

WLM_501201_1/MOLIVERE

**A00719**

Complaint at ¶33.). As the court found in *Citibank*, the fact that the Defendants here were allegedly chosen by, and worked at the wishes of Mercantile, establish that they were its agents for purposes of deciding the present motion to dismiss NHI's Second Amended Complaint. *See Citibank, N.A., 828 F.2d at 692.*

### C.  By NHI's Own Assertions, Defendants' Alleged Wrongdoing Arose Out Of The Loans To Mercantile, And So, Defendants Were Released

NHI seeks to hold the Defendants liable for their actions in connection with a debt owed to Mercantile. Any claims brought by NHI against the Defendants for their actions on behalf of Mercantile could only arise out of the loans from Mercantile to NHI, including Mercantile's administration of the loans and the relationship with NHI. All such claims fall squarely within the broad release contained in the February 26, 2002 agreement, as incorporated by the October 30, 2003 agreement.

Pursuant to the release contained in the February 26, 2002 agreement, NHI:

> "forever releases and discharges the lender and the lender's officers, directors, employees, attorneys, and agents (collectively "the released parties") from any and all claims, causes of action, suits and damages...which any of the obligors jointly or severally, ever had or may now have of any kind or nature against any of the released parties arising out of or related in any way to any of the loans, the loan documents, the obligations or the collateral or the administration thereof....including but not limited to any and all claims based upon or relying on any allegations or assertions of duress, illegality, unconscionability, bad faith, breach of contract, regulatory violations, improper control of the companies or their affairs, negligence, misconduct, or any other tort, contract or regulatory claim of any kind or nature." [February 26, 2002 Agreement at Section 20.]

The release specifically includes a release of matters pertaining to improper control, breach of contract, breach of duty and any tort and contract claim of any kind. The release unambiguously includes the causes of action that are within the scope of the allegations in the Second Amended Complaint.

- 8 -

A00720

In its Second Amended Complaint, NHI makes clear that its claims are based on the acts of the Defendants in making "their primary priorities the paying down of NHI's debt to Mercantile and the collection of exorbitant and extorted consulting fees for KMR." [Second Amended Complaint ¶ 32.] NHI's claims are premised on the Defendants' actions vis-à-vis the repayment of loans owed to Mercantile, and their duties "arising out of and related" to those loans, and thus are well within the release. *See Corporate Property Associates v. Hallwood Group Inc., Del. Supr., 817 A.2d 777 (2003)* ("a general release is one which is intended to cover everything – what the parties presently have in mind, as well as what they do not have in mind….Such general releases are in common use….Their validity is unchallenged"); *Golub v. Cohen, 138 Md. App. 508, 772 A.2d 880 (2001)* ("When the scope of a release agreement is stated in clear and unambiguous language, the words utilized to express this breadth should be given their ordinary meaning as there is no room for interpretation") (internal quotations omitted).

NHI's argument that the "Cash Collateral Agreement does not and could not excuse Defendants' independent contractual and fiduciary duties to NHI"" [Answering Brief at p.13.] is similarly without merit. The February 26, 2002 Agreement released any claims in tort, contract or otherwise, "related in any way" to the debt relationship between NHI and Mercantile. In addition to the broad release language, all of NHI's claims against the Defendants, as plead in the Second Amended Complaint, relate to and arise out of the loans which are the subject of the release ratified by the Cash Collateral Agreement and, therefore, are clearly within its scope.

The first issue to be decided by the Court in this Motion is whether Plaintiff plead that Defendants were Mercantile's agents. Clearly, Plaintiff has pled agency. After determining that Plaintiff has pled agency, the Court should recognize the repeated release of Defendants by NHI

WLM_501201_1/MOLIVERE

A00721

in its February 26, 2002 and October 30, 2003 agreements and grant Defendants' motion to dismiss the Second Amended Complaint.

**D.    Count XII Must be Dismissed as Plaintiffs Have Not Adequately Pled That Defendants Fleet, Riesner and Justis Received Any Preferential Transfers**

Plaintiffs seek a reprieve from dismissal of the preference count by arguing that it is as specific as it can be "at this time." Regardless, the Court must dismiss the preference count as it pertains to Fleet, Riesner and Justis. *Federal Rules of Bankruptcy Procedure 7008*, provides in relevant part that "[a] pleading which sets for a claim for relief ... shall contain ... (2) a short and plain statement showing that the pleader is entitled to relief." *Fed.R.Civ.P. 8(a)(2)*. Furthermore, Section 547(b)(1) provides in relevant part that "the trustee may avoid any transfer of an interest of the debtor in property – (1) to or for the benefit of a creditor...." *See 11 U.S.C. § 547(b)(1)*. The Second Amended Complaint, however, fails to show that the alleged transfers were for the benefit of Fleet, Riesner or Justis, and has failed to show that the Plaintiff is entitled to relief from defendants Fleet, Riesner or Justis. In fact, Plaintiff's Answering Brief supports this position as it clearly states that "[t]he payments reflected in Exhibit 'B' were directed to and received by KMR." Answering Brief at 14.

The Second Amended Complaint further identifies the transferee of each alleged preferential transfer as "KMR Management." Under the applicable standard, the Court must accept all facts alleged in the Second Amended Complaint as true. Therefore, the Court must find that Plaintiff has inadequately plead against defendants Fleet, Riesner and Justis.

Additionally, this Court has stated in numerous decisions that preference actions require the pleading of specific factors, namely: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) *name of transferee* and (iv) the amount of the transfer." *See In re APF*

- 10 -

WLM_501201_1/MOLIVERE

**A00722**

*Co., 308 B.R. 183, 188 (Bankr.D.Del. 2004)* (emphasis added) (quoting (*In re Valley Media),*

*288 B.R. 189, 192 (Bankr.D.Del.2003); In re The IT Group, Inc., 313 B.R. 370 (Bankr.D.Del.*

*2004); HLI Creditor Trust v. Export Corp., 313 B.R. 189 (Bankr.D.Del. 2004); Valley Media Inc.*

*v. Borders, Inc., 288 B.R. 189 (Bankr.D.Del. 2003).* Thus, accepting as true all of the allegations

pled in the Second Amended Complaint, Count XII must be dismissed as to defendants Fleet,

Riesner and Justis as the Second Amended Complaint fails to identify them as transferees of any

preferential payment.

Dated: January 13, 2005                    EDWARDS & ANGELL LLP

Stuart M. Brown, Esquire (No. 4050)
Denise Seastone Kraft (No. 2778)
Mark D. Olivere (No. 4291)
919 N. Market Street
Wilmington, DE 19801
Tel: 302.777.7770
Fax: 302.777.7263

Counsel for Defendants
FleetBoston Financial Corporation,
KMR Management Inc.,
Robert Reisner and
Waring S. Justis

- 11 -

# UNREPORTED CASES

A00724

Westlaw.

Not Reported in A.2d                                          Page 1
1988 WL 32012 (Del.Super.)
(Cite as: 1988 WL 32012 (Del.Super.))

▷
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.

J.E. RHOADS & SONS, INC., a Delaware
corporation, Plaintiff,
v.
AMMERAAL, INC., a Delaware corporation, and
Ammeraal Conveyor Belting B.V., a
foreign corporation, Defendants.
AMMERAAL, INC., Third-Party Plaintiff,
v.
Edward K. MOL, Third-Party Defendant.

March 30, 1988.

Upon defendants Ammeraal, Inc. and Ammeraal
Conveyor Belting B.V.'s motion for summary
judgment, or in the alternative, partial summary
judgment. DENIED IN PART, GRANTED IN
PART. Upon defendants Ammeraal, Inc. and
Ammeraal Conveyor Belting B.V.'s motion for a
more definite statement in Counts II and III.
GRANTED. Upon defendants Ammeraal, Inc. and
Ammeraal Conveyor Belting B.V.'s motion to strike
and dismiss. DENIED.

Richard R. Wier, Jr., and Walter P. McEvilly, Jr.,
of Prickett, Jones, Elliott, Kristol & Schnee,
Wilmington, for plaintiff.

William D. Bailey, Jr., and Charles Gruver, III, of
Bayard, Handelman & Murdoch, P.A., Wilmington,
and Gerard B. Gallagher, and David L. Joslyn, of
Gallagher & Joslyn, Oakbrook, Illinois, for
defendants    Ammeraal,    Inc.    and    Ammeraal
Conveyor Belting, B.V..

William J. Marsden, Jr., of Potter, Anderson &

Corroon, Wilmington, and William H. Fallon, of
Miller, Johnson, Snell & Cummisky, Grand Rapids,
MI for third-party defendant Mol.

MEMORANDUM OPINION

GEBELEIN, Judge.

*1 Pending before the Court is a motion for
summary judgment, or in the alternative, partial
summary judgment, by defendants Ammeraal
Conveyor Belting B.V. (hereinafter "Belting") and
Ammeraal, Inc. (hereinafter "Ammeraal"), based on
plaintiff J.E. Rhoads & Sons, Inc.'s then-announced,
but not yet filed, second amended complaint. A
second amended complaint, then a third amended
complaint, have since been filed. The summary
judgment motion will be viewed in light of the final
complaint. Defendant also claims that the addition
of certain matters and the allegations concerning
one of the defendants come too late to give
sufficient notice to defendant under the State and
United States Constitutions.

*THE FACTS*

The litigation stems from the termination of a
long-standing arrangement between plaintiff and
Ammeraal under which plaintiff distributed
Ammeraal belting products in the United States.
Plaintiff served as the exclusive sales agent for
Ammeraal products from 1973 until 1981,
beginning with a letter agreement and later serving
"at will". (Depo. David Engler, pp. 59-61, Def.'s
Ex. 2).

In 1981, Ammeraal, Inc. was established by
Belting to increase sales in the U.S. (Depo. Roland
Oliemans, "Oliemans", pp. 12-13, Def.'s Ex. 3).
Ammeraal first was established as a wholly-owned
subsidiary of Ammeraal Nederland Beheer
(hereinafter "Nederland"). Nederland was a
wholly-owned subsidiary of Ammeraal Holding,
then the parent company of the entire Ammeraal
group. (Affidavit of Oliemans, para. 5, Def.'s Ex. 1).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 2
1988 WL 32012 (Del.Super.)
(Cite as: 1988 WL 32012 (Del.Super.))

A 1984 reorganization placed Ammeraal beneath Ammeraal International Beheer (hereinafter "International"), now the holding company for all companies in the group located outside of Holland. Ammeraal buys all of its products from International, a wholly-owned subsidiary of Nederland. Nederland is the sole shareholder of Ammeraal companies located in Holland, including the production and sales companies in the group. Belting owns all of the stock of its two subsidiary holding companies, Nederland and International. (Affidavit of Oliemans, ¶¶ 1-3 and 17, Def.'s Ex. 1). ("Belting" hereafter will refer to the parent company of the entire Ammeraal group before and after the reorganization, for purposes of clarity.)

When Ammeraal was established, Rhoads ceased to be the exclusive sales agent for Ammeraal products in the U.S.. After 1981, Rhoads and others ordered the product directly from Ammeraal, even though drop shipments were made to Rhoads direct from Holland. There is a dispute between the parties as to whether Ammeraal is a company separate and apart from its parent or whether it served as an agent of Belting in the United States.

In October of 1982, Ammeraal President Edward Mol signed a letter agreement with Rhoads Chairman David Engler. (Second amended complaint, Ex. A). The agreement basically required Rhoads to sell Ammeraal products exclusively and prohibited it from selling competing products. The agreement was to last throughout 1983, and was to be continued on a year-to-year basis unless either party submitted a 90-day termination notice, prior to year end, in writing.

In July 1982, Ammeraal President Mol wrote to Rhoads Chairman David Engler outlining a new marketing concept for Ammeraal products. (Second amended complaint, Ex. B). Addressing Rhoads' concern that Ammeraal would eliminate distributors and market through its own direct sales force, Mol wrote that he could not "anticipate this *ever* occurring." Mol further expressed his intent to continue Ammeraal's policy of never discharging a person who had built up a sales territory.

*2    On February 28, 1983, Rhoads' then-vice-president, Ken Bull, forwarded to Ammeraal a list of Rhoads' distributors so that

marketing efforts would not be duplicated. Bull said Rhoads had contact with all of the distributors on the list, but that some of them probably did not sell Ammeraal products. (Bull Depo. p. 193, Def.'s Ex. 5). He stated that he did not recall a formal agreement that the list would not be used in marketing by Ammeraal (Bull Depo., pp. 193-94). However, he also stated that there was a request to "leave our accounts alone". (Bull Depo., p. 193).

In September of 1983, Mol was removed from his position as Ammeraal's president, and from his position on the company's board of directors, allegedly for refusing to follow the board's marketing plan. (Oliemans Depo., pp. 71-72, Def.'s Ex. 6). The following month, Mol was named a vice-president of Rhoads. (Mol Depo., p. 3-4, Def.'s Ex. 7).

An October meeting between Rhoads' representatives Jack McGough and Paul O'Connor and Ammeraal Holding Company (Belting) and Ammeraal Board Member, Roland Oliemans, precipitated a second meeting of the parties in November. At the second meeting, the distributorship relationship between the two companies was terminated. The following day, November 17, 1983, Oliemans sent a letter to Rhoads' President McGough confirming the termination. (Complaint, Ex. C). Oliemans and Ammeraal employee Manuel Brentagani (attending the November 16 meeting) both testified they were unaware of the 1982 letter agreement when the relationship was terminated. (Oliemans Depo., pp. 69-70, Def.'s Ex. 10 and Brentagani Depo., p. 17, Def.'s Ex. 10). This is in dispute.

On November 17th, Ammeraal employees contacted Rhoads customers and distributors (listed on the aforementioned distributor list provided by Rhoads) to inform them of the termination and to offer to sell them the product directly. The customers, to include M & M Mars, were told that Ammeraal no longer would be supplying products to Rhoads. (Depo. Jan Brown, p. 44, Def.'s Ex. 12).

*THE ALLEGATIONS*

Plaintiff originally filed suit against defendant Belting in Counts I-III, alleging that Belting, as the alterego of Ammeraal, willfully and in bad faith

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A00726

Not Reported in A.2d
1988 WL 32012 (Del.Super.)
(Cite as: 1988 WL 32012 (Del.Super.))

breached the contract by: 1) failing to provide timely written notice in accordance with the 1982 contract, rendering the termination ineffective and the agreement renewed for another year; 2) failing to ship goods and materials ordered by Rhoads and accepted by defendant, damaging Rhoads' business reputation and goodwill with its customers; and 3) willfully engaging in a course of conduct designed to destroy plaintiff's business reputation, customer relations and competitive position (to include misrepresentation and preferential pricing for Ammeraal). Count IV charged Ammeraal, as the alleged alter ego of Belting, and Belting, with conspiring to improperly solicit and interfere with Rhoads customers, providing preferential pricing and engaging in other misconduct and unfair competition.

Plaintiff's first complaint sought a declaration that the termination of the parties' distributorship agreement was invalid and that the distributorship agreement remains in effect. It also sought compensatory and punitive damages for the purported injury to its business reputation and goodwill, and for its loss of profits due to tortious interference in and disparagement of Rhoads' business and employment relationships. Finally, it sought attorneys' fees and court costs.

**\*3** The second amended complaint, filed on December 2, 1987, alleged intentional breach of contract in Count I, tortious breach of contract and damage in Count II, and consumer fraud and deceptive trade practices in violation of 6 *Del.C.* § 2501 *et. seq.* in Count III. All counts were against both defendants.

On December 8, 1987, plaintiff filed its third amended complaint, naming defendant Ammeraal as the agent of Belting. It alleged in Count I that both defendants intentionally breached the distributorship contract. Count II alleges violation of the Delaware Deceptive Trade Practices Act. 6 *Del.C.* § 2531 *et seq.* Count III alleges violation of Delaware's Uniform Trade Secrets Act, 6 *Del.C.* § 2001 *et. seq.*, due to alleged misappropriation of Rhoads' trade secrets and confidential proprietary information (list of Rhoads' customers, secrets and information on Mars obtained in January 1983; compilation of information on Rhoads' customers and prices.) Count IV alleges that defendants

engaged in unfair competition and intentionally and improperly interfered with Rhoads' existing and prospective business relations. Rhoads seeks compensatory and punitive and treble damages; costs; interest; and attorney's fees.

Defendant moved for summary judgment on October 20, 1987, on the basis of the then-expected second amended complaint. First, it contended that Belting should be dismissed as a defendant since it was not a signatory to the October 25, 1982 agreement and since Ammeraal is not its agent, but a separate corporate entity. Second, it asserted that there was no evidence showing that any of the allegations listed in revised Count IV rose to the level of unfair competition. Defendant also asserted that plaintiff's desired remedies were without basis; specifically, defendants contended that plaintiff was not entitled to a declaration that the distributorship agreement remains in force; that damages should be limited to Ammeraal's failure to give a 90-day notice of termination; that defendant should not be allowed damages based on speculative sales projections; and that plaintiff was not entitled to an award of punitive damages.

Defendant in a December 22, 1987 letter informed the Court that on the basis of the third amended complaint, the questions raised by the summary judgment motion remain at issue, with the exception of the following: 1) the question of whether the distributorship agreement remains in force; and 2) the allegation that there is no evidence to support plaintiff's prayer for recovery for damage to its business reputation and goodwill.

As a preliminary matter, this Court will GRANT summary judgment to defendant only if the pleadings and record show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Superior Court Civil Rule 56(c). Any doubts as to the existence of genuine issues of fact will be resolved against the moving party. *See, e.g., Reiver v. Murdoch & Walsh, P.A.,* D.Del., 625 F.Supp. 998, 1004 (1985).

*THE AGENCY RELATIONSHIP*

**\*4** Turning first to the issue of agency, defendants allege that Belting should be dismissed as a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1988 WL 32012 (Del.Super.)
(Cite as: 1988 WL 32012 (Del.Super.))

Page 4

defendant since it was not a signatory to the October 1982 agreement and since Ammeraal is not an agent of Belting but rather, a separate corporate entity.

Plaintiff, on the other hand, asserts that Ammeraal acted as Belting's agent since Belting formulated a long-term plan and a pricing policy for Ammeraal, supplied employees to Ammeraal, participated in limited hiring decisions for Ammeraal, prepared the 1984 budget for Ammeraal, and demonstrated other indicia of what plaintiff termed routine implementation of Belting's business decisions through Ammeraal.

Agency is a legal relationship which depends upon the existence of required factual elements or situations. 2A C.J.S. *Agency* § 5. An essential element of agency is that the agent has the power to act on behalf of the principal with third persons. The agency can be express or implied. *Id. See also, Billops v. Magness Const. Co.,* Del.Supr., 391 A.2d 196 (1978). The principal must manifest, by words or conduct, that the agent shall work for him. 2A C.J.S. *Agency* § 36. An essential factor in the relation of principal-agent is that the agent do something at the behest and for the benefit of the principal. *Id.* § 5. The right to control the conduct of an agent is the test of agency. *Id.* at p. 6.

In a corporate setting, the issue of liability rests on the amount of control the parent corporation exercises over the actions of the subsidiary. *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.,* D.Del., 658 F.Supp. 1061 (1987). The parent will be liable for its subsidiary's activities only if the parent dominates those activities. *Id.* at 1084. The control must be actual, participatory and total. *Japan Petroleum Co. Nigeria v. Ashland Oil, Inc.,* D.Del., 456 F.Supp. 831, 841 (1940). Factors to consider in determining "domination" include "stock ownership, officers and directors, financing, responsibility for day-to-day operations, arrangements for payment of salaries and expenses and origin of subsidiary's business and assets." *Id.* at 841; *Phoenix,* 658 F.Supp. at 1084; *Fish v. East,* 10th.Cir., 114 F.2d 177, 191.

Case law requires a strong showing of control by the parent to find it to be a principal to its subsidiary. For instance, in *Phoenix,* the court held that the parents were not liable for the activities of their subsidiaries despite the following: (1) they were wholly owned by the parent; (2) there were officers and directors common to the boards of both parent and subsidiary; (3) the parent corporations were involved in substantial financial decisions of the subsidiaries. *Phoenix,* 658 F.Supp. at 1061. In support of the finding that there was no principal-agent relationship, the court cited the facts that each subsidiary kept books and records separate from the parent; maintained its own bank accounts and paid its own taxes; maintained its principal places of business in Ecuador, and was completely responsible for its day-to-day activities.

In the breach of contract action litigated in *Japan,* the Court likewise found that no agency relationship existed between the subsidiary and parent, despite evidence of joint operations. There, the parent was found to have actively aided the startup of the subsidiary, both administratively and monetarily. Most of the officers and directors were the same. *Japan,* 456 F.Supp. at 842-43. The parent approved all expenditures of the subsidiary over $250,000; provided consulting services to the subsidiary; paid the salaries of all the subsidiary's non-Nigerian employees; guaranteed three major bank loans of the subsidiary; and reported in its annual report that the operations of the subsidiary were those of the parent. *Id.*

**\*5** The Court determined that despite these factors, there was sufficient indicia of separate corporate ownership to find against a principal-agent relationship. Among other factors, it found the subsidiary to be an operating corporation with its own obligations and rights in Nigeria. It also noted the Nigerian government's extensive control over the subsidiary's operations. *Id.* Further, the subsidiary had its own bank account and separate, substantial book value; it repaid bank loans; it hired its own employees; and it debited its accounts for salaries paid by the parent. *Id.* at 844- 45. It also had a substantial source of independent corporate assets. *Id.* at 845.

To support its assertion that Belting, as principal, controlled Ammeraal, plaintiff sets forth the following facts. First, it submits the testimony of Belting's chairman, Roland Oliemans, that the parent company formulated overall strategy for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A00728

Ammeraal (Plain.'s brief at 15-16, extract of Oliemans Depo.). Second, it asserts that management personnel were routinely assigned by Belting's chairman to Ammeraal. For instance, Japp Romers was assigned to Ammeraal from International in 1982, but remained an employee of International and took directions from Gerald Fit of International, instead of Ammeraal's president. (Depo. of Jaap Romers, pp. 91-92, Plain.'s Ex. 11). Gerald Fit testified that as an International employee, he ran training for International and set pricing schedules for Ammeraal (Depo. of Gerald Fit, at 41-43, Plain.'s Ex. 5). Mr. Fit further testified that he was directed by the International chairman to serve as managing director in the United States while remaining an International employee. (Depo. Fit, pp. 40-42).

Ammeraal employee, Jonathan Spicer, testified that he was told by International employee Jaap Romers that if "Ammeraal, meaning Ammeraal Netherlands, and Rhoads cannot work out the situation, there's a possibility that Rhoads will discontinue work with Ammeraal" (Depo. Spicer, p. 119, Plain.'s Ex. 13). Plaintiff asserts that this provides some evidence that the parent directed the breach of contract. The Executive Board of Ammeraal Holding studied and formulated a worldwide approach to the M & M Mars account. (Depo. Fit, p. 73). Former Ammeraal president Edward Mol implemented instructions from Mr. Oliemans to seek marketing information for Nederland from plaintiff on the Mars account in order for Nederland to prepare a worldwide corporate approach to Mars; Mol was not privy to the policy. (Depo. Mol, p. 60, Plain.'s Ex. 8).

There is some evidence to show that other Belting employees handled Ammeraal affairs. Johannes Van der Linden, Belting's chief financial officer and board member, arranged banking matters for Ammeraal, hired Ammeraal's financial officer and prepared Ammeraal's 1984 budget. (Depo. Van der Linden, pp. 7, 20, 21). There has been no evidence produced on the subsidiary's book value or separate corporate assets.

**\*6** The plaintiff asserts that the forgoing at least raise a factual question as to whether Belting controlled the day-to-day activities of Ammeraal and used it for its own benefit in its dealings with

plaintiff. The defendants dispute this assertion, stating that Ammeraal is an independent corporation, separate and apart from Belting and as such, should be dismissed from all counts since none of the offenses charged were performed by Belting and its agents.

It must be noted that despite Rhoads' principal-agent argument in its answering brief and third amended complaint, it had asserted in its original complaint that Ammeraal is the alter ego of Belting. Accordingly, defendant in its brief addressed the original issue of whether Ammeraal is the alter ego or instrumentality of Belting and consequently drew heavily upon the equitable cases of "piercing the corporate veil". Under the principle of "alter ego", the "actor" is not an agent, but a tool used by the principal. *Plunkett v. Nationwide Mut. Ins. Co.,* Conn.Supr.Ct. Errors, 187 A.2d 754, 756 (1963).

The Court in *Phoenix, supra,* at 1061, recognized and discussed *two* theories of liability under which a parent corporation may be held responsible for the obligations of its subsidiaries. The first utilizes the equitable terms of "pierce the corporate veil", "alter ego" or "instrumentality", imposing liability on the parent only upon a showing of fraud or some inequity. *Id.* at 1084. The second is based upon the principles of agency, without reference to fraud or inequity. *Id.* Therefore, the courts do recognize that a corporation may be the principal to its agent subsidiary. We, therefore, will review defendants' equitable arguments and supporting cases only for the purposes of analogy.

Contending that Ammeraal is not a mere instrumentality or agent of its parent, Belting, defendant states that Ammeraal has its own directors, officers and records and is required to pay for its product as purchased. It also maintains its own bank accounts and liabilities, employees and auditors. (Affidavit of Oliemans, ¶¶ 7, 14-21, Def.'s Ex. 1). *See, Pauley Petroleum v. Continental Oil Co.,* Del.Ch., 231 A.2d 450 (1967), aff'd Del.Supr., 239 A.2d 629 (1968). Thus, by extension, Ammeraal controls its own affairs, according to defendants.

Equity dictates that corporate entities will be ignored to defeat a fraud, wrong or injustice, if a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1988 WL 32012 (Del.Super.)
(Cite as: 1988 WL 32012 (Del.Super.))

Page 6

corporation's affairs are conducted so as to make it a mere instrumentality of the other. *Pauley,* 239 A.2d 450. However, the "mere instrumentality" rule is invoked cautiously. Mere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity. *Skouras v. Admiralty Enterprises, Inc.,* Del.Ch., 386 A.2d 674 (1978). Further, sole ownership of stock and common directors and officers between the parent and subsidiary are only some factors to be considered in determining whether or not the corporate fiction should be disregarded and the shareholders held liable. *Scott-Douglas Corp. v. Greyhound Corp.,* Del.Super., 304 A.2d 309, 314 (1973). In sum, it takes a very strong case to induce a court to consider two corporations as one on account of one owning the capital stock of the other.

Defendant alleges that even if plaintiff's statements regarding Belting's hiring of employees and making of business decisions were true, it would not be enough to allow the corporate identity of a parent and subsidiary to be ignored. Again, the Court is not jurisdictionally qualified to pierce the corporate veil and to therefore ignore the entity; to hold shareholders liable; or to find the two corporations as one. However, these cases are instructive in that they highlight the high level of control the first corporation must exert over the second before the second will be found to be without independence, to have only derivative authority or to act only for the first corporation's benefit.

*7 Despite these high standards, agency relationships have been found to exist between large entities, as opposed to individuals. One example is *Billops v. Magness Construction Co.,* Del.Super., 391 A.2d 196 (1978), which involved allegedly tortious conduct (as opposed to the breach of contract claim in plaintiff's Count I) of the banquet manager of the Brandywine Hilton, a franchisee of the national Hilton chain. The court there found that because the franchise agreement gave the franchisor the right to exercise control over the daily operations of the franchisee, there was a triable issue of fact as to whether an actual agency relationship existed. *Id.* at 197-98. In finding support for day-to-day control, the court cited a very particularized operating manual, the franchisor's right to enter hotel premises for

inspection, and the ability to terminate the agreement for failure to comply with the manual requirements. *Id.* The Court also found that there was a question of apparent agency (manifestation by alleged principal, Hilton, which creates a reasonable belief in the third party that the agent is authorized to bind the principle). *See also, Smith v. New Castle County Vo-Tech Sch. Dist.,* D.Del., 574 F.Supp. 813 (1983) (Summary judgment precluded on the basis that a jury could find that plaintiff relied upon some indicia of authority from the district that Leonard possessed authority to contract on the district's behalf.)

Defendant argues that its alleged conduct did not rise to the level of control cited in *Billops,* and that the decision to terminate the contract (the alleged breach) was made solely by Ammeraal's Board. However, plaintiff has cited sufficient facts to the contrary to produce the small measure of evidence necessary to rebut summary judgment on the agency relationship. We make no comment on the strength of that evidence.

Defendant correctly asserts that plaintiff did not dispute its assertion that there was no duty on the part of Belting not to sell to Ammeraal at a lower price than it would to Ammeraal's customer, Rhoads. As this is not addressed in the third amended complaint, the point is now moot. Thus, summary judgment as to the issue of agency must be DENIED.

### UNFAIR COMPETITION

Defendants next move for summary judgment on the basis that the alleged acts of unfair competition in Count IV do not rise to the level of unlawful competition. Note that *6 Del.C.* § 2532(c) provides that the deceptive trade practices statute does not affect unfair trade practices otherwise actionable. Accordingly, despite a 1975 holding that the act codifies the common law of unfair competition, cases decided after 1975 continue to recognize the similar tort of interference with an existing contract and with probable future contractual relationships, derived from the common law rule against restraint of trade. *See, Young v. Joyce,* Del.Super., 351 A.2d 857, 859 (1975); *see also, DeBonaventura v. Nationwide Mut. Ins.,* Del.Ch., 419 A.2d 942 (1980) ; *aff'd.* Del.Super., 428 A.2d 1151 (1981).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A00730

Not Reported in A.2d
1988 WL 32012 (Del.Super.)
(Cite as: 1988 WL 32012 (Del.Super.))

Page 7

The elements of the tort of interference with an existing contract are as follows:

*8 (a) an intent to induce a breach (b) of an existing contract, (c) proximate causation, and (d) damages. [A] showing of deliberate interference with a prospective business opportunity requires (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interest in a fair and lawful manner, *Bowl-Mor Company, Inc. v. Brunswick Corp.*, Del.Ch. 297 A.2d 61 (1972), and *Regal Home Distributors, Inc. v. Gordon*, Del.Super., 66 A.2d 754 (1949). *DeBonaventura*, 419 A.2d at 947.

Count IV of the third amended complaint charges defendants with intentionally and improperly interfering with Rhoads' existing and prospective business relations. It supports the allegation with nine specific points, all of which are disputed.

Defendants assert that even if the allegations were true, the parties became competitors when their relationship ended. Thus, they claim Ammeraal was entitled to privileges per the *Restatement of Torts* 2d, § 768, as follows:

Competition as Proper or Improper Interference

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will (in other words, one cannot cause the third party to breach his legal duty to his competitor).

There are material issues of fact as to whether defendant meets the requisites of § 768(b)-(d). Thus, summary judgment is precluded on the issue. A factual dispute also precludes summary judgment on the issue of whether Ammeraal misrepresented Rhoads' capability to service customers.

* * *

Defendants correctly assert that plaintiff did not address the arguments in their opening brief that there was no evidence to support the allegation that defendants mailed the preliminary injunction to Rhoads' customers; that defendant cancelled a Rhoads sales meeting with M & M Mars or that Ammeraal had any duty not to purchase from Belting at less than the price available to Rhoads. Thus, summary judgment is GRANTED on those issues.

*DAMAGES FOR BREACH OF CONTRACT*

Defendant next argues that plaintiff's damages in Count I should be limited to those damages proximately caused by defendant's failure to give notice of termination within 90 days of December 31, 1983; specifically, any damages awarded to plaintiff for breach of contract should compensate it for harm suffered in 1984. Plaintiff asserts that termination following proper notice is not the issue; rather, that Rhoads sustained extraordinary damage due to pulling "its line by ambush without notice and cutting off Rhoads' supply abruptly." Plaintiff further alleges that violation of the covenant of good faith and fair dealing requires that Ammeraal be denied the protections of the limitation, and that defendants must be liable for incidental and consequential damages following breach.

*9 Compensation to one injured by a breach of contract should be such as to place him in the same position he would have been in if the contract had been performed. *J.J. White, Inc. v. Metropolitan Merchandise Mart*, Del.Super., 107 A.2d 892, 894

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1988 WL 32012 (Del.Super.)
(Cite as: 1988 WL 32012 (Del.Super.))

Page 8

(1954). This includes compensatory damages, given for the net amount of losses caused and gains prevented, in excess of savings made possible. 5 *Corbin on Contracts* § 992. Compensatory damages are limited to those "caused by the breach". *Id.* Since the purpose of damages is to put plaintiff in as good a position as he would have been in without the breach, the Delaware law does not allow future profits as damages for a period beyond the termination date of the contract sued upon. *Tanner v. Exxon,* Del.Super., C.A. No. 79C-JA-5 at 7, Stiftel, J. (July 23, 1981). This is because termination automatically extinguishes the relationship between the parties. *Id.* By analogy, 6 *Del.C.* § 2-713 provides that the measure of damages for repudiation by the seller is the cost of cover and incidental and consequential damages. The buyer may recover any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise. 6 *Del.C.* § 2-715(2)(a). Incidental damages resulting from the seller's breach include any commercially reasonable charges, expenses or commissions connected with effecting cover and any other reasonable expense related to delay or breach. 6 *Del.C.* § 2-715(1).

Plaintiff alleges that recovery should take four to five years due to loss of a major product line, and incidental and consequential damages sustained should extend beyond the period the contract would have remained in force after cancellation (December 1984). Based on the foregoing, "future profits" for straight contractual breach should be recoverable only through 1984; but incidental and consequential damages could extend beyond that period if proved to be due solely to the breach of the notice provision. This may be extremely difficult to establish and plaintiff should be aware that damages may well be limited to those suffered up to December, 1984.

Plaintiff further asserts that defendant is liable for damages resulting from its bad faith termination, notwithstanding any contractual provision with respect to notice.

**\*10** The cases cited for denying to defendant the protection of the one-year cut-off after failure to give notice differ somewhat from the case before

the Court. In *Bak-A-Lum Corp. of America v. Alcoa Bldg. Prod.,* N.J.Supr., 351 A.2d 349 (1976), plaintiff orally agreed to act as the exclusive area distributor for defendant; the agreement was terminable at will, without cause. The Court found that the agreement was terminable without cause only on reasonable notice, and that a determination of the period of reasonableness was significantly influenced by defendant's failure to inform plaintiff of its intent to terminate the exclusive distributorship while encouraging expansion of warehouse space for defendant's goods. *Id.* at 350, 352. Damages were limited to losses for the reasonable notice period, held to be 20 months. *Id.* at 352, 353.

In *Parade Oil Co. v. Phillips Petroleum,* Del.Ch., 320 A.2d 769 (1973), *aff'd.* Del.Supr., 343 A.2d 610 (1975), a franchised gas distributor was granted a preliminary injunction against termination of the relationship by the petroleum company. Prior to entry into the contract, plaintiff was told that once defendant entered a market it never retreated from it and that it was looking for a long-term outlet for its products. *Id.* at 771. (Plaintiff here also was given the impression that defendant was looking for a long-term outlet for its products.) Despite these promises, contracts were entered for a stated term of one year. *Id.* They could be terminated by either party upon ninety days notice to the other. *Id.* at 773. Defendant withdrew from the region due to lack of business. *Id.* The court noted that where parties provide by express language that the contract may end at the option of either party, upon notice and without cause, such stipulation generally will be upheld. *Id.* However, the rule is subject to the qualification that termination shall not be contrary to equity and good conscience, particularly as applied to dealers or distributors under a franchise agreement. *Id.* In *Paradee* found that plaintiff demonstrated a probability of success in proving that defendant was attempting unjustly to terminate and refuse to renew the relationship in bad faith or without just cause within the meaning of the Franchise Security Law, regardless of the language of yearly contracts, the injunctive relief was granted. *Id.* at 776. Damages were not addressed.

The contract in the instant case did not involve a franchise, as in *Paradee,* although plaintiff was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A00732

Not Reported in A.2d
1988 WL 32012 (Del.Super.)
(Cite as: 1988 WL 32012 (Del.Super.))

Page 9

given to believe that the contract would not be terminated without cause. The contract was not terminable at will, as in *Bak-A-Lum;* rather, it clearly required 90-day notice of termination before the end of December before the contract went into effect for another year. There is no indication that either party was mistaken or uninformed as to the meaning of the contractual language.

Based on the foregoing, damages in the contract action must be limited to defendant's failure to give notice of termination within ninety days of December 31, 1983, plus exemplary damages, if found to be applicable. The court notes that plaintiff has failed to allege that the notice provision was modified by any subsequent course of conduct.

\* \* \*

**\*11** Defendants next assert that Rhoads should not be allowed to recover damages based on speculative sales projections prepared by its management. Specifically, defendants dispute the projected $1.7 million sales figure for Ammeraal's product in 1984, an approximate 70% increase over 1983 attributable to new business generated by an expanded sales staff, better prices from Ammeraal, and increased sales. Projections for 1985 are $2 million; for 1986 $2.2 million. The latter projections are based on the first.

Because we must view the evidence and inferences in a light most favorable to the non-moving party, this Court finds that Rhoads' pre-termination sales history, post-termination performance and market assessment provide some basis for the sales projections. The Court cannot determine at this point that evidence is so meager or uncertain as to afford no reasonable basis for inference. *See, Tanner, supra,* at 5; *Restatement Contracts 2d* § 352. Of course, if the first figure is proven to be unsupportable, the latter two would be without basis, if the facts are as stated. Thus, this issue of damages must await development of the evidence at trial.

\* \* \*

Next, defendant asserts that there is no evidence to show that defendant's conduct is willful and wanton, such as to justify punitive damages for breach of

contract. Summary judgment is precluded on this point as there is an issue of fact as to whether Ammeraal was aware of the contract before it was terminated, as to whether the termination was intentional or malicious and as to whether defendants intended to injure plaintiff by terminating the relationship and to thereafter solicit its customers. Where breach amounts to an independent, willful tort, exemplary damages may be available. 2 Am.Jur.2d *Damages* § 245. Of course defendant may move for a directed verdict on this issue if evidence at trial supports its view of the facts.

Defendants finally argue that they are entitled to summary judgment as to plaintiff's request for attorney's fees.

It is the general rule in Delaware that attorney's fees cannot be awarded unless authorized by statute or contract. *Honaker v. Farmer's Mutual Insurance Co.,* Del.Super., 313 A.2d 900, 904 (1973).

Attorney's fees may be awarded under limited circumstances per 6 *Del.C.* § 2004 and 6 *Del.C.* § 2533(b). Defendants' motion is, therefore, precluded on this basis.

*THE AMENDED COMPLAINTS*

Defendants, in addition to the summary judgment motion, assert that the addition of certain matters and the allegations concerning one of the defendants in the amended complaint come too late and are insufficient to give adequate notice under the Fourteenth Amendment of the U.S. Constitution and Article 1.9 of the Delaware Constitution, and that they do not conform to Rules 1, 15 and 9. Defendants state that they were unaware of the changes until November 30, 1987. Trial is set for April 5, 1988.

The specific late claim contested is the allegation that defendants violated the Consumer Fraud and Deceptive Trade Practices Act, the underlying allegations of fraud, and the claim for treble damages. Defendants state that plaintiff did not plead fraud with required specificity. Rule 9(b). Defendants also protest the new complaint's allegation that Ammeraal and Belting breached the distributorship agreement. The first complaint

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A00733

Not Reported in A.2d
1988 WL 32012 (Del.Super.)
(Cite as: 1988 WL 32012 (Del.Super.))

Page 10

alleged that only Belting terminated the agreement. (The memorandum does not address Count III of the last complaint, alleged violation of the Uniform Trade Secrets Act, as the third complaint was filed after the memorandum.)

**\*12** At oral argument before this Court, plaintiff asserted that the new allegations arise out of the same transaction and facts previously pled.

Superior Court Civil Rule 9(b) requires that all averments of fraud shall be stated with particularity; malice, intent, knowledge and other condition of mind of a person may be averred generally. The purpose is to apprise the adversary of the acts or omissions by which it is alleged that a duty has been violated. *Mancino v. Webb,* Del.Super., 274 A.2d 711 at 713 (1971).

In *Nutt v. A.C. & S., Inc.,* Del.Super., 466 A.2d 18 (1983), plaintiffs basically and generally alleged that defendant suppliers of asbestos misled them into believing it was safe to work near asbestos and therefore cost them causes of action against third party health care providers due to conflict with a workers' compensation provision. The Court noted that fraud must be pled with sufficient particularity so that parties know what claim was adjudicated. The "circumstances" that must be plead with particularity under Rule 9(b) include the time, place and circumstances of the false representations, as well as the identity of the person making them, according to the Court. *Id.* at 23. The Court found the complaint at issue to be deficient because it did not allege when the purported misrepresentation occurred, when the harm was discovered, what medical-related information was concealed, and which third parties would have incurred liability to the plaintiffs, but for the fraud. The Court ruled that it may not be necessary for all evidence of fraud to be disclosed, but that it was essential that the precise theory of fraud, with supporting specifics, be laid out so as to notify the other party.

In the instant case, the pleading is far more defined than in *Nutt.* The basis for the allegations of deceptive trade, misappropriation and improper interference with Rhoads' business relationship are enumerated in the third amended complaint so as to effectively notify defendant of the acts and omissions of which it is accused. Although

plaintiff could more specifically delineate the individual defendant or agent and the date of each alleged act, the basic requisites of Rule 9(b) are met, as to the requirements of adequate notice. The Court addresses the need for a more definite statement later in this opinion.

Defendant also opposes the addition of Ammeraal as a party to the alleged breach of contract in Count I of the third amended complaint. (Note that the first amended complaint charged Ammeraal with various offenses in a single, separate count, as the alter ego of Belting.) An amendment changing the party against whom a claim is asserted relates back if the amended pleading arose out of the conduct or transaction set forth in the original pleading and if the party to be brought in had sufficient notice so as not to be prejudiced in a defense and knew or should have known, but for a mistake, the action would have been brought against him. Rule 15(c). The Court shall freely allow pleadings to be amended when the presentation of the merits of the action shall be subserved thereby and the objecting party fails to show the amendment will cause him undue prejudice in defending the suit. Rule 15.

**\*13** Here, it is clear that Ammeraal had notice of the suit and claim, as it already was a party defendant. It also was a signatory to the contract allegedly breached, a count included in all previous complaints. As the alleged alter ego of Belting, Ammeraal may also have an identity of interest with Belting that conceivably would have made it a defendant in the count, regardless of any mistake or failure to specifically include it in the count. *See,* e.g., *Hess v. Carmine,* Del.Super., 396 A.2d 173 (1978) (leave to amend should be granted in cases of identity of interest, as with corporation having same directors, officers). Based on the foregoing, defendant has not proved lack of adequate notice or prejudice concerning its inclusion in Count I.

The Court also must determine if plaintiffs have been "inexcusably careless" in failing to file a timely motion to amend. *See Hess,* 396 A.2d 173. If plaintiff's own inexcusable neglect was responsible for failure to name the correct party or if the amendment will unfairly prejudice the opposing party, it will not be allowed. *Id.* at 176. Plaintiffs here have been guilty of delay, since Ammeraal was the original signatory on the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A00734

Not Reported in A.2d
1988 WL 32012 (Del.Super.)
**(Cite as: 1988 WL 32012 (Del.Super.))**

contract, and plaintiff thus knew of the facts on which the proposed amendment was based before filing the original complaint. However, there is no evidence of improper motive or prejudice to defendant. *Id.* at 177. Under the general standard enunciated by the U.S. Supreme Court in *Foman v. Davis,* 371 U.S. 178 (1962), leave to amend should be freely granted unless there is evidence of undue delay, bad faith or dilatory motive on the part of the movant; repeated failure to cure deficiencies; prejudice; futility or the like.

Plaintiff's counsel is guilty of serious delay. However, in the absence of evidence of prejudice or bad faith, delay is insufficient reason to deny leave to amend. *Chrysler Corp. v. New Castle County,* Del.Super., 464 A.2d 75 (1983). The amendment will be permitted as the desirability of ending the litigation on its merits outweighs possible prejudice to defendant. *Bellanca Corp. v. Bellanca,* Del.Supr., 169 A.2d 620 (1961).

Finally, this Court will address the issue of whether the allegations concerning violation of the Uniform Trade Secrets Act and the Deceptive Trade Practices Act come too late and thus unduly prejudice defendants in their defense.

**\*14** Rule 15(c) allows an amendment to relate back to the original complaint where the claim asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading. "If the original pleading gives fair notice of the general fact situation out of which the claim or defense arises, an amendment which merely makes more specific what already has been alleged generally, or which changes the theory of the action, will relate back even though the statute of limitations has run in the interim." *DiFonzo v. Robelen Piano Co.,* Del.Super., 144 A.2d 247 at 248 (1958), *rev'd on other grounds,* Del.Supr., 169 A.2d 240 (1961), quoting 3 *Moore's Federal Practice* at 851-853. However, the amendment must not substantially change the cause of action or defense. *E.K. Geyser v. Blue Rock Shopping Center, Inc.,* Del.Super., 229 A.2d 499 at 501 (1967).

In the first amended complaint, Count III, plaintiffs alleged that defendants engaged in a concerted course of conduct designed to undermine and destroy plaintiffs' reputation, goodwill, customer relations and competitive position by a course of unfair competition and conduct. Among the conduct charged was willful and knowing misrepresentations as to Rhoads' capability and capacity to serve customers and direct interference with business relations between Rhoads and its customers. Included among deceptive trade practices in 6 *Del.C.* § 2532 is: (8) disparagement of the goods, services or business of another by false or misleading fact, and (12) engaging in other conduct which creates a likelihood of confusion and misunderstanding.

The revised complaint and its theory of deceptive trade practices clearly is based on the same general fact situation and conduct set forth in the original pleading. The theory of the action, not the basic facts of the claim, has changed. Thus, the amendment does give defendants adequate notice, and will be allowed. Because the amendment relates back to the filing of the original complaint, the cause is not time-barred under 10 *Del.C.* § 8106.

In the second and third complaints, plaintiff also alleges that defendants violated the Delaware Uniform Trade Secrets Act, 6 *Del.C.* § 2001, by misappropriating Rhoads' proprietary customer lists and pricing information. 6 *Del.C.* § 2001 defines "misappropriation" as, among other things, acquisition of a trade secret by one who knows or has reason to know the trade secret was acquired by improper means; use of a trade secret without express or implied consent by one who at the time of disclosure or use knew or had reason to know his knowledge of the trade was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

The first amended complaint does not address the issue of misappropriating the customer list or pricing information; it alleges only improper contact and solicitation of existing Rhoads customers. It generally alleged unfair competition and misconduct.

**\*15** Again, an amendment to a pleading ordinarily is permitted under liberal construction of Rule 15, subject to the principle that such amendments must

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.