9

- KMR, Riesner and Justis made their primary priorities Mercantile's collateral realization and KMR's collection of exorbitant and extorted consulting fees, while at the same time relegating NHI's business operations and viability as a going concern to distant secondary priorities, in direct contravention of the Consulting Agreement. [Second Amended Complaint ¶ 32.][3]

- Riesner and/or Justis were in contact with Mercantile at least daily during the term of the Consulting Agreement. [Second Amended Complaint ¶ 33.]

- KMR, Riesner and Justis continued on a concentrated course of action to pay Mercantile and KMR at the fastest possible rate without regard to the continuation of NHI's business, while stripping NHI of assets. In collaboration with Krieger (Mercantile's workout manager),

---

Complaint.

[3]

The relevant portion of the Complaint actually reads:

KMR, Riesner and Justis made their primary priorities the paying down of NHI's debt to Mercantile and the collection of exorbitant and extorted consulting fees for KMR, while at the same time relegating NHI's business operations and viability as a going concern to distant secondary priorities, in direct contravention of the Consulting Agreement.

(Doc. # 45, ¶ 32.)

A00921

10

KMR, Riesner and Justis discontinued paying NHI's vendors, suppliers, health care claims and taxing authorities, removed critical employees from plant operations, shipped homes out of the plant prior to completion and with substantial defects, failed to complete homes in the field and focused on short-term returns to Mercantile and KMR, without any concern for the long-term impact on NHI, which were in fact ruinous to NHI's viability as a going concern. [Second Amended Complaint ¶ 46.]

• At the same time, although NHI was still only in technical default with Mercantile, KMR, Riesner and Justis systematically made payments to Mercantile the day after late fees and penalties were incurred. According to NHI, it was apparent that KMR, Riesner and Justis were not concerned with NHI's ability to continue as a going concern - rather, the sole concern of KMR, Riesner and Justis was that Mercantile and KMR be paid. [Second Amended Complaint ¶ 47.][4]

---
[4]

The relevant portion of the Complaint actually reads:
At the same time, although NHI was still only in technical default with Mercantile, KMR, Riesner and Justis systematically made payments to Mercantile the day after late fees and penalties were incurred. It was apparent that KMR, Riesner and Justis were not concerned with NHI's ability to continue as a going concern - rather, the sole concern of KMR, Riesner and Justis was that Mercantile

11

- The [Complaint] alleges that
from October 2000 through
January 2002, KMR, Riesner and
Justis grossly mismanaged NHI's
business; made decisions which
maximized cash flows to
Mercantile and KMR, while
destroying NHI's relationships
with its customers, suppliers,
contractors, employees, etc.,
with the obvious result of
destroying NHI as a viable
going concern; violated the
Consulting Agreement; breached
their fiduciary duty and duty
of loyalty by - rather than
providing "turn around"
management - devising a stealth
plan to strip NHI of all cash
and assets before running NHI
into liquidation, all for the
sole benefit and at the
direction of Mercantile, and to
the extreme detriment and
prejudice of NHI and its
shareholders and creditors.
[Second Amended Complaint ¶
59.][5]

---

and KMR be paid.
(Doc. #45, ¶ 47.)

[5]

Significantly, there is no mention in the Complaint that any of the
activity was at the direction of Mercantile.    Similarly, the
Complaint actually alleges that the activity was for the sole
benefit of Mercantile, KMR, Riesner and Justis.    The relevant
portion of the Complaint actually reads:

From October 2000 through January 2002, KMR,
Riesner and Justis grossly mismanaged NHI's
business; made decisions which maximized cash
flows to Mercantile and KMR while destroying
NHI's relationships with its customers,
suppliers, contractors, employees, etc., with
the obvious result of destroying NHI as a
viable going concern; violated the Consulting

A00923

12

- KMR, Riesner and Justis engaged
  in a scheme to defraud and to
  raid NHI for the purposes of
  stripping       assets      in
  satisfaction of bank debt and
  running down NHI to the point
  where  NHI  could  only  be
  liquidated for the benefit of
  Mercantile rather than turning
  the company around. [Second
  Amended Complaint ¶ 103.][6]

- Mercantile  insisted  on  NHI
  hiring KMR, and then KMR placed
  NHI into an insolvent condition
  in  a  fashion  designed  to
  protect  only  Mercantile.
  [Second Amended Complaint ¶¶
  104, 111.][7]

---

Agreement; breached their fiduciary duty and
duty of loyalty by - rather than providing
"turn around" management - devising a stealth
plan to strip NHI of all cash and assets
possible before running NHI into liquidation,
all for the sole benefit of Mercantile, KMR,
Riesner and Justis, and to the extreme
detriment and prejudice of NHI and its
shareholders and creditors.
(Doc. #45, ¶ 59.)

[6]
The relevant portion of the Complaint actually reads:
On information and belief, KMR through Riesner
and Justis engaged in a scheme to defraud and
to raid NHI for the purposes of stripping
assets in satisfaction of bank debt and
running down NHI to the point where NHI could
only be liquidated for the benefit of
Mercantile rather than turning the company
around, as represented.
(Doc. #45, ¶ 103.)

[7]
The relevant portion of the Complaint actually reads:
KMR, Riesner, and Justis took steps to
implement their fraudulent purpose including:

13

- KMR, Riesner and Justis engaged
  in a scheme to waste the assets
  of NHI in order to liquidate it
  for the benefit of Mercantile.
  [Second Amended Complaint ¶
  110.][8]

(Doc. # 52, pp. 6-7 (emphasis in original).)

   From these paraphrased allegations of the Complaint,

Defendants argue that the Complaint alleges that Defendants were

---

   (1) Mercantile insisting on NHI's hiring KMR;
(2) Riesner and Justis knowingly failing to
take any action which would permit NHI to
continue as a going concern; (3) placing
Justis in a position to perform the duties
which a Chief Executive Officer and Chief
Operating Officer would perform without any
intention of having him act in the best
interests of NHI; (4) the making of a series
of management decisions by KMR, Riesner and
Justis, which had the effect of running down
NHI's business; (5) insisting on the surrender
of voting rights of NHI's shareholders; (6)
refusing to supply the NHI Board of Directors
with financial information about the company
or to involve it in any way in its present
operations; (7) placing NHI into an insolvent
condition in a fashion designed to protect
only Mercantile; and (8) siphoning off
approximately $1.9 million to KMR in fees
rather that [sic] utilizing those assets to
assist NHI's business operations.
(Doc. # 45, ¶¶ 104, 111.)

[8]

The relevant portion of the Complaint actually provides:
   On information and belief, KMR through Riesner
and Justis engaged in a scheme to waste the
assets of NHI to the point where NHI could
only be liquidated for the benefit of
Mercantile.
(Doc. # 45, ¶ 110.)

14

Mercantile's agents and are thereby protected by the releases provided to Mercantile and its agents. Defendants present their position as follows:

> Here, the scope of the release and the released parties is unambiguous. The Debtor released Mercantile and its agents. The Debtor in the [Complaint] repeatedly alleges in paragraph after paragraph that Defendants acted as Mercantile's agents in collaboration with Krieger (Mercantile's workout manager), by consulting with Mercantile on a daily basis, acting for Mercantile's benefit, focusing on short-term returns to Mercantile, making their primary priorities Mercantile's collateral realization, made decisions which maximized cash flows to Mercantile, all in a manner designed to protect Mercantile. [Second Amended Complaint ¶¶ 32, 33, 47, 59, 104, 110, 111]. . . . For the purpose of the Motion to Dismiss, the Court must take such allegations of agency as true.

(Doc. # 52, pp. 20-21 (emphasis in original).) Defendants amplify this position with legal authority in their reply as follows:

> The allegations in NHI's [Complaint] clearly establish, if such allegations are taken as true, that the Defendants had "the power to act on behalf of the principal (Mercantile)." J.E. Rhoads & Sons, Inc., 1988 WL 32012 at *4. NHI's claims against the Defendants are premised on the very notion that they acted "at the behest and for the benefit and for the benefit of the principal (Mercantile)." J.E. Rhoads & Sons, Inc., 1988 WL 32012 at *4.

(Doc. # 60, p. 6.)

In my view, Defendants' conclusion that the Complaint alleges an agency relationship is a misapplication of the law and the facts. I start with a brief statement of the law.

15

"An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." Fisher v. Townsends, Inc., 695 A.2d 53, 57-58 (Del. 1997) (citations omitted). "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Sutter Opportunity Fund 2 LLC v. Cede & Co., 838 A.2d 1123, 1128 (Del. Ch. 2003) (quoting Restatement (First) of Agency § 1(1) (1933)). "The principal must manifest, by words or conduct, that the agent shall work for him. . . . The right to control the conduct of an agent is the test of agency." J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc., 1988 WL 32012, at *4 (Del. Super. Ct. March 30, 1988) (citations omitted).

As mentioned above, at this stage of the proceedings the Court must not only, as Defendants assert, accept the allegations as true, it must also "view[] them in the light most favorable to [NHI] . . . ." Cowell, 263 F.3d at 290. Applying these standards to the allegations in the Complaint precludes Defendants' request for dismissal. The plain language of the allegations in the Complaint does not support the conclusion that Mercantile in any way controlled Defendants or that any party expressly or impliedly consented to an agency relationship. For example, Defendants argue that "NHI's description of the relationship between the Defendants

and Mercantile, in which 'Riesner and/or Justis were in contact
with Mercantile at least daily during the term of the Consulting
Agreement,' (Second Amended Complaint at ¶ 34) is consistent with
an agency relationship." (Doc. # 60, pp. 6-7 (citations omitted).)
While it is true that one can imagine daily contact being an aspect
of an agency relationship, that by itself is not sufficient to
establish that Mercantile exercised control over Defendants.

I find that reading the allegations[9] in the light most
favorable to NHI, the following conclusions can be drawn regarding
Defendants' conduct: (1) Defendants may have believed that
Mercantile would proceed with a foreclosure action absent paying
down the bank debt and otherwise courting favor with Mercantile's
interests; (2) Defendants took action that benefitted Mercantile
with the belief that it would give comfort to Mercantile in
continuing to support NHI's attempt to reorganize; (3) Defendants
favored Mercantile in order to court favor with Mercantile to
obtain future referrals; or (4) Defendants were incompetent in what
they were doing. Indeed, as to the latter possibility, I note that
the Complaint contains a negligence count. It alleges that
Defendants "proved to be incompetent in running the day-to-day
operations of NHI's manufacturing business." (Doc. # 45, ¶ 50.)
It further alleges that Defendants were "grossly negligent" by,

---

[9]
As stated in the Complaint, not as paraphrased by Defendants in
their motion.

17

inter alia, "knowingly reducing NHI's obligations to Mercantile to the point where Mercantile would compel the filing of a bankruptcy." (Id. at ¶ 91.)

As noted above, in its original form the complaint did contain one paragraph that I believe asserted an agency relationship. By an October 8, 2004 letter to counsel, I noted that there were a number of allegations in the complaint that suggested an agency relationship without actually asserting it. However, I noted that Paragraph 33 of the original complaint was rather specific in alleging that Defendants "served at the direction and pleasure of Mercantile." (Doc. # 17, Exh. B, ¶ 33.) At the December 3, 2004 hearing, the following exchange took place:

> The Court: Let me put it succinctly. And I tried to be polite in my letter where I said – quoted from paragraph 33 of the complaint, and I said this sure sounds like an agency relationship to me. Let me put it bluntly. I conclude that that's an assertion of an agency relationship.

> Now, in [NHI's] memorandum, docket number 40, you say on page 1, "The first amended complaint did not allege that the defendants were agents of Mercantile." On page 3, there's a statement, "Defendants were, in fact, not the agents of Mercantile."

> And my simple question is which is it?

> [NHI's counsel]: They were not, Your Honor.

> The Court: Okay.

> [NHI's counsel]: And nor do defendants in this case allege – at least they haven't to date – that they were defendants [sic]. And if Your

18

Honor is concerned with paragraph 33 or 34 to the extent that you believe it alleges an agency relationship, I will amend the pleading to withdraw that allegation –

The Court: Very good.  That's fine.  Okay.

\*\*\*

The Court: Okay.  Are you going to argue or attempt to prove that the defendants were agents of Mercantile in order to bring them within the release?

[Defendants' counsel]: It is not our intention to argue that the defendants were agents of Mercantile.  We – our case at this point –

The Court: Okay.  Then this whole agency is a nonissue at this point.

(Case Doc. # 667, p. 6.)

Under the facts here it would be quite inappropriate to grant a motion to dismiss.  As noted above, in discussing the standard courts should use in ruling on motions to dismiss, the Supreme Court cautioned that "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." Conley, 355 U.S. at 48.  Also as noted above, when read in the light most favorable to NHI, the remaining allegations support a number of different conclusions as to what motivated or explains Defendants' alleged conduct.  For Rule 12(b)(6) purposes, it cannot be said that Defendants' conduct as alleged in the Complaint was premised on Mercantile's consent to have Defendants

19

act on its behalf with Mercantile controlling or directing the
conduct of Defendants.    Thus, I conclude that the Complaint's
allegations do not establish as a fact that Defendants were agents
of Mercantile and beneficiaries of the releases granted to
Mercantile's agents.

<u>Judicial Estoppel</u>

Defendants argue that NHI should be precluded by reason
of judicial admissions and judicial estoppel from claiming
wrongdoing on the part of Defendants due to representations made in
the cash collateral agreement.    Defendants articulate their
position as follows:

> The Cash Collateral Agreement entered into by
> NHI and Mercantile affirms that NHI's pre-
> petition debt to Mercantile is enforceable,
> legal, binding, and NHI has no claims against
> Mercantile.  NHI states that its pre-petition
> indebtedness to Mercantile "is secured by
> validly perfected first priority security
> interests, liens and mortgage liens."  NHI
> also states that its pre-petition indebtedness
> is "fully secured and constitutes the legal,
> valid and binding obligations of the Debtor,
> enforceable in accordance with the terms of
> all applicable documents."   Finally, NHI
> admits that "no offsets, defenses or
> counterclaims to the [pre-petition
> indebtedness to Mercantile] exist, and no
> portion of the [pre-petition indebtedness to
> Mercantile] is subject to avoidance or
> subordination pursuant to the Bankruptcy Code
> or applicable non-bankruptcy law.
>
> ***
>
> Because the Debtor makes such binding and
> conclusive judicial admissions, the Court
> necessarily must conclude, and without even

A00931

20

> the presentation of proof, that Mercantile and
> the Defendants are free from wrongdoing and
> that the Plaintiff is judicially estopped from
> pursuing Defendants for causes of action based
> on the alleged improper collection by
> Defendants of Plaintiff's pre-petition debt to
> Mercantile.

(Doc. # 52, pp. 14-15 (citations omitted).)

"[A] party's assertion of fact in a pleading is a judicial admission by which it is normally bound throughout the course of the proceeding." Elec. Mobility Corp. v. Bourns Sensors/Controls, Inc., 87 F. Supp. 2d 394, 405 (D. N.J. 2000) (citations omitted). "[T]o be binding, judicial admissions must be unequivocal." Glick v. White Motor Co., 458 F.2d 1287, 1291 (3d Cir. 1972) (citations omitted). "An unequivocal statement is one that is clear, unambiguous and expresses only one meaning." Phila. Reinsurance Corp. v. Employers Ins. of Wausau, No. 02-1943, 61 Fed. Appx. 816, 819, 2003 WL 1698892, at *3 (3d Cir. March 31, 2003) (citing Webster's Third New International Dictionary 2494 (4th ed. 1976)).

The above quoted provisions from the cash collateral agreement are rather standard, simply having the debtor acknowledge the binding nature of the amount, perfection and priority of the pre-petition secured debt that is not subject to offsets, defenses or counterclaims. But the Complaint does not contravene those acknowledgments. The Complaint does not allege any wrongdoing by Mercantile and alleges no cause of action against Mercantile.

A00932

21

Pursuant to various orders entered in the bankruptcy case, NHI's assets were liquidated with most of the net proceeds paid over to Mercantile to pay down the pre-petition debt. So far as I know, the loan obligation has been substantially, if not fully, paid down and the Complaint does not seek any disgorgement of those payments. I am at a loss to understand the relevance of NHI's acknowledgments of its debt obligations to Mercantile to the Complaint's multiple allegations of wrongdoing by Defendants, entities and persons other than Mercantile.

This action challenges Defendants performance as turn-around consultant in a failed undertaking. While many of Defendants' actions involved Mercantile and the Complaint alleges that Mercantile benefitted from some of those actions, none of that contests the acknowledgments made by NHI in the cash collateral agreement. Therefore, I find that NHI is not precluded by the cash collateral agreement from making any of the allegations of wrongdoing by Defendants as set forth in the Complaint.

Preference

The final argument made by Defendants is that the Bankruptcy Code § 547 preference action should be dismissed as to Fleet, Riesner and Justis for failure to sufficiently plead the elements of a preference. This Court has recently described the pleading requirements as follows:

> Rule 8(a) states "[a] pleading which sets forth a claim for relief . . . shall contain .

A00933

22

> . . a short and plain statement of the claim
> showing that the pleader is entitled to
> relief." Fed. R. Civ. P. 8(a).  The Third
> Circuit Court of Appeals instructs that
> "[t]echnicalities are no longer of their
> former importance, and a short statement which
> fairly gives notice of the nature of the claim
> is a sufficient compliance with the
> requirements of the rules." Cont'l
> Collieries, Inc. v. Shober, 130 F.2d 631, 635
> (3d Cir. 1942).  Therefore, a complaint will
> be sufficient if it "give[s] the defendant
> fair notice of what the plaintiff's claim is
> and the grounds upon which it rests," Conley
> v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2
> L.Ed.2d 80 (1957), and courts favor decisions
> on the merits rather than technicalities.

TWA Inc. Post Confirmation Estate v. Golf Channel, 305 B.R. 745,

746-47 (Bankr. D. Del. 2004).  With regard to preference actions,

I have found that complaints must contain the following

information: "(a) an identification of the nature and amount of

each antecedent debt and (b) an identification of each alleged

preference transfer by (i) date, (ii) name of debtor/transferor,

(iii) name of transferee and (iv) the amount of the transfer." TWA

Inc. Post Confirmation Estate v. Marsh USA, Inc. (In re TWA Inc.

Post Confirmation Estate), 305 B.R. 228, 232 (Bankr. D. Del. 2004)

(citation omitted).

> In pleading this preference count, the Complaint states:

> During the one year period prior to the
> Petition Date (hereinafter the "Insider
> Preference Period"), KMR, Riesner and Justis
> received from NHI one or more transfers by
> check, wire transfer or their equivalent (the
> "Transfers"), in the amounts and on or before
> the clear dates identified in Exhibit "B",
> attached hereto.

A00934

23

> Each Transfer identified in Exhibit "B" hereto
> was directly to or for the benefit of KMR,
> Riesner and Justis.
>
> \* \* \*
>
> Fleet is liable for the above referenced
> transfers as successor in interest to Progress.

(Doc. # 45, ¶¶ 162-63, 170.) With respect to payments made from November 27, 2001 to the petition date, Exhibit B provides with respect to each transfer the name of the debtor company that made the payments, the party that received the payment, the check number, the check date, the invoice amount and the clear date. With respect to each payment made prior to November 27, 2001, Exhibit B identifies the transferee, the check date and the check amount. The name of the transferor is easily inferred. NHI is only required at this stage to provide Defendants with notice regarding its claim and the basis of the claim. If the facts are later developed to show that Fleet, Riesner and Justis did not receive any benefit from the payments then obviously NHI's requested relief will be denied as to them. But at this point NHI has alleged that they did benefit from the payments and NHI should be allowed to conduct discovery to determine how such payments benefitted those defendants, if at all.

---

For the foregoing reasons, Defendants' motion to dismiss the Complaint is denied.

A00935

## CERTIFICATE OF SERVICE

I, Denise Seastone Kraft, certify that on this 22nd day of February, 2005, I caused true and correct copies of the **Notice of Appeal Pursuant to Federal Bankruptcy Procedure 8001 and 28 U.S.C. Section 158(a)(3)** to be served on the following parties in the manner indicated:

### VIA HAND-DELIVERY

Stephen W. Spence
Phillips, Goldman & Spence
1200 N. Broom Street
Wilmington, DE 19806

Office of the United States Trustee
844 King Street, Room 2207
Lockbox 35
Wilmington, DE 19801

### VIA U.S. FIRST-CLASS MAIL

Guy A. Donatelli
Scott R. Withers
Lamb McErlane PC
24 E. Market Street
P.O. Box 565
West Chester, PA 19381-0565

Denise S. Kraft (#2778)

WLM_501408_1/DKRAFT

A00936

**File an Appeal:**

04-52879-PJW NHI, Inc. v. Fleetboston Financial Corporation et al

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Kraft, Denise Seastone entered on 8/19/2005 at 3:13 PM EDT and filed on 8/19/2005

**Case Name:**     NHI, Inc. v. Fleetboston Financial Corporation et al
**Case Number:**   04-52879-PJW
**Document Number:** 156

**Docket Text:**
Notice of Appeal *Notice of Appeal Pursuant to Federal Bankruptcy Procedures 8001 and 28 U.S.C. Section 158(a)(3)*. Fee Amount $255. (related document(s)[65], [66] ) Filed by Fleetboston Financial Corporation, Waring Justis, Jr., KMR Management, Inc., Robert Riesner Appellant Designation due by 8/29/2005. (Attachments: # (1) Exhibit A# (2) Exhibit B# (3) Certificate of Service)(Kraft, Denise)

The following document(s) are associated with this transaction:

**Document description:Main Document**
**Original filename:**U:\Wilmington Bankruptcy\NHI\Notice of Appeal 22205\Notice of Appeal.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=8/19/2005] [FileNumber=4094355-0]
[6f9df781e62d5f364a3ec3d5643453c85e0c7f3427a60228ab972e05e428e1fbf1aa
a5b11ee6a35f20fa067f76e1e37428999b9b1f9f08a2af49cc14d40fcbca]]
**Document description:Exhibit A**
**Original filename:**U:\Wilmington Bankruptcy\NHI\Notice of Appeal 22205\Exhibit A.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=8/19/2005] [FileNumber=4094355-1]
[782717a90cc5925cb4caf4664f79142167174dfa436196a21922bc814717f309f975
2c4a59683bfd32b90bc1fd05fc1f1bf8d6218fc97622b2de5fe873a43b54]]
**Document description:Exhibit B**
**Original filename:**U:\Wilmington Bankruptcy\NHI\Notice of Appeal 22205\Exhibit B.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=8/19/2005] [FileNumber=4094355-2]
[4051b598338249a9abb2205b48bb506d61719cdba350820eaa02313ddb462ca32d59
91bdf986a75e7cec811a0bb51a37ddd259da6d557324a21511ab49bc9f4f]]
**Document description:Certificate of Service**
**Original filename:**U:\Wilmington Bankruptcy\NHI\Notice of Appeal 22205\COS.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=8/19/2005] [FileNumber=4094355-3]
[2b9304ad6219da162d8767ffc73d1d53b200359126857e148f33bc83686acafc454d
0bc5833a5bdcbd90b8c9b2fc342b635a64a6a95e3e2ce27e679599213abb]]

**04-52879-PJW Notice will be electronically mailed to:**

Stuart M. Brown    sbrown@edwardsangell.com, DEbankruptcy@edwardsangell.com

https://ecf.deb.uscourts.gov/cgi-bin/Dispatch.pl?667056228595589                    8/19/2005

Denise Seastone Kraft     dkraft@edwardsangell.com

Mark Daniel Olivere     molivere@edwardsangell.com

Stephen W. Spence     tap@pgslaw.com;th@pgslaw.com

**04-52879-PJW Notice will not be electronically mailed to:**

John E. O'Brien
Law Offices of John D. O'Brien
P.O. Box 882 - 942-A Walker Square
Dover, DE 19903-0882

**U.S. Bankruptcy Court**
**District of Delaware**

Thank you. Your transaction in the amount of $ 255.00 has been completed.

Please print a copy of your transaction receipt for future reference. The transaction number is 2191801.

**Detail description:**
Notice of Appeal (Ap)(04-52879-PJW) [appeal,ntcapl] ( 255.00)



EXHIBIT

_A_

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                               :
                                     :      Case No.: 02-10651-PJW
NANTICOKE HOMES, INC.                :
                                     :      (Chapter 11)
                                     :
        Debtor.                      :

INTERIM AGREEMENT FOR USE OF
CASH COLLATERAL AND ADEQUATE PROTECTION

WHEREAS, on March 1, 2002 (the "Petition Date"), Nanticoke Homes, Inc. (the "Debtor")

filed a Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code (the

"Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the

"Court"). Since that date, the Debtor has continued to operate its business as a Debtor-in-Possession.

WHEREAS, the Debtor was indebted to Mercantile-Safe Deposit And Trust Company

("Bank") on the Petition Date for the following secured loans and secured guaranties (collectively,

the "Pre-Petition Bank Indebtedness") in the aggregate unpaid balance of Ten Million Three Hundred

Forty-Eight Thousand Six Hundred Sixty-Five Dollars And Fifty-Two Cents ($10,348,665.52)

calculated as of and including February 28, 2002, consisting of the following:  (a) a revolving line

of credit evidenced by a Fourth Amended And Restated Demand Promissory Note dated July 2001

in the originally stated principal amount of Six Million Dollars ($6,000,000.00) and having a present

unpaid balance of Four Million Seven Hundred Fifty-One Thousand Eight Hundred Eleven Dollars

And Two Cents ($4,751,811.02); (b) a term loan evidenced by a Term Loan Promissory Note dated

January 23, 1996 in the stated principal amount of Three Million Five Hundred Thousand Dollars

($3,500,000.00) and having a present unpaid balance of Two Million Three Hundred Nine Thousand

Eight Hundred Sixty  Dollars And One Cent ($2,309,860.01); (c) Guaranty Agreements dated

January 23, 1996 and December 18, 1998 guarantying the obligations to the Bank of Shawnee

Homes, Inc. having an aggregate present unpaid balance of Seven Hundred Eighty Thousand One

Hundred Eighty-Four Dollars And Seventy-Four Cents ($780,184.74); (d) Guaranty Agreement

dated November 13, 1998 guarantying the obligations to the Bank of Shawnee Enterprises Midwest,

L.L.C. and having an aggregate present unpaid balance of One Million One Hundred Three

Thousand Six Hundred Sixty-Six Dollars And Sixteen Cents ($1,103,666.16); (e) Corporate

Guaranty Agreement dated February 12, 1997 guarantying the obligations to the Bank of Tamarac,

Inc. and having a present unpaid balance of Four Hundred Thirty-Nine Thousand Five Hundred

Fifteen Dollars And Ninety-Nine Cents ($439,515.99); and (f) Guaranty Agreement dated

December 18, 1998 guarantying the obligations to the Bank of Nanticoke Homes Midwest

Incorporated and having a present unpaid balance of Nine Hundred Sixty-Three Thousand Six

Hundred Twenty-Seven Dollars And Sixty Cents ($963,627.60).

　　　　WHEREAS, the Pre-Petition Bank Indebtedness is secured by validly perfected first priority

security interests, liens and mortgage liens (collectively, "Pre-Petition Bank Liens") granted to and

held by the Bank in and to substantially all of the real and personal assets (collectively, "Pre-Petition

Collateral") of the Debtor, as such Pre-Petition Collateral is more fully described and evidenced by,

*inter alia*, the following: (a) Loan And Security Agreement dated January 23, 1996, as amended; (b)

Mortgage dated January 23, 1996 recorded among the Land Records of Kent County, Delaware in

Mortgage Book 220, page 292, as amended by First Amendment To Mortgage dated January 8, 1999

recorded among the Land Records of Kent County, Delaware in Mortgage Book 294, page 287, and

Second Amendment To Mortgage dated March 21, 2000 recorded among the Land Records of Kent

County, Delaware in Mortgage Book 365, page 150; (c) Mortgage dated January 23, 1996 recorded

among the Land Records of Sussex County, Delaware in Deed Book 2207, folio 333, as amended

A00941

by First Amendment To Mortgage dated December 29, 1998 recorded among the Land Records of Sussex County, Delaware in Deed Book 2924, folio 095, and Second Amendment To Mortgage dated March 21, 2000 recorded among the Land Records of Sussex County, Delaware in Deed Book 03389, page 333; (d) Mortgage dated August 6, 2000 recorded among the Land Records of Sussex County, Delaware in Deed Book 03478, page 067; (e) Mortgage dated February 28, 2001 recorded among the Land Records of Kent County, Delaware at Mortgage Book 1011, page 208; (f) Mortgage dated February 28, 2001 recorded among the Land Records of Sussex County, Delaware in Deed Book 03674, page 267; (g) Financing Statements recorded with the Secretary of State of Delaware and bearing the following recordation references: (i) 1996003159 recorded on January 30, 1996; (ii) 1996003165 recorded on January 30, 1996; (iii) 1996003168 recorded on January 30, 1996; (iv) 1997-13250 recorded on April 22, 1997; (v) 199858394 recorded on December 24, 1998; (vi) 199858395 recorded on December 24, 1998; (vii) 199858397 recorded on December 24, 1998; (viii) 199858399 recorded on December 24, 1998; (ix) 199858405 recorded on December 24, 1998; and (x) 199936877 recorded on July 20, 1999; (h) Financing Statements recorded with Sussex and Kent Counties, Delaware, the Maryland State Department of Assessments And Taxation, and the Circuit Court of Wicomico County, Maryland; and (i) Collateral Trademark Assignment dated January 23, 1996 and recorded on January 31, 1996 with the United States Patent And Trademark office at Reel 1428, Frame 0947.

WHEREAS, the Pre-Petition Bank Indebtedness is fully secured and constitutes the legal, valid and binding obligations of the Debtor, enforceable in accordance with the terms of all applicable documents, promissory notes, guaranties, mortgages, security agreements and other agreement and documentation (collectively, "Pre-Petition Bank Documents").

A00942

WHEREAS, no offsets, defenses or counterclaims to the Pre-Petition Bank Indebtedness exist, and no portion of the Pre-Petition Bank Indebtedness is subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

WHEREAS, the Debtor's cash and the proceeds of the other Collateral constitute "cash collateral" as defined in Section 363(a) the Bankruptcy Code.

WHEREAS, the Debtor has an immediate and critical need for the use of the cash collateral to pay suppliers and wages and to pay for insurance, security services and attorneys' fees, and to otherwise protect and preserve its assets.

WHEREAS, the Bank is willing to consent to the Debtor's use of the Bank's cash collateral only on the expressly stated terms and conditions expressly set forth in this Interim Agreement For Use Of Cash Collateral And Adequate Protection (the "Agreement").

NOW, THEREFORE, in consideration of the mutual promises and agreements of the parties hereto, the Bank and the Debtor do hereby agree as follows:

1.    Incorporation of Recitals. The Debtor and the Bank acknowledge, agree, and hereby stipulate that the recitals set forth above are true, accurate and complete in every respect, and are hereby incorporated into this Agreement by reference. Notwithstanding the foregoing, nothing in this Agreement shall prejudice the rights of any party in interest other than the Debtor to seek to object to or to challenge (a) the validity, extent, perfection or priority of the mortgages, security interests, liens, and the other Pre-Petition Bank Liens in and to the Pre-Petition Collateral, (b) the validity, allowability, priority, status or size of the Pre-Petition Bank Indebtedness, including the rate of interest accruing thereon as described in paragraph 13 of this Agreement, or (c) to allocate adequate protection payments as between principal, interest and fees (a "Qualifying Objection"); provided, however, that unless such a party commences, as appropriate, a contested matter or

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC         4

A00943

adversary proceeding raising such objection or challenge within sixty (60) days (the "Lookback Period") after the date of formation of the Committee for the unsecured creditors ("Committee"), all such challenges and objections shall be forever waived and the Pre-Petition Bank Indebtedness shall be allowed as a secured claim within the meaning of Section 506 of the Bankruptcy Code for all purposes in connection with this Case. No such period of limitation may be extended without the prior written consent of the Bank. Thereafter, any and all objections or challenges (including, but not limited to, those under Sections 506, 544, 547 and/or 548 of the Bankruptcy Code) by any party (including, without limitation, the Committee and any Chapter 11 or Chapter 7 Trustee appointed herein) to the validity, sufficiency, extent, perfection, priority or refinancing of, or seeking the avoidance or equitable subordination of, the Pre-Petition Bank Liens, the Pre-Petition Bank Indebtedness, and any payments thereon shall be forever barred.

    2.    <u>Use of Cash Collateral By Debtor</u>.

        2.1.    <u>Authorized Amounts</u>. The Bank and the Debtor agree that in the absence of an "Event of Default" (hereafter defined), the Debtor shall have the use of cash proceeds ("Cash Collateral") of the Pre-Petition Collateral in the following limited amounts during the period of time ("Interim Period") commencing on March 1, 2002 and ending on that date which is the earliest of: (a) the date of the occurrence of any Event of Default; (b) August 1, 2003; or (c) the effective date of confirmation of any plan of reorganization or liquidation for the Debtor.

            2.1.1    <u>Maximum Monthly Amount</u>. Without the prior written consent of the Bank and subject to the limitations upon aggregate amounts set forth below in paragraph 2.1.2, the maximum aggregate amount of Cash Collateral that may be used by the Debtor during the Interim Period in any calendar month is Fifty Thousand Dollars ($50,000.00), of which no more than

A00944

Twenty-Eight Thousand Dollars ($28,000.00) may be expended on salaries or other labor-related costs.

2.1.2  Maximum Aggregate Amount. The maximum aggregate amount of Cash Collateral that may be used by the Debtor during the Interim Period shall not exceed Three Hundred Thousand Dollars ($300,000.00) unless the unpaid balance of the Pre-Petition Bank Indebtedness has been permanently curtailed by payments received by the Bank of not less than Three Million Five Hundred Thousand Dollars ($3,500,000.00), and upon such permanent curtailment, the Debtor may use Cash Collateral in an additional aggregate amount of up to Two Hundred Thousand Dollars ($200,000.00) until the unpaid balance of the Pre-Petition Bank Indebtedness has been permanently curtailed by payments received by the Bank of not less than the total aggregate sum of Six Million Two Hundred Thousand Dollars ($6,200,000.00), and upon such additional permanent curtailment, the Debtor may use Cash Collateral in an additional aggregate amount of One Hundred Thousand Dollars ($100,000.00). The parties agree that under all circumstances the maximum aggregate amount of Cash Collateral that may be used by the Debtor shall not exceed in its entirety the sum of Six Hundred Thousand Dollars ($600,000.00).

2.2.  Use Limited to Collected Funds Only. In no event shall the Debtor be entitled to use more Cash Collateral on any given day during the Interim Period than is available in collected funds on deposit in the applicable "Debtor-In-Possession Account" (hereafter defined) with the Bank at 11:00 a.m. on that day.

2.3  No Other Use. Except as expressly authorized by the terms of this Agreement, the Debtor is prohibited from using Cash Collateral.

3.  Maintenance of Debtor-In-Possession Accounts with Bank. The Debtor agrees to establish and maintain the following accounts (collectively, "Debtor-In-Possession Accounts") with

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC        6

A00945

the Bank: (a) its Debtor-In-Possession Operating Account (the " Debtor-In-Possession Operating Account"); (b) its Debtor-In-Possession Collateral Account (the "Debtor-In-Possession Collateral Account"); (c) its Debtor-In-Possession Payroll Account (the " Debtor-In-Possession Payroll Account"); and (d) its Debtor-In-Possession Payroll Tax Account (the " Debtor-In-Possession Tax Account"). The Debtor shall maintain no accounts other than the Debtor-In-Possession Accounts.

    4.    <u>Deposit of Proceeds</u>. The Debtor shall deposit all cash, checks or monies which the Debtor now has on hand, other than funds already on deposit in the Debtor-In-Possession Operating Account, into the Debtor-In-Possession Collateral Account, which shall be in the exclusive control of the Bank, for clearance and transfer into the other Debtor-In-Possession Accounts and for payment of the Pre-Petition Bank Indebtedness. In addition, the Debtor shall deposit into the Debtor-In-Possession Collateral Account any and all cash, checks, or monies the Debtor directly collects, receives, or derives from the operation of its business or the liquidation of its assets, including, but not limited to, all cash, checks and monies received or hereafter received by the Debtor from the sale of its inventory, the collection of its accounts, the sale of its personalty or its realty, and the collection of rents. If required by the Bank, the Debtor shall direct its customers to remit payments to a post office box under the exclusive control of the Bank (the "Lock Box") for deposit to the Debtor-In-Possession Collateral Account. The rights of all parties in interest other than the Debtor with respect to the application of funds to the Pre-Petition Bank Indebtedness during the Lookback Period are reserved. After the expiration of the Lookback Period the application of funds to the Pre-Petition Bank Indebtedness shall be binding upon all parties in interest absent successful prosecution of a contested matter or adversary proceeding raising a Qualifying Objection filed prior to the expiration of the Lookback Period.

A00946

5.    <u>Availability of Funds</u>.  Deposits made by the Debtor into the Debtor-In-Possession Collateral Account shall not be available for transfer into any other Debtor-In-Possession Accounts until they constitute collected funds determined in accordance with the customary policies and procedures of the Bank. The Debtor acknowledges that the Bank will not honor any checks written against any of the Debtor-In-Possession Accounts which would overdraw the collected funds in any such accounts and that the Bank will dishonor and return any such checks with an NSF designation thereon. If, notwithstanding the foregoing, the Bank honors any checks against any of the Debtor-In-Possession Accounts which cause an overdraft, the Bank shall then have a first priority post-petition lien on the "Post-Petition Collateral" (hereafter defined) to the extent of the amount of said overdrafts.

6.    <u>Transfer of Funds from Collateral Account</u>.  Upon approval of this Agreement by the Court and provided that no Event of Default has occurred under this Agreement and subject to the limitations set forth above as to the amounts and uses of Cash Collateral, the Bank will transfer collected funds in the Debtor-In-Possession Collateral Account into the Debtor-In-Possession Operating Account, the Debtor-In-Possession Payroll Account and the Debtor-In-Possession Tax Account in amounts directed by the Debtor from time to time.

7.    <u>Application to Pre-Petition Indebtedness</u>.  All proceeds of the sale, collection or other disposition of the Pre-Petition Collateral shall be applied immediately to the repayment and permanent curtailment of the Pre-Petition Bank Indebtedness, other than the Cash Collateral which the Debtor is expressly permitted to use in accordance with the terms of this Agreement. The Bank is authorized, without any additional consents or instructions from the Debtor, to apply funds in the Debtor-In-Possession Accounts to the Pre-Petition Indebtedness. The rights of all parties in interest other than the Debtor with respect to the application of funds to the Pre-Petition Bank Indebtedness

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC       8

A00947

during the Lookback Period are reserved.  After the expiration of the Lookback Period the application of funds to the Pre-Petition Bank Indebtedness shall be binding upon all parties in interest absent successful prosecution of a contested matter or adversary proceeding raising a Qualifying Objection filed prior to the expiration of the Lookback Period.

      8.    <u>Grant of Replacement Liens</u>. Notwithstanding the provisions of Section 552(a) of the <u>Bankruptcy Code</u>, and in addition to the liens and security interests preserved by Section 552(b) of the <u>Bankruptcy Code</u>, the Debtor hereby grants to the Bank, as security for any and all indebtedness owed by the Debtor to the Bank under the Pre-Petition Bank Documents or this Agreement, whether post or pre-petition, <u>but only to the extent that the Bank's interest in Cash Collateral is diminished,</u> first priority post-petition liens, security interests and mortgage liens in and to all of the Debtor's assets which are or have been acquired, generated, or received by the Debtor subsequent to the Petition Date (collectively, "Post-Petition Collateral") including, without limitation, all of the Debtor's Accounts, As-Extracted Collateral, Chattel Paper, Commodity Accounts, Commodity Contracts, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter-Of-Credit Rights, Payment Intangibles, Promissory Notes, Software, cash, the Debtor-In-Possession Accounts, real estate and all fee and leasehold interests therein, trademarks, licenses, causes of action, rights to payment, tax refund claims, insurance proceeds and tort claims (other than actions for preferences, fraudulent conveyances, and other avoidance power claims and any recoveries under Sections 506(c), 542, 545, 547, 548, 549, 550, 552(b) and 553 of the <u>Bankruptcy Code</u> (collectively, "Avoidance Actions")), and all products, rents, and cash and non-cash proceeds thereof.

      9.    <u>Perfection of Replacement Liens</u>.  The liens, security interests and mortgage liens granted in this Agreement are deemed perfected without the necessity for filing or execution of

A00948

documents which might otherwise be required under non-bankruptcy law for the perfection of said liens, security interests and mortgage liens. Such liens, security interests and mortgage liens and perfection shall be binding, to the fullest extent available under all applicable laws, upon any subsequently appointed trustee either in Chapter 11 or any other Chapter of the Bankruptcy Code and upon all creditors of the Debtor who have extended or who may hereafter extend credit to the Debtor. Notwithstanding the foregoing, the Debtor shall execute such financing statements, mortgages, assignments, and other documents as the Bank may request to permit the Bank to file notice of the liens, security interests and mortgage liens granted herein in such public records as the Bank may select, in its sole and absolute discretion.

10.    Confirmation of Pre-Petition Liens. The Debtor hereby confirms to the Bank the validity, enforceability, and first priority lien status of the Pre-Petition Bank Liens in and to the Pre-Petition Collateral securing the Pre-Petition Bank Indebtedness and all other indebtedness owed by the Debtor to the Bank under the Pre-Petition Bank Documents or this Agreement, including interest, fees, expenses and the like which are authorized and secured by the express terms of the Pre-Petition Bank Documents and which accrued before the Petition Date, and all cash and non-cash proceeds thereof.

11.    Superpriority Claim. To the extent that the other protections granted herein are insufficient to provide adequate protection for the Bank's interests in the Pre-Petition Collateral and the Post-Petition Collateral, the Bank shall be granted a claim against the Debtor having priority over any and all administrative expenses of any kind including, but not limited to, the administrative expenses described in Sections 503(b) and 507(b) of the Bankruptcy Code. The claim granted to the Bank in this paragraph shall not be payable from Avoidance Actions or the proceeds thereof, but shall be payable only from other assets of the Debtor's estate.

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC      10

12.    <u>No Surcharge of Collateral</u>. No costs or expenses of administration which have been or may be incurred in the above-captioned proceedings, or in any conversion of the above-captioned proceedings pursuant to Section 1112 of the <u>Bankruptcy Code</u>, or in any other proceeding relating thereto, and no priority claims are or will be prior to or on a parity with the claims of the Bank against the Debtor or any successor debtor-in-possession or trustee or with the Pre-Petition Liens against the Pre-Petition Collateral or the Post-Petition Collateral; and no such costs or expense of administration shall be imposed against the Bank, its claims, or the Pre-Petition Collateral or the Post-Petition Collateral pursuant to 11 U.S.C. § 506(c) or otherwise. This Section 12 shall not be binding upon any party in interest until such time, if any, as the Court enters an Order finally approving this Agreement following not less than fifteen (15) days notice to the parties entitled to notice of this Agreement pursuant to Rule 4001b(1) of the <u>Federal Rules of Bankruptcy Procedure</u> and an opportunity for a final hearing.

13.    <u>Accrual of Interest</u>. Subject to the provisions of Section 506 of the <u>Bankruptcy Code</u>, interest shall continue to accrue on the Pre-Petition Bank Indebtedness owed in accordance with the stated terms of the Pre-Petition Bank Documents at such rates as are specified therein until all amounts due to the Bank have been paid in full.

14.    <u>Insurance</u>. The Debtor agrees to obtain and maintain insurance against fire, theft or other casualty on the Pre-Petition Collateral and the Post-Petition Collateral in amounts satisfactory to the Bank and to insure that the Bank is named as a mortgagee and loss payee on all policies insuring the Pre-Petition Collateral and the Post-Petition Collateral against fire, theft or other casualty. The Bank agrees that to the extent that the premiums for such insurance exceed Eight Thousand Dollars ($8,000.00) in aggregate amount in any month, the Debtor may use Cash Collateral in an additional amount sufficient to pay such premiums not to exceed such maximum

A00950

amount as is mutually agreed to by the Debtor and the Bank, even if such additional amount causes the Debtor to exceed the monthly limitation upon the use of Cash Collateral set forth above in paragraph 2.1.1. of this Agreement.

      15.    <u>Bank's Right to Assert Unsecured Claims</u>. To the extent that the value of the Pre-Petition Collateral is less than the amount of the Pre-Petition Bank Indebtedness, the Bank shall have an allowed unsecured claim in the Debtor's bankruptcy case. The Debtor acknowledges and agrees that nothing contained herein shall prevent or preclude the Bank from receiving a distribution in the Debtor's bankruptcy case based upon such allowed unsecured claim.

      16.    <u>Reporting by Debtor; Inspection of Collateral</u>. The Debtor agrees to:

      (a)    Keep and maintain such accounting and financial records as are required by the Office of the United States Trustee and the Bankruptcy Court;

      (b)    Permit the Bank's representatives and/or auditors to inspect the Pre-Petition Collateral and the Post-Petition Collateral and all accounting and financial records of the Debtor from time to time;

      (c)    Provide the Bank with copies of all listing agreements, term sheets, offers, contracts of sale and the like which pertain to the sale, liquidation and disposal of the Debtor's assets;

      (d)    Provide the Bank on or before the fifteenth (15th) day of each calendar month with the Monthly Operating Reports for the prior calendar month filed with the Court; and

      (e)    Provide the Bank with such other and further financial information relating to the Debtor as the Bank may request from the Debtor from time to time.

A00951

All financial statements and financial information provided by the Debtor to the Bank pursuant to this Agreement shall have the signature of an officer of the Debtor thereon and shall contain a certification that the information contained therein is true, accurate and complete to the best of said officer's knowledge, information and belief.

17.    No Further Encumbrances of Assets.    The Debtor agrees that no further encumbrances of any kind or type, whether voluntary or involuntary, shall be placed against any real or personal property or other assets which the Debtor owns without the prior written consent of the Bank.

18.    Bank to Receive Notice of Creditor Actions.    In the event that any person or entity seeks an Order pursuant to the Bankruptcy Code or is otherwise given adequate protection of its interests in the above-captioned proceedings, the Bank shall be given an opportunity to be heard prior to the entry of said Order.

19.    Liquidation of Assets.    The Debtor agrees to commence and diligently pursue the orderly sale and liquidation of its assets.

20.    Restrictions Upon Use Of Cash Collateral.    Except for expenses paid from the "Carve Out" (as hereafter defined), no Cash Collateral or other proceeds of Pre-Petition Collateral shall be used for the purpose of: (a) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, perfection, priority, or enforceability of the Pre-Petition Bank Indebtedness, the Pre-Petition Bank Documents, or the Pre-Petition Bank Liens, or any other rights or interests of the Bank or in asserting any claims or causes of action, against the Bank or any officer, representative or agent of the Bank; (b) using Cash Collateral except as specifically permitted in this Agreement or by order of the Bankruptcy Court; (c) incurring indebtedness, including without limitation the obtaining of credit pursuant to 11 U.S.C. § 364; or (d) without its consent, attempting to modify the

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC      13

Bank's rights under this Agreement. As used in this Agreement, "Carve Out" means, at any time of determination, the sum of: (a) allowed administrative expenses payable pursuant to 28 U.S.C. § 1930(a)(6); and (b) "Priority Professional Expenses" (as hereafter defined) subject to the "Priority Expense Cap" (as hereafter defined). "Priority Professional Expenses" means allowed fees, costs and reasonable expenses of professionals retained by the Committee pursuant to Section 327 of the Bankruptcy Code, but shall not include fees, costs, and expenses of third-party professionals employed by the members of the Committee. "Priority Expense Cap" means all unpaid Priority Professional Expenses (including holdbacks) up to an aggregate amount of Fifty Thousand Dollars ($50,000.00). Priority Professional Expenses shall not include fees or expenses incurred by any Person, including the Debtor or the Committee, in (a) preventing, hindering or delaying the Bank's enforcement or realization upon any of the Pre-Petition Collateral or Post-Petition Collateral once an Event of Default has occurred, (b) using or seeking to use Cash Collateral or selling any Pre-Petition Collateral or Post-Petition Collateral without the Bank's consent, (c) incurring indebtedness without the Bank's consent, or (d) objecting to or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of the Pre-Petition Bank Indebtedness or the Pre-Petition Bank Liens or any other rights or interests of the Bank, or in asserting any claims or causes of action, including, without limitation, any actions under Chapter 5 or Section 724(a) of the Bankruptcy Code or for equitable subordination against the Bank. The exclusion from Priority Professional Expenses shall not include investigation of claims or causes of action respecting whether an Event of Default has occurred.

21.    Events of Default. Each of the following shall constitute an "Event of Default":

(a)    The Debtor fails to comply with and/or to perform or satisfy or otherwise violates any terms and/or conditions set forth in this Agreement; or

A00953

(b)     The Order approving this Agreement, or any portion thereof, is vacated, reversed or modified; or

(c)     The above-captioned Chapter 11 proceedings are converted to a case under Chapter 7 of the <u>Bankruptcy Code</u> or is dismissed; or

(d)     A trustee is appointed for the Debtor or any of the Debtor's assets; or

(e)     The Debtor files a motion seeking to convert the above-captioned Chapter 11 proceeding to a case under Chapter 7 of the <u>Bankruptcy Code</u>; or

(f)     The Debtor fails to pay its post-petition tax obligations when and as due; or

(g)     The change of venue of the above-captioned proceedings; or

(h)     Any surcharge of the Pre-Petition Collateral or Post-Petition Collateral; or

(i)     The Debtor incurs any indebtedness or obtains any credit (other than unsecured credit which does not have priority over claims entitled to priority under 11 U.S.C. § 507(a)(1)) from any entity other than the Bank pursuant to 11 U.S.C. § 364; or

(j)     The Debtor initiates any litigation against the Bank.

22.     <u>Default Rights</u>.  Upon written notice to the Debtor of the occurrence of an Event of Default and the failure of the Debtor to cure such Event of Default within three (3) business days after notice thereof, without further order of the Court, the Debtor will immediately cease and be enjoined from using the Cash Collateral and will provide appropriate evidence to the Bank of the Debtor's cessation of the use of the Cash Collateral.  In addition, the Bank shall be entitled to freeze all of the Debtor-In-Possession Accounts, and to take such other actions as to which the Bank is entitled under applicable laws.

23.     <u>Agreement Not Evidence of Adequate Protection</u>.  The Bank and the Debtor agree that the terms of this Agreement shall not constitute conclusive or presumptive evidence concerning

S:\JMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC     15

A00954

the issues of adequate protection in the event such issues are raised or litigated between the Debtor and the Bank.

24. <u>No Novation</u>. This Agreement shall not cause a novation of any of the Pre-Petition Bank Documents, nor shall it extinguish, affect or impair the Debtor's obligations under the Pre-Petition Bank Documents or the obligations of any guarantors or co-obligors of any of the Pre-Petition Bank Indebtedness. Nothing contained in this Agreement shall be deemed to terminate, impair or release any of the Pre-Petition Bank Liens or the priorities thereof.

25. <u>Bank Not Deemed Owner or Operator</u>. By its entry into this Agreement and its agreement to the terms hereof, the Bank shall not be deemed to have assumed any liability to any third person, and shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor or of any of the Debtor's assets.

26. <u>Delay Not Waiver</u>. The failure or delay by the Bank to insist upon strict performance of any one or more of the provisions of this Agreement or to exercise any right, power, or remedy upon default under or breach of, this Agreement shall not constitute a waiver of, or preclude the Bank from exercising, any right, power or remedy.

27. <u>No Waiver of Other Rights</u>. Except as expressly provided in this Agreement, nothing contained herein shall constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of the Bank under the <u>Bankruptcy Code</u> or under non-bankruptcy law, including, without limitation, the right of the Bank to (i) request adequate protection of its interests in the Pre-Petition Collateral or relief from or modification of the automatic stay extant under Section 362 of the <u>Bankruptcy Code</u>, (ii) request conversion of the above-captioned Chapter 11 Case to a Chapter 7 case, (iii) request the appointment of a Chapter 11 trustee or examiner; and (iv) propose, subject to

A00955

the provisions of Section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans (and nothing herein is intended to affect Debtor's existing right to exclusivity under Section 1121); or (b) any other rights, claims or privileges (whether legal, equitable, or otherwise) of the Bank; or (c) the rights of the Debtor to seek to continue to use Cash Collateral after the termination of this Agreement.

28.    Execution In Counterparts.  This Agreement may be executed and delivered in counterparts.

29.    Integration.  The Debtor agrees that this Agreement is the complete and entire agreement between the parties with respect to the matters addressed herein and shall be binding upon the parties hereto only if it, in its entirety, and without addendum or modification not otherwise approved in writing by the Bank and the Debtor, shall be approved by an Order of the Court issued in the above-captioned proceedings and, upon such approval, shall be effective as of the Petition Date.

WITNESS the hands and seals of the parties hereto this _15th_ day of March, 2002.

WITNESS/ATTEST:                     DEBTOR:

                                    NANTICOKE HOMES, INC.

_[signature]_               By: _[signature]_ (SEAL)
                                    Name: _William H. Morguette III_
                                    Title: _Vice President_

                                    BANK:

                                    MERCANTILE-SAFE DEPOSIT AND
                                    TRUST COMPANY

_[signature]_               By: _[signature]_ (SEAL)
                                    Scott H. Krieger,
                                    Senior Vice President

S:\UMS\18886\CASHCOLLAGR-NEW (W CARVEOUT).DOC        17

A00956

UNITED STATED BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                          )
                                )  Chapter 11
NHI, INC., a Delaware           )
Corporation,                    )  Case No. 02-10651 (PJW)
                                )
                                )  December 3, 2004, 3:30 p.m.
                  Debtors       )

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For KMR Management,:        DENISE SEASTONE KRAFT, ESQUIRE
FleetBoston,                EDWARDS & ANGELL, LLP
Robert Riesner, and        919 N. Market Street, 14th Floor
Waring S. Justis, Jr.      Wilmington, DE 19801


For NHI, Inc.:             STEPHEN W. SPENCE, ESQUIRE
                           PHILLIPS, GOLDMAN & SPENCE
                           1200 North Broom Street
                           Wilmington, DE 19806


For NHI, Inc.:             GUY DONATELLI, ESQUIRE
                           SCOTT R. WITHERS, ESQUIRE
                           LAMB, MCERLANE, PC
                           24 East Market Street
                           West Chester, PA 19381




Transcribed by:            DIANA DOMAN TRANSCRIBING
                           P.O. Box 129
                           Gibbsboro, New Jersey  08026-129
                           (856) 435-7172
                           FAX:  (856) 435-7124
                           Email:  Dianadoman@comcast.net


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

A00957

Colloquy                                    2

1      (Hearing in session)

2          THE CLERK:  Please rise.

3          THE COURT:  Please be seated.  Yes.

4          MR. SPENCE:  Good afternoon, Your Honor.  Stephen

5   Spence on behalf of NHI, Inc.  Your Honor, I was advised by

6   your staff before we started that the two matters that were the

7   first two items on our agenda today were both the subject of

8   certificates of no objection.  I think the Court has already

9   acted on those.

10         THE COURT:  Yes.

11         MR. SPENCE:  And so the only other matter we had on

12  today's agenda was really at my doing a suggest -- or not a

13  suggestion, but the though process that perhaps it might be

14  time to have a -- a status conference really at your discretion

15  as to the status of the adversary proceeding that's mentioned

16  in the agenda, and without further ado, I was going to cede the

17  podium to my co-counsel, Guy Donatelli or -- or to field any

18  questions from the Court before we start as the case may be.

19         THE COURT:  Well, let's see.  I must say at this

20  point I'm confused as to what the plaintiff's case is.

21         MR. SPENCE:  All right.  Then I should -- I should

22  probably cede to Mr. Donatelli.

23         THE COURT:  Okay.

24         MR. DONATELLI:  Your Honor, may I please the Court,

25  Guy Donatelli on behalf of -- of NHI.  I'll start by -- by

1   trying to address Your Honor's confusion.

2        The complaint is rather lengthy, because we attempted

3   in it to lay out what we thought would be a fairly clear

4   chronological discussion of what occurred over the period of

5   time at issue.  This is a case boiled down to its essence where

6   NHI alleges that KMR and its representatives failed in their

7   contractual duties to NHI in the sense that instead of pulling

8   it out of some financial difficulties as it was required to do

9   under the contractual documents, it simply went about

10  liquidating NHI.

11       The -- the claim is against various defendants.  I'll

12  call them all the KMR defendants.  KMR was supposed to have

13  been a work out -- was supposed to have been a work out company

14  that would come in and restore profitability to NHI.  It failed

15  to do that, and instead, it appeared to the representatives of

16  NHI that they were more interested in paying down the bank debt

17  to Mercantile than they were in restoring KMR to profitability,

18  and part and parcel of KMR's conduct not only was paying down

19  the bank debt as rapidly as possible but also over the course

20  of the roughly 14 months in which they were involved with NHI

21  taking out $1.7 to $1.9 million worth of fees.  Such an

22  accelerated payment to the bank and such a withdrawal of assets

23  from NHI could not possibly have helped NHI regain

24  profitability.

25       The complaint was drafted to -- to try to capture in

1    a fairly comprehensive form what occurred over that period of

2    time.  We run into problems, Your Honor, because there were

3    some allegations in that -- in that complaint which the

4    defendants painted as allegations of agency, and the reason

5    that became important is because before the petition in this

6    case was filed, there was a settlement agreement between

7    certain representatives of NHI and their principles and

8    Mercantile as it related to Mercantile's loans to NHI and the

9    guarantees that went along with it.

10          The defendants have come in and have said we read

11   plaintiff's complaint as alleging that KMR were the agents of

12   Mercantile.

13          THE COURT:  And I read it that way too.

14          MR. DONATELLI:  There is -- there is one paragraph,

15   Your Honor -- I believe it's paragraph 33 or 34 -- which could

16   be the only paragraph that alleges an agency relationship, but

17   I'd like to expound on that.  Nowhere in our complaint, nowhere

18   do we make the allegation that KMR were the agents of

19   Mercantile.  What we tried to capture in the -- in the

20   complaint --

21          THE COURT:  Let me put it succinctly.  And I tried to

22   be polite in my letter where I said -- quoted from paragraph 33

23   of the complaint, and I said this sure sounds like an agency

24   relationship to me.  Let me put it bluntly.  I conclude that

25   that's an assertion of an agency relationship.

Colloquy                                                5

1          Now, in your memorandum, docket number 40, you say on

2   page 1, "The first amended complaint did not allege that the

3   defendants were agents of Mercantile."  On page 3, there's a

4   statement, "Defendants were, in fact, not the agents of

5   Mercantile."

6          And my simple question is which is it?

7          MR. DONATELLI:  They were not, Your Honor.

8          THE COURT:  Okay.

9          MR. DONATELLI:  And nor do defendants in this case

10  allege -- at least they haven't to date -- that they were

11  defendants.  And if Your Honor is concerned with paragraph 33

12  or 34 to the extent that you believe it alleges an agency

13  relationship, I will amend the pleading to withdraw that

14  allegation --

15         THE COURT:  Very good.  That's fine.  Okay.

16         MR. DONATELLI:  That should -- hopefully, that should

17  clear up --

18         THE COURT:  That's the only issue I have today.

19         MR. DONATELLI:  Okay.  Then, Your Honor, if you don't

20  have any other questions, may I be seated?

21         THE COURT:  Yes.

22         MR. DONATELLI:  Thank you.

23         THE COURT:  Now, let me ask the defendants --

24         MS. KRAFT:  May I state my name for the record?

25         THE COURT:  Yes.

Colloquy                                                    6

1      MS. KRAFT:  Denise Kraft representing the defendants

2  Fleet, KMR Management, Robert Riesner, and Waring Justis for

3  the record.

4      THE COURT:  Okay.  Are you going to argue or attempt

5  to prove that the defendants were agents of Mercantile in order

6  to bring them within the release?

7      MS. KRAFT:  It is not our intention to argue that the

8  defendants were agents of Mercantile.  We -- our case at this

9  point --

10     THE COURT:  Okay.  Then this whole agency is a

11  nonissue at this point.

12     MS. KRAFT:  Except for the fact that we have cited

13  the case law that's clear that if you allege in your complaint

14  -- amended complaint and to motions and responses as alleged by

15  the plaintiff here a -- an allegation, then you are not allowed

16  to withdraw that allegation.  It becomes a judicial admission.

17     I believe that the case law is clear as we have cited

18  in the motion to strike and the reply to the motion to strike.

19  We've cited several cases for that proposition, and I have not

20  seen anything from the plaintiffs that alleges otherwise or

21  even addresses that case law.

22     So our position today is that the case law we've

23  cited on judicial admission is the correct law as placed before

24  the Court and that the plaintiffs are not able to amend their

25  complaint at this time if --